1

2

3

4

5

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

6

7

8

9

10

11

12

13

14

15

16

**THE GUIDIVILLE RANCHERIA OF CALIFORNIA, AND UPSTREAM POINT MOLATE LLC**,

         Plaintiffs,

    **vs.**

**THE UNITED STATES OF AMERICA, SALLY JEWELL, *et al.*,**

And

**THE CITY OF RICHMOND,**

         Defendants.

And Counterclaims.

Case No.: 12-cv-1326 YGR

**ORDER GRANTING MOTION OF CITY OF RICHMOND FOR JUDGMENT ON THE PLEADINGS, FRCP 12(C); CONTINUING CASE MANAGEMENT CONFERENCE**

17

18

19

20

    Plaintiffs Upstream Point Molate, LLC ("Upstream") and the Guidiville Rancheria of California ("the Tribe") (collectively "Plaintiffs") bring this action against Defendants the United States of America, Sally Jewell, Secretary of the Department of the Interior, Ken Washburn, Assistant Secretary – Indian Affairs, and City of Richmond.

21

22

23

24

25

    Defendant City of Richmond ("the City") moves under Federal Rule of Civil Procedure 12(c) for an order granting judgment on the pleadings as the following claims in Plaintiffs' Third Amended Complaint (Dkt. No. 91, 'TAC'): the Seventh for breach of contract, the Eighth for breach of the implied covenant of good faith and fair dealing, the Ninth for unjust enrichment, the Tenth for quantum meruit, and the Thirteenth for specific performance.

26

27

28

    The City maintains that, by bringing this lawsuit, Upstream has violated a 2006 court-approved settlement agreement which addressed the legal effect of the contract at issue here. Specifically, Plaintiffs bring claims against the City for breach of a Land Disposition Agreement

United States District Court
Northern District of California

("LDA"), as well as quasi-contract theories based on that LDA.  The City argues that the contract-based claims run contrary to the discretion granted to the City in the LDA, and restated in the settlement agreement that Plaintiff Upstream entered into in prior environmental litigation concerning the project at issue here.

Having carefully considered the papers submitted and the pleadings in this action, as well as the matters judicially noticeable[1] in connection with this motion, and for the reasons set forth below, the Court hereby **GRANTS** the Motion for Judgment on the Pleadings as to the Seventh, Eighth, Ninth, Tenth, and Thirteenth claims in the TAC.[2]

I.  **BACKGROUND**

A.  **Land Development Agreement**

During June 2003, the City's then-City Manager discussed with Plaintiff Upstream the possibility of development of a gaming project on a parcel of land referred to as "Point Molate." Part of the Point Molate land consisted of a decommissioned Naval Fuel Depot, still owned by the

---

[1]  Both parties seek judicial notice of a number of documents.  The Court may consider matters judicially noticeable in connection with the motion.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005).  However, the Court cannot take judicial notice of the contents of documents for their truth.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Likewise, the Court will not take judicial notice of documents where their relevance has not first been established.  *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (declining to take judicial notice of documents where they were not relevant to the resolution of the matter).

As to the City's request for judicial notice (Dkt. No. 114), Upstream objected to Exhibits D, G, H and O.  (Dkt. No. 154-2.)  Those objections were not submitted in a proper form, see Local Rule 7-3(a).  However, the Court considers them an opposition to the request.  The Court **GRANTS IN PART** the request for judicial notice as to the City's Exhibits A, B, C, E, I, J, L, M and N; judicial notice is otherwise **DENIED**.

Plaintiffs sought judicial notice of some 228 documents.  The City opposed the request.  (Dkt. No. 161.)  The Court **GRANTS IN PART** Plaintiffs' request as to: Exh. 49, 75, 104, 115, 138, 149, 158, 166, 167, 170, 181, 198, 226, and 227; judicial notice is otherwise **DENIED**.

Plaintiffs submit a Declaration of James D. Levine (Dkt. No. 68) in support of their opposition, to which the City objects.  The objection is **SUSTAINED** and the declaration has not been considered by the Court.

[2]  Plaintiff argues in the supplemental brief filed October 25, 2013, that the motion should be converted to one for summary judgment since the City's Motion presented evidence outside of the pleadings.  (Dkt. No. 206, Jt. Supp. Br. at 4-5.)  The Court declines to convert the motion.  The Court has only considered documents that are properly judicially noticeable.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005).

Navy, and located in the City of Richmond.  The City could only acquire that portion of the property

from the Navy if it was to be used for a self-sustaining regional economic development.  (TAC ¶ 37.)

In 2004, Upstream paid the City $250,000 for the exclusive right to negotiate with the City

for the redevelopment of the Navy Fuel Depot, including the gaming project.  On August 2, 2004,

then-Mayor of Richmond, Irma Anderson, sent a letter to then-Governor Arnold Schwarzenegger

announcing that the City was nearing a conclusion of its negotiations with the Tribe and Upstream,

and noting that the "City strongly supports the Tribe in its efforts to obtain a [gaming] Compact

[with the State]."  (TAC ¶ 41.)

Plaintiffs entered into several agreements with the City thereafter.  In November 2004, the

Tribe, Upstream, and the City entered into the LDA which provided that the City would transfer the

Point Molate property to Upstream for development of an Indian casino (the "Casino Project") in

cooperation with the Tribe, contingent upon the Casino Project's final legal approval.  (TAC ¶ 47

and Exh. 3 [LDA] §§ 1.1, 2.2(a), 2.8.)  Final legal approval, in turn, depended upon a number of

permits and approvals, including determinations by the federal government to allow gaming at Point

Molate,[3] as well as environmental review of the Casino Project under the California Environmental

Quality Act ("CEQA").

Further, the Casino Project depended upon the Tribe confirming its ability to conduct gaming

activities at Point Molate.  In California, only Indian tribes may engage in full casino gaming

activities.  California Constitution Article IV, Section 19; *Artichoke Joe's v. Norton,* 353 F.3d 712

(9th Cir. 2003).  Guidiville is a federally recognized Indian Tribe.  *Federal Register,* vol. 73, No. 66

at 18554 (April 4, 2008).  Its lands include those lands held by the United States in trust status for the

benefit of the Tribe. 25 U.S.C. 2703(4)(B).  The Court Decree in *Scott's Valley Band v. United

States,* CIV C-86-360 WWS (N.D. Cal. 1991) and the Indian Reorganization Act, 25 U.S.C. §§ 461

*et. seq.,* provide the legal basis for the Tribe to have newly acquired lands taken into trust status.

However, the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et. seq. ("Gaming Act"), prohibits

gaming on Indian lands newly acquired after 1988 unless a tribe meets one or more of several

---

[3]  Concurrent with these efforts at the local government level, the Tribe also sought to have
the federal government place the Point Molate land into a trust and designate it as tribal land on
which gaming could be permitted under the Gaming Act, 25 U.S.C. § 2719.

United States District Court
Northern District of California

1   exceptions.  25 U.S.C. § 2719.  Thus, in order for the Casino Project to go forward at Point Molate, a

2   portion of the land would have to be taken into trust status for the benefit of the Tribe, and the

3   federal government would have to determine that the land qualifies for gaming under one of the

4   exceptions set forth in the Gaming Act.[4]

5        If at any point the Casino Project was determined to be "not legally permitted" due to

6   "federal, state, and local permitting issues," the LDA granted Upstream an additional exclusive 120-

7   day period to negotiate with the City regarding a non-casino development proposal (the "Alternative

8   Proposal").  (LDA § 2.8.)  In connection with any Alternative Proposal, Upstream was "required to

9   submit land use and building plans for such alternative proposal to the City for its discretionary

10  approval in accordance with all applicable federal, State, and local laws, rules and regulations."  (*Id.*)

11       In exchange for the City's reservation of exclusive purchase rights for Upstream, the LDA

12  required Upstream to make payments to the City.  (*Id.* § 1.2.)  Specifically, "[t]o compensate the City

13  for granting Developer the right to purchase and lease the Property until January 15, 2006,"

14  Upstream was required to pay "Initial Consideration" of $1 million.  After this initial term, Upstream

15  had the option to extend the closing period of the LDA for four successive 12-month periods, for

16  payments of $2 million, $3 million, $4 million, and $5 million, respectively, plus monthly amounts

17  to extend the period thereafter up until April 2011.  These payments were "Non-refundable

18  Consideration," which was to be "earned by the City upon receipt" and "in all events [] retained by

19  the City and [] nonrefundable."  (*Id.*)  The Non-refundable Consideration was to be credited against

20  the purchase price if the sale closed; however, the LDA stated that Upstream "shall not receive any

21  _____

22      [4]  The Tribe initiated the application for the land to be taken into trust status and sought an
    Indian Lands Determination pursuant to 25 U.S.C. § 2719(b)(1)(B)(iii) (the "restored lands
23  exception") that the Point Molate lands would qualify as part of the restoration of the Tribe's land
    base.  On September 1, 2011, the Department of the Interior issued a negative Indian Lands
24  Determination finding that the Point Molate lands do not qualify under the restored lands exception.
    25 U.S.C. § 2719(b)(1)(B)(iii).  This determination is the subject of other claims in this litigation.
25      Plaintiffs now contend that the Tribe also sought, in the alternative, a two-part determination
    pursuant to 25 U.S.C. § 2719(b)(1)(A) (the two-part-determination exception) that the proposed
26  gaming project on Point Molate is in the best interest of the Tribe and not detrimental to the
    surrounding community.  Plaintiffs argue that the Tribe continued to a favorable determination under
27  two-part determination exception, and were still pursuing that avenue and others when the City filed
    the declaratory relief action which spurred the instant action.

28

4

United States District Court
Northern District of California

1  refund of the Non-refundable Consideration if [the] Project is disapproved . . . or if the Project

2  otherwise becomes legally or economically infeasible." (*Id.* § 2.2(a).)[5]

3      The LDA also included a provision obligating the City to provide support for the Casino

4  Project in the form of "correspondence to the BIA, and to the Governor of the State of California,

5  and the County of Contra Costa which supports the application of the Tribe to the United States and

6  requests that the United States take the Property into trust for the benefit of the Tribe,"  as well as

7  "urg[ing] the Governor of the State of California to negotiate and execute with the Tribe a Compact

8  for gaming purposes in accordance with the intent of this Agreement," and working with "other

9  governmental agencies to help resolve any impediments to the approval process."  (LDA ¶ 2.7.)

10     In addition, the LDA contained a provision defining what acts would constitute a default by

11  either party, and the remedies for such default.  With respect to the City's default, that section of the

12  LDA provided:

13     The following events each constitute a default by the City hereunder:
14         (a) The City fails to convey the Property as provided in this Agreement;
       or
15         (b) The City breaches any other material provision of this Agreement.

16     Upon the happening of any of the above-described events, Developer shall first
17     notify the City in writing of its purported default, giving the City sixty (60) days
       after receipt of such notice to cure such default. In the event the City does not
18     then cure the default within such sixty-day period (or, if the default is not
       susceptible of cure within such sixty day period, the City fails to commence the
19     cure within such period and thereafter to prosecute the cure diligently to
       completion), then Developer shall be entitled to (i) terminate this Agreement in
20     writing; and/or (ii) seek any rights or remedies afforded it in law or in equity;
       provided that any monetary damages payable by the City shall be limited to the
21     amount of the sum of the Non-refundable Consideration, deposits paid to the City
       in connection with the Exclusive Right to Negotiate Agreement plus actual costs
22     expended by the Developer in processing permits and applications for the Project,
       provided, further that such limits shall not apply in the case of a breach resulting
23     from any willful action or omission taken or authorized to be taken by the City
       Council or the City Manager.
24
25  (LDA § 6.2.)

26

27  _____

28      [5]  Upstream ultimately sought several extensions and made the required Non-refundable
    Consideration payments through April of 2011.  (TAC ¶ 56.)

5

When the LDA was executed in 2004, CEQA review for the Casino Project had not yet been conducted.  (*See* City RJN, Exh. A, ¶ D [noting that preparation of an Environmental Impact Report (EIR) did not begin until 2005].)  The LDA provided that, as to the scope and nature of the Project, a final determination would only be made after consideration of the CEQA review process, which "may include 'no project' or 'reduced project' alternatives."  (LDA § 2.2(a).)

## B.   CEQA Litigation and Settlement

One month after the LDA was executed, Citizens for the Eastshore State Park ("Citizens Group") filed a lawsuit against the City and Upstream claiming that the LDA constituted a de facto "approval" of the Casino Project without the prior environmental review required by CEQA.  (*See* RJN Exh. B, ¶ 36.)  Under CEQA, a public entity cannot approve a project until it has considered the environmental impacts of the project, if any, and the impacts of possible project alternatives.  Cal. Pub. Resources Code § 21001.  Project approval can be an overt action by a public agency, or may include action that "commits the agency to a definitive course of action" with respect to the project. 14 Cal. Code Reg., 15352(a); *see also Save Tara v. City of W. Hollywood*, 45 Cal. 4th 116, 138 (2008) (agency action that "significantly furthers a project in a manner that forecloses alternatives or mitigation measures" is de facto approval).  Citizens Group alleged that the LDA "committed the City to promoting and assisting Upstream in carrying out 'the [Casino] Project' to the exclusion of other uses of the Property" in violation of CEQA.  (*Id.* ¶ 36.)  The California Attorney General intervened on Citizens Group's side, likewise claiming that through the LDA the City "chose one potential use to the exclusion of all other alternatives" in violation of CEQA.  (RJN Exh. C, ¶ 4.)

To resolve the legal challenge and ensure that the LDA was in compliance with CEQA, the Attorney General, Citizens Group, the City, Upstream, and other parties in the case entered into a court-approved Settlement Agreement and stipulated order (City RJN, Exh. A, the "Settlement Agreement") which clarified that the LDA did *not* commit the City to the Casino Project or any other project.  The Settlement Agreement stated that the LDA "in no way restrict[ed]" the City's discretion to approve or deny the Casino Project after environmental review, and that a denial "would not constitute a default on the part of the City under the LDA."  (Settlement Agreement ¶ 1.)

United States District Court
Northern District of California

United States District Court
Northern District of California

Specifically, the City and Upstream both "agree[d] and acknowledge[d] that the LDA has the following legal effect:

> a. The City retains its discretion to select any alternative use or non-use of the Point Molate site that was open to it before approval and execution of the LDA, including, but not limited to, alternatives that do not involve: a gaming and/or entertainment complex or the Project or Alternative Proposal.  The LDA in no way restricts such discretion.
>
> b. The City's exercise of its discretion as described in Paragraph 1.a will not constitute a default on the part of the City under the LDA.  In the event the City elects not to pursue and/or disapproves the Project or the Alternative Proposal, as either may be modified in the environmental review or the permit process, the City is not obligated to transfer or lease the land to Upstream or any other person or entity.  The City's decision not to transfer or lease the land under these circumstances would not constitute a default on the part of the City under the LDA, and the City would not be obligated to return any consideration it has received under the LDA.
>
> c. The provision in the LDA that requires the City to take specified actions to support the application of the Guidiville Band of Pomo Indians (LDA, Section 2.7) . . . [is] contingent on the City's decision to pursue and/or approve the Project or Alternative Proposal as described above.

(Settlement Agreement ¶ 1.)

On January 23, 2006, the Marin County Superior Court entered an order approving the Settlement Agreement and dismissing the lawsuit.  (City RJN Exh. 1 at 9.)  Shortly thereafter, in the First Amendment to the LDA executed on March 6, 2006, Upstream and the City acknowledged they had each entered into the Settlement Agreement, that its terms were already in force, and that it was applicable to the LDA on an ongoing basis, including as amended.  The First Amendment stated:

> Developer and City agree that this amendment in no way modifies or affects the Agreements made by City and Developer in that certain Settlement Agreement by and among the City, the Developer, [co-party] Harrah's Operating Company, Inc., the Attorney General of the State of California, and any other signatories to said Settlement Agreement, and the City and Developer agree that the Settlement Agreement will continue to apply to the LDA as amended hereby.

(Original Complaint, Dkt. No. 1, Exh. First Amendment to LDA § 4(e).)[6]

---

[6] The LDA and its amendments are referenced by the TAC and were attached to Plaintiffs' original complaint.  Judicial notice of the amendments is, therefore, appropriate.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005).

United States District Court
Northern District of California

**C.     Growing Opposition to the Casino Project**

Several amendments and extensions of time on the LDA, approved by City Council, followed.  However, in 2006 the City elected a new mayor, Gayle McLaughlin, who had campaigned against the Casino Project.  Mayor McLaughlin began casting her vote against these extensions when they came before the City Council.  Plaintiffs allege that initially, the City advocated on behalf of the Casino Project but, beginning in or around 2009, the City's new mayor and members of the City Council began to take actions that undermined Plaintiffs' ability to achieve the conditions precedent to the Casino Project.  On February 1, 2010, Mayor McLaughlin sent a letter to Assembly member Nancy Skinner seeking her assistance in the City's effort to lobby Governor Schwarzenegger to withdraw the Governor's support for the Casino Project.  On June 1, 2010, Mayor McLaughlin sent a letter to U.S. Senators Dianne Feinstein, Barbara Boxer, Harry Reid, Michael Ensign and Charles Schumer lobbying in favor of denial of the Tribe's application for a Land Determination to allow it to engage in gaming at Point Molate.  And, on or about August 15, 2010, Mayor McLaughlin spoke at a conference of U.S. Representative, saying that the Tribe's Land Determination Request should be denied so that the City could seek other alternatives for development of Point Molate.  However, at the same time the Mayor was voicing opposition to the Casino Project, the City Council approved additional extensions of the LDA.  (RJN Sixth Amendment to LDA, May 2010.)

**D.     Final CEQA EIR and Disapproval of the Casino Project and Alternatives**

On March 8, 2011, following a period of public comment, the City certified a Final CEQA Environmental Impact Report ("EIR") for the Casino Project.  The Final EIR "evaluated the potential environmental impacts that could result from the approval of any project alternative including a casino use…, analyzed a reasonable range of feasible alternatives to the proposed casino project and identified measures designed to mitigate or avoid the potentially significant impacts of that project." (City RJN, Exh. M. [Resolution 23-11 of City of Richmond] at 2.)  The City determined that the Final EIR "found that the project alternatives including a casino use would have significant and unavoidable impacts to traffic and historic resources."  (*Id.* at 2, 5.)  Thus, the City concluded that a casino use at Point Molate would have "significant and unavoidable impacts" on traffic and historic resources and that "the alleged 'benefits' of a casino use do not support overriding these significant

United States District Court
Northern District of California

1   and unavoidable impacts." (*Id*. at 2, 5.)  Thus, the City elected not to adopt the Statement of

2   Overriding Considerations that would be required under CEQA to approve the project in the face of

3   the negative impacts identified in the Final EIR.  (RJN Ex. M at 5.)  Based upon this and other

4   reasons set forth in its April 5, 2011 Resolution, the City Council decided "consistent with the terms

5   of the Settlement Agreement . . . and the Land Disposition Agreement," to "discontinue

6   consideration of a casino use and determine that a casino use is 'not legally permitted' at Point

7   Molate." (*Id.* at 3, 8.)

8          Upstream did not seek writ review under CEQA to challenge the Final EIR's findings or the

9   City's decision not to adopt a Statement of Overriding Considerations.[7]

10  ## II.    STANDARDS APPLICABLE TO THE MOTION

11         Under Rule 12(c) of the Federal Rules of Civil Procedure, judgment on the pleadings may be

12  granted when, accepting as true all material allegations contained in the nonmoving party's

13  pleadings, the moving party is entitled to judgment as a matter of law.  *Gen. Conference Corp. of*

14  *Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th

15  Cir. 1989); Fed. R. Civ. P. 12(c).  The applicable standard is essentially identical to the standard for a

16  motion to dismiss under Rule 12(b)(6).  *United States ex rel Cafasso v. Gen. Dynamics C4 Sys., Inc.*,

17  637 F.3d 1047, 1055 n.4 (9th Cir. 2011).  Thus, although the Court must accept well-pleaded facts as

18  true, it is not required to accept mere conclusory allegations or conclusions of law.  *See Ashcroft v.*

19  *Iqbal*, 556 U.S. 662, 678-79 (2009).  In ruling on a motion for judgment on the pleadings, the Court

20  may also consider documents incorporated by reference in the pleadings and "may properly look

21  beyond the complaint to matters of public record" that are judicially noticeable.  *Mack v. South Bay*

22  *Beer Distrib., Inc*., 798 F. 2d 1279, 1282 (9th Cir 1986), *abrogated on other grounds by Astoria Fed.*

23  *Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991); *Durning v. First Boston Corp.*, 815 F.2d 1265,

24  1267 (9th Cir. 1987).  The Court "need not . . . accept as true allegations that contradict matters

25  properly subject to judicial notice or by exhibit" attached to the complaint.  *Sprewell v. Golden State*

26  *Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001) (citation omitted).

27  _____

28         [7]  The Department of the Interior determined, on September 1, 2011, that the lands could not
qualify for gaming.  However, this decision came after the project was disapproved through the
CEQA process.

III.   **DISCUSSION**

A.   **Breach of Contract**

Plaintiffs allege a claim for breach of contract, contending that the City breached the LDA by (1) discontinuing consideration of the Casino Project; (2) rejecting of the Alternative Proposal; (3) failing to support the Tribe's applications for gaming approvals or other aspects of the Casino Project; and (4) failing to negotiate in good faith.  (TAC ¶ 103(a)-(q).)  The Court finds that, based upon the terms of the LDA and the Settlement Agreement interpreting and clarifying those terms, as well as the applicable law, Plaintiffs cannot state a claim for breach of contract on any of these grounds.

1.   *City's Discretion Under the Terms of the LDA and Settlement Agreement*

The terms of the LDA itself gave the City discretion to approve, or disapprove, the Casino Project and any Alternative Project.  While Upstream argues that the LDA is "sales contract" not an "options agreement," the plain terms of the LDA state that the transfer of the property to Upstream is "on and subject to the terms, covenants and conditions set forth herein."  (LDA §1.1(a).)  One of those conditions was CEQA review and approval, with ultimate approval authority vested in the City.  The payments made by Upstream to the City were categorized in the LDA as "Non-refundable Consideration," earned by the City in exchange for Upstream's right to continue working to get the Casino Project approved, not for any particular outcome.  (LDA § 1.2.)  None of those funds were recoverable by Upstream in the event the Casino Project was disapproved by the City or any other party, "or if the [Casino] Project otherwise bec[a]me[] legally or economically infeasible."  (LDA § 2.2.)

To the extent there was any doubt about the meaning of the terms of the LDA and the discretion that the City retained, the Settlement Agreement removed that doubt. The Settlement Agreement entered into by the City and Upstream in the Citizens Group CEQA litigation, stated that the parties agreed that the LDA's terms had "the following legal effect": (1) the City retained its discretion to "select any alternative use *or nonuse* of the Point Molate site *that was open to it before approval and execution of the LDA*;" and (2) "*The City's exercise of its discretion will not constitute a default*" and (3) "[i]n the event the City elects not to pursue the project or the alternative proposal, the *City is not obligated to transfer or lease the land to Upstream*."  (Settlement Agreement ¶¶ 1(a)

United States District Court
Northern District of California

and (b) [emphasis added].)  Moreover, the Settlement Agreement also stated that parties thereto agreed that the provision of the LDA requiring the City to "take specified actions to support the application" of the Tribe, as stated in Section 2.7 of the LDA, was contingent upon the City's "decision to pursue and/or approve the Project or Alternative Proposal as described above." (Settlement Agreement ¶ 1(c).)  Indeed, the First Amendment to the LDA expressly incorporated the terms of the Settlement Agreement into it, stating that the First Amendment "in no way modifies or affects the agreements made by City and Developer in [the] Settlement Agreement," but that "the Settlement Agreement *will continue to apply to the LDA* as amended hereby." (First Amendment to LDA at § 4(e) [emphasis added].)

Upstream entered into the Settlement Agreement and obtained the benefit of that agreement in the Citizens Group litigation.  That agreement is binding here.  *Cal. State Auto. Ass'n (CSAA) v. Sup. Ct.*, 50 Cal. 3d 658, 664 n.2 (1990) (holding that when a party stipulates to the resolution of a specific issue in a court-approved judgment, the judgment binds the party in subsequent actions); *see also Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) (noting that doctrine of judicial estoppel prevents a party from benefitting from inconsistent positions in different legal proceedings).  What is more, Upstream expressly acknowledged that it was bound by the Settlement Agreement's terms when it executed the First Amendment to the LDA, and thus incorporated the Settlement Agreement's interpretation of the terms into the LDA itself.  *Cf. DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 713 (2009) (terms of extrinsic documents can be incorporated into contract where they are clear, incorporated by consent, and known or easily available to the contracting parties).[8]

---

[8]  Plaintiffs argue that certain City Council members and Mayor McLaughlin took positions on the legal issue of what constitutes a breach of the LDA that are contrary to those argued here, and that those positions now constitute admissions against interest.  First, the Court is not considering evidence outside the four corners of the complaint and the matters properly subject to judicial notice. Even assuming these documents were properly the subject of judicial notice in connection with this motion, they do not constitute "admissions against interest."  The statements agree with a particular legal opinion about the meaning of the documents, namely the opinion of the Deputy Attorney General litigating the Citizens Group lawsuit against the City and Upstream.  Statements of agreement with that legal opinion are neither binding nor relevant to the Court's analysis here.

United States District Court
Northern District of California

Consequently, the breaches alleged in the TAC are all precluded by the terms of the LDA and Settlement Agreement.  First, as to the alleged breaches based upon aspects of the CEQA review and approval process (TAC ¶ 103(g)-(j)), the terms of the Settlement Agreement confirmed that the City retained the discretion to *disapprove* the Casino Project and any alternative under CEQA. (Settlement Agreement ¶1(a), (b).)  The intent of the Settlement Agreement was to confirm that the City was not obligated to approve any project.  Other alleged breaches (TAC ¶ 103 (k)-(m)) including the City's alleged "abandonment" of the Project and declaration that the Casino Project was "not legally permissible," are simply consequences the project's failure to obtain CEQA approval.

Moreover, with respect to the alleged breaches on account of the City's failure to support the Tribe's efforts to obtain gaming authority (TAC ¶ 103(a)-(f)), the Settlement Agreement makes clear that those provisions of the LDA did not attach until *after* approval of the Casino Project. (Settlement Agreement ¶ 1(c).)  That contingency did not come to pass.

Finally, Plaintiffs allege breach in that "[t]he City failed to negotiate in good faith during the 120 days following the City's Resolution to Discontinue the [Casino] Project" and failed to sell the property to Upstream for an alternate use as "required" by LDA section 2.8.  (TAC ¶ 103(o), (p).) These allegations are insufficient to state a breach of contract claim since they are contradicted by the terms of the LDA and the matters judicially noticeable, and are otherwise too conclusory to state a basis for the City's liability.  Concerning an Alternative Proposal, the terms of the LDA provided:

> …the Developer and the City shall negotiate exclusively in good faith for a period not to exceed one hundred twenty (120) days with respect to an alternative development proposal and, if such negotiations are successful, execute an amendment to this Agreement to reflect such alternative proposal*; provided, that* Developer will be required to submit land use and building plans for such alternative proposal to the City for its discretionary approval in accordance with all applicable federal, State and local laws, rules and regulations.

(LDA § 2.8.)  Thus, the LDA does not *require* the City to approve any alternative, and all alternative proposals would have been subject to the City's discretionary approval, both as a matter of contract and a matter of CEQA requirements.  Moreover, Plaintiffs do not allege any specific proposal or negotiations they attempted during the 120-day period following the City's Resolution rejecting the

United States District Court
Northern District of California

Casino Project.  However, the City has submitted, as part of its request for judicial notice, a letter

from the Richmond City Attorneys' office notifying Upsteam as follows:

> We presented Upsteam's [*sic*] latest proposal for development of Point Molate to
> the City Council in closed session on January 24, 2012, including the estimated
> schedule for development of Phase 1 that you sent to us that afternoon.  The
> Council discussed your revised proposal at length, but ultimately determined that
> it was not acceptable.  As a threshold matter, the City cannot commit, at least at
> this time, to a project requiring the level of subsidies you propose.
>
> This letter confirms that Upstream and the City did not reach agreement on the
> terms of an alternative development proposal within this second 120-day period
> occasioned by your proposal to the City dated September 16, 2011. Neither was
> an agreement reached during the 120-day period following the City Council's
> April 6, 2011 determination to discontinue consideration of a casino use at Point
> Molate. [¶]  Accordingly, the City and Upstream have no further obligations
> under Section 2.8 of the LDA.

(City RJN, Exh. N.)  This letter indicates that the City did consider alternatives proposed by

Upstream but that it rejected Upstream's proposal due to "the level of subsidies" it required.  (*Id.*)

Thus, Plaintiffs' fail to plead any non-conclusory allegations that are not contradicted by the

complaint itself or the matters judicially noticeable, and their contract claim fails.

### 2.      *Alleged Breach Based Upon Unfavorable CEQA Determination*

Plaintiffs' breach of contract claims based upon the City's decision are not only contrary to

the terms of the LDA and Settlement Agreement, they are also an improper attack on the City's

exercise of its CEQA approval authority.  *See* Cal. Public Resources Code § 21168; *Mission Oaks

Ranch, Ltd. v. Cnty of Santa Barbara*, 65 Cal. App. 4th 713, 722 (1998), *overruled on other grounds

by Briggs v. Eden Council for Hope and Opportunity*, 19 Cal. 4th 1106 (1999) (barring developer's

breach claim against county based on allegedly improper EIR when developer had not challenged the

EIR).

CEQA requires the preparation of an EIR for a proposed project—here, the Casino Project—

that may have a significant effect on the environment.  Cal. Pub. Res. Code § 21100(a), (b).  CEQA

regulations provide that, when the EIR shows that the proposed project would cause substantial

adverse changes in the environment, the governmental agency can respond to in several ways,

including "[*d*]*isapproving the project.*" 14 Cal. Code Regs., § 15002(h) (emphasis added); *see id.* §

United States District Court
Northern District of California

United States District Court
Northern District of California

1   15042 ("A public agency may disapprove a project if necessary in order to avoid one or more

2   significant effects on the environment that would occur if the project were approved as proposed.").

3   The City had the discretion to find the Casino Project's environmental impacts "acceptable" and to

4   adopt a Statement of Overriding Considerations to approve the Casino Project.  14 Cal. Code Reg. §§

5   15002(h)(7), 15093.  However, the City found that the benefits of a casino use did *not* outweigh the

6   environmental impacts so as to justify a Statement of Overriding Considerations to approve the

7   project.  The City was not required to adopt a Statement of Overriding Considerations to select the

8   "no project" alternative, since that "alternative" is nothing more than a decision not to proceed.  *See*

9   14 Cal. Code Reg. § 15126.6(e)(3)(B) (defining the "no project" alternative as "the circumstance

10   under which the project does not proceed.").[9]

11        A writ petition is the exclusive means for challenging a CEQA project approval or

12   disapproval.  *Mission Oaks,* 65 Cal.App.4th at 722.  Thus, Plaintiffs' claims that the City "approved

13   the Final EIR solely as a pretext for discontinuing the Project" (TAC ¶ 103(h)) and "failed in good

14   faith to consider the decision whether to adopt a Statement of Overriding Considerations" (TAC ¶

15   103(j)) were required to be brought by way of a writ petition.

16        Plaintiffs made no challenge to the CEQA determination.  Their time to do so appears to have

17   expired.  Cal. Public Resources Code § 21167; 14 Cal. Code Reg. § 15112.[10]  Regardless, "[o]ne

18   may not bypass the mandamus remedy by filing a separate suit for damages."  *Mission Oaks,* 65

19   Cal.App.4th at 722 (citing *Hensler v. City of Glendale*, 8 Cal.4th 1, 25-26 (1994)).  Thus, Plaintiffs

---

[9]  Plaintiffs also allege that "after" the approval of the Final EIR, the City did not consult with them about possible mitigations of adverse impacts for the Casino Project.  (TAC ¶103(i).)  The alleged "consultation" requirement is not one of the agency's options *after* adoption of the EIR.

[10]  Plaintiffs contend that the time never started to run because no "Notice of Determination" was ever issued.  However, it does not appear that a "Notice of Determination" was required to effectuate *disapproval* of the casino use based on the EIR.  *See* Cal. Pub. Res. Code § 21152(a) (Notice of Determination required for *approval* of project).  Simply saying "we disapprove the project," is an acceptable determination by an agency under the CEQA regulations.  14 Cal. Code Regs. §§ 15002(h) and 15042.

cannot challenge the City's disapproval of the Casino Project under CEQA, based on the EIR's findings of "significant and unavoidable impacts," by way of a breach of contract action.[11]

### 3. *Waiver Provision of the Sixth Amendment to the LDA*

Finally, by signing the LDA's Sixth Amendment on May 18, 2010, Plaintiffs expressly disclaimed any assertion that actions taken before that point breached the LDA.  In the Sixth Amendment, Plaintiffs and the City agreed that "no event of default under the LDA exists as of [May 18, 2010], and that no event has occurred which, with the passage of time or the giving of notice, or both, *would constitute an event of default*."  (Original Complaint, Exh. Sixth Amendment to LDA § 5 [emphasis added].)  The LDA required Upstream to give notice and an opportunity to cure in the event of a claimed default by the City.  Plaintiffs did not do so, but instead signed the Sixth Amendment to the LDA, despite being fully aware of the facts upon which they now claim the City breached the LDA by failing to support the Casino Project, as well as Mayor McLaughlin and others' public opposition to it.  By acknowledging that "no event has occurred which… would constitute an event of default" under the LDA, Plaintiffs agreed that these preceding actions were not in breach of the LDA.

### 4. **Mammoth Lakes *Does Not Control***

Plaintiffs argue that the *Mammoth Lakes* case provides a blueprint for the legal sufficiency of their breach of contract claim.  *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435 (2010).  However, the Court finds the agreement in *Mammoth Lakes* to be distinguishable from the LDA here in significant ways.  In *Mammoth Lakes*, the developer brought an action for breach of contract against a town when it refused to go forward with a construction

---

[11]  In their supplemental briefing filed October 25, 2013 (Dkt. No. 206), Plaintiffs now make an additional argument: that the City never made a "final determination" as required by the terms of the LDA, regardless of the requirements of CEQA.  Seemingly conceding that the City had no *statutory* obligation to make any determination under CEQA, they argue that the City had a contractual obligation to make a "final determination" about which CEQA option they were exercising, *i.e.* expressly selecting the "no project" alternative as the determination.  This argument does not change the analysis.  The LDA, as interpreted in the Settlement Agreement, gave the City the discretion to select any use or non-use of Point Molate that was available "before approval and execution of the LDA."  The City's resolution in April 2011 was a determination not to proceed with the Casino Project.  Plaintiffs point to no provision of the LDA that required the City to do more in reaching a "final determination."

United States District Court
Northern District of California

United States District Court
Northern District of California

1   project.  The contract in *Mammoth Lakes* was a "development agreement" within the meaning of

2   California Government Code § 65865(a).

3          The court of appeal in *Mammoth Lakes* detailed the history of "development agreements"

4   authorized under this provision of the Government Code.  Prior to the enactment of the Development

5   Agreement Statute, California case law held that a public entity could not be found to have

6   "contracted away" its police power to impose new land use regulations, rules and policies, and a

7   developer had no remedy if those changes in policy derailed a project, even if the developer had

8   incurred substantial liabilities in reliance on earlier approvals in the development process.  *Mammoth*

9   *Lakes,* 191 Cal. App. 4th at 443 (quoting *Avco Community Developers, Inc. v. South Coast Regional*

10  *Comm.,* 17 Cal.3d 785, 791 (1976)).  The California Legislature's 1979 enactment of the

11  Development Agreement Statute created a specific procedure under which a city and a developer

12  may contract to create a "vested right" for the developer to construct a particular project, eliminating

13  a future city government's discretion to disallow it or impose new conditions on its development.  *Id.*

14  at 442-44; *see* Cal. Gov't Code § 65864 *et seq.*  In order to qualify as a "development agreement,"

15  however, the statute requires that a contract between a city and a developer meet certain criteria, such

16  as approval by ordinance and the possibility of a referendum vote of the local electorate.  *Mammoth*

17  *Lakes*, 191 Cal. App. 4th at 443 (citing Cal. Gov't Code § 5867.5(a)); *see also Neighbors in Support*

18  *of Appropriate Land Use v. Cnty of Tuolumne*, 157 Cal. App. 4th 997, 1011 (2007) (development

19  agreement is a "legislative enactment, not *merely* a consensual agreement.").  Further, the project

20  must be reviewed under CEQA *prior* to the approval of the development agreement.  *Cf. Save Tara*,

21  45 Cal. 4th at 137-38 & n.12 (noting that the approval of a development agreement triggered CEQA

22  review because it had "contracted away [the city's] power to consider the full range of alternatives

23  and mitigation measures required by CEQA and had precluded consideration of a 'no project'

24  option").

25         The determination that the town in *Mammoth Lakes* breached its obligations depended upon

26  the contract with the developer being a statutory development agreement which gave the developer

27  vested rights.  Moreover, *Mammoth Lakes*' holding that administrative mandamus was not the

28  developer's exclusive remedy was based upon a finding that the developer did not challenge the

town's quasi-judicial, discretionary permitting decisions. *Mammoth Lakes,* 191 Cal. App. 4th at 457. And, because it depends on the special nature of a statutory development agreement, *Mammoth Lakes* does not control a situation where, under CEQA, the approval of the project itself is within the discretion of the public entity.

The parties here agree that the LDA was not a statutory "development agreement." Such an agreement would have precluded the City exercising its discretion to decide against the Casino Project. Here the agreement between the City and Upstream vested the City with discretion about whether to proceed with the Casino Project. The Settlement Agreement confirmed that the City retained that discretion, as it was required to do in order to comply with CEQA's prohibition on approval of a project prior to environmental review. *Save Tara,* 45 Cal.4th at 137-38. Thus, Plaintiffs' reliance on *Mammoth Lakes* is unavailing.[12]

### 5. *City's Retained Discretion Does Not Render Contract Illusory*

Plaintiffs further argue that the discretion that the City retained was simply discretion "under CEQA" and that any broader understanding of that discretion would render the LDA an illusory contract. The Court does not agree.

"[A] contract is illusory where one party provides *no legal consideration* whatsoever." *Martin v. World Sav. & Loan Ass'n*, 92 Cal. App. 4th 803, 809 (2001) (emphasis added). The LDA *expressly indicates* what Upstream got in exchange for its payments: the exclusive right to purchase and lease Point Molate for a specified amount of time. (LDA § 1.2 ["To compensate the City for granting Developer the right to purchase and lease the Property . . . the Developer shall pay to the City…"], § 2.10.) A conditional right to purchase is an enforceable form of contract under California law. *See Bill Signs Trucking, LLC v. Signs Family Ltd. P'Ship*, 157 Cal. App. 4th 1515,

---

[12] Plaintiffs argue they were unable to enter into a statutory development agreement because of various factors involved in the Casino Project, including the need to take part of the land into trust for the Tribe, federal regulations concerning the elimination of any encumbrances on the land to be taken into trust, the Tribe's status as a separate sovereign nation, and the federal government's continued control of the land as a decommissioned Naval facility. Whether or not these factors actually precluded Upstream and the City from entering into a statutory development agreement does not, in the end, change the outcome here. The fact remains that the LDA here did not qualify as a statutory development agreement, and therefore Plaintiffs' reliance on *Mammoth Lakes* as a basis for the City's liability is without support.

1522 (2007) ("A preemptive purchase right is a grant from a landowner that gives the grantee the first opportunity to purchase the property *if the landowner decides to sell*.") (emphasis added); *Hartzheim v. Valley Land & Cattle Co.*, 153 Cal. App. 4th 383, 389 (2007) (recognizing "the conditional right to acquire property, depending on the owner's willingness to sell" (internal quotation marks and alterations omitted)).

### B.     Breach of the Covenant of Good Faith and Fair Dealing

Plaintiffs' eighth claim alleges that the actions constituting breach of the LDA, plus others taken by the City, also constitute breach of the covenant of good faith and fair dealing.  Plaintiffs allege that the City exercised its discretionary authority under the LDA in bad faith for the purpose of frustrating Plaintiffs' legitimate expectations.  (TAC ¶107 (a).)  In order to plead breach of the implied covenant, "a plaintiff must establish the existence of a contractual obligation, along with conduct that frustrates the other party's rights to benefit from the contract."  *Fortaleza v. PNC Fin. Servs. Grp.*, 642 F.Supp. 2d 1012, 1121-22 (N.D. Cal. 2009).

First, Plaintiffs' Opposition appears to concede that there can be no breach of contract or covenant based on the City's "ultimate discretionary determinations" regarding the Casino Project and Alternative Proposal. (Upstream Oppo. at 19 ["The ultimate determinations . . . are not the acts of breach in themselves"].)  However, Plaintiffs maintain that the City breached the covenant of good faith and fair dealing because it "abused its discretion" in making those determinations.  *Id.*  As with the breach of contract theory above, many of the breach of covenant allegations (TAC ¶ 107 (f)-(j), (m)) boil down to a claim that the City's CEQA determination was based on improper considerations.  And, as with the breach of contract claim, Plaintiffs' avenue for remedy is limited to administrative review under CEQA.  *See Rossco Holdings Inc. v. State of Cal.*, 212 Cal. App. 3d 642, 660 (1989) (holding that where the "essential underpinning" of a claim is "the invalidity of the administrative action," a plaintiff's failure to seek a writ of administrative mandate "renders the administrative action immune from collateral attack"); *Mission Oaks*, 65 Cal. App. 4th at 722.

Moreover, the express terms of the LDA conferred broad discretion on the City.  A breach of covenant claim cannot be used to limit the exercise of that discretion.  *See Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992) (contract's express terms may grant a party the

United States District Court
Northern District of California

right to engage in conduct which would otherwise be prohibited by an implied covenant of good faith and fair dealing); *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120 (2008) (implied covenant "will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself"); *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808 (1995) (same).  Thus, since the City had discretion under the LDA (and the Settlement Agreement) to discontinue consideration of the Casino Project and to disapprove any Alternative Proposal, actions it is alleged to have taken contrary to approval are not forbidden by an implied covenant.

The core of the breach of covenant allegations concern actions by Mayor McLaughlin and others in expressing opposition to the Casino Project, opposing approvals by other governmental entities regarding gaming at Point Molate, and placing a referendum on the ballot concerning gaming at Point Molate.  (TAC ¶ 107(a)-(e), (k), (n).)  The Settlement Agreement makes clear that the provisions of the LDA requiring the City to express its support for the Project and gaming approvals did not attach until *after* approval of the Casino Project.  (Settlement Agreement ¶ 1(c).)

In addition, Plaintiffs allege that the City "intentionally concealed" that it would put a referendum on the ballot, that the Mayor was expressing opposition to the Casino Project in a variety of avenues, and that the City had "changed its intentions" regarding the settlement agreement.  As to the referendum put before the voters, and the Mayor's expressions of opposition, the allegations of the TAC itself leave no doubt that these were not "concealed."  As to the "changed intentions," it was, again, well within the City's discretion under the LDA and the Settlement Agreement to change its decision on whether to proceed with the Casino Project.  These allegations do not amount to a breach of the implied covenant.

Finally, as with the breach of contract claim, any allegation that, because Mayor McLaughlin or other members of the City Council spoke out against the Casino Project, the City did not "fairly consider" Plaintiffs' proposals, was waived by Plaintiffs when they executed the Sixth Amendment to the LDA.  By expressly agreeing that "no event has occurred which, with the passage of time or the giving of notice, or both, would constitute an event of default," Plaintiffs gave up their right to claim damages based upon this conduct.  *Cf. Carma Developers*, 3 Cal. 4th at 374 ("[T]he parties

1   may, by express provisions of the contract, grant the right to engage in the very acts and conduct

2   which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.").

3        *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089 (2004), relied upon by

4   Plaintiffs, does not compel a contrary result.  The court in *Pasadena Live* acknowledged that "[t]he

5   implied covenant of good faith and fair dealing is limited to assuring compliance with the *express*

6   *terms* of the contract, and cannot be extended to create obligations not contemplated by the contract."

7   *Pasadena Live,* 114 Cal. App. 4th 1089 at 1094 (emphasis in original) (citing 1 Witkin, SUMMARY OF

8   CAL. LAW (2003 supp.) Contracts, § 743, p. 449).  A breach of covenant claim cannot be used to

9   require the City to exercise its discretion in any particular way.  Here, the express terms of the

10  contract did not obligate the City to approve to any project, or to act in support of any project until

11  such approve was given.  Thus, no covenant claim is stated.

12       **C.     Quantum Meruit, Unjust Enrichment and Specific Performance**

13       Plaintiffs also bring claims against the City on theories of Quantum Meruit, Unjust

14  Enrichment, and Specific Performance.  These claims fail for a number of reasons.

15       First, quasi-contractual remedies are generally not available when the terms of an express

16  contract control.  *Cal. Med. Assoc., Inc. v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151,

17  172 (2001).  Moreover, Plaintiffs acknowledge in their opposition to the motion that quantum meruit

18  and unjust enrichment are remedies typically unavailable to parties suing a public entity for breach of

19  contract, citing *Los Angeles Unified Sch. Dist. v. Great American Ins. Co.*, 49 Cal.4th 739, 748

20  (2010) ("*LAUSD*").  *See also Pasadena Live,* 114 Cal. App. 4th at 1094 ("A public entity cannot be

21  held liable on an implied in law or quasi contract theory") (citations omitted).  Plaintiffs argue that,

22  should the Court find the LDA to be an unenforceable illusory contract, these alternate remedies

23  should be permitted, as they were in *LAUSD*.  *LAUSD,* 49 Cal.4th at 748, 753 ("although [in a suit

24  against a public entity]... a contractor may not be entitled to quantum meruit recovery for work

25  performed beyond the contract requirements…, as between a truly blameless contractor and the non-

26  disclosing public entity that received the benefit of the contractor's work, requiring the public entity

27  to pay for that benefit is hardly unjust.")

28

United States District Court
Northern District of California

1    The LDA is not alleged to be an illusory contract, nor does it appear to be so from its face.

2  Instead, the express terms of the agreement give the City discretion as described above.

3  Consequently, Plaintiffs have not offered a basis for the exception to the general rule against

4  allowing such claims, in contrast to *LAUSD*.

5    Plaintiffs further argue that Upstream is entitled to specific performance of the LDA to the

6  extent that the terms are "sufficiently certain to make the precise act which is to be done clearly

7  ascertainable" and to the extent that the City still "has the power lawfully to perform [the act]."  Cal.

8  Civ. Code § 3390.  Specifically, Plaintiffs seek a limited order of specific performance to require

9  City to consider and negotiate in good faith the sale of the property to Upstream and a non-casino

10  project for the site.  Specific performance is a contract remedy derivative of Plaintiffs' breach of

11  contract claim, rather than a separate cause of action, so it necessarily fails with Plaintiffs' improper

12  breach of contract claims.  *See Barroso v. Ocwen Loan Servicing LLC*, 208 Cal. App. 4th 1001, 1007

13  n.2 (2012).

**IV.    CONCLUSION**

15    Accordingly, for the reasons stated, the Motion for Judgment on the Pleadings is **GRANTED**.

16  Plaintiffs' claims for breach of contract, breach of the covenant of good faith and fair dealing,

17  quantum meruit, unjust enrichment, and specific performance only are **DISMISSED**.

18    Plaintiffs claim for declaratory relief against the City remains operative.

19    The case management conference currently set for Monday, December 16, 2013, is

20  **CONTINUED** to **Monday, January 27, 2014 at 2:00 p.m.**  The parties shall file an updated case

21  management statement seven days in advance of the continued conference date.

22    **IT IS SO ORDERED**.

23    This Order terminates Docket No. 113.

24  Date: December 12, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**