UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE GUIDIVILLE RANCHERIA OF CALIFORNIA, et al., | Case No.  CV 12-1326 YGR |
| | [PROPOSED] **JUDGMENT** |
| Plaintiffs, | ON CLAIMS BETWEEN PLAINTIFFS GUIDIVILLE RANCHERIA OF CALIFORNIA AND UPSTREAM POINT MOLATE, LLC, AND DEFENDANT CITY OF RICHMOND |
| vs. | |
| THE UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

1    In March 2012, plaintiffs Guidiville Rancheria of California (Tribe) and Upstream Point

2    Molate LLC (Upstream) (together, Plaintiffs) commenced the above-captioned action (Action)

3    against defendant City of Richmond (City).  The controversy concerns a Land Disposition

4    Agreement (LDA) and its amendments, between Upstream and the City, the subject of which was

5    a proposed development of property located at the former Navy Fuel Depot Point Molate in

6    Richmond, California.

7        Following the signing of the LDA in 2004 and in accordance with the California

8    Environmental Quality Act (CEQA), the Court finds that the City conducted a multi-year review

9    of potential environmental impacts resulting from several proposed projects, including a project

10   with residential units.[1]  In 2011, the City certified a final environmental impact report (EIR) for

11   potential projects at Point Molate.  No party challenged the EIR.

12       In this Action, Plaintiffs allege, *inter alia*, that the City breached the LDA; the City denies

13   Plaintiffs' claims.

14       In accordance with the stipulated request of the Parties, and good cause appearing,

15       **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

16       1.    Under 28 U.S.C. §§ 1331 and 1362, the Court has jurisdiction over the Action and

17   shall retain such jurisdiction to enforce this Judgment.

18       2.    The Court expressly finds and determines that the terms of this Judgment are fair,

19   reasonable and in the public interest.

20                              **DEFINITIONS**

21       3.    "Judgment" shall mean this Judgment and all exhibits attached hereto.

22

23

24

25   _____

26       [1] The project with residential units analyzed in the 2011 Certified EIR is consistent with
     the City's previously approved Point Molate Reuse Plan, which the City adopted to comply with
27   the terms of the transfer of Point Molate from the U.S. Navy to the City.  The Reuse Plan
     expressly contemplates 670 residential units at Point Molate and Alternative D of the Certified
     2011 EIR analyzed a project with more than 670 residential units.
28

4.      "Point Molate" or the "Property" shall mean the approximately 270 acres of upland and 134 acres[2] of tidal and submerged real property that was transferred to the City by the United States Navy in or around September 2003, and the "Remainder Property" transferred to the City by the Navy in or around September 2009.

5.      "Development Areas" shall mean the four development areas shown on Figure 6, Land Use Areas, Point Molate Reuse Plan (attached as Exhibit A) or any parcel subsequently designated or subdivided from those four Development Areas subject to the provisions of Paragraph 20.

6.      "Point Molate Reuse Plan" shall mean the Reuse Plan prepared by a 45-member Blue Ribbon Advisory Committee in or around March 1997, and adopted by the Richmond City Council in 1997.  In 2002, the U.S. Navy published a "Record of Decision for Disposal and Reuse of the Fleet Industrial Supply Center, Naval Fuel Depot, Point Molate, CA" (67 Fed. Reg. 41967, June 20, 2002) based on the Point Molate Reuse Plan, which included residential use as one of three alternatives.  A complete copy of the Point Molate Reuse Plan is attached as Exhibit B and it is also available on the City's website at https://www.ci.richmond.ca.us/DocumentCenter/Home/View/7510.  The City shall maintain a hard copy of the Point Molate Reuse Plan for review by the public.

7.      "Certified EIR" shall mean the final Environmental Impact Report certified by the City on or about March 8, 2011, which can be located at http://www.ci.richmond.ca.us/1863/Point-Molate-Resort-and-Casino, and any and all errata, addenda or other modifications thereto, and as the same may be amended, supplemented or updated.  The City shall maintain a hard copy of the Certified EIR for review by the public.

8.      "Discretionary City Approvals" shall mean all discretionary approvals made by the City necessary to entitle development and construction of the Development Areas.  The Discretionary City Approvals shall allow for a minimum of 670 residential units and further the

_____

[2] Any variation of the total acreage shall not alter the Parties obligations regarding the Property, which the Parties understand to mean the total land transferred from the Navy to the City in 2003 and 2009.

goals of the Point Molate Reuse Plan, including preservation of open space and rehabilitation of the Core Historic District (including Building 6). Those 670 residential units must comply with the requirements of the City's inclusionary housing ordinance in effect at this time. That compliance can be met either by (i) providing within the City the percentage of below market units presently specified in section 15.04.810.063 of the City's Municipal Code or (ii) paying an in-lieu fee, which must equal the amounts presently applied to residential projects within the City. Discretionary City Approvals includes any additional review and actions required under CEQA, zoning changes, and general plan amendments, but excludes (1) design review permits and certificates of appropriateness by the City; (2) ministerial permits provided by the City; and (3) other approvals or permits provided by any entity other than the City, such as the United States government, State of California, or regional agencies, such as the Bay Conservation Development Commission and the Regional Water Quality Control Board. The City shall diligently process any required design review permits and certificates of appropriateness and ministerial permits to be provided by the City; and City shall also diligently process and cooperate with all requests for information that might be required for any other approvals or permits provided by any entity other than the City, such as the United States government, State of California, or regional agencies, such as the Bay Conservation Development Commission and the Regional Water Quality Control Board.

9. "Effective Date" shall mean the date this Judgment is entered by the Court.

10. "Revenues" shall mean all amounts received or earned by City or Plaintiffs from the sale or development or long-term leasing (more than one (1) year) of any portion of the Development Areas, including, without limitation, any amounts received for (i) exclusive rights to negotiate, (ii) any purchase monies or purchase deposits paid, (iii) any option payments, (iv) any amounts paid pursuant to a services agreement or any similar one-time payment, or recurring payments made to City or Plaintiffs by the purchaser(s), developer(s), builder(s) or any subsequent owner of any portion of the Development Areas or (v) any reimbursement for costs or expenses incurred pursuant to Paragraph 24. "Revenues" does not include grants, reimbursements paid to the City or to Plaintiffs by a third party (e.g., developer) for costs incurred

in the pre-development phase other than costs incurred under Paragraph 24, short-term rental/use fees collected by the City prior to the sale of the Development Areas, property taxes or other taxes paid to the City and proceeds received from a financing district.

11. "Customary Fees" means fees paid to City for permits or similar customary administrative fees, cost-recovery fees, development fees and/or impact fees (e.g., traffic, school and in-lieu housing impact fees) in amounts routinely charged and similarly collected by the City on other projects.

12. "Sale" or "Sold" or "Sell" or any similar term relating to the sale of the property that is the subject of this Judgment, shall mean close of escrow upon which purchase monies are paid to City or Plaintiffs in exchange for which title to the portion of the property being sold in that transaction is simultaneously transferred to the buyer(s). The terms "Sale" or "Sold" or "Sell" shall also include execution of a contract or agreement to sell any portion of the Development Areas so long as the sale of a substantial portion of any one of the Development Areas is closed and title transferred within 48 months of the Effective Date, with the understanding that such contracts/agreements are to facilitate phased developments and must remain in effect until the final parcel of the Development Area at issue is sold.

13. "Entitlement Costs" shall mean all costs incurred after the Effective Date, which directly concern the issuance of entitlements and compliance with CEQA, including, without limitation, the preparation of environmental review documents and costs similar to those Plaintiffs previously paid prior to completion of the Certified EIR. The City is responsible for Entitlement Costs and related legal fees.

14. "Pre-Development Costs" shall mean other costs incurred after the Effective Date, such as surveying and engineering consulting fees, and other costs associated with creating parcels, escrow fees, and title fees, and legal fees related to the disposition of the property, including, but not limited to, legal counsel for preparing and reviewing contracts and agreements, parcel maps, and subdividing and surveying the property.

15. "Net Revenue" shall mean Revenues less Customary Fees and Pre-Development Costs.

16.     Within 24 months from the Effective Date, in accordance with CEQA and other applicable law, City shall provide Discretionary City Approvals, as defined in Paragraph 8 of this Judgment.

17.     The Court anticipates and expects that City will receive and consider input from the public with respect to the future development of Point Molate.  Nothing herein shall prohibit or limit the City from holding public workshops or receiving any other public input with respect to any future development considered by City pursuant to this Judgment, including selection of a master developer or developers.

18.     Of the approximately 270 acres of upland area, the Point Molate Reuse Plan designates approximately 30% as Development Areas and 70% as open space, the ratio of which shall not change.  In the Core Historic District (including Building 6), there are 374,572 square feet of contributing structures (based on the list in Table 3.6-1 and Figure 3.6-6 from the Certified EIR), all of which shall be preserved for adaptive reuse.

19.     City may utilize the existing Certified EIR and prior studies pertaining to the Property to the extent possible to comply with CEQA.

20.     The Discretionary City Approvals may adjust lot lines as allowed and analyzed under the Certified EIR, or otherwise to allow for construction of the residential units on different portions of the Property than is set forth in the Point Molate Reuse Plan and may allow for more than 670 residential units and non-residential use, insofar as this is consistent with the overall open space preservation goals of the Point Molate Reuse Plan.

21.     Within 48 months of the Effective Date or 24 months of the City issuing the last Discretionary City Approval, whichever occurs earlier, City must market the Development Areas for sale to one or more qualified developer(s) or builder(s) using commercially reasonable efforts. At the City's discretion, separate portions of the Development Areas may be sold to different developers or builders to increase the sales price derived from the sale of the Development Areas. With the consent of the Parties, which consent must be made by a writing signed by all Parties, Development Areas or parcels may be leased long term instead of being sold.  Prior to the Sale of

the Development Areas, either Party may elect to have an independent, third-party that is selected

jointly by the Parties verify that the subject Sale is fair and reasonable and the product of an arms-

length negotiation, and such verification shall be a condition precedent to completion of such

Sale. The Parties shall share evenly the costs associated with any such verification.

22. Plaintiffs Tribe and Upstream, on the one hand, and City, on the other hand, will

split all Net Revenues 50/50.

23. Within thirty (30) days of receiving any Revenues, City shall notify Upstream and

the Tribe of the amount and source of such Revenues. Within sixty (60) days of receiving any

Revenues, City shall distribute 50% of any Net Revenues via wire transfer into a banking account

to be designated by Plaintiffs in writing within thirty (30) days of the Effective Date, or as may be

designated in writing thereafter by Plaintiffs.

24. City shall bear all expenses of maintaining and securing the Property, until the

Development Areas are sold to a third party.

25. If the Northern Development Area, Southern Development Area, Central

Development Area, or any portions thereof, are not Sold within 48 months of the Effective Date

or 24 months of City approving the last Discretionary City Approval, whichever occurs first

("City Sale Deadline"), Plaintiffs or either of them as designated by Upstream and the Tribe in

writing, shall have the option to buy such Development Area(s) or portions thereof for a purchase

price of $100 per Development Area or portion thereof. Plaintiffs' option to purchase the

Development Area shall include up to fifty percent of the land-side portion of the shoreline knoll

referenced in the Certified EIR. Promptly after Plaintiffs, or either them, exercise the option

granted herein, City shall be obligated to forthwith sell the parcels identified in the exercise of the

option, or portions thereof, to Plaintiffs, or either of them. Within thirty (30) days of the Effective

Date, City shall cause a memorandum of this Judgment to be recorded on title to the Property,

which shall reference the above-referenced option of Upstream and Tribe.

26. For each parcel of the Development Area or portion thereof sold to Plaintiffs, upon

a sale by either of them of such parcel(s), Plaintiffs shall pay to the City fifty percent (50%) of the

Net Revenues received by Plaintiffs. Plaintiffs must sell any Development Area or portion

thereof purchased pursuant to this Judgment within 5 years of the City's Sale Deadline or 4 years after the City makes a decision on any additional, discretionary City entitlements concerning any purchased portions, whichever is later, otherwise the Development Area(s) or portion(s) thereof revert back to the City, and the City shall pay Plaintiffs $100 for each Development Area or portion thereof.[3] If the City takes back property under this Paragraph, the Revenue sharing described in Paragraph 22 will still apply, and the City will have an on-going obligation to market and sell the remaining unsold portions of the Development Areas.

27. Within thirty (30) days of receiving any Revenue, Plaintiffs shall notify the City of the amount and source of such Revenue. Within sixty (60) days of receiving any Revenues, Plaintiffs shall distribute 50% of Net Revenue received by Plaintiffs to the City via wire transfer into a banking account to be designated in writing by the City.

28. Upstream and Tribe, or either of them as designated by Upstream and the Tribe in writing, and any of their transferees, may pursue development of the parcels in accordance with the Discretionary City Approvals, or may seek additional or new entitlements for the development of the parcels beyond the Discretionary City Approvals required by this Judgment that City may or may not grant in its sole discretion. The Parties, and each of them, acknowledge the Tribe, commencing in 2004 and ending in 2012, maintained an office in Building 123 at Point Molate.

## REPORTING REQUIREMENTS

29. Absent further order from the Court, the Parties shall provide a joint update to the Court every 120 days regarding efforts to comply with the Judgment.

30. Within 30 days of a request made by Plaintiffs, or either of them, the City must provide Upstream and Tribe a copy of any contracts, agreements or other documents providing

---

[3] For purposes of paragraph 26, discretionary City entitlements include any additional review and actions required under CEQA, zoning changes, and general plan amendments but excludes (1) design review permits and certificates of appropriateness by the City; (2) ministerial permits provided by the City; and (3) other approvals or permits provided by any entity other than the City, such as the United States government, State of California, or regional agencies, such as the Bay Conservation Development Commission and the Regional Water Quality Control Board.

for payment of Revenue to City with respect to any portion of the Property that is the subject of this Judgment.

31.     The City must provide Plaintiffs a copy of any agreements the City executes for sale of any portion of the Property, including the Development Areas, within fifteen (15) days of the City Council's approval of such agreement(s).

32.     The reporting requirements of this Judgment do not relieve City of any reporting obligations required by any other federal, state or local law, regulation, permit or other requirement.

33.     Notwithstanding the foregoing, Upstream and Tribe may use and disclose any information provided pursuant to this Judgment in any proceeding to enforce the provisions of this Judgment and as otherwise permitted by law.

## AUDITING OPTION

34.     The City shall keep accurate and complete accounting records of all transactions relating to the maintenance, entitlement, development, sale of, or receipt of funds relating to the Property, including, without limitation, any records of Revenues or other monies paid to or received by City relating to the Property, all accounting records, invoices, ledgers, cancelled checks, deposit slips, bank statements, original estimates, estimating work sheets, contracts or contract amendments, change order files, insurance documents, memoranda and correspondence. City shall establish and maintain a reasonable accounting system that enables City to readily identify City's costs, expenses, Revenues, and other monies paid to or received by City relating to the Property.

35.     Upon no less than 30 days' written notice, and no more than once a year during the first five years after the Effective Date, Upstream and Tribe and their authorized representatives may audit, examine and make copies of City's records kept by or under City's control relating to its performance under this Judgment, including, without limitation, records of all Revenues or other monies paid to, received by, or committed to City relating to sale or development of the Property.  If an audit is requested, City, at Plaintiffs' expense, shall make its records available for examination and copying during regular business hours at City's offices or another location as

mutually agreed by the Parties. Excluded from any audit are records protected by federal, state, and local privilege laws, including any records that would fall under exemptions set forth in the California Public Records Act.

36. Costs of any audits conducted under the authority of this right to audit will be borne by Upstream and Tribe unless the audit identifies City's failure to disburse more than $50,000 owed to Upstream and Tribe hereunder, in which case City shall reimburse Upstream and Tribe for the costs of the audit.

## COMPLIANCE WITH CEQA AND OTHER LAWS

37. The Parties acknowledge, and the Court expressly finds and orders, that this Judgment is not an approval of a project, and the City is responsible for compliance with all federal, state and local laws, regulations, and permits, relating to the Property, including compliance with CEQA. This finding and order may be asserted by the Parties as a bar to any suit challenging the validity of this Judgment.

## RELEASE

38. Upon entry of this Judgment, Plaintiffs, and each of their respective executors, representatives, heirs, successors, assigns, bankruptcy trustees, guardians, and all those who claim through them or who assert claims on their behalf, will be deemed to have completely released and forever discharged City from any claim, right, demand, charge, complaint, action, cause of action, obligation, or liability of any and every kind, based on an alleged violation of the LDA or its amendments, in connection with the sale and/or development of Point Molate, and all claims for monetary, equitable, declaratory, injunctive, or any other form of relief, whether known or unknown, suspected or unsuspected, under the law of any jurisdiction, which Plaintiffs ever had or now have, resulting from, arising out of, or in any way, directly or indirectly, connected with the claims raised in the Action or in the California state court action entitled *The City of Richmond v. Upstream Point Molate, LLC*, filed in Contra Costa County Superior Court, Case No. C11-01834 ("State Court Action"), or claims which could have been raised in the Action or State Court Action based on or relating to the same facts.

39.     Upon entry of this Judgment, City, and all those who claim through City or who assert claims on behalf of City, will be deemed to have completely released and forever discharged Plaintiffs, and each of their respective executors, representatives, heirs, successors, assigns, bankruptcy trustees, guardians, and all those who claim through them or who assert claims on their behalf, from any claim, right, demand, charge, complaint, action, cause of action, obligation, or liability of any and every kind, based on an alleged violation of the LDA or its amendments, in connection with the sale and/or development of Point Molate, and all claims for monetary, equitable, declaratory, injunctive, or any other form of relief, whether known or unknown, suspected or unsuspected, under the law of any jurisdiction, which the City ever had or now has, resulting from, arising out of, or in any way, directly or indirectly, connected with the claims raised in the Action or in the State Court Action, or claims which could have been raised in the Action or State Court Action based on or relating to the same facts.

40.     As of the Effective Date, all claims asserted in this Action shall be and hereby are dismissed with prejudice. The Parties further agree that they will dismiss with prejudice the claims asserted in the State Court Action.

41.     The Parties, and each of them, each waive and release any and all provisions, rights, and benefits conferred either (a) by section 1542 of the California Civil Code, or (b) by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to section 1542 of the California Civil Code, with respect to the claims released pursuant to Section 4.1. Section 1542 of the California Civil Code reads:

> Section 1542. General Release, extent. A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The Parties, and each of them, may hereafter discover facts other than or different from those that they know or believe to be true with respect to the subject matter of the claims released pursuant to the terms of this Judgment, but the Parties, and each of them, expressly agree that, upon entry of the Judgment, they shall have waived and fully, finally, and forever settled and

released any known or unknown, suspected or unsuspected, asserted or unasserted, contingent or non-contingent claim with respect to the claims released, whether or not concealed or hidden, without regard to subsequent discovery or existence of such different or additional facts.

42. The Parties shall bear their own costs of this action, including attorneys' fees, except that the prevailing party in any action or proceeding to enforce the terms of this Judgment shall be entitled to recover, from the non-prevailing party, all reasonable costs, including reasonable attorney's fees.

43. Nothing in this Judgment is intended to limit or expand the Tribe's right to continue to pursue its claims asserted in this Action against the Federal Defendants, which expressly are not resolved herein, or to pursue any lands be taken into trust by the United States for the benefit of the Tribe, for any lawful purposes. The Tribe will request to license City-owned or City-controlled property for Tribe use and the City will process that request in the normal course, in the same manner as other such requests are processed.

## NOTICES

44. Unless otherwise specified in this Judgment, whenever notifications, submissions, or communications are required by this Judgment, they shall be made in writing and addressed as follows:

As to Upstream by email:  Jim.Levine@upstream.us.com; and
garet@okeefelaw.com

As to Upstream by mail:  Jim Levine
Upstream Point Molate LLC
2000 Powell Street, Suite 920
Emeryville, CA 94608
(510) 350-4101

and

Garet D. O'Keefe
O'Keefe & O'Keefe LLP
1068 Cragmont Avenue
Berkeley, CA 94708
(510) 282-0319 (t)

As to the Tribe be email:  mdwastenot@gmail.com; and
scottcrowell@clotag.net

| | | |
|---|---|---|
| 1 | As to the Tribe by mail: | Guidiville Rancheria of California |
| 2 | | P.O. Box 339 |
| | | Talmage, CA 95481 |
| | | Attention: Merlene Sanchez, Chairperson |
| 3 | | and |
| 4 | | Scott Crowell |
| | | Crowell Law Offices – Tribal Advocacy Group |
| | | 1487 W. State Route 89A, Suite 8 |
| 5 | | Sedona, AZ 86336 |
| | | (425) 802-5369 (t) |
| 6 | | |
| 7 | As to City by email: | agonzalez@mofo.com |
| | | aamezcua@mofo.com |
| 8 | and | |
| | | Bruce_Goodmiller@ci.richmond.ca.us |
| 9 | | Rachel_Sommovilla@ci.richmond.ca.us |
| 10 | | |
| 11 | As to City by mail: | Arturo González |
| | | Alexis Amezcua |
| 12 | | Morrison & Foerster LLP |
| | | 425 Market Street |
| 13 | | San Francisco, CA 94105 |
| | | and |
| 14 | | Bruce Reed Goodmiller |
| | | Rachel Sommovilla |
| 15 | | City Attorney's Office |
| | | 450 Civic Center Plaza |
| 16 | | P.O. Box 4046 |
| | | Richmond CA 94804-1630 |
| 17 | | |

45. Any Party may, by written notice to the other Parties, change its designated notice recipient(s) or notice address provided above.

46. Notices submitted pursuant to this Section shall be deemed submitted upon receipt, unless otherwise provided in this Judgment or by agreement of the Parties in writing.

# RETENTION OF JURISDICTION

47.     The Court shall retain jurisdiction over this Action to enforce the terms of this Judgment.  To avoid doubt, this Judgment applies to and is binding upon the Tribe and Upstream and the City, and their respective heirs, successors, assigns and future councils for the City and the Tribe.  Consistent with settled law, any change in the composition of the City Council for the City shall not alter the City's obligations under this Judgment.

48.     This Judgment embodies the final, complete and exclusive agreement and understanding among the Parties with respect to the agreement reflected in this Judgment and supersedes all prior agreements and understandings, whether oral or written, concerning settlement embodied herein.  Other than deliverables that are subsequently submitted and approved pursuant to this Judgment (if any), the Parties acknowledge that there are no representations, agreements, or understandings relating to the disposition of the Action other than those expressly contained in this Judgment.

Dated: ___April 12, 2018_____

_____
YVONNE GONZÁLEZ ROGERS
UNITED STATES DISTRICT COURT

FOR THE GUIDIVILLE RANCHERIA OF CALIFORNIA:

Dated: 4 - 2 - 18

Merlene Sanchez
MERLENE SANCHEZ
Tribal Chairperson

As to Form:

CROWELL LAW OFFICES – TRIBAL
ADVOCACY GROUP

Dated: 4 - 3 - 18

By: _____
Scott Crowell
Attorneys for Plaintiff Guidiville
Band of Pomo Indians

FOR UPSTREAM POINT MOLATE, LLC:

Dated: 4/5/18 _____

_____
JAMES D. LEVINE
General Manager
Upstream Point Molate, LLC

AS TO FORM:

O'KEEFE & O'KEEFE LLP

Dated: 3/30/18 _____

By: _____
Garet D. O'Keefe
Attorneys for Plaintiff UPSTREAM
POINT MOLATE LLC

1    FOR CITY OF RICHMOND:

2    Dated: 4/4/18

3                                          BILL LINDSAY
                                           City Manager, City of Richmond
4

5                                  AS TO FORM:

6                                  CITY ATTORNEY FOR CITY OF RICHMOND

7

8    Dated: 4/4/18                 By:
                                          Bruce Reed Goodmiller
9                                         Attorneys for Defendant CITY
                                          OF RICHMOND
10

11                                 ALEXIS AMEZCUA
                                   NAVI SINGH DHILLON
12                                 MORRISON & FOERSTER LLP

13

14   Dated:                        By:
                                          Arturo González
15                                        Attorneys for Defendant CITY
                                          OF RICHMOND
16

17

18

19

20

21

22

23

24

25

26

27

28
     Case No. CV 12-1326-YGR              -16-
     [PROPOSED] JUDGMENT

FOR CITY OF RICHMOND:

Dated: _____

                                             _____
                                             BILL LINDSAY
                                             City Manager, City of Richmond

AS TO FORM:

CITY ATTORNEY FOR CITY OF RICHMOND

Dated: _____

By: _____
            Bruce Reed Goodmiller
            Attorneys for Defendant CITY
            OF RICHMOND

ALEXIS AMEZCUA
NAVI SINGH DHILLON
MORRISON & FOERSTER LLP

Dated: 4/3/18

By: _____
            Arturo González
            Attorneys for Defendant CITY
            OF RICHMOND

EXHIBIT A



POINT MOLATE REUSE PLAN
City of Richmond

■ ■ ■

Figure 6:
Land Use Areas

■ ■ Development Area

------- Historic District Boundary
In Northern Development Area

SHORELINE PARK

CENTRAL DEVELOPMENT AREA

CORE HISTORIC DISTRICT

NORTHERN DEVELOPMENT AREA

HILLSIDE OPEN SPACE

SOUTHERN DEVELOPMENT AREA

0  300  600  1200

Scale: 1" = 600'

BRADY AND ASSOCIATES
Planners and Landscape Architects

EXHIBIT B

# POINT MOLATE REUSE PLAN



R I C H M O N D • C A L I F O R N I A

■ ■ ■

SUBMITTED TO THE :
CITY OF RICHMOND

MARCH, 1997

BRADY AND ASSOCIATES, INC. PLANNERS AND LANDSCAPE ARCHITECTS



# POINT MOLATE REUSE PLAN
## R I C H M O N D  •  C A L I F O R N I A

■  ■  ■

SUBMITTED TO THE :
CITY OF RICHMOND

PREPARED BY :
CITY OF RICHMOND
BRADY AND ASSOCIATES, INC.

SUBMITTED IN CONJUNCTION WITH :
DINWIDDIE & ASSOCIATES
BAY AREA ECONOMICS
MANNA CONSULTANTS, INC.
BUESCHER BIOLOGICAL CONSULTING
CHEUNG ENVIRONMENTAL
PITTMAN & HAMES ASSOCIATES
THE ENVIROSYSTEMS GROUP
ARCHITECTURAL RESOURCES GROUP

MARCH, 1997

BRADY AND ASSOCIATES, INC. PLANNERS AND LANDSCAPE ARCHITECTS



POINT MOLATE REUSE PLAN
TABLE OF CONTENTS

■  ■  ■

Page

I.  REUSE PLAN
    A.  Introduction ................................. I-1
        1.  Reuse Vision ............................. I-1
        2.  Point Molate Setting ....................... I-2
        3.  History of the Site ......................... I-5
        4.  Buildings ................................ I-7
        5.  Reuse Planning Process ..................... I-7
        6.  Goals and Objectives ....................... I-11
        7.  Market Demand .......................... I-12
    B.  Reuse Plan Components ......................... I-14
        1.  Thematic Concepts ......................... I-20
        2.  Land Use Overview ........................ I-24
        3.  Core Historic District ...................... I-33
        4.  Northern Development Area ................. I-40
        5.  Central Development Area .................. I-44
        6.  Southern Development Area ................. I-45
        7.  Open Space, Parks, and Public Access .......... I-47
        8.  Transportation ........................... I-55
        9.  Infrastructure ............................ I-58
        10. Public Safety ............................ I-63
        11. Parcelization ............................ I-64
    C.  Property Conveyance/Disposal ..................... I-65
        1.  Federal Agency Transfers ................... I-66
        2.  Homeless Assistance ....................... I-66
        3.  Public Benefit Conveyances ................. I-67
        4.  Port Conveyances ......................... I-69
        5.  Economic Development Conveyance ........... I-69
        6.  Special Legislation ........................ I-70
        7.  Negotiated Sale With a Public Body ........... I-71
        8.  Public Bid Sale ........................... I-71
    D.  Reuse and Development Strategy .................. I-71
        1.  Additional Investigations and Assessments ...... I-72
        2.  Early Reuse .............................. I-75
        3.  Environmental Clean-Up Program ............ I-76
        4.  Jurisdictional and Regulatory Considerations .... I-79
        5.  Capital Improvements and Financial Feasibility .. I-82

      6.    Demolition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-83
      7.    Phased Action Plan . . . . . . . . . . . . . . . . . . . . . . . I-85

II.    BACKGROUND INFORMATION . . . . . . . . . . . . . . . . . . . . II-1
    A.    Existing Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . II-1
        1.    Local Setting . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-1
        2.    Land Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-6
        3.    Access and Circulation . . . . . . . . . . . . . . . . . . . II-6
        4.    Buildings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-7
        5.    Infrastructure . . . . . . . . . . . . . . . . . . . . . . . . . . . II-8
        6.    Public Services . . . . . . . . . . . . . . . . . . . . . . . . . II-10
        7.    Topography . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-11
        8.    Soils and Geology . . . . . . . . . . . . . . . . . . . . . . . II-11
        9.    Hydrology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-12
      10.   Seismicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-12
      11.   Biological Resources . . . . . . . . . . . . . . . . . . . . . II-13
      12.   Cultural Resources . . . . . . . . . . . . . . . . . . . . . . II-17
      13.   Visual Resources . . . . . . . . . . . . . . . . . . . . . . . . II-18
      14.   Climate and Air Quality . . . . . . . . . . . . . . . . . . II-18
      15.   Environmental Clean-Up and Contamination . . . . II-19
      16.   Applicable Richmond Policies, Plans
           and Regulations . . . . . . . . . . . . . . . . . . . . . . . . II-23
    B.    Opportunities and Constraints by Area . . . . . . . . . . . . . II-28
        1.    Area 1- Pier Area . . . . . . . . . . . . . . . . . . . . . . . . II-28
        2.    Area 2- Shoreline Area . . . . . . . . . . . . . . . . . . . . II-29
        3.    Area 3- Shoreline Park . . . . . . . . . . . . . . . . . . . . II-31
        4.    Area 4- Main Development Area . . . . . . . . . . . . . II-31
        5.    Area 5- Eastern Development Area . . . . . . . . . . . II-32
        6.    Area 6A- Hillside Development Area . . . . . . . . . . II-33
        7.    Area 6B- Secondary Ridge . . . . . . . . . . . . . . . . . II-34
        8.    Area 7- Gateway Area . . . . . . . . . . . . . . . . . . . . . II-34

III.   MARKET CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . . III-1
    A.    Preliminary Market Analysis of Considered Uses . . . . . . III-1
        1.    Introduction and Summary of Findings . . . . . . . . III-1
        2.    Detailed Market Overviews . . . . . . . . . . . . . . . . III-4
        3.    Additional Information . . . . . . . . . . . . . . . . . . . III-19
    B.    Focused Market Analysis of a Winery . . . . . . . . . . . . . . III-22
        1.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . III-22
        2.    Wine Industry Profile . . . . . . . . . . . . . . . . . . . . III-24
        3.    Questions about Potential Winery Operations . . . . III-31
        4.    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . III-37

IV.  GLOSSARY OF ACRONYMS . . . . . . . . . . . . . . . . . . . . . . IV-1

V.  BIBLIOGRAPHY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . V-1

# LIST OF FIGURES

1.  Regional Location ................................... I-3
2.  Aerial Photograph of Point Molate ...................... I-4
3.  Opportunities ...................................... I-15
4.  Constraints ....................................... I-17
5.  Photograph of Winehaven Close-Up ..................... I-21
6.  Land Use Areas .................................... I-25
7.  Conceptual Land Use Plan ........................... I-27
8.  Bird's-Eye View Looking Southeast ..................... I-29
9.  Bird's-Eye View Looking Northeast ..................... I-30
10. Photograph of Building 6 ........................... I-36
11. Photograph of Winemaster's House ..................... I-36
12. Photograph of Cottages .............................. I-37
13. Photograph of Winehaven from Pier .................... I-37
14. Sketch of Historic District Streetscape ................. I-41
15. Conceptual Open Space Plan ......................... I-49
16. Photograph of Existing Shoreline Park .................. I-51
17. Photographs of Hillside Open Space .................... I-51
18. Photograph of Pier Close-Up ......................... I-52
19. Photograph of Pier from Hillside ...................... I-52

# LIST OF TABLES

1.  Existing Buildings at Point Molate ...................... I-8
2.  Land Use Spatial Allocations ......................... I-31
3.  Phased Action Plan ................................. I-86
4.  City of Richmond Racial/Ethnic Groups ................. II-2
5.  Projected City of Richmond Housing Needs .............. II-3
6.  Bay Area Meeting Centers ........................... III-6
7.  Selected Residential Projects in Point Richmond
    and Marina Bay .................................... III-16
8.  Representative Space Requirements and Employee Count
    for California Wineries .............................. III-32

## LIST OF APPENDICES

A.  Point Molate: Envisioning the Future—A Summary of the Visioning Workshop held on November 18, 1995, for the Point Molate Reuse Plan Blue Ribbon Advisory Committee

B.  Maps from the City of Richmond *Draft Land Use Concept Paper* and Navy's *Environmental Baseline Survey*

| | |
|---|---|
| Figure 1-2: | Parcel Delineations |
| Figure 5-2: | Fuel Distribution System |
| Figure 4-4: | Potable and Fire Protection Water System |
| Figure 4-3: | Storm Drain System |
| Figure 4-6: | Sanitary Sewer |
| Figure 4-5: | Electrical System |
| Figure 5: | Soil Types and Rainfall |
| Figure 5-4: | IRP Site Locations |
| Figure 5-8: | Extraction Trench Location (IR Site 03) |
| Figure 5-1: | Environmental Condition of Property Categories |
| Figure 5-3: | Spills and Releases |

C.  Biological Inventory
List of Threatened and Endangered Species
Inventory of Animal Species
List of Vertebrates
CNPS Plant Survey-May 16, 1996
List of Vascular Plants

D.  Marketing Appendix
Robert Mondavi Wine and Food Center Brochure
Wente Vineyards Press Kit
Hall & Bartley Architecture Brochure (Winery Specialists)

E.  Comments on Draft Point Molate Reuse Plan

**Chapter I**
**REUSE PLAN**

■   ■   ■

## A. Introduction

In 1995, the Point Molate Navy Fuel Depot (Point Molate) was listed for closure and disposition under the Defense Base Closure and Realignment Act of 1990. The process formally began with the President's approval on July 14, 1995, and Congressional approval on September 28, 1995. Point Molate ceased operations on September 30, 1995.

The Point Molate Reuse Plan (Plan) serves as the guide for reuse and development of Point Molate by establishing a conceptual land use plan that balances economic needs with community goals and objectives. The Plan allows for the orderly and phased development of the site for civilian use over the next 20 years. The Plan, along with the Homeless Assistance submission and summary of public comments, is required to be submitted to and approved by the Department of Defense (DOD) and the Department of Housing and Urban Development (HUD) prior to conveyance of the property to the City of Richmond.

### 1. Reuse Vision

Closure of Point Molate offers the City a unique opportunity to take advantage of the exceptional location and historical attributes of this site. It also poses a number of challenges. The types of uses that can be accommodated are somewhat limited because of the steep topography, vehicular access constraints, contamination from past Naval operations, and neighboring heavy industrial use.

Point Molate will play an important role in enhancing the economic base of Richmond, enhancing Richmond's regional presence, expanding open space and recreational opportunities, and creating a new City neighborhood with a mix of uses. The City of Richmond envisions the site recreating the vitality, commerce, and activity reminiscent of its era as a winery and village. To that end, the City hopes to:

- Retain and promote the historic significance of Winehaven and the other historic buildings on the property;

- Create and attract job and business opportunities;

- Preserve and promote the enjoyment of the natural resources of the area; and,

- Improve the overall quality of life for Richmond residents.

Potential themes for the reuse and development of Point Molate were established during a Visioning Workshop held on November 18, 1995 (Appendix A). All of these themes have been incorporated into the conceptual plan. These include:

- Natural and Recreational Uses
- Education and Research
- Conference Center
- Tourism/Visitor Attraction
- Arts and Cultural Uses
- Business Opportunities
- Reuse of Existing Structures

The overall vision, thematic concepts, and specific recommendations of the Plan are consistent with President Clinton's Five Point Plan for achieving successful conversion and reuse of closing military bases, which emphasizes job creation and economic development.

## 2.     Point Molate Setting

The Point Molate site covers approximately 290 acres of land above the mean higher high water line in the Potrero Hills on San Pablo Peninsula on the eastern shore of San Francisco Bay (Figures 1 and 2). Point Molate is located in the northwest portion of the City of Richmond and is about 1.5 miles north of the Richmond-San Rafael Bridge. The site is approximately three miles from the intermodal Richmond BART and Amtrak Station in downtown Richmond. Western Drive provides the only road access to Point Molate. It is directly accessible to westbound traffic on I-580 but only indirectly accessible to eastbound traffic. The City of Richmond has a 40-foot easement along the road to the site.

Point Molate is surrounded on the north, east and south by Chevron. Chevron's property to the north and south is used to store and transport petroleum products. To the east, on the other side of Potrero Ridge, is part of Chevron's oil refinery, where the more active and intensive industrial uses



Figure 1:

Regional Location

 Point Molate Reuse Site

POINT MOLATE REUSE PLAN
City of Richmond



Figure 2:
Aerial Photograph of Point Molate

and manufacturing occur. Further east are the industrial and residential areas of the City of Richmond, the City of San Pablo, and a small section of unincorporated county land; and to the southeast lies the neighborhood of Point Richmond. The land uses immediately adjacent to the site also include a private rifle and pistol range for use by Chevron employees to the north and the Dutra Materials quarry to the south.

Point Molate's topography ranges from sea level on the western shoreline to nearly 500 feet in elevation on the eastern ridge crest. Slopes range from moderate (0 to 10 percent) to steep (greater than 50 percent). Of the 290 terrestrial acres, approximately 90 acres, or 32 percent of the site, are developable and generally below a 15 percent slope. Because of Point Molate's hillside character, it is highly visible from the Richmond-San Rafael Bridge and eastern Marin County. Point Molate provides panoramic views of the northern portion of the San Francisco Bay.

Another distinctive feature of Point Molate is the 1,450-foot pier that extends into the bay from the central point of the site.

The U.S. Navy (Navy) has used the site and its buildings as a fuel depot since World War II. Although none of the buildings has been leased by the Navy, Shoreline Park, located at the southern end of the site, has been leased to the City of Richmond for the past 20 years and is currently on a month-to-month lease arrangement with the Navy.

The Navy leases a 10.4-acre parcel adjacent to the northeast corner of the site from Chevron. Chevron will retain ownership of the parcel. The City has no plans to lease it.

3.    **History of the Site**

The history of the site can be divided into five periods: Native American occupation; Chinese occupation; Mexican occupation; Winery operations; and Naval operations.

a.    Native American Occupation.  Between approximately 2,000 BC and 500 AD, the Costanoans (People of the Coast), also known as Ohlones, inhabited the Point Molate area. The settlement of the Spanish and founding of the missions led to rapid, devastating reductions of the local Native American populations due to difficult lifestyle changes and the introduction of European diseases such as smallpox, influenza, mumps, and syphilis. Point Molate was eventually claimed by Mission San Francisco de Assis.

b.    <u>Chinese Occupation</u>. A Chinese Shrimp Camp was established at Point Molate between 1860 and 1880. As early as 1871, the area had one of its first industries. Chinese fishermen used bag nets to harvest shrimp from the bay. The Camp was located at the south end of the site along the shoreline, extending east of current-day Western Drive. By the turn of the century, the camp housed between 40 and 100 people in four groupings, all of whom worked for the Union Shrimp Company of San Francisco. At least five wharves, 110 shrimp boats, and 25 buildings were present at this camp, which was prominent enough to be mapped by the U.S. Coast and Geodetic Survey in 1898 and the U.S. Geologic Survey in 1915. This camp existed until approximately 1912 when the California Department of Fish and Game enacted laws (between 1901 and 1911) that restricted large-scale shrimping in the bay. The laws eventually prohibited the use of Chinese shrimp nets, the exportation of dried shrimp, and enacted a closed season for shrimping, thus closing the camp.

c.    <u>Mexican Occupation</u>. The Point Molate property was made part of a Mexican land grant known as Rancho San Pablo and was deeded to the Castro family. A patent was issued in 1873 by the U.S. government recognizing title to the land, and in 1893, the land was divided into 200 parcels. Lots 49 and 50 were held by Richard O'Neil and A. Maraschi. In the early 1800s, land at Point Molate was used by the padres of Mission Dolores. Some years later it became a Spanish Rancho.

d.    <u>Winery Operations</u>. The California Wine Association (CALWA) operated the largest winery in the state at the site from 1907 to 1919 when Prohibition forced it to close. The total capacity of the plant was 11 million gallons. Grapes were brought in from all over Northern California by rail, crushed and stored on site, and distributed by ship. The complex of buildings included several wine cellars and warehouses, cottages for the winery workers and their families, a hotel, a school, a post office, and a steam generating plant. The Winehaven Hotel, which had 29 rooms, accommodated tourists. In 1937, CALWA dissolved and began selling off its holdings. The property was sold to Santa Cruz Oil and later purchased by the Navy. The "Village of Point Molate" was placed on the National Register of Historic Places in October, 1978 (#78000658). The current Historic District encompasses approximately 71 acres of the site and includes 35 historical buildings.

e.    <u>Naval Operations</u>. The Navy acquired Point Molate in 1942 and began using it as a fuel depot during World War II. The San Pablo Peninsula had long been used for fuel storage by private parties. The Navy extended that use to the open lands vacated by the Winery, as well as to lands further south that had not been part of the Winehaven parcel.

By 1944, the Navy had installed 43 underground and 32 aboveground storage tanks at the site. The Navy also built a new pier on the shoreline and equipped the area with drum storage areas and rail lines, and 17 miles of pipelines. The petroleum storage tanks had a total capacity of 1.1 million barrels (PRC Environmental Management, Inc., 1996). Between 1949 and 1960, the Navy demolished several buildings associated with the site from its Winehaven days, including two large-frame industrial buildings, the school house and the Winehaven Hotel. The Navy also made changes to some of the remaining Winehaven buildings, primarily to create office space and to modify the exterior of the residential buildings.

4.    **Buildings**

There are 65 standing buildings at Point Molate, at least 47 of which are within the existing Historic District (Table 1). Of these, 35 are listed on the National Register of Historic Places, and are considered to be buildings that contribute to the Historic District. The architecture of the Historic District is both unique and distinctive of the turn-of-the-century period in which the buildings were constructed (See Chapter I, Section B.2 for a detailed description of the buildings of the Historic District). Buildings constructed during the period of Naval ownership include industrial and warehouse buildings related to use of the site as a refueling station.

Today, the Navy has only a few grounds maintenance and security personnel located at Point Molate, based in Building 123. No other buildings are occupied or in operation.

5.    **Reuse Planning Process**

With the anticipated closure of Point Molate, the City of Richmond established the City Council as the Local Reuse Authority (LRA) in September, 1995. The LRA is recognized by the DOD as the official governmental agency responsible for the reuse planning and disposition strategy for the Point Molate site.

In accordance with processes suggested by the DOD, as well as its own policies, the LRA established a 45-member Blue Ribbon Advisory Committee (BRAC) on October 16, 1995, to help prepare a draft Plan. The BRAC is comprised of representatives of a wide variety of interest groups from the local community. Its composition is intentionally broad to allow discussion, compromise, and balance between the social objectives of Richmond's diverse population and economic interests. The BRAC is composed of four subcommittees: 1) Environment; 2) Development Standards; 3) Cultural,

## Table 1
## EXISTING BUILDINGS AT POINT MOLATE

| Building Description | Current NRHP* | Structural Condition | Size (SF) |
|---|---|---|---|
| Building 1 (Winehaven) General Warehouse, Wine Cellar | Yes | Fair to poor. Unreinforced brick, steel beam frame, and unreinforced parapets. | 198,865 |
| Building 6 Administration and Warehouse, Wine Cellar | Yes | Good to fair - except ceiling of lower warehouse partially collapsed from water damage. | 116,196 |
| Building 10 Lab, Sampling Equipment and Flammable Storage, Loading Dock, Refrigeration Bldg. | Yes | Fair to poor with the brick portion in better condition. | 18,864 |
| Building 13 Steam Generating Plant | Yes | Fair - building contains concrete rubble and debris. | 5,067 |
| Structure 14A Fuel Dispensing Station | No | Good. | NA |
| Building 17 Maintenance Storage | Yes | Fair. | 2,016 |
| Building 18 Storage Shed | No | Poor, roof has partially collapsed. | 4,800 |
| Building 21 Fuel Laboratory | No | Good. | 903 |
| Building 24 Storage Shed | No | Poor. | 645 |
| Building 63 Fire Station | Yes | Good. | 4,236 |
| Building 68 Pump House #2 | No | Good, but some cracks on walls and interior paint heavily peeling. | 4,555 |
| Building 69 Pump House #1 | No | Good, but interior paint is heavily peeling. | 4,637 |
| Building 70 Gagers' Gear Locker | No | Fair. | 169 |
| Pump House #6 | No | Poor. | 100 |
| Building 73 Water Pump House | No | Fair. | 1,000 |
| Building 76 Waterfront Operations | No | Fair. | 1,153 |
| Building 77 Oil Spill Storage | No | Poor. | 1,963 |
| Building 82 Pump House #3 | No | Good, but interior paint is heavily peeling. | 2,346 |
| Building 83 Pump House #4 | No | Good, but interior paint is heavily peeling. | 1,598 |
| Building 85 Paint Shop | No | Good. | 1,836 |
| Building 86 Pump House #5 | No | Good. | 561 |

Table 1 *continued*

| Building Description | Current NRHP* | Structural Condition | Size (SF) |
|---|---|---|---|
| Building 87 DVECC Laboratory | No | Good to fair. | 8,900 |
| Building 88 Vehicle Wash | No | Fair. Floor drain plug is still intact. | 8980 |
| Building 89 Drum Filling Shed | No | Good. | 7,643 |
| Building 93 Range House | No | Poor. Building is overgrown with vegetation. | 388 |
| Building 94 Truck Oil Loading Facility | No | Good. | NA |
| Building 95 Shed | No | Poor to fair. | NA |
| Building 115 Transmitter Building | No | Fair. | 48 |
| Building 118 Storage Shed | No | Poor. | 366 |
| Building 123 Shop | No | Good. | 6,000 |
| Building 132 | No | Unknown. | Unknown |
| Housing: Bldgs 31-60 | Yes | Good to fair. | 820 to 2,097 |
| Housing: Building 111 Garage | No | Fair. | Unknown |
| Garages: 55, 65, 67, 80, 81 | Yes | Fair | Unknown |

* NRHP: Contributing Historical Building on the National Register of Historic Places.

Source: PRC Environmental Management, Inc., 1996, and JRP Historical Consulting Services, 1996.

Education, Recreation and Open Space; and 4) Marketing and Economic Development. These subcommittees began meeting on a regular basis in 1995 to develop a policy framework for the Plan.

On January 30, 1996, the Navy published a notice in the Federal Register listing Point Molate as surplus property. In accordance with the Redevelopment Act, the City of Richmond LRA then published its Notice of Interest to solicit reuse proposals from state and local agencies, including representatives of homeless organizations. The solicitation period extended from February 16, 1996, to May 16, 1996. From the close of the solicitation period, the LRA has 270 days to complete its reuse plan.

The City provided the public opportunities to participate in the Point Molate reuse planning process. Workshops were advertised, and planning materials were made available for public review in the City Manager's Office. As part of the City's process for notifying state and local agencies and homeless providers about the availability of the site, the City also conducted scheduled tours of the facility. To generate private development interest in the site, the BRAC and LRA hosted an Open Site Day on October 9, 1996. Invitations were mailed to potentially interested parties, and the event was advertised in local newspapers. A panel of real estate developers and land use planning experts presented their views regarding reuse and development of the site.

In late October, 1996, the LRA contracted with a consulting firm to assist in the preparation of the Plan. The BRAC completed its draft Land Use Concept Paper for Point Molate in early November, 1996. With the assistance of the private firm, the BRAC arrived at a preferred conceptual land use alternative during a workshop held on November 18, 1996. This alternative was used as the foundation for the draft Plan.

During that workshop, the BRAC established the preferred alternative as a mixed-use historical village centered around a winery, with a retreat center, educational and job training facilities, housing, and light industrial use. The criteria selected by the BRAC in evaluating the alternatives included the following:

- Preservation of Open Space and Visual Quality
- Long Term Economic Viability
- Promotion of Public Access and Use
- Ability to Attract Regional Interest
- Compatibility with Other Proposed Uses
- Promotion of Historic Legacy or Use
- New Jobs Creation
- Minimal Environmental Impacts, Especially Biological
- City Revenue Generation
- Encourages a Mix of Uses

This Plan must be finalized and submitted to DOD and HUD on March 28, 1997. The Plan will be used as the basis for the Navy's preparation of an Environmental Impact Statement/Report (EIS/EIR) to assess disposal impacts. The EIS/EIR is slated for completion by June 28, 1998. The Navy will then make a Record of Decision (ROD), as to how and when property at Point Molate will be conveyed.

Concurrent with the finalization of the Plan, a Cooperative Agreement between the Navy and City of Richmond, which will outline the City's

responsibilities until property at Point Molate is transferred, will be negotiated.

## 6. Goals and Objectives

The major goals and objectives developed by the BRAC subcommittees to guide this Plan can be grouped into four categories: economic development, public benefit, development compatibility, and environmental compatibility. These are listed below:

### Economic Development

- Seek to attract growth business firms.

- Encourage resident entrepreneurs and small businesses.

- Maintain and increase the number of new and permanent private sector jobs.

- Increase investment.

- Encourage intensified economic activity.

- Attract new business and commercial activities.

### Public Benefit

- Promote Richmond as a destination point for non-residents by building on shoreline, waterfront, scenic, historical and cultural resources.

- Attract regional interest.

- Develop local and regional strategies.

### Development Compatibility

- Provide and maintain public infrastructure facilities.

- Provide adequate transition between residential, industrial and commercial areas.

- Ensure that industrial use is fully compatible with Historic District and residential areas.

- Encourage variety in the character of development.

- Improve the aesthetic, cultural, and recreational value of individual sites.

- Enhance sites or areas of natural or cultural history.

- Encourage residential, commercial, industrial and mixed use developments.

- Improve the appearance of entrances to communities.

- Promote highest and best use of the existing housing and facilities.

**Environmental Compatibility**

- Minimize impacts of future development on natural environment.

- Limit new development to areas previously developed.

- Preserve hillsides from further development.

- Ensure adequate and safe clean-up of contaminated land and groundwater.

- Protect natural resources with emphasis on wetland, riparian habitat and critical habitat areas.

- Identify rare, threatened and endangered species and ensure protection of them and their habitat.

- Preserve visual access to the bay and other features.

- Provide a variety of open space for outdoor recreation.

- Control exotic vegetation and restore native plants.

- Minimize the risk to people, property and the environment due to fire hazards, slide areas, and flooding.

- Ensure that the production, use, storage, disposal and transport of hazardous materials within the Point Molate area is minimized and adequately regulated.

## 7.   Market Demand

After the BRAC subcommittees developed their goals and objectives and held workshops to generate ideas for reuse at Point Molate, the City asked a private consulting firm to investigate the marketability of three of those ideas and to comment on the others. The results of this analysis are reported in Chapter III.A. and summarized below. The preliminary market analysis was used to help establish the reuse program for Point Molate, but because today's market will change over time as the Plan is implemented, the recommendations of the Plan do not strictly adhere to the market study conclusions. The land use program for Point Molate was intentionally designed with flexibility to respond to changing market demand.

After the program was fairly well established, it became clear that there was a strong interest in reviving the historical use of the winery. The firm was then

asked to conduct a focused marketing study of this particular use. This is also
reported in Chapter III (in Section B) and summarized below.

a.    Preliminary Market Assessment of Considered Uses. Developers,
brokers, and other individuals interviewed as part of this study agreed that
Point Molate's natural setting and scenic attributes are the most important
aspects of the site. The two uses with the strongest and most immediate
market potential were identified as a small meeting center and residential
development. It was envisioned that the existing Winehaven building could be
used as a meeting center, and the existing cottages could provide overnight
accommodations for those attending the meetings. A retreat facility could
take advantage of the potential recreation opportunities and the remoteness of
the site. It would be best directed at the non-profit and public sectors. The
undeveloped portions of Point Molate were determined to be most suitable
for residential development. It was suggested that residential development be
phased, allowing multi-family development in the flat areas near the water at
approximately 16 units per acre, followed by lower density, single family
housing in the hillside areas. The importance of developing attractive housing
in the first phase to set a standard for subsequent development was stressed.
The promotion of "green housing" in support of the site's open space image
and by integrating residential use with the overall theme of environmentally
sensitive uses was also suggested.

There was less enthusiasm for incubator businesses, offices, light industrial
uses, and live/work space, all ideas that were considered by BRAC as
appropriate uses for Point Molate. The greatest concerns regarding these
options included the uncertain availability of start-up funds, the unknown costs
of upgrading the buildings and infrastructure, the remoteness of the site, and
limited road access. It was pointed out that there are alternative sites in
Contra Costa County with superior access and infrastructure for commercial
and industrial uses. However, it was recognized that there is potential for a
special user more amenable to limited building upgrades and campus-like
layout, who is less dependent on accessibility. Point Molate's secluded
location and separation from a dense urban area were perceived as the
greatest constraints to live/work usage. However, there are examples of
remote areas that are popular as live/work or as artist facilities including the
Vulcan Foundry in industrial Oakland, an artist colony in the City of Benicia
and Fort Cronkhite in the Marin Headlands, none of which are located near
mass transit or business districts.

b.    <u>Focused Marketing Assessment of a Winery</u>.  The marketing analysis of
a winery was much more positive.  In general, small wineries are a strong
market segment in the Northern California wine industry, which is still a
relatively young industry.  A majority of the small wineries do not have
vineyards, primarily because of the high capital cost associated with land
ownership, but there is a growing interest in developing vineyards because of
recent shortages in grape supplies.  Tasting rooms and other direct marketing
techniques significantly contribute to the sales of wine.  The incorporation of
food into the marketing of wine, including associated restaurants, is a recent
upward trend.  No lodging has been built directly in association with a winery,
but overnight accommodations are fully complementary.  It is believed that
the synergy of a winery, restaurant, retreat center, and on-site recreational
amenities would be highly successful.

The Winehaven building, which is almost 200,000 square feet in size, is more
than adequate to provide for the full spectrum of winery operations including
crushing, fermentation, racking, aging, bottling, distribution, wine tasting and
retail.  Wineries range in size from approximately 20,000 square feet to
100,000 square feet or more.  A fully operational winery would require large
amounts of water and sewer infrastructure, particularly for the crushing and
pressing processes.

Wine industry employment includes a small number of highly trained and
educated workers and only a moderate number of low skilled workers who are
typically trained on the job.  The City could consider requiring the operator to
hire local residents and to provide a job training program.


### B.  Reuse Plan Components

This section of the Plan describes the types and intensities of land uses
proposed for various locations throughout the site.  Eventually, this
information will be used to amend the City of Richmond General Plan and to
serve as a basis for developing zoning regulations at Point Molate.

The Plan concepts described in this chapter respond to: (1) the goals and
objectives developed by the BRAC for Point Molate, and the findings of the
four BRAC sub-committees; (2) the opportunities and constraints of the
existing site resources, agency regulations and plans, legal encumbrances, and
other conditions (Figures 3 and 4); and (3) a preliminary assessment of
demand for potential land uses in today's market.





**POINT MOLATE REUSE PLAN**
City of Richmond

■ ■ ■

Figure 3:
Opportunities

| | |
|---|---|
| 🏢 | Buildings with Reuse Potential |
| | Areas with 15% Slope or Less for New Development |
| | Potential Shoreline Access (BCDC) |
| | Potential Water Access and Docking |
| | Potential Park/Trail Staging Area |
| ✳ | Potential Gateway |
| ••••• | Potential Trail |
| | Eucalyptus Grove |
| | Beach |
| → | Road Access |
| ↰ | Views |
| ⊙ | Underground Fuel Tanks |

Scale: 1" = 600'
0   300   600   1200



# POINT MOLATE REUSE PLAN
## City of Richmond



**Figure 6:**
**Constraints**

- ☐ Questionable Building Reuse Potential
- ▪ 15% Slope or More
- ■ High Sensitivity to Seismic Activity
- ▨ Current Historic District
- ▥ Shoreline (BCDC)
- ▨ Ridge Area
- ▨ Known Hazardous Waste: IR Sites and Category 5 and 6 Property Classification Parcels
- ✳ Archaeological Site
- ⚲ Deteriorated Roadways
- Sensitive Vegetation
- –·– Railroad Easement

Western Drive Needs Resurfacing and Shoulder

Buildings 6 and 17 (need extensive improvements)

Sewage Treatment Plant May Not Be Operable

Building 130 (unknown condition)

Point Molate Beach Park: A Survey Would Be Required for any Ground Disturbing Activity Within the Area of the Chinese Shrimp Camp

Proposed Railroad Use of Existing Tracks Would Impede Public Access to Water and Bay Trail Plans

BCDC Maintains a 100' Jurisdiction Corridor Inland Form High Tide; Must Maintain Public Access to Shore, Development is Limited

Pier Needs Seismic Upgrading; Improvements to Surface and Removal of Fuel Facilities

Building Needs Extensive Improvements

Scale: 1" = 600'

0    300    600    1200

It is assumed that the Navy will undertake a full environmental clean-up of
the site based on the priorities established as part of this Plan, and that use is
not constrained by either known or unknown contamination. It is less certain
how long it will take to complete the environmental clean-up program;
however, it is assumed that clean-up will be accomplished within another five
years.

The Plan takes into consideration the various regulatory and jurisdictional
agencies that guide land use at Point Molate. Uses proposed in the off-shore
areas, which are subject to tidal action and a State public trust easement
administered by the City, are consistent with those specified in the Tidelands
Public Trust Doctrine. Because the land at Point Molate is public, the entire
site falls within BCDC jurisdiction, which designates it as "Waterfront Park,
Beach." To accommodate all the uses in the proposed Plan, the BCDC San
Francisco Bay Plan will need to be amended. The Plan's proposed uses
correspond with provisions of the Bay Trail Plan developed by the Association
of Bay Area Governments (ABAG), and East Bay Regional Park District's
Master Plan. In addition, the Plan responds to pertinent City of Richmond
General Plan policies regarding shoreline, ridgeline, open space, visual
resource, historic preservation, access and existing and proposed zoning
regulations. Upon approval of the Plan, the General Plan will be amended to
reflect residential and other proposed uses instead of the current designation
as Community and Recreational and Marine Industrial.

To some extent, there is incompatibility between Chevron and existing
neighboring residential and commercial land uses, as well as those uses
proposed for Point Molate. Although prevailing winds are to the east, in the
event of an industrial accident, such as an explosion, during an infrequent
period when the wind blows in the opposite direction, residents, employees
and visitors at Point Molate could potentially be exposed to toxic fumes or
firespread. The 500-foot Potrero Ridge, which separates Point Molate from
the refinery, would help mitigate if not prevent these effects. With only one
road connection to I-580, evacuation could be hampered or made impossible,
although potential refuge to the north could be sought.

Chevron is concerned that any development, but particularly residential, will
lead to new residents demanding the curtailment of their operations or forcing
the implementation of performance standards that may inhibit Chevron's
ability to operate and/or expand into areas visible from Point Molate. It
should be recognized that residential use at Point Molate, Point Richmond
and elsewhere has co-existed since the beginning of the 1900s. The hillside

open space designated in the Plan will act as a buffer between proposed Point Molate development and Chevron's nearby refinery and storage tanks.

## 1.    Thematic Concepts

The land use plan is founded on a number of concepts that reflect the goals and objectives developed by BRAC (as described in Chapter I) and site opportunities and constraints (Figures 3 and 4). These are described as follows:

a.    Preservation of Historic Resources. Buildings listed in the National Register of Historic Places (NRHP) that can be economically upgraded and maintained to meet current building code and seismic requirements, and renovated to serve new uses without adversely affecting the historical integrity of the architecture, will be preserved. Buildings that are seismically and structurally unsound, and cannot be economically upgraded, will not be reused. It may be desirable to demolish one or more of these buildings to make room for new development.

Point Molate's historical period as a winery is preserved in its architectural character. The architecture of the main, three-story Winehaven building is unique to the Bay Area, if not to the country at large, for it resembles a Rhineland castle with its red brick crenelated parapet and corner turrets (Figure 5). Several additional concrete buildings also have crenelated parapets. The wood frame houses represent the turn-of-the-century period architectural style, with simple gable roofs, enclosed porches, brick chimneys, and wood floors. An area of approximately 71 acres, which includes these buildings, was listed in the National Register of Historic Places in 1978.

This historical period, represented by the remaining 35 buildings (Table 1), is the inspiration and theme for reuse at Point Molate. The two primary warehouse buildings are most suited for winery usage because their unique building construction ensures constant internal temperature and humidity, which minimizes operational costs. The reuse vision for Winehaven includes a single winery, or a consortium of winery interests that will use the facility to promote their own products (see Chapter II, Section B). The reuse vision emphasizes public visitation to the Winehaven building, support facilities, and to the site itself. The intent is to capture that portion of the tourism market directed at visitors who have time only to visit places of interest within the immediate Bay Area. In this way, the City will generate regional interest in the little known historical site and increase public access.



Figure 5:
Photograph of Winehaven Close-up



POINT MOLATE REUSE PLAN
City of Richmond



In addition to the winery era, other historical periods will be interpreted and reflected in reuse facilities and programs, but to a lesser extent. These include the early occupation of the site by Native Americans and Chinese shrimpers, and the post-winery Naval operation as a fuel depot.

b.    Mixed Use Village. The winery will be supported and supplemented by a mix of other uses, not unlike the original rural village. The historical buildings (and the one contemporary building - Building 123 - that is in good condition) will be shared by a combination of winery, commercial entertainment, cultural, educational, and overnight uses. Recreational, residential, and special light industrial uses will be accommodated elsewhere on the site as new development. Residential use will be sited and designed to reinforce the village concept and complement public use of the site without creating a perception that Point Molate is privately owned. To reinforce the village concept and the existing architectural style and scale of development, new buildings will retain a small-scale, reinforcing the sense of a town with buildings sited along a main street, and in campus-like clusters determined by site topography and related use. New construction will be compatible with the existing architectural vernacular, and will "borrow" similar architectural features and materials.

c.    Preservation of Open Space and Visual Resources. To provide local and regional recreational opportunities, attract visitors from around the Bay Area as well as from Richmond, protect the scenic quality of the site, and promote Point Molate as a western gateway to the City of Richmond, more than two-thirds of the site will be preserved as open space and parkland in the highly visible hillsides and along the 1.4-mile shoreline. Development will be limited to the low-lying, relatively level portions of the site. Most facilities and use areas will be oriented to the waterfront and views of the bay.

d.    Promotion of Public Access and Use. A network of recreational trails will provide access to the undeveloped hillsides and will be linked to the Bay Trail and promenade along the shoreline. The 1,450-foot pier will be renovated to provide access by private boat and public ferry. Commercial recreation facilities will be allowed on and around the pier. A waterfront park with both interpretive and traditional facilities will be located at the base of the pier. Other outdoor visitor attractions may include a public plaza, amphitheater, and a publicly-oriented agricultural enterprise. Indoor attractions will include the winery and associated functions, a museum, a performing arts center, a restaurant and bar, retail, and retreat facilities.

e.    Attraction of Regional Interest.  Early reuse of the site will focus on increasing public access to the site.  This will establish regional visibility and help attract business interests from around the region which can provide more long-term financial support and jobs.

f.    Accommodation of Interim Use.  The Plan takes into consideration near-term uses that will not preclude long-term use, and uses that will require minimal upgrading of buildings and infrastructure and may occur before full environmental clean-up is accomplished.  Use of at least some of the existing buildings will likely occur before any new development if funding can be obtained to make them safe for occupation.  Such uses should be attractive and enhance the marketability of the property for preferred long-term uses.

g.    Long-Term Economic Viability.  The Plan attempts to balance low-cost, non-profit or low-revenue generating uses with those uses that can finance site-wide infrastructure improvements through sales and leasing.  The timing of these two types of uses will be critical to the financial success of the project.  It may be necessary to provide for some new development before all the existing buildings can be fully utilized in order to finance necessary infrastructure improvements.

h.    Job Training.  Closure of NFD Point Molate did not create a significant loss in jobs.  However, the City of Richmond does have a relatively high unemployment rate for the Bay Area.  Therefore, one of the City's primary goals for the site is to provide for vocational training by encouraging businesses and educational institutions that will provide job training.  In this way, the City hopes to help the unemployed.

i.    Market Flexibility.  While some of the uses, such as the winery, are quite specific, others are more generalized so that the Plan can respond to changing market conditions over the next 20 years.  The Plan also specifies alternative land use options in certain areas for even greater flexibility.  Because redevelopment costs are largely unknown at this point in time, flexibility is especially important to ensure financial feasibility.

j.    Homeless Assistance.  Relative to other bases around the Bay Area which have been or soon will be closed, Point Molate's supply of buildings for reuse is quite small.  This is also the case for housing units, which will require the least amount of upgrading.  Consequently, the demand for the existing cottages for a variety of purposes is competitive.  Allocation of the housing units to the homeless is considered a low priority because Richmond already provides a relatively large share of this kind of assistance and because of the distance of Point Molate from the community services upon which the

homeless depend. Further, new residential use will not be at the lower end of the market because of the high value waterfront location and the need to offset the high cost of infrastructure improvements site-wide. However, proposed residential development will fulfill a moderate to high end segment of the City's housing needs.

In summary, the Historic District is the central focus of Point Molate, providing the themes for reuse and the appearance of new development. It is in the village core of the Historic District and immediate surrounding area where use will be the most diverse, intensive, and public oriented. The historical village core will be supported by the Shoreline Park and hillside open space which will visually dominate the site. New development will be nestled amid the hills.

## 2. Land Use Overview

Following is an overview of the Plan and how the goals and objectives established for Point Molate will be physically implemented.

For the purposes of the Plan, the site was divided into five distinct land use areas. These are shown in Figure 6 and include: the Core Historic District; the Northern Development Area; the Central Development Area; the Southern Development Area; and the Shoreline Park and Hillside Open Space Areas. It should be noted that part of the recently approved Historic District actually extends into the middle of the Northern Development Area. The conceptual land use plan is illustrated in Figures 7 through 9, and summarized in Table 2.

All but a few of the buildings at Point Molate are located within the Historic District. As shown in Table 2, 33 buildings in the proposed Core Historic District will be reused along with a small number of additional buildings in the Northern Development Area. In addition, several buildings along the shoreline may be reused including the sewer treatment plant that may be reactivated, buildings at the end of the pier that may be used in conjunction with park or commercial recreation use, and a quonset hut that may be used temporarily until the Southern Development Area is developed for either residential use or light industry. Historical Buildings 6 and 17 need further evaluation to determine whether or not they should be demolished. Remaining buildings and other structures on the site are proposed for demolition.



HILLSIDE OPEN SPACE

HISTORIC DISTRICT

SOUTHERN DEVELOPMENT AREA

NORTHERN DEVELOPMENT AREA

SHORELINE OPEN SPACE

CENTRAL DEVELOPMENT AREA

REGIONAL PARK

Scale: 1" = 600'

0    300    600    1200



POINT MOLATE REUSE PLAN
City of Richmond

■  ■  ■

Figure 6:
Land Use Areas

BRADY AND ASSOCIATES



EDUCATION AND JOB TRAINING
Satellite Campus
Administration
Laboratories
Conference Center
Small Hotel

Water Tank

OFFICES (cottage 32)

Steam Generating Plant

Building 17

INCUBATOR BUSINESS (cottage 31)

Fire Station

HILLSIDE OPEN SPACE
WITH TRAILS

PROPOSED
HISTORIC DISTRICT (cottages 33-60)
Retreat Center
Bed and Breakfast
Recreation Amenities

JOB TRAINING

SINGLE FAMILY RESIDENTIAL
12 Units/Acre
(Alternative Use:
Special Use Light Industrial
or Research and Development)²

Emergency Heliport

Refrigeration Building

INTERIM USE

WINEHAVEN BUILDING
Winery
Museum
Retail
Restaurant
Meeting Rooms
Performing Arts
Recording Studio

PUBLIC PLAZA

MULTI-FAMILY RESIDENTIAL
20 Units/Acre

Sewage Treatment Plant

ENTRANCE AREA

BAY TRAIL

BUILDING 6
Winery Operations
Live/Work Space
Special Industry and
Warehousing
(Alternative Use for Site:
Special Use Light
Industrial or
Single Family Residential
9 Units/Acre)¹

FORMAL PROMENADE

MULTI-FAMILY RESIDENTIAL
20 Units/Acre

COMMERCIAL RECREATION
Waterfront Cafe
Rental Watercraft
Boating Center
Seafood and Produce Market
Public Market

SHORELINE PARK

PIER
Marine Supply Shop
Food Concession
Seasonal Vendors

Scale: 1" = 600'
0    300    600    1200

POINT MOLATE REUSE PLAN
City of Richmond

■ ■ ■

Figure 7:
Conceptual Land Use Plan



Buildings to be Reused

Proposed Parking

Recommended Land Use

Use of Area is Contingent on
Building 6 Demolition

Revised Historic District

Roads to be Reused

Proposed Trail

Existing Underground Fuel Tank

1. Alternative use assumes demolition of building 6.

2. Special use light industry is recommended over single
family residential if building 6 is demolished and light
industry is not accommodated around the building.



A. Open Space alternative in Northern Development Area.



B. Residential alternative in Northern Development Area.

Figure 8:
Bird's eye view looking southeast



POINT MOLATE REUSE PLAN
City of Richmond



A. Residential alternative in Southern Development Area.



B. Light Industry alternative in Southern Development Area.

## Table 2
## LAND USE SPATIAL ALLOCATIONS

| Area/Building | Proposed Uses | Potential Users/Developers | Acreage/SF | Density | # Units | Estimated Parking |
|---|---|---|---|---|---|---|
| **Historic District** | | | **17 AC** | | | |
| Winehaven Building (1) | Winery<br>Museum<br>Retail<br>Restaurant<br>Meeting Rooms<br>Performing Arts<br>Recording Studio | Private Industry<br>Non-Profit Organizations<br>Private Industry<br>Non-Profit Organization/Private Industry<br>Non-Profit Organization/Private Industry<br>Non-Profit Organization/Private Industry<br>Private Industry | 198,885 SF | | | 250 |
| Cottage 31 | Micropopogation | Orchidnet or similar Non-profit Organization | 996 SF | | | 7 |
| Cottage 32 | Office | Non-Profit Organization/Private Industry | 996 SF | | | 5 |
| Cottages 33-59 | Retreat Accommodations<br>Bed and Breakfast<br>Classrooms<br>Labs<br>Administration | City of Richmond<br>Contra Costa College/West CCUSD | 25,220 SF | | | 45 |
| Winemaster's Cottage (60) | Retreat Center<br>Job Training | City of Richmond<br>Contra Costa College/West CCUSD | 2,097 SF | | | 5 |
| Fire Station | Fire Station | City of Richmond | 4,236 SF | | | 5 |
| Steam Generating Plant (13) | Used Clothing<br>Warehousing | Non-Profit Organization/Private Industry | 5,067 SF | | | 5 |
| Refrigeration Building (10) | Micropropogation | Non-Profit Organization/Private Industry | 18,864 SF | | | 5 |
| **Northern Development Area** | | | **20 AC** | | | |
| Administration Building (123) | Job Training | Non-Profit Organization/Private Industry | 6,000 SF | | | 15 |
| Building 6* | Winery<br>Live/Work<br>Special Industry | Non-Profit Organization/Private Industry<br>Non-Profit Organization/Private Industry<br>Non-Profit Organization/Private Industry | 116,196 SF | | | 150 |
| Building 17* | Warehousing | Non-Profit Organization/Private Industry | 2,016 SF | | | |
| Miscellaneous Buildings | Job Training<br>Light Industrial/Single Family | Non-Profit Organization/Private Industry<br>Non-Profit Organization/Private Industry | 9,064 SF<br>14 AC | 9 | 126 | 50<br>NA |

Table 2 *continued*

| Area/Building | Proposed Uses | Potential Users/Developers | Acreage/SF | Density | # Units | Estimated Parking |
|---|---|---|---|---|---|---|
| **Central Development Area** | | | 6 AC | | | |
| | Multi-Family Residential | Private Industry | 6 AC | 20 | 120 | |
| **Southern Development Area** | | | 35 AC | | | |
| | Single Family Residential/Light Industrial | Private Industry | 27 AC | 12 | 324 | |
| | Multi-Family Residential | Private Industry | 5 AC | 20 | 100 | |
| | Entrance Area | Private Industry | 3 AC | | | |
| **Open Space/Park** | | | 191 AC | | | |
| Hillside Open Space | Recreation | City of Richmond/EBRPD | 156 AC | | | |
| Shoreline Open Space | Recreation | City of Richmond/EBRPD | 14.4 AC | | | |
| Shoreline Park | Recreation | City of Richmond/EBRPD | 20.9 AC | | | 200 |
| **Total** | | | 275 AC | | 670 | 742 |

ª May be demolished pending further investigation.

A maximum total of 61 acres are designated for new development (assuming Building 6 is demolished). The preferred development scenario favors special use light industry in the Building 6 area (rather than residential), and residential in the Central and Southern Development Areas. In this scenario, a total of 544 housing units could be developed at the densities proposed, as opposed to a total of 670 if all new development was residential.

Whether or not residential development ultimately occurs is dependent upon: the policy decision of the City of Richmond to proceed with residential development on any of the suggested sites; the ability to provide sufficient infrastructure capacity to service any or all of the suggested residential units, and; the market for residential development at a price sufficient to address infrastructure and construction costs. If the EIS/EIR determines that housing is inappropriate for health and/or safety reasons, light industry will serve as the preferred alternative.

New development can occur in the Northern, Central and Southern Development Areas. The Northern Development Area is comprised of part of the Historic District and additional areas to the west and east. Building construction would be allowed in the Northern Development Area portion of the Historic District but it would require sensitive siting and architectural design that is fully compatible with the existing historic buildings, and approval of the SHPO. The Central Development Area is located on a narrow bench approximately 150 feet above the middle portion of the shoreline. The Southern Development Area consists of two separate areas situated in low-lying terrain at the base of the hillside and generally east of Western Drive. There are no existing buildings in either the Central or Southern Development Areas. The Shoreline Park extends from the south end to the north end of the site, and includes the pier and the area below the Central Development Area. The remaining area, which is dominated by the west-facing slopes of the site, is classified as the Hillside Open Space Area. The boundaries of these areas will be refined over time as the Plan is implemented.

The sections below briefly describe the physical characteristics, proposed allowable uses, and general urban design guidelines applicable to each of the five main areas.

## 3.    Core Historic District

The following section discusses the existing and approved revision to the Historic District configuration; describes the historical buildings and reuse recommendations; and presents design and development guideline considerations for existing and new buildings.

a.    Historic District Boundary.  The current Historic District boundary was
established in 1978.  It follows the northern boundary of the site and is
bounded on the east by a road that runs from the middle of Western Drive to
near the ridge, on the south along the southern end of Building 6, and on the
west along the shoreline.  As currently defined, the Historic District is
approximately 71 acres in size and contains 35 contributing (built between the
years 1907 and 1919) buildings (1, 6, 10, 13, 17, 31 through 60, and 63), all of
which are in "good to fair" condition except buildings 1, 10, 13, and 17, which
are in "fair to poor" condition (PRC Environmental Management, Inc., 1996).
There are 28 non-contributing structures including buildings, fuel tanks, and
sewage treatment ponds (JRP Historical Consulting Services, 1996).  The
Historic District also includes a large portion of eucalyptus woodland.

JRP Historical Consulting Services recommended in their March 1996 report
that the Historic District be reduced in size to about 27 acres.  The intent was
to increase the ratio of contributing to non-contributing elements from 55
percent to 76 percent without eliminating any historically significant buildings,
and to reduce the overall land area (Figure 6).  As of this writing, the State
Historical Preservation Office (SHPO) has agreed with the boundary revision
and has sent the matter forward to the National Park Service, keeper of the
National Register, for approval.

Building 6, originally designed as a wine cellar and later renovated by the
Navy for administrative use, is a two-story concrete structure with a total floor
area of approximately 100,000 square feet (Figure 10).  It has minimal
architectural merit.  Its structural condition was evaluated as "good to fair -
except ceiling of lower warehouse partially collapsed from water damage" by
Naval consultants (PRC Environmental Management, Inc., 1996).  An
independent analysis was performed by W. B. Clausen Structural Engineers
for the City.  In a letter dated June 6, 1996, the company stated that "The
building has suffered major water damages to wooden roofs and floors.  It is
our opinion that costs to repair this building will exceed its value.  This
building should be demolished."

Whether or not this building should in fact be demolished may be dependent
on the interest and financial capabilities of a potential user.  Uses that may
make it economical to save and reuse include wine storage and other
warehousing, and possibly a special use light industry or live/work space.
However, based on the structural analyses performed to date and on a
preliminary market assessment of the need for space in this building,
demolition is recommended over preservation, especially the longer it stands
empty.  Demolition would be advantageous in that it would free additional

land for new development needed to help finance improvements for reuse of
the other historical buildings.

b.    Historic District Buildings and Reuse Potential.  As shown in Figure 7,
the proposed Core Historic District would include 33 existing buildings: the
Winehaven building; a steam generating plant; a refrigeration building, the
Winemaster's house; 28 cottages; and a warehouse that serves as a fire station.
It would also include six residential garages, a tennis court, and a children's
playground, none of which are contributing features.

The historic core is nestled against the hillside just below the eucalyptus
woodland.  The Winemaster's house dominates this residential area from a
high point (Figure 11).  The cottages are arranged in an orderly, compact
fashion on the hilly terrain along Western Drive and two secondary roads
(Figure 12).  They all have lawns.  Most of residences are oriented to the
waterfront and have dramatic views of Mount Tamalpais and the bay.  The
two-and-three bedroom, single-story, wood-frame houses have brown and gray-
colored shingled roofs and an attractive two-color paint scheme:  pale yellow
above and marine gray below.  They have contemporary interior features and
wood floors that have been well-maintained.  However, there are no concrete
foundations, and the brick chimneys are not reinforced.  The buildings would
require structural/seismic improvements for reuse.

The individual cottages total 29,309 square feet.  Because of their small sizes
and overall density, they are less suitable for long-term residential use than for
short-term accommodation.  They are ideal as retreat center overnight
facilities, a bed and breakfast, or similar use that is suited to the solitude and
scenery of Point Molate.  As retreat facilities, they could be used in
conjunction with the Winehaven building or the proposed educational
facilities.  In support of a bed and breakfast business, the existing recreational
amenities should be improved and additional ones, such as a swimming pool
or outdoor jacuzzi could be considered.  Either a retreat center or bed and
breakfast could provide leisure service job training opportunities.

Buildings not needed for overnight use could be used for daytime activities
that do not conflict with retreat or bed and breakfast usage.  For example,
they could be used for children's extended school programs, as artist work
space, or as classrooms as part of a satellite college campus (see the Northern
Development Area).  Any sharing of space would help minimize improvement
and operating expenses and foster collaboration.



Figure10: Photograph of Building 6



Figure 11: Winemaster's House

---

Figures 10 & 11:
Photograph of Building 6
Photograph of Winemaster's House



POINT MOLATE REUSE PLAN
City of Richmond

BRADY AND ASSOCIATES



Figure 12: Photograph of Cottages



Figure 13: Photograph of Winehaven from Pier

Figures 12 & 13:
Photograph of Cottages
Photograph of Winehaven from Pier



POINT MOLATE REUSE PLAN
City of Richmond

BRADY AND ASSOCIATES
PLANNERS AND LANDSCAPE ARCHITECTS

A detailed condition survey is needed to determine needed physical and structural improvements and their costs. Conversion to overnight accommodations is expected to be relatively inexpensive and cost effective if the buildings are rented as units. Concerns about lead paint and possible asbestos contamination need to be further investigated and mitigated.

The flat-roofed, four-story Winehaven building (Figure 13), single-story refrigerator building, and steam generating plant are all unreinforced red brick buildings with crenelated parapets. The lower level of the main structure of the Winehaven building and the single-story addition at the north end are concrete. Other additions are constructed of sheet metal. The east side has a covered, elevated wooden loading dock. The fire station, another historical building is constructed of concrete. Neither the steam generating plant nor the refrigeration building is a functioning building, but both are spacious. The fire station is still operational.

The Winehaven building offers 198,865 square feet of space, but is somewhat limited for reuse by numerous metal and wood supports. There are specialized elevators and interior stairs at both ends of the building. Only the western wall has windows, and these are small. The exterior walls are thick and insulating. The building is unheated.

As discussed previously, the Winehaven building is most suitable as a "winery", the purpose for which it was originally designed, or for any use that requires minimal modification of the building facade and that could take advantage of the internal consistency in temperature and humidity, low levels of natural light, and noise insulation.

Three types of winery options exist for this building: as an independent facility under one ownership or lease, as a satellite facility to a larger winery located outside of the immediate Bay Area, or as a consortium of winery interests who individually lease space in the building. Under any of these scenarios, grapes could be shipped in and crushed on-site, or crushed off-site and the wine simply stored and distributed wholesale from the site. It is anticipated that the lower level of the building would be used for wine storage, while a portion of the upper levels would be used for a wine shop, wine tasting room, restaurant, and bar. This would leave much of the building available for other complementary and compatible uses such as a museum, museum store, other retail businesses, performing arts center, meeting rooms, and similar public oriented uses with entertainment or educational purposes. A small grocery store or cafe should be considered in the Winehaven building or elsewhere in the village center in support of local residents and visitors. All building levels would be suitable as a repository for museum artifacts or as

a governmental archive. If grape crushing operations occur on-site, it is recommended that such use be conducted in Building 6, if it is not demolished. The significance of potential impacts (e.g., noise, odors and infrastructure requirements) of this industrial aspect of the winery would need to be assessed.

Programs associated with the Winehaven building may include guided public tours, elementary and secondary school outreach, demonstrations, lectures, and research.

The refrigeration building and steam generating plant could be used in support of these uses or they may be converted for use by Orchidnet, a non-profit organization that propagates endangered orchids and has requested space at Point Molate. It is recommended that the fire station continue to function in this capacity.

c.   Historic District Design and Development Considerations.  No new building construction should be allowed in the core portion of the Historic District. New buildings in the southern portion of the district should be sited and designed as described in the following section. Non-historical site features such as fences should be removed. Overhead power lines and other above ground utilities should be buried. Consideration should be given to the removal of non-native shrubs and trees in the residential area, except for the historic grove of eucalyptus near the winemaster's house, which were planted there during the presence of the winery.

Parking for the Winehaven building should be located to the north side of the building, across Western Drive between the fire station and steam generation plant, and if necessary, at the front of the building. The area between the parking lot and Building 6 should be developed into a public plaza with brick and concrete paving and formal landscaping, possibly using palm trees transplanted from elsewhere on the site, or native trees such as oak, bay, or walnut. An historical feature or environmental art piece could be placed at the focal point near the waterfront. The plaza, as shown in Figures 7 and 8, could expand in an eastern direction between the two buildings, with views of the steam generation plant and wooded hillside beyond. Formal gardens could be established between the west wall of Winehaven and the waterfront for outdoor dining and special events like weddings.

The renovation of historic buildings will be subject to the review and approval of the SHPO. Highly visible modifications such as large windows are not likely to be approved, whereas skylights are allowable. All historic buildings, especially Winehaven, will require extensive renovation to meet structural,

mechanical, electrical, and Americans with Disabilities Act (ADA) codes, to
create individual tenant spaces and to improve building access, interior
circulation, natural ventilation, and natural lighting. Building 6 is more
adaptable to remodeling than Winehaven, but the latter has much greater
architectural significance. Historic District grounds may require improved
and/or expanded vehicular circulation and parking, and landscaping
(Figure 14). Although the landscape in the Historic District can be renovated
and upgraded, elements of the original site plan, including roads, sidewalks,
plantings, and outbuildings, must not be substantially altered. Also, the
relocation of buildings would not likely be approved.

### 4.    Northern Development Area

This is one of the three general areas of the site designated for new
development. Following is a description of the area, recommended land uses,
and design and development considerations.

a.    <u>Description of Area</u>. The southern portion of the Historic District,
where Building 6 is located is in the heart of the Northern Development Area
(10.5 acres). Other areas designated for new development include an upper
valley to the east (2.5 acres) and the treatment pond area to the west (7 acres,
for a total of 20 acres).

Topographically, the area lies within the same enclave as the core Historic
District located to the north. The area is bounded on the east and south by
hills and eucalyptus woodland, and the bay on the west. Western Drive and
Building 6 divide the area in half. The eastern half is slightly elevated above
the western half, most, if not all of which, is bay mud fill. A substantial
portion of the area is covered with asphalt.

The western area is visually prominent and dominated by the sewage
treatment ponds, which are planned for removal as part of the Navy's
Installation Restoration Program to clean up the site. There are several small
Naval buildings that were used in association with the sanitary sewer and
water systems, and two small fuel tanks. Most of the grounds are disturbed
grassland.

The eastern area is hidden in the upper end of a small valley and surrounded
by trees. An old paint shop and vehicle wash are still standing. About half of
the area is asphalt covered.



Figure 14:
Sketch of Historic District Streetscape



POINT MOLATE REUSE PLAN
City of Richmond

BRADY AND ASSOCIATES
Planners and Landscape Architects

The middle portion contains historical Buildings 6 and 17, as described above. There are also several small Naval buildings, most notably Building 123, which is currently used as office space and is in good condition. These buildings are scattered around the valley. On a hill to the south, there remains the foundation of a hotel that existed during the Winehaven period.

b.    Proposed Allowable Uses. The area to the east of Western Drive is proposed for educational and job training purposes. This area could be used as a satellite college campus with individual buildings serving as classrooms, laboratories, shops, administrative offices, and other related facilities. In support of the educational function, this area could also provide retreat facilities, including a conference center or small hotel on the old hotel site. Small scale research could be accommodated in this area, as well as "back office" tenants. A small outdoor amphitheater oriented along a sightline over the public plaza could be located at the back edge of this area where outdoor educational programs could be conducted. Nearby fuel tanks located further up the hillside could be used as campsites for a children's environmental camp program, once properly cleaned and sealed.

As discussed above, if not demolished, Building 6 could be used as part of the winery operation or for other warehousing purposes. If financially feasible, it could be used as light industrial space, preferably "knowledge based" and environmentally "clean". Building 6 could also be included under the educational/job training theme whereby uses proposed to the east of Western Drive could also be accommodated in this building.

The area between Building 6 and the shoreline could be developed for additional, similar light industrial or educational use (with filling of the treatment ponds and full environmental clean-up). Industrial users would be specialized companies who would benefit from or at least be appreciative of the remote, waterfront location, and who would have sufficient up-front capital to invest in site-wide infrastructure and building improvements.

Industrial uses should be consistent with M-1 Industrial/Office Flex District permitted and conditional uses in the Zoning Ordinance, with the exception of: auto parking/repairs; surface and bulk sales distribution; and the manufacturing of chemical and allied products. The remote location, sensitive environmental conditions and limited road access are not compatible with these uses. Permitted uses would include light manufacturing, light assembly, research, product development and testing, engineering and sales development, other research functions leading to new product development and marketing, publishing, printing, and small distribution facilities using small delivery trucks. Manufacturing activities are limited to non-nuisance light

manufacturing and assembly, and pilot plant operations for manufacturing and testing of prototype products. Commercial offices including corporate headquarters could be found within this category. Retail uses are generally limited to those providing support services or which are regional serving and sell in bulk warehouse quantities. It is assumed that Industrial/Office Flex uses will have warehouse-like buildings with over 10 percent of their floor space devoted to office uses. Types of uses that would be found within this category include: laboratories, biotechnology and high-technology uses, light assembly, retail-warehouses, limited warehousing, and comparable types of uses.

Light industrial uses may be permitted including warehousing, distribution centers, commercial nurseries, support retail/service and related establishments which have limited external impact on the surrounding area. It is assumed that these uses will be controlled to ensure compatibility between the industrial operations and other uses in the area. Light Industry sites may have warehouse-like buildings with less than 10 percent office space.

If Building 6 is demolished, it is recommended that all of the area west of Western Drive (14 acres) be converted to light industrial use if an appropriate user can be found. Otherwise, it should be developed for residential use. Either type of use will generate some of the financing needed to renovate the existing historical buildings to allow for their reuse by tenants who typically do not have large amounts of investment funds. Residential use would have the advantage of creating a greater sense of community and 24-hour presence on the site. Currently, residential development is the highest market demand at Point Molate. It is estimated that approximately 126 homes could be constructed in this area at a density of nine units per acre. In this alternative, environmental remediation would have to meet residential standards, which are the highest standards. Educational use is not recommended because of the amount of financing required for developing new educational facilities.

c.   Design and Development Considerations. New buildings should be located along Western Drive, with parking in the rear, to serve the entire complex of buildings in this area. Buildings should be small and arranged on the site similarly to the cottages: orderly, with similar setbacks along Western Drive and secondary roads. They should incorporate red bricks in the facades or be painted the same colors as the cottages, and should have flat or shingled hip roofs, and small windows. They should be no higher than three stories. The remainder of the grounds should be landscaped open space with pavement limited to walkways connecting the various buildings.

The portion west of Western Drive is highly visible from the shoreline, hillsides, and Historic District. For this reason, building arrangement on the site, architectural design, and roof treatments should be carefully and sensitively planned (see Figure 8 as an example of how buildings could be arranged on the site). If Building 6 remains, additional parking may be needed. Parking should be located where it would be least visible from the Winehaven building.

If new housing is developed, it should respect the design and layout of the existing historical village. Residential development should be medium-density single-family homes (nine units per acre), similar to the density of the cottages. Houses should be limited to two stories with a maximum floor area typical of urban housing. The architectural design and exterior color palette should resemble that of the cottages. Streets should be narrow, with no on-street parking allowed. Separate garages sited behind residences should be encouraged over integration into the main structures. There should be a landscape transition between the residential area and adjacent public spaces.

## 5. Central Development Area

The Central Development Area is one of the three general areas of the site that could receive new development. Proposed land use, and design and development considerations are described below.

a. <u>Description of Area</u>. Located in the central western portion of the Point Molate site, this narrow, flat six-acre area is physically isolated by steep terrain approximately 160 feet above the surrounding area. It is reached from the north by a secondary road off Western Drive. There are three fuel tanks but no buildings. Views to the northeast are enclosed by woodland; views to the southwest extend across the bay to Marin and San Francisco. Vegetation on the bench is predominantly disturbed grassland with remnants of coastal scrub. There may be sensitive plant and animal species on the bluffs around the area.

b. <u>Proposed Allowable Uses</u>. Because of its isolation and dramatic views, this area is appropriate for high end residential use. Too small for single family residential, a low-rise, multi-family complex of condominiums or townhouses is proposed at 20 units per gross acre. This would allow approximately 120 units. This density falls within the current General Plan designation of High Density Residential (21 to 43 units/net acre) and the Zoning Ordinance designation of MFR-2 Multi-Family, under which the minimum lot size is 5,000 square feet, and the lot area may be no less than 1,200 square feet per dwelling unit.

Because this area is highly visible from off-shore, supports habitats unique to the region, and may support sensitive plant and animal species, it should be developed after the single family housing in the Southern Development Area, and only if needed to support full implementation of the Plan. Development would have to be designed/sited to avoid impacts to California Native Plant Society-listed plant species.

c.    <u>Design and Development Considerations</u>. There are a number of options for building configuration and siting, but the recommendation is two individual buildings that are separated where the access road reaches the top of the bench. Each building complex should be oriented toward the water, with parking at the back. Another set of buildings could be constructed on the other side of the parking lots, if buildings extend to or just over the rim of the hill. No more than three stories should be allowed to keep the housing in scale with existing development, and to minimize visual impacts. The building design and materials do not need to match those of the historical buildings, but should be complementary in form, color, and architectural details.

6.    **Southern Development Area**

The Southern Development Area consists of several independent areas that are located in close proximity to each other. These are the last of the three general areas of the site that should be developed. A description of the area, the allowable land uses, and design and development considerations follow.

a.    <u>Description of Area</u>. The south end of Point Molate is the entrance to the site and therefore the first area to be seen as one approaches on Western Drive. For this reason, the appearance of development in this area is particularly important, as it will establish the overall image of the Point Molate site.

The area which is first visible as one approaches Point Molate lies across Western Drive from the entrance to the existing City-leased park. The area has been excavated into a hill for parking. A variety of fences are located in the area. A small area has been landscaped around a "Point Molate Village" sign.

Beyond this is a gently sloping area approximately 27 acres in size that extends from the Western Drive east to the base of the hillside. Nearly the entire area is paved.

Further north, east of Western Drive, there is another level area that measures approximately four acres. A number of roads cross this area,

leading to the Naval waste disposal site and fuel tanks in the hills. Vegetation cover is a mixture of native and non-native of grasses and shrubs.

b.    Proposed Allowable Uses. The entrance area should receive special treatment (as described below) to serve as a gateway to Point Molate.

It is proposed that the larger of the two level areas be developed for single family residential use at a density of up to 12 units per acre (in keeping with the existing residential density of 9 units per acre for the cottages). This would allow for approximately 324 homes. The corresponding General Plan designation is Medium Density Residential (9 to 21 units/net acre) and the Zoning Ordinance designation is MFR-1 Multi-Family, which allows single-family residences on lots no less than 5,000 square feet in size and specifies 1,650 square feet of lot per dwelling unit. However, if Building 6 is demolished and residential development occurs in the Northern Development Area, it is alternatively recommended that this area be reserved for light industrial use or research and development, rather than additional housing. Industrial use is also recommended if it is determined in the EIS/EIR that housing is not an appropriate use. Light industrial use would be fully compatible with M-1 zoning as described for the Northern Development Area. When developed, it may be desirable to relocate Western Drive slightly west, closer to the 100-foot BCDC setback from the high water line.

For the smaller level area, multi-family residential use at 20 units per gross acre is proposed (as defined in the General Plan as High Density Residential), for a total of 100 residential units. The old waste disposal site, which includes this area, has been identified as one of the most contaminated areas at Point Molate. Any use in this area, and particularly residential use, will not be able to occur until it can be assured that all potential toxins have been completely removed or otherwise mitigated. It is recommended that this area be developed last and only if needed to financially support other aspects of the Plan.

c.    Design and Development Considerations. Similar to the Central Development Area, the architectural style of the housing should be complementary with the historical architecture, especially since it will establish an image of Point Molate, being near the entrance to the site. Unlike housing near the Historic District, parking could be allowed on the streets and in integrated garages. However, to achieve the desired high density, housing should be arranged in a tight cluster, streets should be kept narrow, and setbacks small. The maximum height allowed should be equivalent to two stories. This arrangement would be compatible with the residential layout of the Historic District.

If light industrial use is pursued, buildings should not be massive or have large blank walls, but should appear more like typical office and commercial buildings. Parking should be located against the hillside or to the sides, preferably in several small lots rather than in one large one, to minimize visibility from Western Drive. Landscaping should be liberally employed to help screen unsightly features and further reduce the visibility of buildings.

The smaller residential site could be creatively developed by stepping the multi-family housing up the slopes. Parking could be provided at ground level or off to the sides or rear of the development.

The Chinese Shrimp Camp is believed to extend from the shoreline past Western Drive to the east (Figure 4). Prior to excavation of the site for development, a full evaluation must be completed to determine the potential for the site to be recorded on the NRHP. If the site is found to be not eligible, the site may be excavated with the supervision of a monitoring archaeologist and artifacts found used for an on-site museum. If the site is found to be eligible for the NRHP, avoidance of historic resources is recommended by the SHPO.

## 7.   Open Space, Parks, and Public Access

Point Molate is one of the few places on the San Francisco Bay where undeveloped hillside interfaces directly with the waterfront. This high quality open space should be both preserved and used to its full advantage.

The framework for the Plan is the open space, which connects all the development areas with pedestrian linkages and serves to protect an important public resource for recreation and appreciation of the site's natural qualities (Figure 15).

a.   Description of Area.  Open space is provided along the shoreline and throughout the west facing hillside. The proposed Shoreline Park, approximately 40 acres in size, is a strip at least 100 feet in width running along the entire length of the waterfront, a total of 1.4 miles. There are several buildings within the shoreline area, as previously described. At the south end is the City-leased park (Figure 16). It has aging recreation facilities and a beach. At the north end is an emergency heliport.

All terrain exceeding a 15 percent slope is categorized as Hillside Open Space. In the central portion of the site, the Shoreline Park and Hillside Open Space adjoin one another. There are 19 underground fuel tanks, above and below ground fuel pipelines, and two elevated water tanks in the hillside area (Figure

5-2 in Appendix B), as well as numerous steep and narrow roads that are in poor condition (Figure 17).

At the base of the pier (Figures 18 and 19) is a broad, flat, paved area bordered along the south side by a low, excavated hill. The area is ideal for more intensive park uses and commercial recreation facilities because of its central location on the shoreline, proximity to the pier, and site characteristics. Of the four buildings in this area, two may be usable.

There is another building, a Navy quonset "hut" on the shore side of Western Drive near the existing park. It was once used as a laboratory. To the south of the building is a large parking lot for the park.

All together these areas cover approximately 190.8 acres.

b.      Proposed Allowable Uses.  A trail is recommended along the shoreline which will eventually be incorporated into a Bay Trail extension from the Richmond-San Rafael Bridge northward.  This extension is provided for in the EBRPD Master Plan, the Bay Trail Plan adopted by ABAG, the San Francisco Bay Plan adopted by BCDC, and the Richmond General Plan.

A significant portion of this trail is already in place where a road parallels the shoreline, beginning just north of the quonset hut and continuing to a point near the Winehaven building.  At the south end of Point Molate, the Bay Trail could follow the edge of the existing Shoreline Park parking lot, or be developed along the railroad right-of-way.  The trails would provide opportunities for walking, bicycling, and rollerblading.  A secondary trail is proposed on the top of an existing elevated berm through the park.

Trails are also proposed throughout the hillside along existing roadways for hiking.  These connect with the various development areas and Shoreline Park.  Some of the tank sites near the Historic District and Northern Development Area could be used for group camping once their condition is evaluated and proper steps are taken to remove any hazards.  Agricultural use of the open space should also be encouraged, if the soils and climate are suitable.  Potential agricultural uses include a demonstration vineyard, fruit orchard, and Christmas tree farm, and are permissible where there are no known unique habitat areas, or habitats for sensitive plants or animals.

The existing City park would be absorbed into the larger Shoreline Park.  The portion proposed at the end of the end of the pier could potentially include some traditional facilities such as playfields, picnic areas, and children's play equipment.  In addition, there could be an amphitheater for concerts and



Hillside Trails

HILLSIDE OPEN SPACE

Tree-Lined
Village Street

Beach

Promenade

Bay Trail

SHORELINE PARK

Parking

Public Plaza

Playing Fields

Waterfront Commercial

Play Structure / Interpretive Facility

Landscaped
Formal Entrance

Public Pier

Scale: 1" = 600'

0    300    600    1200



POINT MOLATE REUSE PLAN
City of Richmond

■  ■  ■

Figure 15:
Conceptual Open Space Plan

Formal Plaza Areas

 Viewpoint Facilities

• • • • •  Bay Trail and Promenade

 Tree-Lined Streets / Promenade



Figure 16: Photograph of Existing Shoreline Park



Figure 17: Photograph of Hillside Open Space

Figures 16 & 17:
Photograph of Existing Shoreline park
Photograph of Hillside Open Space



POINT MOLATE REUSE PLAN
City of Richmond





Figure 18: Photograph of Pier Close-up



Figure 19: Photograph of Pier from Hillside

Figures 18 & 19:
Photograph of Pier Close-up
Photograph of Pier from Hillside



POINT MOLATE REUSE PLAN
City of Richmond

BRADY AND ASSOCIATES
PLANNERS AND LANDSCAPE ARCHITECTS

other special events here or in the hillside open space in association with the winery or college. A significant portion of the pavement could be preserved for large public gatherings uses such as a weekly fresh seafood/produce market or flea market, and infrequent events like art fairs and carnivals. Parking is planned around the bottom of the slope, hidden from the rest of the park by the raised berm.

The park would have an interpretive component. A number of historical features could be located within the park, including a railroad car once used to haul in grapes, wine making machinery, and a model of the old Chinese Shrimp Camp or artifacts from the camp. Once cleaned, a maze of oil pipes colorfully painted in yellow and purple could serve to interpret the Naval fuel supply period and be used as a children's play structure. In addition, an existing coastal bluff plant community could serve as an educational feature. The SS Red Oak Victory ship could be docked at the pier, if it is determined to be appropriate and economically viable.

Building 132, which was used as part of oil operations, has 2,688 square feet of space, is in good condition, and may be reused in support of the park or commercial recreation. Building 89 was used as a drum storage shed and could be used as a park shelter. However, due to its unattractiveness and potential contamination it is recommended for demolition, rather than reuse as a shelter. The quonset hut could be used temporarily, until the area is developed for residential or industrial use.

In support of this Plan, the City intends to promote ferry and private boat access to Point Molate. To encourage tourists and other visitors to walk the distance from the pier to the Winehaven building, a promenade linking the pier and the public plaza is proposed. Certain commercial recreation facilities would be allowed on the pier and adjacent to the promenade and park. These would be managed by the City or other entity as leases. Such uses may include a "bait and tackle" or similar type of marine/sports supply shop; a "crab shack", waterfront cafe, or other kind of food concession; public restrooms; and a public recreation center, watercraft rental shop, boating center or school and other marine-related facilities. While a waterfront hotel is not proposed, it should be considered as an allowable use depending upon market demand at the time of Plan implementation. Public use of the dock will be encouraged. A private marina could be considered if the demand for one should increase in the future. In this case, a breakwater would be needed. However, transient mooring should be accommodated at the pier, off-shore buoys, and possibly a number of floating docks. Ramps would be needed to facilitate access from boats to the top of the pier. Long-term

mooring of large vessels at the pier could be made available to help meet a
current bay-wide need, assuming no dredging is required.

The public plaza and formal gardens described under the Historic District
section would extend slightly into the Shoreline Park.

c.   Design and Development Considerations. Residual pavement along the
shoreline should be removed, along with any other unattractive site features
such as fuel pipes, fences, overhead power lines, recreation facilities in
disrepair, and eventually the quonset hut. Paved, graveled, and disturbed
vegetative areas should be rehabilitated and planted with native species.
Unstable cut slopes should be stabilized and seeded where practical. Where
slopes are stabilized and seeded, native plants should be used. Trees along
the entire length of the shoreline could be considered to help establish a
special identity for Point Molate, as seen from the water and Richmond-San
Rafael Bridge.

The Bay Trail should be located to help separate the Shoreline Park from
proposed residential development. The residential developer should be
required to install attractive fencing to further partition private property from
public land.

In the Hillside Open Space, unsightly features and aboveground pipelines
should be removed to the extent practical. If the Navy fails to remove the
above ground pipelines, they should be painted a color that blends in with the
landscape. Prior to removal, the potential for impacting sensitive species
needs to be evaluated. The tops of the fuel tanks should be seeded with
native grasses and the entrances to the tanks should be fully secured shut. A
resource management program is recommended to slowly replace non-native
vegetation with indigenous species and to control the spread of eucalyptus
woodland, pampas grass, and coyote bush to reduce fire hazards.

The pier will require restraints to prevent people from accidentally falling off.
This may entail the removal of existing pipelines and replacement with a
railing. It is recommended that the pipes, as well as the vapor recovery
system and loading arms at the ends of the wharf, be removed, as they will
require high maintenance and may become an environmental hazard. Low
level lighting should be provided on the pier and along the promenade. The
promenade should be a wide, tree-lined, walkway with special pavement,
benches, and other amenities. Local artists should be considered to design
unique public features (such as benches and lighting standards) that will
enhance the unique quality of the site and establish a special identity.

## 8. Transportation

Access and circulation is a major consideration in the planning of Point Molate. Detailed investigations are needed to determine exactly what kinds of transportation-related improvements will be needed in support of reuse. Following are descriptions of transportation issues and the improvements that will likely be required to implement the Plan. Desirable and necessary pier improvements are also discussed.

a.     I-580 Interchange. One of the greatest constraints to reuse of the site is poor vehicle access. There is only one road into Point Molate, and it is directly accessible from only the west-bound direction of I-580, near the Richmond-San Rafael Bridge tollgate. Those traveling eastward across the bridge must drive two exits past the tollgate (to the Castro Street exit), cross under the freeway, return to the interstate, and continue westward back to the Western Drive/Point Molate exit. Also, the west-bound on-ramp to I-580 is an unconventional left-hand on-ramp.

The lack of direct access for eastbound vehicles poses a constraint for all proposed land uses to some extent. However, the existing interchange configuration would be particularly inconvenient for residents traveling to and from Marin on a daily basis.

No trip generation studies based on the proposed land uses have yet been conducted. This type of study is needed to assess the impacts of reuse on I-580 traffic volumes and flow. Also, a trip generation study will help determine whether or not enough traffic would be generated to justify/require the reconfiguration of the interstate interchange to provide direct west-bound access and improve the west-bound on-ramp. In addition, an interchange feasibility analysis will be necessary to determine if in fact a west-bound off-ramp could be constructed at that location, and if it could be built economically. Any modifications to the existing interchange, if required, will most likely require upgrading the entire interchange to current standards, including increased curve radii for better sight distances, longer acceleration/deceleration distances, wider shoulder widths, retaining walls, and other features.

b.     Western Drive. The access road into Point Molate is Western Drive, a 24-foot wide, two-lane road with potholes and no shoulders, curbs and gutters, sidewalks, or bicycle lanes. It lies within a 40-foot wide City easement. No capacity studies have yet been conducted for this roadway.

Reuse may necessitate a variety of improvements to Western Drive, including road and/or shoulder widening, resurfacing, and a safe pedestrian/bicycle route. The widening of Western Drive in the Historic District is not recommended because of the potential impact on historic features, and because most of the traffic generated by reuse will occur south of this area. The roadway may be realigned through the Southern Development Area if and when the area is developed for residential use. An ample landscaping easement and/or berming would assist in mitigating traffic impacts to the adjoining residences. Street tree planting along the entire length of Western Drive from the interchange through Point Molate is recommended. In addition, the intersection of Western Drive and the road to Dutra Materials south of the site may need to be realigned to improve sight distances.

It is recommended that Western Drive receive special treatment at the entrance to Point Molate to establish a gateway. Landscape features and plantings at this entrance should be major design features, commanding attention and evocative of the historic character of the site. A separate design should be developed for this entry. Design features could include tree "plantations", creating a landscaped island in the middle of the roadway with identification signage or constructing landmarks, such as red brick crenelated walls reminiscent of the Winehaven parapet, on either side of the entrance to the site. This area should be well lit and all unattractive features should be removed or mitigated with landscaping.

The majority of traffic on Western Drive through Point Molate is generated by four facilities located further north, and on-site environmental clean-up activities. Truck traffic generated by the Port of Richmond amounts to between 100 and 230 tanker truck trips per month, or 4.5 to 10.5 trips per work day. There have been incidents of tank spillage, leading to the closure of sections of Western Drive (Uribe & Associates, 1995).

Any expansion of these facilities that would create additional traffic carrying hazardous materials, such as the oil terminal proposed by Wickland Oil to the north of Point Molate, would require an assessment of adverse impacts on reuse at Point Molate.

c.    Internal Circulation. Secondary roads and paved aprons are prevalent at Point Molate. Very few of them will be needed for reuse, except as described in the land use sections above and as shown in Figure 7. Roads in the Hillside Open Space may remain and be used as hiking trails. Some of the paved areas can be used for parking, or, as in the case of the regional park, can provide a durable surface for public events. Where used, pavement needs paint striping to more clearly delineate circulation and parking stalls.

Small parking lots located in strategic, convenient, and less visible areas are preferable to fewer, larger parking lots. No signalized street lights exist at Point Molate, or are needed for reuse.

d.      Alternative Transit. Currently, there are no bicycle or bus routes to Point Molate. Use of the pier has been limited in the past to Naval fuel supply ships.

In an effort to help minimize vehicular traffic to and from Point Molate, the Plan recommends a bicycle trail along the shoreline and a staging area near the pier. The City and interested agencies should continue to pursue trail development both north and south of Point Molate so that regional linkage can be provided.

At some point in the future after a "critical mass" of residents and public visitors is established, it may be possible to extend and operate a City bus route to Point Molate, as well as a school bus route. A special private shuttle to and from the Richmond BART station, located three miles to the east, should be considered along with other ideas as part of a Transportation Demand Management (TDM) measure to minimize vehicle traffic and to serve residents.

Water access to the site will be encouraged by the City through redevelopment and reuse of the pier, and through promotional materials and programs. The pier, which is 1,450 feet long and has a load capacity of 80,000 tons, can accommodate vessels up to 800 feet long, with a draft of up to approximately 18 feet, without dredging at the end (pers. comm. with Tom Robertson). Water depth along the causeway varies from one foot to nine feet according to 1984 nautical charts. The pier is sufficiently strong for pedestrian use and emergency or maintenance vehicle traffic.

The surface of the pier is adequate but in relatively poor-shape; some repair is required if tourism is to be promoted as planned. It will need continuous maintenance.

The pier is at risk of suffering damage from liquefaction, lateral spreading, and seismic shaking in the event of an earthquake. It would likely require redesign to meet current seismic requirements (Moffatt & Nichol Engineers, 1996). A more detailed evaluation is recommended to determine: (1) if this is actually the case; (2) the minimum that would be required to make it usable for public docking; and (3) the cost of such improvements. The assessment should include an evaluation of the removal or re-anchoring of existing fuel and water lines, and whether the system has emergency shut-off valves.

## 9.    Utility Infrastructure

This section describes the plan for providing essential utility and community services in support of reuse at Point Molate. Utilities include the potable and fire protection water supply, storm water, sanitary sewer, industrial sewer, electricity, natural gas, street lighting, and telephone and telecommunication systems.

Issues related to the utility infrastructure at Point Molate are varied. First and foremost, utility systems have received only a cursory assessment of their condition and capacity. In order to determine the cost of upgrading them to meet current standards and reuse capacity requirements, and in some cases replacing them entirely, extensive field investigations need to be conducted by specialized civil engineers. Until this is accomplished, it can only be surmised what improvements will actually be needed, based on available information.

It is expected that infrastructure redevelopment and replacement costs will b substantial at Point Molate, and that reuse priorities will be land uses such as residential and light industrial which have the ability to raise the capital resources needed to make site-wide improvements through private land sales and development.

a.    Water Supply.  The Navy's water supply system is approximately 50 years old and continuously leaks. East Bay Municipal Utility District (EBMUD) supplies the water to the Navy's system, which is distributed to the site in an eight-inch pipe along Western Drive from the Potrero and Richmond Reservoirs. Water is pumped uphill to a 1,134,000-gallon storage tank and redistributed on-site via the Navy's system which consists of a main 14-inch line and several secondary lines that provide fire protection throughout the Hillside Open Space (Figure 4-4 in Appendix B). The Fleet and Industrial Service Center in Oakland (FISCO) monitors the Navy's system from the tank. The water supply system is currently shut down, except for the main line, which is being kept operational for fire protection.

Lead above the U.S. Environmental Protection Agency's (EPA) established standards has been found in the Navy's drinking water system.

EBMUD is planning to replace the Potrero Reservoir (tank) and the six-inch section of pipe at the north end of Western Drive with a 12-inch pipe. A reduced reservoir capacity is planned in anticipation of limited projected industrial use in the service area.

The following evaluations are recommended to fully assess the quality, condition, and capacity of the water supply:

1.  The condition and reusability of the entire water pumping and distribution system should be assessed for conformance with the latest specifications and standards of the City of Richmond, EBMUD and other appropriate jurisdictions. EBMUD is the regional water provider for the area and EBMUD standards should be the criteria used for reusability of the Navy system.

2.  The adequacy of the system for meeting the capacity needs of the proposed uses should be evaluated.

3.  Drinking water should be sampled and tested for lead content throughout the system and the source of lead determined.

4.  Cathodic protection of old and possibly new pipelines may be required to comply with the latest American Water Works Association (AWWA) standards.

5.  EBMUD should reconsider the planned capacity of the Potrero tank and distribution lines to Point Molate in light of the uses proposed in this Plan. The City should request EBMUD to remove the old lines when they install the new ones.

6.  An assessment should determine the need for a new EBMUD reservoir to serve those portions of the site above 100 feet, as well as for a new pumping plant. An assessment should be made of the site's water service demand and of providing additional reservoir facilities.

7.  The fire protection system should be tested to verify that it will withstand higher pressure requirements (60 to 150 pounds per square inch). This test should include pipelines and appurtenances and consider the effects of all changes in pipeline sizes and loop system arrangements.

8.  The feasibility and requirements should be determined for adopting the monitoring system so it is compatible with the City's system.

At this point in time, it is anticipated that the Navy's water supply system will require substantial repair and upgrading, if not full replacement, to satisfy reuse and new development needs. In addition, water meters will be needed for individual water users.

b.   Stormwater System.  The stormwater collection system is comprised of storm catchment basins, storm drains, stormwater lines, holding and settling tanks for removing floating fuel, and outfalls (Figure 4-3 in Appendix B).  The discharge of storm water is governed by the National Pollutant Discharge Elimination System (NPDES) program.

The condition and adequacy of the system is unknown, but should be further assessed in the field to ensure that discharge into the bay meets environmental standards.  This would include the following:

1.   An evaluation of soil and groundwater contamination after the environmental clean-up program is completed.

2.   Preparation of a storm drainage master plan that corrects problems and deficiencies.

The system may need to be permitted by the Regional Water Quality Control Board (RWQCB).  The entire storm system would have to be field inspected, televised, and hydrostatically tested to determine if major improvements are required.

c.   Sanitary Sewer System.  Point Molate has its own sanitary sewer system (Figure 4-6 in Appendix B).  There is a primary sewage treatment plant at the edge of the shoreline and secondary treatment ponds nearby.  The facility serves only the northern third of the site where buildings currently exist.  The treatment plant has been closed and cleaned but not dismantled.  Sanitary sewer lines have been plugged and capped at the manholes.  As part of the Installation Restoration Program, the treatment ponds will be decommissioned.  Similar to storm water, permits are issued under the NPDES program.  The current permit expires on October 19, 1999 (PRC Environmental Management, Inc., 1996).

The treatment plant can be reactivated mechanically and electrically, but there is doubt that the RWQCB would authorize it without it being upgraded to meet current standards.  Secondary treatment would be required in the form of a "package treatment plant" unless solids were removed and hauled off-site by truck.  Development in the central and southern portions of the site would require connection to a sanitary sewer system.  It is recommended that the City:

1.   Determine what improvements are necessary to bring the treatment plant and related facilities up to code and to ensure adequacy and reliability.

2.  Compare the costs of improving the plant for secondary treatment with
    the long-term operating costs of removing solids for deposition
    elsewhere.

3.  Evaluate the capacity of the existing plant to determine if new
    development can be accommodated or not, and if not, evaluate the
    feasibility of increasing the capacity of the system or connecting to the
    City's sewer system either by gravity or by a pumping station.

d.  <u>Industrial Sewer</u>.  The Oil Reclamation Plant (ORP) transferred ballast,
wastewater, and fuel from the pier and other areas to storage tanks.  After the
tank contents settled and separated, fuel was extracted and recycled.  The
remaining wastewater was then transferred to another tank for further
separation, and sent on to the treatment ponds.  These systems have been de-
activated, except for the treatment ponds.

Information regarding the condition of the causeway boxes, tanks, pumps, and
associated equipment is unavailable and would require a field survey to obtain.
An industrial sewer system will not be needed in support of the reuse
proposed.  Any industry that is considered should not depend on such a
system.

e.  <u>Electricity</u>.  Pacific Gas and Electric (PG&E) provides electricity to
Point Molate via a single 12 kV (kilovolt), three-phase service that terminates
at the main switchgear near building 13, the substation (Figure 4-5 in
Appendix B).  One 12.5 kV feeder runs from the main switchgear to the main
substation where it is stepped down to 2400 volts for distribution.  The five 2.4
kV distribution circuits that emanate from the substation are owned by the
Navy.  The circuits are not connected with normal open tie switches,
preventing another circuit to pick up load in the event of a power failure.  As-
built drawings and other records showing the main single line and describing
the electrical loading analyses for the distribution feeders and equipment
ratings cannot be located.

A number of transformers contain greater than 50 parts per million (ppm) of
PCB, a hazardous material.  These should be replaced and properly disposed
to avoid the risk of contamination.

A field audit needs to be conducted to provide the following information:

1.  The layout, sizing, and condition of the electrical system, including the
    switchgear, poles, lines, transformers, and other equipment, to
    determine whether the equipment can be reused or should be replaced.

Facilities must be brought into compliance with the standards of a service provider. Once the configuration of the system and condition of the equipment is known, electrical loads to be placed on each distribution line can be assigned. The adequacy and reliability of the electrical system can then be adjusted for application to proposed uses. Uses that require continuity of electrical energy will demand additional reliability, including service from more than one source or other forms of emergency power. Some rearrangement of the distribution feeders or additional feeders may be required to meet this need.

2. Electrical loading and equipment ratings to determine how the system can best be adapted for specific proposed reuse and development. Any available recent maintenance records and work orders would be useful in making these determinations.

Meters will be required for individual users. Under recent California Public Utilities Commission rulings, consumers will, in the near future, be able to select and negotiate rates for electrical services from suppliers other than PG&E.

Consideration should be given to providing underground duct banks where new development occurs to maximize flexibility of installation, additions, and changes to the electrical wiring systems. The undergrounding of wiring systems will improve the reliability of the systems and eliminate unsightly overhead wiring. While initial costs may be higher, the costs can be shared among the suppliers of the various systems.

f.    Natural Gas.  Currently, no natural gas is supplied to Point Molate. While gas is not essential, it would be desirable as an alternative to diesel and electrical space heating, and to add value to the housing as a source of energy for cooking. Commercial establishments that serve food would also benefit from having gas.

Gas would have to be extended to Point Molate via a new pipeline from the nearest source. An investigation would be required to determine if this is feasible and economical. All users would need to be metered.

g.    Street Lighting.  Street lights are overhead high pressure sodium fixtures mounted on a combination of wood and electric poles, some of which are dedicated poles. The existing street lighting system provides minimal illumination, typical of a rural environment (Figure 4-5 in Appendix B).

Reuse and new development will need higher illumination levels and more even distribution of illumination. Areas not currently lit will require system expansion. Redesign and expansion of the system can be postponed until new development is planned.

It is recommended that when the system is upgraded, all lines be placed underground to enhance the scenic quality of the site. Although metal poles are more durable, wood poles would be in keeping with the historical character of the site.

h.      Telephone and Telecommunications. Pacific Bell provides telephone service and owns the telephone lines on the site. The Navy owns and operates the associated equipment, which is part of the Consolidated Area Telephone System (CATS).

There are no fiber optic lines, except between the main office and gas station. Cable TV wiring is provided to the cottages and the fire station.

The new communications age requires a means of interconnection, either through hard-wired systems such as telephone or fiber optics, or wireless systems such as space satellites. For the size of development proposed at Point Molate, the wired systems would be adequate and more affordable. The existing telephone wiring will likely be increased by Pacific Bell. Fiber optic lines, which are recommended for new development, would be the responsibility of the individual developers. Additional Cable TV wiring is also recommended, particularly for new housing and commercial entertainment establishments. If Cable TV is to be franchised out, the supplier would install the wiring system.

## 10.     Public Safety

This section focuses on public services for fire, police, and medical emergency services. Concerns related to existing contamination are discussed in Chapter II, Section A.5.

a.      Fire Protection. There is a fire station at Point Molate that is owned and operated by the Navy. Naval Supply (NAVSUP) supplies the fire engine, pumper truck, and brush rig. In the past, the station was manned by a full-time Fire Chief and five individuals (two 24-hour shifts). Back-up services can be provided by Station 61, the nearest City fire station. A fire alarm system exists only in the area of fuels operations at the shoreline, and on the pier. It is connected to FISCO.

It is uncertain if the existing equipment will be made available for the City of Richmond to purchase or otherwise use. An analysis should be conducted to determine the minimum staff requirements for manning the station during and upon completion of Plan implementation. This analysis should evaluate the alternative of providing additional staff at Station 61, and comparing the benefits and costs. In addition, an assessment should be made of emergency access routes and additional access needs.

To minimize the chance of fire, a fire hazard mitigation plan should be developed and implemented. To ensure fire protection, the water supply system should be upgraded as described above, and all buildings should be supplied with ceiling sprinklers and fire alarm systems. The alarm signals would be transmitted over the telephone or fiber optic systems to the appropriate central control station.

b.      Police Protection.  One Naval Security Officer is currently stationed at Point Molate. The closest police station (Southwest) is three to five minutes away, within the standard response time.

A police station is not needed, but future tenants and owners may want to hire security guards for specific buildings and development areas. Also, the City of Richmond and/or California Highway Patrol may need to include Point Molate on their regular patrol.

c.      Medical/Emergency Services.  No medical facilities exist at Point Molate, but there is a heliport at the north end of the site. Current City codes prohibit its use; however, use of this heliport for medical, fire, and other emergencies is desirable. NAVSUP provides some medical emergency equipment on-site.

Point Molate is tied into the City of Richmond telephone Emergency Medical Services. The closest hospital is Kaiser-Richmond, eight minutes away.

No medical or emergency staff or additional facilities are anticipated to be needed for reuse.

**11.    Parcelization**

A parcelization plan has not been prepared as part of this document because specific land uses have yet to be fixed permanently. This has been done intentionally to ensure flexibility in meeting changing market conditions and land use demand as the Plan is implemented.

Parcelization is necessary where land is to be sold and/or subdivided for private ownership. Applicable areas include those proposed for residential and light industrial development. In addition, if the proposed regional park is to be leased or transferred in fee title, the boundary needs to be legally defined. This would also apply to any other land leased or sold, such as to a higher education institution.

The land areas shown in Figure 7 portray the generalized boundaries of residential development and light industrial parcels (but not individual residential lots). Parcels will become better defined later in the reuse planning process as more information becomes available regarding market demand, necessary building and infrastructure improvements, and the success of environmental clean-up.

### C. Property Conveyance/Disposal

This chapter describes the various mechanisms for transferring property from the Navy to other entities for reuse and development. They are presented in order of priority established as part of the base closure process.

The LRA published and disseminated a Notice of Availability to agencies and organizations in early 1996 to attract Homeless Assistance and PBC applicants. The following entities responded: Contra Costa College/West Contra Costa Unified School District (CCC/WCCUSD), Orchidnet, Richmond Rescue Mission, Richmond Neighborhood Coordinating Council, and Contra Costa Health Services (See Appendix E).

The BRAC evaluated the applicants' proposals based on the following criteria: project viability, benefit as a PBC, benefit to the public, use and development compatibility, marketability and economic contribution, and environmental compatibility. However, the BRAC decided not to approve any of the requests so that the City could maintain control over reuse of the buildings at Point Molate. It was decided to recommend that two applicants, CCC/WCCUSD and Orchidnet, use facilities under leases with the City (discussed below in Section 3). The request for use was recommended because they demonstrated the largest amount of public benefit through the provision of job training and educational programs, and because the proposal was determined to be compatible with the overall reuse concept. Orchidnet's request was also highly recommended because their use of facilities will have educational and tourism components consistent with the BRAC's goals and objectives. The Richmond Rescue Mission's homeless assistance request was not recommended primarily because they require the attendance at religious

services as part of their program, raising the issue of separation between church and state, and also because of the lack of community support services for the homeless at Point Molate. The BRAC decided that the Richmond Neighborhood Coordinating Council's PBC request for warehousing and office space had no direct public benefit and was not recommended. Contra Costa Health Services application was also not recommended. These are described in more detail below.

## 1. Federal Agency Transfers

Other federal agencies have "first right" at no cost to base property made available through base closure from the DOD. Point Molate was listed in the Federal Register in January, 1996. To date, no federal agencies have expressed any interest in the transfer of Point Molate property.

## 2. Homeless Assistance

The Base Closure Community Redevelopment and Homeless Assistance Act of 1994 requires BRAC to accommodate, where feasible, the needs of the homeless. Since surplus property is conveyed to the homeless at no cost, no revenue is produced through this type of conveyance for capital improvements and operating expenses. It is BRAC's responsibility to determine how to balance homeless needs with the need for economic development.

As of May 16, 1996, the City of Richmond had received only two complete requests for homeless assistance from the Contra Costa Homeless Collaborative and the Richmond Rescue Mission. The Richmond Rescue Mission, a non-profit, religious based organization, submitted a request to use the 29 cottages. They proposed to use 12 of the units as transitional housing for recent Richmond Rescue Mission Recovery Program graduates, 12 units for Jobs Skills Development Programs, and five units for staff and their families. In addition, the organization requested use of an industrial/office/warehouse building for additional job training in limo-chauffeur driving, auto detailing and sales, used clothing recycling, desktop publishing and printing, and other types of training and employment. The Richmond Rescue Mission also expressed interest in using the dock for the shipping of used clothing and possibly a Bay Tour Job Skills Development Program. They indicated it would take approximately six months for start-up.

Currently, the Recovery Program assists homeless men for 15 months, the Transitional Housing Program provides housing to homeless individuals for up to 12 months, and the Women, Women with Children, and Families Shelter Program provides emergency housing for two months.

Assuming that an average of eight people could sleep in a cottage, the Richmond Rescue Mission could provide housing for 96 homeless people on any given night. It is unclear how many people would benefit from the job training programs.

The Contra Costa County Homeless Collaborative's application, which was incomplete, included a request by the Contra Costa County Food Bank and Shelter Inc. These agencies expressed an interest in sharing the warehouse space to store donated items until they can be distributed, and shared that Rubicon Programs Incorporated wanted to provide landscaping installation and grounds maintenance job training at Point Molate in conjunction with the Richmond Rescue Mission (as well as with CCC/WCCUSD, discussed below).

The City of Richmond currently provides a proportionally significant amount of housing for the homeless of West Contra Costa County (City of Richmond, 1995). For this reason and because of the remoteness of the site from other community services such as food services, health care, schooling, employment opportunities and government-supplied social services, the City believes the provision of job training opportunities is more important than the provision of housing specifically at Point Molate. Therefore, the Richmond Rescue Mission and Contra Costa County Homeless Collaborative requests were not recommended.

## 3.    Public Benefit Conveyances

Local and state government agencies as well as non-profit institutions that serve a specific public benefit can be conveyed property at no cost or at a discounted price. Any entity requesting such a Public Benefit Conveyance (PBC) must have a federal agency sponsor. A PBC can be denied if the BRAC believes it is inconsistent with the goals and objectives of the Plan.

The types of uses that are typically eligible to obtain a PBC include educational, public health, recreational, and correctional uses. More specifically, these may include community colleges, vocational schools, medical emergency clinics, utilities, sanitary landfills, golf courses, athletic fields, trails, state prisons, and county jails.

CCC, with accompanying letters of interest/support from the WCCUSD, requested use of the property for a variety of educational and vocational programs. These included an English as a Second Language program, a marine and environmental biology laboratory, a hotel/motel/restaurant program, a conference center program that emphasizes food services, and high school level vocational/technical programs. Approximately 300 to 500 students

(elementary, high school, and college) per year would benefit from these programs. Full implementation would take three years. Facility improvement and operating capital would be derived from federal, state, and district funds, as well as student fees and rental housing income.

The request specifically asked for use of the 29 cottages for housing foreign students and conference/retreat attendees, as well as for instruction and training purposes. (For example, the Winemaster's house was cited as a retreat supporting a restaurant for culinary training.) The request did not specify if the use of other non-residential buildings was desired, although it appears that some of the other buildings on the site would be suitable.

The City would relinquish ownership responsibility to CCC/WCCUSD if property were transferred through a PBC. This would restrict usage for other purposes such as a bed and breakfast or any use not proposed as part of the CCC/WCCUSD programs. Furthermore, in transferring buildings through a PBC (versus a City lease), CCC/WCCUSD would be fully responsible for the upkeep of the property as soon as it is conveyed, regardless as to whether or not the buildings are used right away. CCC/WCCUSD would be able to rent empty buildings only to other users who also meet the requirements of the PBC for educational use. The LRA would not have the ability to replace CCC/WCCUSD should they fail to meet their financial obligations.

For these reasons, the City is not recommending a PBC. However, the City proposes to negotiate with CCC/WCCUSD for the lease of appropriate space in the future. CCC/WCCUSD would be required to make necessary facility improvements.

Orchidnet, a non-profit conservation and educational organization that promotes high technology propagation of world-wide endangered orchids, requested use of one of several buildings for a miropropagation facility, a showcase for their computer technology, an office, educational exhibits/displays, a library, botanical artwork, a gift shop, a greenhouse, and a botanical garden. The organization proposed to host weekend training seminars, provide student intern training programs, and serve as a local tourist attraction. The operation would employ four full-time and several part-time individuals. Space requirements include 1,000 square feet for indoor space, 2,100 square feet for greenhouse space, and 400 square feet for lab space.

Orchidnet's request for a PBC was also not recommended, but the City would negotiate a suitable lease of one or more buildings to Orchidnet when in a position to do so, assuming that the organization can contribute financially to required facility improvements.

A number of buildings may be appropriate for Orchidnet's use, including cottage 31, which has southern exposure, the steam generation plant, refrigeration building, and any of the storage buildings located in the Northern Development Area east of Western Drive.

The City also received a letter from the Richmond Neighborhood Coordinating Council (RNCC) requesting use of one of the cottages for office space, holding meetings, storing documents, and training staff.

A letter of interest also was received by the City from Armstrong University in Berkeley, California. However, a formal proposal was not submitted.

Prior to reuse planning, the East Bay Regional Park District (EBRPD) was approached by the City of Richmond to determine if the District would be interested in Point Molate property under a PBC. EBRPD has expressed no interest in assuming any of the property for a park under their jurisdiction as a PBC, but they are willing to consider other arrangements. It is recommended that the City continue a dialogue with EBRPD regarding park development and long-term leasing.

Recommended PBCs, through the U.S. Department of Health and Human Services, are the fire station to the City of Richmond Fire Department, and the stormwater, sewage treatment, and other Navy-owned utilities that are not conveyed through negotiated sales or public bid to the City Public Works Department.

## 4.    Port Conveyances

In 1994, Congress approved an additional conveyance mechanism via the National Defense Authorization Act that would allow the BRAC to reuse property as a port, marina, or other maritime activity at no cost. As of this writing, no property at other installations has been transferred in this manner.

No port or full scale marina is being recommended as part of this Plan, although some facilities typically found at marinas are being proposed along the shoreline and around the pier. Therefore, a port conveyance is not recommended.

## 5.    Economic Development Conveyance

The Economic Development Conveyance (EDC) was created to expedite the property transfer process to local communities that need to spur economic development activities and job creation. Property is transferred at or below

the estimated fair market value and is negotiable; payment can occur at the time of transfer or be deferred. Any discount in the price of the property must be justifiable; the most important consideration is the need to put the property into more immediate use to create jobs. The income that can be generated from some of the higher value property (e.g., use of the cottages and Winehaven building, and areas targeted for residential development) is supposed to be used to offset the marketing and maintenance costs of less desirable areas or buildings of the property (e.g., terrain too steep to develop, contaminated areas).

The BRAC is the only entity eligible to receive Point Molate property under an EDC. It would have to submit a formal application, including a business/operational plan. The request would be made after the Plan has been submitted to DOD for consideration in its review under NEPA, and prior to final adoption.

Additional advantages of this mechanism are that the City would have considerably more decision-making flexibility and control over reuse and development than with the other mechanisms, including a lease. Richmond could either maintain property and lease it to other entities, or sell portions of Point Molate real estate, as needed, to finance building and infrastructure improvements elsewhere on the site. The ability to manage property transactions and respond to changing market conditions would enable the City to maximize opportunities for job training, creating jobs, and raising revenue.

A drawback to the EDC is that net proceeds from sales (i.e., monies remaining after the costs of property improvements) must be shared with DOD. Further, the City would have to accommodate the homeless to the greatest extent possible.

For Point Molate, the City of Richmond was given an alternative to the EDC mechanism through special legislation. This is described below. The City decided that they preferred using the special legislation over the EDC mechanism, so the EDC option is not recommended.

6.    **Special Legislation**

As part of the DOD Authorization for Fiscal Year 1996 (Public Law 104-106) signed into law by President Clinton on February 10, Section 2867 (otherwise referred to as the "Dellums Legislation" in reference to U.S. Congressional Representative Ronald V. Dellums from California's 9th District who sponsored the legislation) permits DOD to convey Point Molate to the City of

Richmond, in lieu of a lease. This legislation permits the Navy to convey
Point Molate to the City of Richmond through a direct transfer at no cost.

Through this mechanism, the City will be able to obtain ownership of Point
Molate and lease individual buildings and parcels of land to interested parties.
The City will maintain control over the development of the property.

## 7.    Negotiated Sale With a Public Body

The use of this conveyance mechanism has declined since creation of the
EDC. Negotiated sales are made with local governments and publicly owned
utility companies who propose property uses that do not meet the intent of a
PBC but cannot obtain the property through any other mechanism. Property
can be purchased at a discount.

Because of the special "Dellums" legislation option described above, this
mechanism is unnecessary for Point Molate.

## 8.    Public Bid Sale

As a last resort when property has not been conveyed using any of the above
options, the DOD can sell the property through a public bid sale. The
proceeds from such a sale are deposited in the U.S. Treasury. Because
proceeds could not be directly applied to the reuse and development of Point
Molate, there is no advantage to the City of Richmond to purchase property
in this manner. Navy owned utilities not conveyed to the City may be
disposed by public bid.

## D. Reuse and Development Strategy

This section summarizes the decisions that need to be made to finalize and
implement the Plan, uses that can occur early on, environmental clean-up
schedules and commitments, regulatory considerations, financing options, and
demolition recommendations. The phased action plan is described at the end
of the section.

The Plan will be used as a basis for amending the City's General Plan and
Zoning Ordinance. A Specific Plan, which would be more detailed and
comprehensive than this conceptual reuse Plan, is recommended as the vehicle
for developing these amendments. A Specific Plan is appropriate for Point
Molate because of the large size of the site and the likelihood that a number
of individual, private developers will be involved in the development of

projects on separate parcels of land sold to them by the City. The Specific Plan is also an appropriate mechanism for conducting detailed site investigations (biological surveys, more detailed design and restoration plans, and open space design and planning), coordinating with regulatory agencies (discussed below), and creating development strategies and more specific land uses. Changes to the existing land use and zoning designations and regulations will be required to accommodate the proposed reuse and development of Point Molate regardless as to whether or not a Specific Plan is used as the tool for refining the Plan. City of Richmond policies, plans, and regulations that may need amending are listed in Chapter II, Section A.16.

1.    Additional Investigations and Assessments

A number of studies must be conducted before the Plan can be finalized and/or fully implemented. Many of these will require extensive field investigations. Those specifically related to buildings, transportation, utilities, and public services are listed below and discussed in more detail in Section B above:

- **A detailed evaluation of Building 6** (as well as 17, 132, and the cottage garages) **to determine if it should be reused or demolished.** All improvements required to bring it in conformance with building and safety codes, including structural, seismic, fire, ADA, mechanical, electrical, and plumbing upgrades should be evaluated and associated costs estimated. The study should also address practical improvements likely to be required for reuse, such as an improved building entrance, new interior walls, better lighting, and replacement of the flooring.

- **An evaluation of the tanks and pipelines.** This investigation should determine the condition and usability of the tanks and pipes, both above and below ground, and the cost for removing them and surrounding contaminated soils. If there are any lingering health and safety concerns, they should be removed before the property is transferred to the City.

- **More detailed evaluations of the Winehaven building, cottages, and all the other buildings slated for reuse.** This study should identify all needed improvements (as described for Building 6) to make them ready for occupation, and the associated costs. The Navy will be responsible for asbestos removal only if it poses an immediate health hazard. If the Navy does not agree to the removal of asbestos, the City will need to determine where it is a problem, and what it will cost to remove it. A similar assessment should be conducted for lead in non-residential buildings.

- **A trip generation analysis based on the proposed land uses traffic volumes.** Traffic volumes should be estimated to assess the potential impacts on I-580 traffic and required improvements to the I-580 interchange and Western Drive. This study should include any anticipated traffic from the proposed expansion of the Port of Richmond and Wickland Oil project.

- **Public and private bus service feasibility.** The study should also evaluate the cost of bus service alternatives.

- **A detailed seismic assessment of the pier to make it safe for public use.** This study should include a cost estimate for bringing it fully up to the required standards.

- **An assessment of the Navy's water supply system.** This study should address the condition, capacity, and code conformance of the on-site infrastructure to serve existing buildings and additional proposed development, and the costs for required improvements. It should include testing of the fire protection system and an analysis of the water quality, especially in order to determine lead content and some (lead pipes, solder, or lead in cast iron joints). The monitoring system should also be evaluated in terms of the City's ability to assume control.

- **An assessment of the ability of the EBMUD water supply system to serve the site.** The study should include the available capacity of the Potrero tank and distribution line. The capacity should be designed to accommodate proposed development at Point Molate. This should include an assessment of water service demand for the site.

- **An investigation of water-conservation measures for both internal and external use on-site.** This should include an analysis of appropriate drought resistant plants, use of inert materials, and minimum turf area.

- **An analysis of the stormwater system.** The study should evaluate the condition, capacity, and code compliance of the entire system and determine the cost to upgrade it. The study should consider the potential for residual environmental contamination and the need for on-going monitoring.

- **An evaluation of the sanitary sewer system.** This study should assess feasibility and costs of the following alternatives: a package treatment plant, connection to City sewer lines, and manual disposal of solid wastes off-site.

- **An assessment of the electrical system.** The study should analyze the condition, capacity, and code compliance of the equipment and configuration of the system. This study should also assess back-up power supply and metering needs based on the proposed uses. Costs

for supplying adequate and reliable electricity should be included in the study, along with the option of placing the distribution system underground.

- **An analysis of the street light system.** This study should determine the appropriate levels of light throughout the site and how that standard can best be accomplished. The cost assessment should include costs for replacing metal poles with wood poles and burying the lines.

- **An evaluation of the telephone system and telecommunication needs, including fiber optics, Cable TV, and cellular systems.** The study should reflect proposed uses requiring these various systems. The costs of provision/upgrading should be provided where public and non-profit organization uses are being considered.

- **Options for providing fire protection.** A cost comparison should be made between equipping and staffing the on-site fire station and adding positions, if necessary, to Station 61.

- **Options for providing greater security.** Options should include the hiring of security guards and adding the site to the patrol route.

In addition, the following studies should also be performed:

- **More detailed and focused marketing assessments.** Initially, these should be conducted to validate the proposed uses and identify any uses that may have been overlooked. As the Plan gets implemented, additional marketing studies should be conducted to better define potential and appropriate tenants, buyers, and products.

- **Seismic studies.** The potential for severe seismic shaking and liquefaction hazards should be analyzed wherever development is proposed, but particularly in those areas suspected to be fill overlying bay mud (Figure 5 in Appendix B). Calculations should be determined for the maximum credible lateral accelerations as baseline information.

- **Geohydrological studies.** These are needed to obtain a better understanding of the flow of underground water and existing and potential migration of site contaminants. Ongoing monitoring of the lower area of the Northern Development Area is especially critical if the area is going to be developed for residential use and parkland.

- **Environmental clean-up program monitoring.** After Installation Restoration Program sites are cleaned, they should be monitored to watch for further contamination and to ensure that additional hazardous materials are removed or otherwise remediated. All areas of the site to be used or developed and all buildings to remain standing should be independently inspected by the City to determine if

environmental clean-up has been adequately completed. Ongoing
monitoring will be especially critical in those areas planned for
residential and parkland development.

- **Vegetation Management Plan.** To manage the site's vegetation,
  additional studies will be needed to identify plants that need to be
  removed or restored.

- **Additional biological and cultural studies for specific areas.** These may
  be needed when development plans are prepared for specific areas to
  avoid or mitigate adverse impacts on protected and sensitive resources
  including any wetlands that may exist and be adversely affected.

## 2.    Early Reuse

The timing of reuse and development depends on the outcome of a number of
the above mentioned studies. For example, the extent and cost of renovating
and upgrading individual buildings will determine which ones can be occupied
early on (i.e., those requiring minimal improvements), rather than after a
certain amount of revenue has been generated for making major
improvements. Market demand will also have a significant influence on the
sequence of use. The environmental clean-up program if phased as
recommended in the following section, will allow for implementation of this
Plan as proposed. However, remediation to residential use standards may
cause a delay in the implementation schedule. Further, the pace and success
of the environmental clean-up program may affect when new development can
occur in areas where IR sites are located. Early reuse may be restricted to
those IR sites already identified and under remediation.

Reuse of the existing buildings will take precedent over new development,
primarily because of the comparably smaller amount of required capital for
improvements, and the ease of leasing currently available space. As described
in the previous section, there already is competitive interest in the use of most
of the existing buildings. New development will inherently require more time
for the property sales process, site planning, architectural and engineering
design, construction, and lot sales/building leases.

Early uses that will be given highest priority are those which will maximize
public access, promote economic activity, and provide vocational and job
training at minimal cost. A winery will meet all three of these interim use
objectives. Many of the non-profit uses such as a museum, and retreat center
will meet at least two of the three objectives. A satellite college will directly
provide the training, and indirectly, as graduates enter the workforce or start
new businesses, contribute to the economy.

All of the required building uses, if accommodated, are proposed to be in place within a three-year period following building upgrades.

No uses have been assigned to buildings unless they can remain permanently. An attempt was made to avoid designating interim use of a building that is better suited in the long run for another use.

### 3. Environmental Clean-Up Program

Intensive industrial use at Point Molate over the last half century has resulted in extensive hazardous environmental contamination of the site. Under the requirements of the Base Realignment and Closure Act, the Navy initiated the Environmental Baseline Survey (EBS) process at Point Molate to assess environmental concerns. The Draft EBS focused on areas of known environmental contamination, and specifically designated four IR sites for clean-up prioritization under the Regional Water Quality Control Board (RWQCB) Site Clean-up Requirements Order No. 95-235. The sites are: IR-1 (the Waste Disposal Area), IR-2 (the Sandblast Grit Areas), IR-3 (the Treatment Ponds Area), and IR-4 (Shoreline Areas) (Appendix B, Figures 5-4 and 5-8). Approximately two-thirds of the site was classified as Category 7 and requires further field sampling and investigation to identify additional clean-up needs (Figures 5-1 and 5-3 in Appendix B).

Subsequent to the Draft EBS, the Navy prepared the Base Realignment and Closure Clean-up Plan (BCP), published November 1, 1996. It provides general approaches to and schedules for the clean-up of the IR sites. Clean-up at Point Molate has been impeded in the past by the lack of funding, but activities are now being aggressively scheduled to accelerate the process. As reflected in the Environmental Program Master Schedule, the Navy expects all IR sites at Point Molate to meet minimum Community Environmental Response and Facilitation Act (CERFA) requirements for property transfer by the second quarter of the fiscal year 1999. Following are the highlights of the BCP.

According to the final BCP investigation, clean-up is currently underway at only one site, IR-3. A Site Investigation (SI) and Phase I Remedial Investigation (RI) have been completed at IR-1. A non-time-critical removal action is planned to contain floating product and possibly contaminated groundwater. After initiating this removal action, a Phase II RI will be conducted. At IR-2, chromium, lead, nickel, and zinc have been found. Consequently, IR-2 has been identified for accelerated closure. An SI, Phase I RI, and removal action have been completed at

IR-3. A Phase II RI should be initiated as soon as possible to assess the risks associated with residual contamination at the site. IR-4 includes both sediment contamination along the shoreline and upgradient contaminated soil and groundwater along the entire length of the shoreline. A Phase II RI/Feasibility Study was scheduled to begin at the end of 1996. A time-critical removal action is planned at IR-4 to contain floating fuel and a benzene, toluene, ethylbenzene, and xylene (BTEX) plume that is migrating into the bay.

Of the 43 underground storage tanks, 18 have been cleaned and certified for temporary closure, six have been cleaned and are awaiting certification, two are under contract negotiation for lining removal and hydrogen sulfide detection activities, and one is active and has not been cleaned. In addition, 16 heating oil tanks remain in place and in use. Underground fuel lines associated with the industrial sewer system are active and are scheduled for cleaning.

Of the 32 above ground storage tanks, 12 are active and 20 are inactive. Contract negotiations are underway for cleaning five of the active tanks and eight of the inactive ones. One of the inactive tanks has already been cleaned. No further action is currently scheduled for cleaning the other 19 tanks. The active tanks are used by the gasoline station, Building 123, and industrial sewer. All of the aboveground tanks will be removed, but no schedule for doing so has been developed.

A feasibility study on the closure options for the underground storage tanks and the associated fuel pipelines is underway, and a decision will be reached early in 1997.

No remediation of electrical equipment, or the removal of equipment or devices with PCB-containing oils is planned.

All hazardous materials and wastes other than materials that are built into the facilities, such as asbestos, will be removed before the property is transferred if they pose an immediate health hazard. The removal of asbestos from the buildings will be negotiated between the Navy's Public Works Center and the City of Richmond.

The Navy will abate lead-based paint hazards found in the cottages that are intended for reuse as housing. Abatement will not be performed if a building is scheduled for demolition or nonresidential use. Clarification as to whether or not "residential" includes overnight accommodations is advisable.

The oil/water separator (OWS) system discharges into the wastewater treatment plant. Closure is slated for September, 1998, after which the City of Richmond would like to assume control of the plant. Closure and removal of this system depends on the funding and construction of a new wastewater treatment plant, which the Navy intends to incorporate into its 1998 budget. The treatment ponds are an integral part of the industrial wastewater treatment system and are being used in the interim for surface water treatment. Because the treatment ponds are part of the Installation Restoration Program, the plan is to close and dismantle the treatment ponds as quickly as possible to assure that stormwater runoff is not contaminated. Therefore, a package treatment plant is recommended over reuse of the ponds.

No funding has been budgeted for remediation of a small arms range near the southeastern boundary of the site where elevated concentrations of lead are suspected.

Individual parcels of property at Point Molate may be transferred to the City of Richmond for interim reuse based upon a Finding of Suitability to Transfer (FOST) after a Record of Decision (ROD) is made on the EIS/EIR. However, successful reuse of Point Molate can only happen once adequate environmental clean-up has occurred. To expedite reuse, clean-up priorities should reflect the Plan's priorities. It is understood that additional investigation is needed to determine the full extent of contamination at Point Molate, and that subsequent investigation and remediation may result in delays for reuse. At the same time, clean-up schedules and methods should accommodate early and interim reuse to the extent possible which means readying the buildings for reuse first. Areas that require more intensive clean-up, and hence more rigid schedules, include the area in and around the sewage treatment ponds, and in new residential areas, the regional park, and the existing beach where children will play and make contact with soil. The Treatment Ponds IR Site is suspected of being the most contaminated and the most difficult site to remediate on a permanent basis. Clean-up to residential standards may not be practical for the entire site. Contaminated areas in the open space may require fencing when interim use begins, if they have not yet been restored. Permanent fencing may need to be considered in areas that are low priorities, or where the extent of petroleum contamination cannot be determined.

The priorities for implementation are shown below and are reflected in the three phases of reuse implementation described in Section 7, below. These respond to the City's desire to first reuse existing buildings, most of

which are in the Core Historic District, followed by reuse and development of the immediate surrounding areas (the Northern Development and Shoreline Park and Hillside Open Space) for a variety of purposes in support of reuse of the Winehaven Building and cottages. After this, the focus will shift south to the undeveloped areas where development is proposed to help raise capital for longer-term improvements. The last priority is the multi-family area proposed at the bottom of the Waste Disposal IR Site.

1.     Historic District (IR-2; Categories 6 and 7)

2.     Northern Development Area (IR-2 and IR-3; Categories 5, 6, and 7)

3.     Shoreline Park (IR-3 and IR-4; Categories 5, 6, and 7) and Hillside Open Space (IR-4, Category 7)

4.     Southern Development Area (with the exception of the multi-family housing area, which should be the last clean-up priority) (IR-2; Categories 6 and 7)

5.     Central Development Area (Category 7)

6.     Southern Development Area multi-family housing portion (IR-4, Category 6)

### 4.   Jurisdictional and Regulatory Considerations

To implement the Plan, the requirements, restrictions, policies, and plans of a number of other jurisdictions must be taken into account. Consultation with and permits from certain agencies may be necessary. These are discussed below.

a.   Advisory Council for Historic Preservation (ACHP) and State Historic Preservation Office (SHPO). As mandated under Section 106 of the National Historic Preservation Act (Public Law 89-515), the ACHP is responsible for implementing regulations related to the evaluation of historic properties, and for providing comments on those actions that will have an effect on eligible or listed properties. The definition of historic properties includes archeological sites and properties of traditional cultural value, as well as those solely of historic significance. The criteria for evaluating National Register eligibility or significance of historic properties are found in 36 CFR 60.4.

Regulations relating to the Historic District at Point Molate are important since the Plan is proposing reuse or demolition of historically significant buildings and grounds. A formal request to upgrade and renovate for reuse 33 of the historical buildings and to demolish Buildings 6 and 17 must be reviewed and approved by the SHPO and ACHP. Proposed changes within the Historic District are subject to the Standards for Rehabilitation of the Secretary of the Interior.

If private developers plan to utilize the 20 percent investment tax credit for renovating historic buildings, proposed development projects will need to be reviewed by the SHPO. Also, any ground disturbing activities in the vicinity of known or suspected archeological resources will require field investigations and protection under the California Environmental Quality Act (CEQA), Public Resources Code Section 5021.1[b]. In addition, California Health and Safety Code Section 7052 prohibits the disturbance of human remains except under certain conditions. This code specifies procedures to be followed in the event that Native American graves are found.

b.    State Lands Commission. The State acquired sovereign ownership of all tidelands and submerged lands and beds of navigable waterways upon its admission to the United States in 1850. These lands are commonly referred to as public trust lands, and are to be used for purposes of commerce, navigation, fisheries, water-oriented recreation, preservation in their natural condition, and other public trust uses. Through various acts beginning with Chapter 317, Statues of 1913, the California Legislature has granted state tide and submerged lands to the City of Richmond. These acts give the City administrative rights. The State Lands Commission has oversight responsibility to insure that City action are consistent with the terms of the granting statues.

Regarding areas which are subject to the public trust, the State Lands Commission has stated that tideland within Point Molate which had been sold by the Board of Tide Land Commissioners (BTLC) in the last century and which were filled by 1980 are free of the public trust, as are areas within the facility which historically were above tides. Present day tide and submerged lands and tidelands filled after 1980 will remain subject to the public trust and to the grants to the City of Richmond.

c.    San Francisco Bay Area Conservation and Development Commission (BCDC). Within the San Francisco Bay, the BCDC has primary land use planning authority over public trust tidelands and adjacent public land. The overriding documents controlling use of the

tidelands and shoreline is the BCDC Bay Plan, as amended, which shows Point Molate as "Waterfront Park, Beach." Where possible, BCDC designated parks should emphasize hiking, bicycling, riding trails, picnic facilities, viewpoints, beaches, and fishing facilities. Recreational facilities that do not need a waterfront location, e.g., golf courses and playing fields, should generally be placed inland, but may be permitted in shoreline areas if they are part of a park complex that is primarily devoted to water-oriented uses. Limited commercial recreation facilities, such as small restaurants, should be permitted within waterfront parks provided they are clearly incidental to the park use, are in keeping with the basic character of the park, and do not obstruct public access to and enjoyment of the Bay.

The BCDC San Francisco Bay Plan will need to be amended to accommodate all the proposed uses which are not related to parks and open space.

The BCDC considers any expansion of an existing pier and the construction of new piers in the San Francisco Bay as fill and requires permits for such improvements. In addition, new storm and sanitary outfalls that discharge within the BCDC jurisdiction require the approval of the BCDC.

d.    State of California Regional Water Quality Control Board (RWQCB). The RWQCB is charged with enforcing federal Storm Water Pollution Prevention Programs (SWPPs) and National Pollutant Discharge Elimination System (NPDES) requirements for the region. The RWQCB identifies beneficial uses and water quality objectives for the San Francisco Bay. Beneficial uses identified at Point Molate include commercial, recreational, and navigational uses.

The RWQCB also has responsibilities for implementing the Federal Clean Water Act. This includes permit responsibilities for both non-point source (stormwater) and point-source discharges of pollutants. The RWQCB issues Water Quality Certifications for any discharge into federal navigable waters (including the Bay) under Section 401 of the Clean Water Act.

e.    The U.S. Army Corps of Engineers (COE). Permits from the COE will be required only if Plan implementation necessitates any dredging, filling, or other disturbance of wetlands and navigable waters (33 CFR 320.4). Under Section 404 of the federal Clean Water Act, wetlands are defined as "those areas that are inundated or saturated by surface or

ground water at a frequency and duration sufficient to support, and that
under normal circumstances do support, a prevalence of vegetation
typically adapted for life in saturated soil conditions." Indicators of all
three wetlands parameters (hydric soils, hydrophytic vegetation, wetlands
hydrology) must be present for a site to be considered a jurisdictional
wetland. COE involvement is not anticipated at this time because
construction at the shoreline is not expected.

f.    California Department of Fish and Game (CDFG). California
provides procedures for state listed species under the California
Endangered Species Act, CDFG Code Section 2090. Also, the CDFG has
the authority to reach an agreement with a party proposing to affect
wetlands pursuant to Section 1603 of the California Fish and Game Code.
In accordance with its policy of "no net loss" of wetland habitat, the
CDFG encourages the avoidance or mitigation of impacts to all wetlands,
regardless of acreage. CDFG involvement is likely only if wetlands or
sensitive plant and animal species may be affected by proposed
development on the site. Based on current surveys, which may be
inadequate, no state listed species exist at Point Molate.

g.    The U.S. Fish and Wildlife Service (USFWS). The federal
Endangered Species Act requires that the USFWS issue a permit prior to
actions that could result in the killing, harming, or harassing of a federally-
listed endangered or threatened species. This permit process is directed
under Section 7 for actions in which a federal agency is involved and in a
similar process under Section 10a for state and local agencies, as well as
for individuals. USFWS involvement is unlikely unless further field
surveys uncover evidence of federally listed species such as the Alameda
whipsnake on the site.

h.    East Bay Regional Parks District (EBRPD). EBRPD is a limited
purpose agency with the responsibility of developing and operating a
regional park system in the East Bay. Point Molate is included in the
District's Master Plan and 1988 financing program (Measure AA).
EBRPD's Master Plan proposes a Bay Trail that would encircle the entire
Point San Pablo Peninsula (pers. comm. with Martin Vitz). The Bay Trail
Plan, which is supported by EBRPD, shows a desired alignment through
Point Molate following a railroad right-of-way along the shoreline.

5.    Capital Improvements and Financial Feasibility

As described in Section B and above, there are significant building,
transportation, and utility improvements needed at Point Molate to

accommodate users in the existing buildings and new development. The extent of costs for these improvements are unknown at this time. It is also unclear what portion of the improvements may be fundable through new development on the site.

The City hopes to fund some of the building and infrastructure assessments and the more immediate, critical improvements through special federal government grants. State industrial bonds are another potential source of revenue. General Fund monies are not likely to be a funding source.

The primary revenue is expected to be generated through the sale of land parcels in the Northern, Central and Southern Development Areas for new residential and light industrial development. This revenue will be supplemented through the leasing of existing buildings and possibly land (e.g., the Shoreline Park by EBRPD, buffer areas by Chevron). Early building lease revenue will not be sufficient for upgrading buildings. Most infrastructure and building improvements may be delayed until new development occurs. Developers can be required, as part of the land sales agreement to upgrade existing facilities. These costs must be kept reasonable in order to maintain marketability.

The City may designate Point Molate as a redevelopment area to attract private developers who would otherwise find development financially unviable.

6.     **Demolition**

The Navy is not required to demolish any buildings and will consider demolition only if the cost of demolition is less than the cost of caretaking those facilities. Therefore, the costs of demolition will affect the City's ultimate determination of what buildings and structures should be removed.

It is important that the City further assess the condition and potential reuse of Buildings 6 and 17, which are on the NRHP, as soon as possible, and decide if they should or should not be demolished.

A determination should also be made regarding the cottage garages, which are also on the NRHP. These are in generally fair or poor condition, and will be incongruous with the overnight accommodation use planned for the cottages.

Building 132 (POL operations), near the base of the pier, which has 2,688 square feet of space and is in good condition, is recommended for reuse in association with the proposed regional park and/or waterfront commercial recreation. However, upon inspection, this building may not be practical for reuse, in which case it should also be demolished.

Buildings and other structures that should be demolished, unless they are determined to be critical to the functioning of utility systems and are more cost-effective to renovate rather than replace, include the following:

- Structure 14 A (fuel dispensing station)
- Building 24 (storage shed)
- Building 68 (pump house #2)
- Building 69 (pump house #1)
- Building 70 (Gager's gear locker)
- Pump House #6
- Building 73 (water pump house)
- Building 76 (waterfront operations)
- Building 77 (oil spill storage)
- Building 82 (pump house #3)
- Building 83 (pump house #4)
- Building 86 (pump house #5)
- Building 88 (vehicle wash)
- Building 89 (drum filling shed)
- Building 93 (range house)
- Building 94 (truck oil loading facility)
- Building 95 (shed)
- Building 115 (transmitter building)
- Building 118 (storage shed)
- Garages 55, 65, 67, 80, and 81 (on the NRHP)

In addition, extraneous pavement, fencing, and other miscellaneous structures and unusable utilities should also be removed. The Navy is conducting a study early in 1997 to decide if the fuel tanks and pipelines should be removed or left in place. The City should encourage the Navy to remove the tanks in the Central Development Area, all exposed pipelines, and any underground pipelines that cross areas planned for development, including the proposed Shoreline Park.

As discussed in Section 4 above, the cost to upgrade the pier and the capability of the City to make these repairs needs to be determined early on, along with possible requirement that the Navy be responsible for demolishing it if the City is unable to pay for the mandatory improvements.

Priorities for demolition and removal should be based on the following criteria:

1. Uneconomical upgrade costs
2. Impractical for reuse
3. Relatively little marketing value/no expressed interest in reuse
5. Degrades visual quality

## 7. Phased Action Plan

Implementation of the Plan will be sequenced in three phases (Table 3) beginning after the Record of Decision has been made based on the EIS/EIR. The goal of the phased plan is to establish the envisioned reuse themes in both an economical and timely fashion. The phasing plan is structured to accommodate the extensive environmental clean-up that needs to occur, as well as the need for major infrastructure improvements. In all, final reuse is estimated to take place in a 20-year period.

The first phase of action will be instrumental in developing a solid foundation for implementing this Plan. The goal of Phase One is to plan for site-wide infrastructure improvements, as well as to activate the heart of the site, thus firmly establishing the reuse vision of historic preservation, mixed-use development, and job training. A Specific Plan will be used to resolve development issues and to provide specific development strategies. Early reuse of the Historic District, Northern Development Area and Shoreline Park will attract visitors to the site while establishing the character for further reuse and development of Point Molate.

In addition, the preparation of a Vegetation Management Plan will guide the management of non-native plant species and the restoration of native species. A comprehensive study of the existing vegetation at Point Molate will be included in this effort.

In Phase Two, additional infrastructure improvements will be made to accommodate new development, which will begin to occur in the Northern and Southern Development Areas. Western Drive will be improved in support of reuse and new development, including providing for bicycle and pedestrian traffic. If funding for upgrading existing buildings and associated infrastructure cannot be obtained in Phase One, some Phase Two development may need to occur earlier.

The focus of Phase Three will be to complete residential development. Infrastructure improvements will be fully installed during Phase Three, as well as the remaining landscaping.

**Table 3**
**PHASED ACTION PLAN**

| PHASE I (0-5 YEARS) | PHASE II (5-10 YEARS) | PHASE III (10-20 YEARS) |
|---|---|---|
| **PLANNING/PLAN IMPLEMENTATION** | | |
| • Negotiate transfer of property with Navy<br>• Prepare building leases<br>• Prepare Specific Plan<br>• Amend General Plan<br>• Amend Zoning Ordinance<br>• Prepare Vegetation Management Plan<br>• Negotiate use or acquisition of railroad ROW<br>• Submit for SHPO approval proposed renovations for historic buildings | • If Building 6 is demolished, sell a development parcel in the Northern Development Area for light industrial use (or alternatively for residential use)<br>• Sell the larger development parcel in the Southern Development Area for single family housing (or alternatively for light industrial use)<br>• Review and approve the development plans for these two parcels | • Sell remaining parcels of land in the Central and Southern Development Areas (if deemed financially necessary) for private development<br>• Review and approve development plans |
| **INVESTIGATION STUDIES** | | |
| • Coordinate with EBMUD to ensure sufficient water capacity to site when EBMUD upgrades their system<br>• Make final building and pier assessments and demolition determinations<br>• Assess water system<br>• Assess stormwater system<br>• Assess sanitary sewer system<br>• Assess electrical system<br>• Assess street light system<br>• Assess telecommunications needs<br>• Assess fire protection options and implement preferred option<br>• Assess security options and implement preferred option<br>• Conduct additional marketing, seismic, geohydrological, biological and cultural studies | • Assess the potential for providing mass transit | — |
| **DEVELOPMENT** | | |
| • Establish a trail system in the Hillside Open Space<br>• Renovate buildings in the Historic District and Northern Development Area for reuse<br>• Develop Bay Trail and promenade, including landscaping, paving, and site furniture installation<br>• Retrofit the pier | • Continue development of the Regional Park<br>• Develop parcel in the Northern Development Area (developer's responsibility)<br>• Develop larger parcel in the Southern Development Area (developer's responsibility)<br>• Design and develop the entrance to the site | • Develop Central and Southern Development Areas (developer's responsibility) for multi-family housing |

Table 3 *continued*

| INFRASTRUCTURE IMPROVEMENTS | | |
|---|---|---|
| • Upgrade buildings to be leased early on<br>• Upgrade utilities associated with buildings to be reused (except for street lighting)<br>• Provide gas, telecommunications, and other services to existing buildings that are not currently served but would benefit from such services | • Widen and resurface Western Drive and provide for a pathway and landscape improvements<br>• Upgrade the street lighting system throughout the site<br>• Extend all utilities to the new development areas (developer's responsibility)<br>• Provide additional public safety services as needed | • Extend utilities to new development areas (developer's responsibility) |
| **ENVIRONMENTAL CLEAN-UP** | | |
| • Monitor the Navy's environmental clean-up program<br>• Remove asbestos and lead paint from buildings to be reused if the Navy does not agree to do this | • Continue monitoring of the Navy's environmental clean-up program | • Continue monitoring the Navy's environmental clean-up program |

* Investigation studies will be included in a Specific Plan if the City opts for this planning mechanism.

## Chapter II
## BACKGROUND INFORMATION

■ ■ ■

### A. Existing Conditions

The first step in developing the reuse plan for Point Molate involved
conducting an inventory and analysis of existing conditions on-site and within
a regional context. Environmental documents and study reports were
reviewed and combined with site reconnaissance and interviews with experts to
create the existing conditions inventory. This information was then analyzed
and graphically portrayed as a set of opportunities and constraints maps
(Figures 3 and 4), thus providing a comprehensive guide for determining
future reuse and development of Point Molate.

### 1.    Local Setting

Point Molate is located in the City of Richmond, in West Contra Costa
County. Contra Costa County is part of the nine-county San Francisco Bay
Area, which has a population of approximately six million people, and the
fourth largest economy in the United States.

West Contra Costa County is also densely populated, housing 25 percent of
the County's residents. In terms of its location, high density development,
and ethnic diversity, West Contra Costa County has a stronger relationship to
cities in Alameda County, such as Oakland, Berkeley, and Albany, than to
cities in East Contra Costa County, such as Walnut Creek, Concord, and
Antioch.

a.    Land Use and Population. Richmond is the largest city in West Contra
Costa County both in terms of land area and population. The City
encompasses approximately 35 square miles of land on the edge of San
Francisco Bay. Approximately 34 percent of the land is designated as open
space, the most extensive land use in the City; City parks comprise 240 acres,
and regional parks comprise an additional 5,541 acres of open space. The
second largest land use category is residential, comprising 33 percent of the

land in Richmond. The remaining land includes a mix of commercial and industrial uses.

Incorporated in 1905 with a population of just 2,000, Richmond's population exploded with the growth of the local ship-building industry during World War II. By 1950, Richmond's population increased to 99,200. However, after the shipyards closed following the war, the local economy weakened. People began to leave Richmond, and by 1960, the population had decreased to 71,900.

In recent years, Richmond's population has grown four percent from 87,425 in 1990 to 90,916 in 1996 (State Department of Finance, 1996). Twenty-six percent of the population is under 18, and 11 percent is over 65. The average household size is 2.7 persons (January, 1995 estimate). The ethnic make-up of Richmond's population is described in Table 4:

**Table 4**
**CITY OF RICHMOND RACIAL/ETHNIC GROUPS**

|  | No. | Percent |
|---|---|---|
| Black | 38,292 | 43.8% |
| White | 31,648 | 36.2% |
| American Indian, Eskimo & Aleut | 525 | 0.6% |
| Asian & Pacific Islander | 10,316 | 11.8% |
| Other Race | 6,644 | 7.6% |
| Total | 87,425 | 100.0% |
| Hispanic Origin * | 12,690 | 14.5% |

\* Hispanic is not an ethnic category. Persons of Hispanic origin may be of any race.

Source: 1990 U.S. Census.

b.    Housing.  Richmond had a total of 34,530 year-round housing units in 1990, of which 32,747 (95 percent) were occupied units, and 1,783 (five percent) were vacant units. Forty-six percent of the occupied housing units were rentals and 54 percent were owner-occupied. Richmond has increased its housing units by 3 percent since 1980 to its current level of 35,571 units.

Richmond is one of the more affordable communities in the San Francisco Bay Area for home ownership. The median value of owner-occupied homes

in Richmond was $144,000 according to the 1990 Census. However, only 15 percent of the housing units in Richmond are affordable to low-income households. This cost gap poses a particular problem for first-time homebuyers.

The majority of Richmond's rental housing stock (82 percent) consists of units with two or fewer bedrooms. Only 18 percent of the rental units have three or more bedrooms. Richmond has a high incidence of overcrowding among large-related households (five or more persons). For low- and extremely low-incomes groups, the rate of overcrowding is 76 percent and 73 percent, respectively.

Over 50 percent of the county's homeless population lives in Richmond, making it the largest homeless provider in the county and the most frequented destination for the county's homeless individuals. Richmond provides 40 percent of the homeless facilities for Contra Costa County yet receives less than 40 percent of the available funding to maintain services (City of Richmond, 1996).

Although the City of Richmond is committed to providing increased housing opportunities to low- and extremely low-income groups, as well as to the homeless, the greatest need for housing is for moderate- and above-moderate income households, as indicated in Table 5:

**Table 5**
**PROJECTED HOUSING NEEDS BY INCOME GROUPS**
**FOR THE PERIOD 1995-2000**

| Income Group* | Average Earnings | Percentage of Units Based on 1988-95 Projections | Number of Units Needed |
|---|---|---|---|
| Very Low-Income | $29,200 | 1.1% | 27 |
| Low-Income | $41,600 | 5.8% | 143 |
| Moderate-Income | $58,400 | 32.2% | 792 |
| Above Moderate-Income | $70,080 | 60.9% | 1,498 |
| Total | | 100.0% | 2,460 |

* For a family of 4 persons.
Source: City of Richmond Planning Department.

c.    Employment.  Richmond's labor force was estimated to be 43,044 in 1990, an increase of 31 percent over the 1980 figure of 32,909.  The City's overall unemployment rate in 1990 was about 10 percent (U.S. Census, 1990). This was much higher than the County's unemployment rate of five percent and slightly higher than the City's 1980 rate of nine percent.  The unemployment rate among Blacks was disproportionately high in 1990: 14 percent as compared to five percent for Whites.  For Hispanics, the 1990 unemployment rate was 11 percent.  According to the State Employment Development Department, Richmond's unemployment is one of the highest in Contra Costa County, at 10.4 percent.  As a result of regional military base closures, 146 Richmond residents have lost military-related jobs (including the 11 job losses at Point Molate).  This has heightened the need for additional job-training and employment opportunities.

Richmond is currently faced with increasingly limited resources and an increasing demand for community services and facilities.  With a 10 percent rate of unemployment, 20 percent of individuals 25 years of age or older without a high school diploma, and 18 percent of all households headed by females (31 percent of these households are below the poverty level), there is an increasing demand for a variety of job readiness and employment training services.

Future job opportunities in Richmond have been projected to be mostly in the service, retail, and high technology industries.  However, the greatest employment needs for Richmond residents will be in re-entry jobs. Additionally, there is a need to train women for non-traditional occupations in local refineries, bio-technology industries, and construction.  Employment and job-training services are also needed for homeless persons.

d.    Economy.  Richmond has a diversified local economic base including the Hilltop Mall regional shopping center, the extensive wholesale flower nurseries in North Richmond, the Port of Richmond deep water terminal facilities, Chevron Refinery, and the University of California at Berkeley's Field Station.

Richmond is the government center and major manufacturing and transportation hub for West Contra Costa County.  Oil refineries, chemical plants, and other basic manufacturing industries such as fabricated metal comprise the City's industrial base, supported by major rail lines and marshalling yards, a deep water port, three freeways, BART, and a maze of pipeline.

In 1995, the two largest manufacturing employers in Richmond were: Chevron USA Refinery (1,658 employees in Richmond); and Zeneca, Inc. (formerly ICI Americas, Inc., and formerly Stauffer Chemical, 327 employees). Richmond's three largest non-manufacturing employers in 1995 were: the City of Richmond (1,340 employees); Chevron Research and Technology (1,313 employees); and the U.S. Government Social Security Payment Center (1,260 employees).

The estimated average household income in the Richmond area in 1995 was $39,100 (Association of Bay Area Governments-ABAG projections). Average household income is projected to be $40,100 by the year 2000.

The Richmond economy is currently undergoing a major transition from its former heavy industrial character towards more light industry and modern high technology companies. Also, there are new residential communities and business parks that accommodate both light industrial and "office/flex" type commercial buildings. As a result of this image shift, Richmond has experienced an influx of research and development industries. At the same time, the major manufacturers are continuing to upgrade their Richmond facilities, making major investments in modernization and expansion.

e.    Economic Projections. Similar to the Bay Area as a whole, Richmond is experiencing a recent reversal in its economic conditions. Comparisons between the years 1994 and 1995, and projections for 1996 highlight the following improvements:

- Unemployment in Richmond decreased from 10.8 percent in April, 1995 to 10.4 percent in April, 1996.

- New housing development in Richmond for 1996 was more than three times that of 1995 (62 units in 1995, and 200 for 1996).

- Richmond building permit values increased 41 percent over the 1994 issuance values.

- Assessed valuation increased 1.5 percent from 1994/95 to 1995/96.

In addition, regional marketing indications are positive. Research and development (R & D) vacancy rates continue to decline as the market continues to improve in the Bay Area. Mortgage interest rates have remained stable and are expected to remain so. Employment projections estimate an 11.5 percent increase in all job classifications over the next five years throughout the Bay Area region. All of these economic indicators point to a window of opportunity for development at Point Molate. R & D, office flex,

retail, and residential providers will be seeking locations to develop their products.

## 2.    Land Status

Approximately 415 acres of land (only 285 of which are above the mean higher high water line) at Point Molate is owned by the U.S. Navy. Tidal and submerged lands at Point Molate are held in a State public trust easements administered by the City (Section 14c for additional information). In addition to the land owned by the Navy, a 10.2-acre parcel adjacent to the northeast corner of the site is leased from Chevron USA. Until recently, the property was used as a Naval fuel supply station for The Department of Defense. The Navy ceased operation of the site on September 30, 1995. The Department of Defense will retain ownership throughout the base closure and realignment process until July 2001 or sooner, when it will be transferred in fee title to the City of Richmond. The City leases an existing 18-acre parcel (most of which is submerged) at the southern end of the site from the Navy as a park.

A railroad right-of-way (ROW) traverses the property along the shoreline and continues northward around the Point San Pablo peninsula. The 50-foot wide ROW is owned by Burlington Northern/Southern Pacific (pers. comm. with Rick Nygren). Under a 1963 agreement with the Navy, the railroad company is responsible for maintaining this main line, while the Navy is responsible for maintaining spur lines and associated trackage separate from the main rail line. The rail lines are in disrepair.

The City of Richmond owns and maintains a 40-foot wide road right-of-way along Western Drive between I-580 and Terminal #4 through the Point Molate site.

## 3.    Access and Circulation

Western Drive provides access from I-580 to the site and is the only road to Point Molate. The existing I-580 interchange is very restricted in that it only provides direct access to and from the Richmond area. Eastbound I-580 traffic cannot exit onto Western Drive without some inconvenience. The exit to Point Molate is not well signed and visible. The eastbound entrance to I-580 is an unconventional left-hand on-ramp.

Western Drive is a 24-foot wide, two-lane, non-standard (e.g., no curbs or gutters), two-directional road with varied ownership. The City of Richmond has a 40-foot easement along Western Drive from I-580 to Terminal #4. The

roadway has no shoulders, sidewalks, or bicycle paths. There are extensive pot holes and loose gravel.

The majority of traffic on Western Drive is generated from Port of Richmond properties, Shoreline Park, the Chevron Rod and Gun Club, San Pablo Yacht Harbor, East Brother's Lighthouse, and clean-up activities associated with Point Molate. Truck traffic, generated by PAK Tank (Port of Richmond operation north of Point Molate) amounts to between 100 and 230 tanker truck trips per month. There have been related incidents of tank spillage, leading to the closure of sections of Western Drive (Uribe and Associates, 1995).

Point Molate is extensively covered with secondary roads and large areas of pavement. The roads are generally narrow and poorly maintained. Secondary roads in the hillside area are also steep, potholed, and overgrown with weeds. There are no street signals and traffic flow is unclear in some areas. Parking is plentiful but not clearly defined.

There is currently no public transit service to Point Molate. There are also no designated bicycle or pedestrian paths on site or connecting to the site.

Extending 1,450 feet into San Francisco Bay from the Point Molate shoreline is a T-shaped fuel pier that was built in 1942 and has been periodically rehabilitated. The outboard length of the pier measures 552 feet; the inboard measures 468 feet. Mooring islands off the north and south ends of the pier allow berthing of ships up to 800 feet long. The pier can service four ships or barges simultaneously and has a load capacity of 80,000 tons. In the past, the Navy regularly dredged a channel around the pier to a depth of 35 feet below the mean lower low water (MLLW) level. However, without dredging, the natural depth near the end of the pier is approximately 18 feet (pers. comm. with Tom Robertson). This depth will accommodate private pleasure crafts and large historic naval vessels (pers. comm. with Bob Burnett of the S.S. Jeremiah O'Brien).

## 4. Buildings

An overview of the buildings at Point Molate is presented in the introduction in Chapter I. The condition and potential reuse of buildings are discussed in the Reuse Plan section, where appropriate. The buildings and their conditions are summarized Table 1.

## 5.    Infrastructure

a.    <u>Water.</u>  Potable water is provided to the site by the East Bay Municipal
Utility District (EBMUD) via the Potrero and Richmond reservoirs and the
Western Drive pipeline.  Combined, the purpose of these reservoir facilities
is to provide storage for operational, emergency, and fire flow storage for uses in
the Point San Pablo/Point Molate/I-580 area.  Potrero Reservoir is part of the
Central Pressure Zone, which includes Richmond Reservoir located in Point
Richmond.  Potrero Reservoir also acts to hold the water pressure gradient at
the end of the long Western Drive pipeline.

Water is received at Building 13, pumped to a tank located mid-slope, and
then pumped to a 1,134,000-gallon storage tank at the top of the hill
(Appendix B, Figure 4-4).  The Navy provides its own water system from
Building 13.  A monitoring system relays information from Building 13 to
FISCO.  The Navy's water system was installed in the 1940s and has
experienced many leaks due to age and topographical differences.

Currently, the water system at Point Molate is shut down and bottled water is
being brought in for existing personnel.  Although the main line is operable, it
provides water for fire protection only.

EBMUD plans to replace about 15,700 feet of deteriorated 6-inch diameter
pipe located in the north section of Western Drive with a 12-inch line.  This
will improve delivery from 470 to at least 1,000 gallons per minute at 20 psi of
residual pressure.  Another 23,000 feet of existing 8-inch and 16-inch pipe will
remain in place between the replaced pipe and Richmond Reservoir.

Potrero Reservoir, a 1,000,000-gallon welded steel reservoir will be replaced
with a 400,000-gallon pre-stressed, above-ground concrete tank.  This reduced
size is based on industrial land use projections for the area which indicate that
far less water will be needed in the future.  (Richmond Reservoir at
11,400,000 gallons is expected to satisfy fire flow storage along with 120,000
gallons in the new Potrero Reservoir.)

A bid opening for improvements to the Western Drive pipeline and the
Potrero reservoir was held in January, 1997.

It is also important to note that where tested, lead has been detected in the
navy's water supply system at levels exceeding EPA standards.

b.  Sanitary Sewer. A primary wastewater treatment plant and secondary treatment ponds are located at Point Molate (Appendix B, Figure 4-6). During fueling and storage operations, the design capacity of the system was 24,000 gallons per day. Additional details of this facility are unknown. Operation of this system was terminated by the Navy in conjunction with its cessation of fueling operations. The treatment plant has been closed and cleaned, but not dismantled. Sanitary sewer lines have been plugged with rubberballs and are cement-capped at manholes. Currently, portable toilets are available for use by remaining personnel.

c.  Industrial Sewer. There are two active underground fuel/wastewater piping systems: the Oil Reclamation Plant (ORP), more commonly known as the Ballast, Sediment, and Wastewater (BS&W) system, and the Oil Recovery System (ORS). The BS&W system (Appendix B, Figure 5-2) was used to transfer ballast, wastewater and fuel from the pier and other areas to tanks 20, B, and C for temporary storage. The tank contents were then allowed to settle, allowing the separation of fuel and wastewater. The fuel was extracted for recycling and the wastewater was transferred to tank E, then to the oil water separators, and finally, to the treatment ponds.

d.  Storm Water. Stormwater is collected throughout the site in a series of storm catchment basins and storm drains. Stormwater from various areas is channeled to a "boat box", which is equipped with belt fuel skimmers designed to remove floating fuel from stormwater before discharge into San Francisco Bay. The collection system is comprised of stormwater sewers, storm catchment basins, bay outfalls, and within the ORS, holding and settling tanks.

e.  Electricity. Pacific Gas & Electric (PG&E) provides electricity to the facility by a single 12.5 kV (kilovolt), three-phase service overhead distribution line. The service terminates at the main switchgear across from building 13, the main substation (Appendix B, Figure 4-5). The electric system from this point on belongs to the Navy Department of Public Works. One 12.5 kV feeder runs from the main switchgear to the main substation where it is stepped down to 2,400 volts for distribution. A second 12.5 kV feeder extends from the switchgear via an overhead line to a substation at the POL Pumping Station.

There are five 2.4 kV overhead distribution circuits that emanate from the main substation. Feeder #1 serves the storage tanks and other facilities on the south half of the site; Feeder #2 serves the cottages along the northern end of Western Drive; and Feeder #3 serves the storage tank facilities in the northeastern portion of the site. Circuits #4 and #5 serve the western area, including the administration offices. With the possible exception of circuits

#4 and #5, it does not appear that the circuits are connected via normal open tie switches, which would allow a transfer of load on another circuit in the event of a failure.

Eighty-three primary electrical devices were identified at Point Molate during a PCB survey conducted by the Public Works Center in 1993. Two oil switches and two transformers were found to contain PCB concentrations between 5 and 49 parts per million (ppm). Seven transformers were found to contain greater than 50 ppm of PCB, but less than 500 ppm. The remaining 72 devices contained less than 5 ppm, with most devices containing less than 2 ppm of PCB.

f.    Street Lighting.  The street and area lighting system consists of overhead high pressure sodium fixtures mounted on wood, electric, or dedicated poles (Appendix B, Figure 4-5). The existing street lighting system provides minimal illumination and is adequate only for a rural environment.

g.    Telephone.  Pacific Bell provides service to Point Molate and owns the telephone lines on the site. The on-site system is part of the Navy's Consolidated Area Telephone System (CATS) and the equipment is owned and operated by the Navy (Uribe and Associates, 1995). Cable TV is provided to the cottages and fire station (pers. comm. with Tom Robertson).

6.    Public Services

Public services (fire and police) are provided by the City of Richmond. Until the property is transferred, the Navy provides additional security. The City is currently negotiating with Engineering Field Activity West (EFA-West) Naval Facilities Engineering Command to assume Caretaker Status of the site and Retrocession of Jurisdiction, which would allow full City authority by the Richmond Police Department.

In the past, the Point Molate Naval Fueling Station employed a five-shift fire-fighting team. The Fire Chief also served as the Security Officer. There is a functioning fire station at Point Molate with the following Navy-owned facilities: a fire engine, a pumper truck, a brush rig, and miscellaneous emergency equipment. There is also an existing heliport to the north of the Winehaven building that provides emergency access to the site.

The closest facilities are Fire Station House 61 in Point Richmond (over the standard 6-minute response time), Southwest Police Substation (3-5 minute response time), and Kaiser-Richmond Hospital (8-minute response time). The

site is currently connected to the City of Richmond Emergency Response System (911).

## 7.    Topography

Point Molate is located on the west facing slopes of the Potrero Hills, which form a peninsula between the northern end of San Francisco Bay and the southeastern end of San Pablo Bay. The western edge of the site is at sea level. The eastern edge follows the Potrero Hill ridgeline at approximately 500 feet above mean sea level. Approximately eighty-four acres, or one-third of the dry land portion of the site is under 15 percent slope (some of which is reclaimed tidal land). The remaining 195 acres of dry land has slopes up to 50 percent. The submerged lands have a very low gradient, so that a large amount of tidelands are exposed at low tide.

## 8.    Soils and Geology

The Potrero Hills are composed of shales, sandstones, and some chert. These rocks are strong, although highly fractured. Soils at Point Molate are derived either from weathering of the underlying Franciscan Formation, or from accumulations of bay mud deposits beneath artificial fill. Most of the flat land adjacent to the bay represents the latter condition. The Franciscan Formation is composed of sandstone, serpentine, chert, greenstone, and other metamorphic rocks. In an unsheared state, these rocks are dense and hard and relatively stable during earth-shaking. Soils formed in the steep slopes tend to be shallow and well-drained. Landsliding occurs on the steeper, exposed slopes of the site. There have been three landslides since 1988. Erosion problems are evident where there is little vegetation holding the soil in place (LSA Associates, 1987).

Appendix B includes a plan of the distribution of the native soils and urban fill soils where tidal lands have been filled for development between two and 15 feet deep (Figure 5). Below the fill is a layer of soft, silty clay with organic matter known as bay mud (Qhbm). A majority of the site under 15 percent slope, however, is recent fill underlain by alluvium. The bay mud "pinches out" and is not present in areas landward of and higher than the 1898 shoreline.

The underground tank field is primarily located on the geologic Potrero-San Pablo Ridge. The ridge areas are typically underlain by thin soil and colluvium, over bedrock. The tanks are generally sited on fill over colluvium and/or bedrock.

## 9. Hydrology

Surface drainage flows down natural channels and slopes, and via storm drain channels and culverts. Drainage is controlled in the developed areas by curbing, runoff channels, and storm drains.

The amount and movement of groundwater at Point Molate is controlled by topography, geology, and seasonal trends. Groundwater movement generally occurs within preferential flow pathways, including alluvial channels, unconsolidated emplaced fill, relatively loose horizons within colluvium, or fractured and fissile bedrock zones. The presence of groundwater is consistent along shores having little or no relief, and forms a highly variable water table that is, in some places, in hydraulic communication with the San Francisco Bay. Natural groundwater divides (subcropping bedrock) are also present at Point Molate. The steep topography controls groundwater flow from higher elevations to the bay.

Tsunami runup of up to 10 feet above MLLW can be expected on the site. With the possible exception of the sewage treatment plant, no buildings are below this line.

## 10. Seismicity

Point Molate is located in the tectonically active Coast Ranges Geomorphic Province near the contact between the North American and Pacific crustal plates. In the San Francisco Bay region, the San Andreas fault system (which includes the Hayward and Calaveras faults) is an important structural boundary. The faults within this structural setting exhibit primarily horizontal movement.

Historically, four major earthquakes have occurred in the San Francisco Bay Area since 1800. Two of these earthquakes occurred along the San Andreas Fault, and two occurred along the Hayward Fault. In addition, the October, 1989, Loma Prieta earthquake had its epicenter south of San Jose and produced significant damage in San Francisco, Oakland, and local areas to the north of these cities.

The magnitude and impacts of ground shaking at a particular location depends upon several factors including: 1) distance of a site from the causative fault; 2) distance of the site from an earthquake epicenter; 3) magnitude of an earthquake; and 4) response characteristics of a site's geologic materials (soils) and constructed structures. Ground shaking at Point Molate could accompany a major earthquake on any of the faults described above.

The site includes two earthquake damage susceptibility zones. The portion of the site underlain by bedrock has low damage susceptibility. As long as foundations and slopes are stable, bedrock provides good support during earthquakes. The Bay margins have high damage susceptibility. If the underlying materials are deep, unconsolidated, and water-saturated, earthquake vibrations will be transmitted with much greater intensity than through the adjacent bedrock.

No active or potentially active faults have been identified at the site, and the site does not lie within an Alquist-Priolo Special Study Zone as defined by the California Division of Mines and Geology. One structure, the San Pablo fault, is located along the eastern edge of the Potrero-San Pablo Ridge. This fault has been classified as inactive based on the lack of near-surface expression of the fault and the absence of any historical seismicity. While the possibility of surface rupture due to faulting is remote, ground shaking could occur.

No studies have been performed to assess the actual likelihood of liquefaction on the site. Until such studies are prepared, it would be reasonable to assume that the filled portions of the site could be subject to liquefaction in a major earthquake.

## 11.    Biological Resources

Resources discussed in this analysis include vegetation, wildlife, sensitive species, and sensitive habitats at Point Molate. Vegetation and wildlife composition of the property have changed over the past century due to livestock grazing and the introduction of eucalyptus trees and nonnative grass and brush species.

a.    <u>Vegetation Communities</u>. Point Molate is dominated by disturbed coastal vegetation communities and landscaped areas. Four vegetation communities cover much of the property: mixed native and non-native grasslands; coastal bluff plants; native northern coastal scrub; and non-native eucalyptus woodland. Other native vegetation communities include willow thickets, coast live oak woodland, coastal terrace prairie, and freshwater and salt marshes. Appendix C shows the general locations of vegetation communities at Point Molate. A list of plant species prepared by the California Native Plant Society (CNPS) is also presented in Appendix C and lists scientific names for those species discussed here. Coastal terrace prairie, freshwater marshes, and salt marshes are discussed under sensitive habitats.

(1)  <u>Native and Nonnative Grasslands</u>.  Common non-native grassland species at Point Molate include wild oats, soft chess, ripgut grass, barley, and rattail fescue.  Native species that exist in these grasslands include purple needlegrass, seashore bent grass, red fescue, California poppies, and coast buckwheat.

(2)  <u>Northern Coastal Scrub</u>.  Northern coastal scrub communities cover approximately 50 acres of the property and consist mainly of toyon and native coyote brush, poison oak, blackberry, and coastal sage.

(3)  <u>Non-Native Woodlands</u>.  Eucalyptus trees were planted concurrent with the construction of Winehaven and are now almost 100 years old.  Many blue gum eucalyptus trees have established themselves in other areas of the property.  Common understory plants in the eucalyptus woodland include black locust, toyon, and poison oak.  Planted cypress trees also form small woodlands.

(4)  <u>Arroyo Willow Thicket</u>.  The native arroyo willow dominates this vegetation community at Point Molate with common understory species of poison oak, blackberry, toyon, grasses, and sedges.  The presence of willows indicate areas of higher soil moisture content.  These trees are located at the bottom of drainages.

(5)  <u>Coast Live Oak Woodland</u>.  Small remnants of a native oak woodland are present at Point Molate.  One large coast live oak tree and scattered areas of young bay, oak, and California buckeye are growing throughout the site.

b.  <u>Fish and Wildlife</u>.  Wildlife on the site is typical of that found in coastal areas of the region and includes fish, amphibians and reptiles, birds, and mammals.  Point Molate retains a higher diversity of wildlife than many parts of the Bay Area due to the variety of vegetation communities and the amount of native habitat that exists on the property.  Appendix C provides a list of animal species whose presence is known or suspected at Point Molate.

(1)  <u>Fish</u>.  Freshwater fish do not inhabit Point Molate.  Fish species that are common to the off-shore waters include striped bass, topsmelt, and shiner surfperch.  The pier has been used for sport fishing.

(2)  <u>Amphibians and Reptiles</u>.  Common native amphibian species that inhabit the region include the western toad and Pacific chorus frog, both of which inhabit willow thickets.  Native reptiles species typical of the region include the western fence lizard, gopher snake, and western rattlesnake.

(3)    Birds. The variety of vegetation communities support many bird species. Wetlands and mudflats along the coast support large number of native shorebirds such as the black oyster catcher, killdeer, long-billed curlew, and marbled godwit. Coastal aquatic areas attract mallards, herring gulls, California gulls, western gulls, and double-crested cormorants. Great blue herons and black-crowned night herons are known to frequent the property and are attracted to aquatic areas with nearby mature trees.

Upland areas support raptors that may nest in mature trees and forage in grasslands. Native raptor species found in the Protrero Hills include the red-tailed hawk, northern harrier, black-shouldered kite, and American kestrel. Owl nests have been detected in the Winehaven buildings including the barn owl and great-horned owl.

Numerous other upland birds are found at Point Molate and include common native species such as the common crow, house finch, white-crowned sparrow, western meadowlark, northern mockingbird, California quail, American robin, and Anna's hummingbird. The non-native house sparrow and starling are also commonly found at the site.

(4)    Mammals. Small mammal species mainly inhabit the grassland areas of Point Molate and include the deer mouse, pocket gopher, California ground squirrel, and black-tailed hare. Large mammals include aquatic species such as the harbor seal, and upland species, including the mule deer, coyote, gray fox, raccoon, and striped skunk. The deer population of about 50 individuals that inhabits the Point Molate property may be one of the few remaining stable populations within the City of Richmond. Empty buildings and warehouses may harbor bats, including the Mexican free-tailed bat.

c.    Sensitive Species. Sensitive species include those that are listed by the U.S. Fish and Wildlife Service (USFWS) and by the California Department of Fish and Game (CDFG) as endangered, threatened, proposed for endangered or threatened status, and candidate species. Also included as other sensitive species are those listed by USFWS as species of concern, CDFG species of special concern, and plants listed on CNPS lists one through four. The table in Appendix C lists endangered and threatened species and other sensitive species that may inhabit the area based on recorded sightings in nearby areas. Endangered and threatened species with the potential to inhabit the site are discussed separately below. The marsh gumplant, a species on CNPS list 4 but not listed by federal or state agencies, was found during surveys of the property in May 1996. No other endangered, threatened, or sensitive species have been detected at the site.

(1)   Plants.  Santa Cruz tarplant (*Holocarpha macradenia*) historically inhabited coastal prairies and valley and foothill grasslands from the San Francisco Bay Area south to Monterey.  This species was recently extirpated from the Bay Area as a result of development, invasion of non-native plant species, and agriculture.  Grasslands and remnant coastal prairie at Point Molate may support this species.

No habitat is available on the property for the pallid manzanita (broadleaf upland forest and woodlands) or Monterey spineflower (coastal strand).  The small salt marsh on the property does not support the soft bird's-beak or California sea blite.  The marsh gumplant has been identified at Point Molate and the potential exists for the fragrant fritillary to exist on the property within the remnant coastal prairie community.

(2)   Animals.  Winter-run chinook salmon (*Oncorhynchus tshawytsha*) migrate from the Pacific Ocean to inland spawning grounds through the Sacramento River delta, going by the site.

The Alameda whipsnake (*Masticophis lateralis euryxanthus*) inhabits mostly coastal sage scrub and northern coastal scrub areas and may also inhabit grasslands and open rocky areas where its primary prey species, the western fence lizard, exists.  Point Molate contains large areas that may support this species.

The American peregrine falcon (*Falco peregrinus anatum*) has recently reoccupied much of its historic breeding range in California after decades of exposure to the chemical DDT had reduced its breeding success and populations.  This resurgent species feeds on other birds and may forage at Point Molate.  It is possible that the individuals of this species would occasionally nest in the larger trees.  .

No habitat is available on the property for the tidewater goby-(brackish lagoons), California red-legged frog (freshwater drainages and ponds with substantial vegetation cover), California clapper rail, or the California black rail (large marsh areas).  For the brown pelican, California least tern, and western snowy plover, nesting sites are endangered.  Appropriate habitat for nesting is not available at Point Molate although these species may be occasionally seen there foraging.  The small salt marsh is not large enough to support the salt marsh harvest mouse.  Other sensitive animal species that may inhabit the Point Molate area include the green sturgeon (deepwater areas), and three bird species that may inhabit the grassland and scrub areas (burrowing owl, loggerhead shrike, and Alameda song sparrow).

d.     Sensitive Habitats.  Sensitive habitats are communities that are listed by
regulatory agencies such as the CDFG or those that are of local concern.
Sensitive habitats at Point Molate include remnant coastal terrace prairie and
wetlands, and the coastal bluff plant community.

Coastal terrace prairie is found on coastal sandy loam soils under 1,000 feet in
elevation within the fog belt and is characterized by tall perennial grasses.  At
Point Molate, remnants of this community are found on the bluff above the
existing pier.  No surveys have been conducted at Point Molate to delineate
jurisdictional wetlands.  Several of the on-site drainages support willows, which
favor moist to near-saturated soil conditions.  Wetland type vegetation,
including cattails (*Typha latifolia*), bulrush (*Scirpus acutus*), and sedges (*Carex*
spp.), inhabit the three sewage treatment lagoons (LSA Associates, 1987).
Three small salt marshes covering approximately 300 square feet are
dominated by cordgrass (*Spartina foliosa*) and pickleweed (*Salicornia virginica*).

e.     Fire Hazards.  The fire hazard at Point Molate is considered moderate
to high.  Reasons for this include the rather high volume of dead and dry
brush in the brushland stands, the generally southeasterly exposure of the site
which enhances fuel moisture reduction, the normal westerly winds of the site,
and the presence of public access on the western side of the site (LSA
Associates, 1987).

12.    Cultural Resources

Five cultural resource sites have been identified on the Point Molate property.
These include three prehistoric shell mounds or middens and two historic
sites, the Winehaven Historic District (listed on the NRHP as site CA-CCO-
422H) and the Chinese Shrimp Camp.  The potential exists for additional
resources to be uncovered by future ground disturbing activities.

CA-CCO-423 is located within the Winehaven housing area, and is the most
intact midden on the site.  It has been concluded that CA-CCO-282 has been
completely destroyed by construction and no longer needs to be listed in the
cultural resource inventory for Point Molate.  It has been determined that
CA-CCO-283 does not warrant listing on the NRHP because the integrity of
the site has been severely compromised by past construction activities.  The
remaining deposits are significant to the local Native American people
because they contain human bone from prehistoric burials.

The Historic District is discussed in the Reuse Plan section of Chapter I.  The
Chinese Shrimp Camp is located in the area of Shoreline Park and drum
storage area #2.  The site has not been fully evaluated to determine its

potential for listing on the NRHP. The site was covered by fill when the park was created and has not been disturbed since that time.

## 13.  Visual Resources

The scenic quality of Point Molate is characterized by the hilly nature of the terrain and the dramatic backdrop of the San Francisco Bay. The hillside is dominated by coastal scrub and grasses, eucalyptus woodland, and above-ground fuel lines. The shoreline is dominated by tidal mudflats, salt marsh, and a beach. Buildings associated with the Navy and former winery are located at the center of Point Molate. The scenic characteristics and quality of the site are associated with the dramatic panoramic views of the bay, Marin and San Francisco skyline, and the Richmond-San Rafael Bridge, which can be observed from points all around the site.

Point Molate is highly visible from the Richmond-San Rafael Bridge, but visibility is somewhat restricted by the bridge's railings.

## 14.  Climate and Air Quality

a.    Climate.  Average rainfall at Point Molate ranges from 15 to 20 inches. Most of this rainfall occurs from November through April. The summers are dry, but like most of coastal California, they are also cool. In winter, the site experiences occasional ground or "tule" fog which flows westward out of the Central Valley. The mean temperature ranges from 50° F in January to 62° F in July. Temperatures below 28° F or above 90° F are rare. Winds are gentle to moderate and are predominately from the southwest. The winter tule fogs are borne on easterly winds. During the late summer and early fall, dry northeast winds occasionally occur.

b.    Air Quality.  Point Molate is located in the San Francisco Bay Area Air Basin (SFBAAB) which covers an area of approximately 5,540 square miles.

Maximum pollutant concentrations measured at various monitoring stations in the vicinity of the Port of Richmond from 1991 through 1993 characterize the background air quality of the project region. The Richmond monitoring station, located a few miles north of the Richmond Harbor, is the closest station to the project site.

### 15.    Environmental Clean-Up and Contamination

After conducting a Preliminary Assessment on September 22, 1987, the Naval
Energy and Environmental Support Activity recommended a Site Investigation
under the Navy's IR Program to clean up.

The RWQCB Site Clean-up Requirements Order No. 95-235 was adopted on
December 13, 1995. The Order establishes the RWQCB's expectation of
Point Molate schedules for completion of investigation and remediation of
fuel contamination. The intent of the Order was to elevate funding priority
and thereby assure timely clean-up and abatement of soil, groundwater, and
sediment contamination. The Order specifies 31 individual tasks to be
conducted, including semi-annual groundwater monitoring reports, extraction
of free product with the operation and extension of the extraction trench,
sediment evaluation, corrective action plans for groundwater containment, and
landfill contamination.

In general, no comprehensive sampling has been performed on the majority of
the site. Sixty-six percent of the Point Molate site falls into Category 7, a
Navy designation indicating that there are inconclusive, inadequate or no
evaluations of the site conditions. The RWQCB is directing the
characterization and clean-up of the four IR sites (described below), but the
RWQCB focus is on water quality only. Numerous areas of the site are
suspected of being contaminated from past oil spills from tanks and associated
pipelines. Additional sites may be designated as IR sites in the future.

According to the RWQCB Order, the investigation and feasibility study for
remedial alternatives for the waste disposal area (IR-1) is due February 1,
1997. Draft correction action plan for the sandblasting areas (IR-2) is due
July 1, 1988. The draft baseline sediment quality evaluation report that will
include a feasibility study or remedial alternatives (if necessary) is due January
1, 1988. IR site remediation is expected to be completed by the second
quarter of fiscal year 1999.

a.    Installation Restoration (IR) Sites. The Navy has identified four IR
sites at Point Molate (Appendix B). These are:

### IR-1  Waste Disposal Area

This area is located in a steep ravine near the center of the site. It has
been impacted by fuel releases from tanks, pipelines, and valve boxes
and the disposal of drums, cans, and debris. Covered in the mid-1960s,
the site is approximately 1,200 feet long, 400 feet wide, and 50 feet
deep.

IR-2   Sandblast Areas

There are four areas of historical sandblasting where sandblast grist from cleaning metal litters the ground. Two are located in the valley east of building 6, and two are near the south end of the site east of Western Drive. Soil samples include high concentrations of chromium, lead, and nickel, in addition to solvents.

IR-3   Treatment Ponds Area

There is extensive fuel and solvent contamination in the area of the existing sanitary treatment ponds. The site is a former waste disposal sump pond, which was constructed in the 1940s and closed in 1975. It was historically used for the containment of contaminated fuels, tank bottom sludges, bunker fuel, leaking drums other liquid waste, and batteries. After closure, all liquids were pumped out, sludges were removed, and the ponds filled with soil and rock. Residual fuel, fuel constituents, and sludges remain in the soil and in the groundwater.

IR-4   Shoreline Area

This area includes the entire perimeter of the Point Molate property along San Francisco Bay. It is the terrestrial endpoint for migrating contaminants.

b.     Remediation. Remediation efforts to date have been concentrated on the IR-3 site. A 1,100-foot extraction trench was installed as a remediation action to capture and remove floating fuel and contain groundwater for temporary treatment at the wastewater treatment plant. Installation of a new treatment plant for the extraction trench discharge water is under way. The extraction trench is 1,100-feet long and 19 to 26 feet deep; it has four 10-inch, stainless steel extraction wells and four six-inch, stainless steel monitoring wells. It contains groundwater migrating toward the bay via a continuous high density polyethylene liner installed on the down gradient side of the extraction trench (Figure 5-8 in Appendix B). Funding is being requested to extend the trench along the eastern edge of the shoreline (towards the pier) to prevent further migration of contaminants into the bay.

Remediation is not currently planned for equipment or devices with PCB-containing oils.

c.     Other Contamination Areas of Concern. During water sampling of several buildings in 1994 and 1995, lead was detected in the EFA drinking water, including the cottages. Lead has also been detected in the soil around the housing units. Elevated concentrations of lead may also be found in the

soil where an outdoor small arms range once existed in the southeast corner of the site. This area has not undergone investigation and is not identified as a remediation site as of yet.

d.     Water Quality. Quarterly groundwater sampling has been conducted at Point Molate to evaluate groundwater contamination and verify trends in specific contaminants detected during 1994 in shoreline monitoring wells. The first quarterly report provided baseline information for subsequent quarterly reports and to summarized historical information, facility operations and systems, environmental conditions, previous investigations, and the hydrogeologic setting. Subsequent quarterly reports presented only groundwater sampling data, associated figures, and hydrologic (water level) data. The fourth quarterly report also included additional discussions of trends observed thus far (PRC Environmental Management, 1995).

(1)     Groundwater Sampling. Twenty-six groundwater monitoring wells were sampled during the December 1994 sampling event. This sampling event was the final of four quarterly events planned to evaluate groundwater quality in a network of monitoring wells along the shoreline. A total of 166 samples, including duplicates, were collected and submitted for chemical analyses.

(2)     Regional Groundwater Trends. Groundwater flow direction in the vicinity of Point Molate is west-southwest, generally toward San Francisco Bay. Groundwater recharge is predominantly attributable to rainstorms during the wet season (November through February).

Rainstorms in the San Francisco Bay area were particularly prevalent from November 1994 through January 1995. Many monitoring wells sampled during the fourth quarterly 1994 were characterized by significantly higher static water levels than measured in September 1994. This trend, as well as the preceding decrease in water levels during the dry season, is easily observed in 1994 hydrographs for Point Molate monitoring wells. Also observed during fourth quarter sampling was extensive continued surface water flow within the hillside ravines, resulting in surface water-groundwater interaction and steady discharge from stormwater outfalls into San Francisco Bay.

Recharge in the hillside ravines results in some (localized) areas of perched groundwater that drain toward San Francisco Bay in unconsolidated colluvium and fill (above bedrock). Groundwater in the near-shore environment is attributed to both recharge from the upgradient hillsides and hydraulic communication with San Francisco Bay.

(3)   Site-Specific Groundwater Trends. The treatment ponds, located adjacent to the wastewater treatment plant, bedrock outcrops and associated subcrops, and structural building foundations influence local flow patterns.

The groundwater flow direction in the immediate vicinity of the treatment ponds area is mostly radial, except in the upgradient (northeastern) direction. Groundwater flow direction is influenced by water table mounding beneath the treatment ponds. The hydraulic gradient on the western side of the treatment ponds is much steeper than that on the eastern side. Groundwater mounding in the vicinity of the treatment ponds can be attributed to several factors. The treatment ponds are unlined and are apparently recharging the shallow (otherwise unsaturated) soil profile in the immediate vicinity of the treatment ponds. A subsurface cutoff wall located directly downgradient of the treatment ponds provides a partial hydraulic barrier resulting in the sharp gradient evident there. In addition, the compaction and permeability of fill material in the ponds area may be different (less) than that in the fill material originally used downgradient along the shoreline.

(4)   Floating Product Plume Extent. Product thickness measurements and visual identification of fuel types were used to depict the extent of hydrocarbon plumes. In general, bunker fuel, diesel fuel, and mixtures of bunker and diesel fuel are present in the treatment ponds area. Small isolated plumes of diesel fuel occur along the south shoreline, and two JP-5 seeps appear in the ravine associated with the waste disposal area.

e.   Hazardous Waste. Point Molate is a generator of hazardous waste and has an Environmental Protection Agency identification number CA 0170090021). The 1996 Draft Environmental Baseline Survey (PRC Environmental Management, 1996) indicates several instances of current or previous storage of hazardous waste:

- Parcel 18—Apparently full, unlabeled 55-gallon drum and unidentified small quantities of paint and paint products and lubrication oil in a plastic bottle. A building on this parcel was used for the storage of flammable liquids and samples of petroleum products.

- Parcel 19—Storage of hazardous waste.

- Parcel 30—Illicit drain pipe. A 1,000-gallon tank was removed in 1990 and rinstate from the drain may have been released to San Francisco Bay.

- Parcel 32—Bermed area used for the accumulation of hazardous waste.

- Parcel 32—Sixteen empty 55-gallon drums littered throughout a soil stockpile area. Unknown if they once contained hazardous waste or simply petroleum products.

## 16. Applicable Richmond Policies, Plans and Regulations

The Point Molate area falls completely within the boundaries of the City of Richmond. Numerous policies, plans and regulations included in the General Plan and Zoning Ordinance currently apply to Point Molate, although it is understood that these may be amended to adopt the Proposed Plan.

a.  <u>General Plan</u>. Point Molate property is currently designated as Port Marine Terminal/Ship Repair and Recreational Lands in the City of Richmond General Plan, which are defined as follows:

(1)  <u>Port Marine Terminal/Ship Repair</u>. Use of lands within this district should be reserved for a wide range of municipal or private maritime marine terminals, cargo handling, ancillary manufacturing or related establishments that are dependent on direct port access for the import or export of raw materials or finished products. Included in this designation are areas designated for Port-Priority use under the BCDC/MTC Seaport Plan, and land uses included within port priority use area. In addition to marine terminals, cargo handling, ancillary manufacturing and office uses, the following types of uses may be found within this category: Support services for the fishing industry, trucking and railroad yards, manufacturing uses which extensively use rail or transport facilities, and other ancillary uses allowed within port priority use areas.

(2)  <u>Recreation Lands</u>. Open space for outdoor recreation includes areas of outstanding scenic, historic and cultural value; it also includes areas particularly suited for park and recreation purposes, including access to the shoreline, creeks and areas which serve as links between major recreation and open-space reservations, including utility easements, banks of creeks, trails, and scenic highway corridors.

These district designations and corresponding zoning regulations may be amended when this Plan is implemented. However, this reuse plan does adhere to the following General Plan guidelines:

*(a)  Buffers.*

- Establish buffer zones between industry and other uses: LU-B.2, LU-H.1.

- Establish standards to govern industrial uses to safeguard adjacent uses: LU-B.4.

- Avoid land uses that place residential dwellings with "heavy" industrial uses: LU-O.7.

*(b)    Open Space.*

- Ensure the comprehensive planning of regional open space: OSC-T.

- Require sufficient visual open space and/or landscaped screen between industrial uses and adjacent residential or recreational activities: LU-B.5, OSC-Q.

- Achieve the City park acreage standards of three acres of parks per 1,000 people, (where this standard includes City parks and recreational trails, but not regional parks): GM-Other Performance Standards, Park and Recreation (1).

- Encourage the acquisition of historic buildings at Winehaven by the East Bay Regional Park District or the City when the Naval Fuel Depot become surplus federal land: Promote commerce and commercial recreation at Winehaven when the site is available, but after public recreation and scenic roads along the shoreline north of the toll plaza are developed (L.U. Area Specific Guidelines 7 and 8).

*(c)    Shoreline.*

- Preserve and enhance the potential amenities of the shoreline for maximum availability to the public: LU-E.1, LU-E.2, LU-L.5, LU Shoreline—General 1., OSC-G, OSC-O.1.

- Upgrade the appearance of Red Rock Marina at Castro Point: LU West Shoreline 1.

- Designate a site for a marina at the Point Molate Naval Fuel Supply Depot: LU West Shoreline 8.

- Retain existing parks at Point Molate Beach: CF West Shoreline 8.

*(d)    Ridgeline.*

- Preserve and enhance the potential amenities of the ridgeline for maximum availability to the public and preserve its landmark character: LU-E.2, LU West Shoreline 9., OSC-Q, OSC-O.8.

*(e)    Environment.*

- Preserve environmental conditions that, if disturbed, would destroy important wildlife habitats: OSC-A, OSC-Q, OSC-Q.1.

- Evaluate proposals for the use of the San Pablo Peninsula and Castro Rocks with attention to their effects of the deer population, the Monarch butterfly and the Harbor Seal: OSC-Area Specific Guidelines, West Shoreline 1.

- Preserve environmental conditions that, if disturbed, would destroy valued natural features i.e., Pt Potrero/San Pablo Ridge: OSC-A, OSC-F, OSC-Q, OSC-F.1, pg. OSC-38: Ridge Ordinance.

   *(f)    Views.*

- Preserve views of the Bay and the regional landscape from the trails and open spaces along the shoreline area's ridgelines by controls on siting and height of adjacent structures: LU Shoreline—General 2, OSC-G.

- Preserve vista points along the shoreline, purchase them and include in trail system if possible: OSC-G.1, OSC-G.2.

- Consider lands in areas with high development constraints and high visual importance to the community for open space designation: OSC-Q.3.

   *(g)    Historic Preservation.*

- Acquire the historic buildings of Winehaven by East Bay Regional Park District or by the city: LU West Shoreline 6.

- Promote commercial recreation/conference use of the buildings, but only after public recreation and scenic roads are developed: LU West Shoreline 7, CF West Shoreline 5.

- Provide a legacy of history, archaeology, and culture: OSC-E, OSC-E.2.

   *(h)    Access.*

- Develop the full potential of Point Molate beach by improving bike, hike and limited auto access: CF West Shoreline 4., OSC-S, OSC-O.1, OSC-O.7.

- Preserve, enhance and expand sites for public access to the Bay: OSC-O, OSC-S, OSC-O.7, OSC-O.8.

- Create a recreational corridor along the western shore of Point San Pablo: CF West Shoreline 6., OSC-S, OSC-O.1.

- Coordinate City and Park District projects to implement the Regional Shoreline Trail Project: CF-A 3., OSC-S, OSC-T.

- Establish right-of way for the Bay Trail: OSC-S.2.

- Encourage and support the development of regional trails and scenic drives interconnecting the shoreline and hill areas: OSC-O.7, OSC-O.8.

    *(i)     Gateways.*

- Enhance the gateways to Richmond: LU-D.3, ED-C.1.

- Accent entries/gateways with native plantings: OSC-A.4.

    *(j)     Safety.*

- Continue to obtain needed fire prevention facilities: CF-E 1.

- Implement code compliance, maintenance, and replacement of projects for asbestos abatement, underground fuel tanks: CF-H 12.

- Require all hillside development, at a minimum, to have a geotechnical investigation as specified in Recommended Guidelines for Geotechnical Investigations Table OSC-1: OSC-1, SF-A.13.

- Achieve Locational Standards of six-minute response time for first engine company, and three to five minutes for life-threatening service calls to the Police: GM-10.

    *(k)* The City of Richmond has a Coastline Plan, adopted in 1973, as part of the General Plan. In it are policies addressing visual resources at Point Molate:

Develop two viewpoints on Western Drive: One above Red Rock Marina, and one on the Point Molate ridge spur. There are also policies with regards to Scenic Highways, views, and utility lines:

    III.a. Designate and maintain as scenic highways:

        The Hoffman Boulevard-Standard Avenue-Richmond-San Rafael Bridge route and Western Drive north of the Richmond-San Rafael Bridge toll plaza.

    VI.9. Preserve views of the Bay and regional landscape from the trails and open spaces along the Coastline Area's ridgelines by controls on siting and height of adjacent structures.

    III.9 Require placement of utility lines underground along Western Drive (north of) the Richmond-San Rafael bridge toll plazas.

b.    Zoning Ordinance. The Zoning Ordinance and zoning maps propose Community and Regional Recreational and Marine Industrial zoning district designations for the property, in conformance with General Plan land use designations.

In addition to the proposed base zoning designations, a Special Features Overlay District covers Point San Pablo Peninsula (San Pablo Peninsula Additive District #3). This overlay designation regulates the preservation of ridge crests, ridge slopes, and ridge forms; the preservation and enhancement of public pedestrian and visual access to San Francisco Bay; and preservation of views from vista points to San Francisco Bay. In cases of conflict with Chapters 12.44, 15.04, or 15.08, the regulations prescribed by the Special Feature District take precedence.

The City of Richmond has adopted policies pertaining to visual resources in the Point Molate area. These policies are contained in the Special Features Additive District (SFAD) No. 3—Point San Pablo Peninsula Ordinance (adopted 1974). These policies, as they apply to Point Molate, are summarized below:

    (1)    Preservation of Ridge Crests.

- Structures within the boundaries of SFAD No. 3 are not to rise above the top of the ridge crest.

- Excavation is not to reduce the elevation of the ridge crest.

    (2)    Preservation of Ridge Slopes and Ridgeform.

- Where practical, visible scars created by grading activities are to be replanted with vegetation to blend with the natural landscape.

    (3)    Hillside Development Regulations and Guidelines. Draft hillside development regulations and guidelines are currently under review and are expected to be adopted by the City Council in early 1997. The ordinance would restrict development in hillside areas with slopes of fifteen percent or greater. A conditional use permit would be required if a structure is proposed within one hundred vertical feet of a ridgeline or the average slope of the parcel exceeds 15 percent. (Certain exceptions do apply.)

## B. Opportunities and Constraints

Point Molate is a very complex site in terms of the opportunities and
constraints it presents for civilian reuse. Although it is fairly small compared
to other regional realignment bases such as Mare Island and Treasure Island,
Point Molate has unique resources that will both permit and guide visionary
reuse, and restrict the kind and intensity of reuse.

The major site considerations are summarized below by area: the pier, the
shoreline area, Shoreline Park, the main development area, eastern
development area, the hillside, the secondary ridge, and the gateway area.
These areas and their associated opportunities and constraints are illustrated
in Figures 3 and 4. It should be noted that the following areas do not
necessarily correspond to the development areas as defined for the Plan and
described in Chapter I.

### 1.    Area #1-Pier Area

The pier extends from the point 1,450 feet into the San Francisco Bay.
Historically, the pier served a utilitarian function, supporting the pipes that
carry oil from dry land out to ships moored at the end of the pier. The pier
provides a unique mooring feature for Point Molate, as well as unique access
to the San Francisco Bay.

a.    <u>Opportunities</u>. The pier provides opportunities for both public and
private water (e.g., ship, boat, barge and ferry) access to and docking at Point
Molate in support of other, land based uses. In particular, because of its
length and surrounding water depth, the pier can accommodate some boats
that are too large for other Bay Area marinas. It has the advantage of a
location near the mouth of the San Francisco Bay, as well as the San Joaquin-
Sacramento River. The pier provides unusual panoramic views that include
Mt. Tamalpais, the San Francisco skyline and the Point Molate landscape. Its
width and load capacity lends itself to public/recreational, commercial and
industrial uses. The land area to which the pier is attached is level,
extensively paved and highly developable, particularly for water oriented
recreational and commercial purposes.

b.    <u>Constraints</u>. The pier's substructure is in generally good condition
having been rehabilitated periodically by the Navy, although there is some
question regarding its ability to meet seismic and other pertinent codes that
now exist. The surface of the pier is in a state of disrepair. The extent to
which it would need to be improved depends, in part, on the uses proposed.
Unless needed in support of a proposed use, it would be desirable to remove

the existing fuel pipelines and associated features, which are visually unattractive. The building on the pier would likely need to be demolished or extensively repaired and remodelled for commercial use. Any dredging to deepen the channels around the pier would require an analysis of sediment contamination, as well as appropriate sediment disposal sites. Although commuter ferry service is not likely, such use would present parking and traffic constraints.

Similar facilities on the land would also require removal. Extensive landscaping and some pavement removal would be necessary to enhance the attractiveness of the land area by the pier. All development within 100 feet of the shoreline would be subject to the review and approval of BCDC. The site is a Category 6 parcel where a release has occurred and remedial clean-up action is required but not yet underway. Until further investigations are conducted, the extent of this concern and what can be done about it remains unclear.

## 2.    Area #2-Shoreline Area

a.    <u>Southern Shoreline</u>. This segment of the shoreline faces southwest and is bordered by the undeveloped portion of the site. The most southern 1,500 feet are part of the area leased in the past by the City for a park. Eel grass grows extensively in the tidal land area, and there are a few trees scattered throughout the park. The main railroad line runs between Western Drive, which delineates the eastern boundary of this area, and the beach. There is one 8,900 square foot building in good condition.

(1)    <u>Opportunities</u>. Being located at the southern road entrance to the Point Molate site, this area could be enhanced to serve as an attractive "gateway" in conjunction with the area east of Western Drive. The railroad alignment, which parallels the entire shoreline, provides a perfect opportunity for pedestrian and bicycle trail development to improve public access and opportunities for bird-watching. The existing parking lot could serve as a staging area for the trail, which is planned to extend around Point San Pablo to the north. The park could be improved and expanded.

(2)    <u>Constraints</u>. Access to the site is limited. There is no public transit, bicycle and pedestrian trails are non-existent or have not been maintained, rail lines are currently inoperative, and Western Drive needs resurfacing and the addition of shoulders to handle emergency situations. Also, Western Drive could fail due to liquefaction in a major earthquake. Once on site, roads on steep slopes are in disrepair and are inaccessible for larger trucks. The proposed alternative land uses would likely require an I-

580 interchange, and as such, Caltrans would have to be consulted for feasibility and conformance to Caltrans standards.

If the railroad is reactivated rather than developed as a trail, public safety and access to the beach from the parking area would be problematic. Because this segment of the shoreline is below the drum storage area, the waste disposal area and known oil spill area, there are concerns about hazardous materials draining onto the shoreline, which is an Installation Restoration (IR) site. This portion of the shoreline (excluding the park) is a Category 6 parcel. Until further investigations are conducted, the extent of this concern and what can be done about it remains unclear. Other constraints include the recommended avoidance of disturbing archaeological sites CA-CCO-283 and the Chinese Shrimp Camp. Development in this area would be subject to potentially severe seismic shaking and liquefaction hazards, and special foundation and building design would be needed to protect against these hazards.

b.    Northern Shoreline. This rocky segment of the shoreline faces northwest and is bordered by the old garrison area, including the treatment ponds located immediately adjacent and the Winehaven building located further inland. A 1,000-foot long extraction trench for intercepting floating fuel and contaminated groundwater parallels most of the shoreline between the shore and the railroad. There are two small wetlands. The sewage treatment plant is located in this area.

(1)    Opportunities. As is the case for the southern shoreline, there are opportunities for public access and recreation via the development of a trail along the railroad alignment. There is no beach along this stretch, but with landscaping and site improvements, the shoreline is highly suited as a waterfront promenade connecting the pier and Winehaven building, as well as for shore-bird viewing.

(2)    Constraints. The greatest constraint in this area is the likely presence of hazardous materials. A portion of the shoreline is an IR site and a Category 5 parcel where a release has occurred and remedial or removal actions have begun but are not complete. To make the site attractive, miscellaneous buildings and other structures would have to be removed, as well as some of the pavement. Landscaping would improve the aesthetic character, help reduce wind and provide shade. The two wetland areas contain sensitive plant species and should not be disturbed. It is unknown if the sewage treatment plant can be reactivated without significant upgrading.

While the treatment ponds are in operation, there is a risk of public exposure to petroleum products along the shoreline, so human contact with the water should be prohibited and recreational uses should be limited until full site remediation is completed. Development in this area would be subject to potentially severe seismic shaking and liquefaction hazards, and special foundation and building design would be needed to protect against these hazards.

### 3.      Area #3-Shoreline Park

This 500-foot wide by 1,500-foot long public park is located on the southern end of the property between Western Drive and San Francisco Bay. Leased by the City of Richmond for the past 20 years, the park is developed with active recreational equipment and facilities (e.g. play structures, picnic tables, and barbecue pits), but primarily functions as a passive recreation area. Under the lease agreement, the City of Richmond is responsible for its maintenance. While the current lease expired September 30, 1996, the Navy intends to extend it on a month-to-month basis until final disposition of the property.

a.      Opportunities. Park use is established with appropriate equipment and site planning. If maintained as a park, new furnishing and maintenance will be needed. This flat area has adequate access to Western Drive and an existing parking area. In addition to view opportunities and water access, Shoreline Park provides a staging area for potential trails at Point Molate.

b.      Constraints. The park is currently under utilized. In addition, the park sits on top of part of the Chinese Shrimp Camp, thus restricting future changes to the site layout and use.

### 4.      Area #4-Main Development Area

The Main Development Area is within the National Register Historic District, and includes significant buildings, not all of which are conforming. Winehaven is 198,865 square feet, and has historic significance.

a.      Opportunities. This area is the "heart" of the site, containing the most significant and distinct historical architecture, embodied in the large, three-story Winehaven building. The ultimate draw to the Point Molate site must encompass reuse of this structure. Its historical use as a large and important winery, the uniqueness of its design and the public's general unawareness of its existence all contribute to its potential for reuse. The surrounding grounds offer ample parking space, and mature palm trees enhance the exterior space.

Views across the Bay are available from the site and building windows.
Building 6 also maintains historical significance, but is far less attractive.

b.   Constraints.  Seismically and structurally, Building 6 may not be
economical to bring up to code, considering that it has minimum architectural
value.  The Winehaven building also needs to be seismically and structurally
reinforced, and other improvements are needed to bring it fully up to code for
fire, disabled access and other requirements.  All rehabilitation and alterations
will have to meet the Secretary of the Interior's Standards for Rehabilitation.
These standards are intended to be flexible enough to allow for upgrading and
alterations needed for reuse.  However, they discourage major, irreversible
alterations which would destroy the character of the building.  For example,
for Winehaven, installation of large new window openings into the masonry
facades would probably be discouraged.  The number of interior supports may
limit any uses requiring expansive space, unless innovative and possibly
expensive structural support systems can be used to reduce the number of
steel posts.  Moving of the houses or re-siting would be discouraged under the
Secretary of Interior's Standards.

Lead and asbestos have been identified for clean-up, and the area is an IR
site.  It also contains a Category 5 parcel where a release has occurred and
remedial or removal actions have begun but are not complete.  The area
under remediation needs to be fenced off to restrict human contact.

Secondary roads leading to the buildings are considerably steep and could
present a problem for large trucks and buses.  Also, the widening of Western
Drive and secondary road improvements could significantly impact adjacent
historical buildings.  Development in this area would be subject to potentially
severe seismic shaking and liquefaction hazards, and special foundation and
building design would be needed to protect against these hazards.

5.   **Area #5-Eastern Development Area**

This area contains an operational fire station, power house, building shop and
other key buildings.  It is also included in the National Register Historic
District, and again, not all the structures are conforming.

a.   Opportunities.  Many of the buildings including the 29 residential units
are in good condition and available for reuse with relatively little
improvement.  The houses are charming in appearance, are modernized, have
been fairly well maintained and have considerable potential as single family
residences, for long-term housing for individuals such as the homeless, or as
overnight accommodations for visitors.  They may also be used for non-

residential uses such as artist studios, especially the Winemaster's house. They are located conveniently close to the Winehaven building, yet distant from it, against the eucalyptus forest.

b.      Constraints. All the buildings need to be upgraded, specifically to meet seismic codes, and some, such as the various shops, are not likely to be cost effective to rehabilitate. The housing units require some structural reinforcement and clean-up related to asbestos and lead. Most of the buildings are subject to the restrictions of historic properties.
The streets do not conform to modern standards. There are two small sandblast grit areas targeted as IR sites. A portion of this area is a Category 6 parcel where a release has occurred and remedial action is required but not yet underway. Until further investigations are conducted, the extent of this concern and what can be done about it remains unclear.

The excavation of archaeological site CA-CCO-423 may constrain development. Artifacts from CA-CCO-423 are currently archived at UC Berkeley.

## 6.      Area #6A-Hillside

The Hillside area rises east of Western Drive and associated developable land to the ridge separating Chevron USA (on the eastern slope of the ridge) from Point Molate (western slope of the ridge).

a.      Opportunities. With views of the Bay Area, varied vegetation and existing narrow roads, this area provides opportunities for hiking, picnicking and other open space oriented uses. The underground fuel tanks, if fully cleaned and filled with soil, could be used as foundations for buildings of a limited size, especially high end single-family residential. Restoration and protection of remaining native habitats not found elsewhere in the East Bay could be incorporated in an interpretive trail. Eucalyptus not within the historic district should be controlled and/ or removed.

b.      Constraints. The steep topography, steep and narrow roads, and limited building sites severely restrict development. Supporting infrastructure would be extremely expensive. Development is further limited from the upper 100 feet because of City hillside policies and incompatibility with Chevron petroleum-processing facilities on the other side of the ridge. People at Point Molate are at potential risk from an industrial accident on the east side of Potrero Ridge. Several plants that are not found anywhere else in the East Bay or which are rare occur in the hillside area. The hillsides are also potential habitat for the Alameda whipsnake. A number of oil spills have

been recorded in various locations around the area, and an IR site (waste disposal area) is designated in a centrally located ravine. This area is a Category 6 parcel. Another Category 6 parcel exists at the south end.

It is likely that the IR-1 site area may need to be restricted from human contact with fencing. The presence of petroleum products in the soil and groundwater will not be a health problem as long as the area is undisturbed (not excavation). The tanks themselves are probably stable enough to be left in place, even if unfilled. Entrances would have to be blocked or filled to prevent entry. Also, the fill around the pipeline may be acting as conduits for the petroleum contamination.

### 7.     Area #6B-Secondary Ridge

This ridge separates the developed, northern portion of the Point Molate site from the undeveloped, southern portion. It is separated on the east end from the remainder of the hilly terrain by Western Drive. The top of the ridge is generally level, surrounded by steep slopes approximately 150 feet high. There are no trees on the ridge, but the eucalyptus forest appears above it in the background.

a.     Opportunities. The level portion of this area could be developed for recreational or residential use (including commercial overnight facilities). Development could be oriented toward the southwest, with views of the Richmond-San Mateo Bridge and Marin/San Francisco skyline. There are no known oil spills, and it was assigned the lowest priority status for clean-up investigation.

b.     Constraints. The marsh gum plant, a CNPS List 4 rare plant which grows on the coastal bluff in the southwestern portion of this area, should be protected from major disturbance. There are potential habitat areas for the Alameda whipsnake and Santa Cruz tarplant on the secondary ridge. As one of the more visible areas of Point Molate as seen from off-site, development along the top of this low ridge would have to be sensitively designed and arranged on the site to minimize visual impacts.

### 8.     Area #7-Gateway Area

This is a level area, most of which is paved, located between Western Drive (and the park site) and the hillside at the south end of Point Molate. It is the visual focus of visitors entering the Point Molate site.

a.     Opportunities. This is the most accessible and developable area at Point Molate and the most suitable for light industry or commercial use requiring a large amount of level space, and which is not necessarily dependent on other uses located in the northern portion of the site. No demolition would be required except for the removal of pavement for building foundations.

b.     Constraints. Being at the "gateway" of Point Molate, development would have to be sensitively designed, sited and landscaped to ensure an attractive entrance to the overall site and to help establish the desired image for Point Molate. Development would also have to be compatible with public access and use of the shoreline. There are two small sandblast grit areas targeted as Installation Restoration sites. Most of the area is a Category 6. Until further investigations are conducted, the extent of this concern and what can be done about it remains unclear.

**Chapter III**
**MARKET CONSIDERATIONS**

■ ■ ■

### A. Cursory Market Analysis of Considered Uses

**1. Introduction and Summary of Findings**

The purpose of this section is to present a real estate market assessment of potential land use development options for Point Molate. After reviewing the list of land uses included in the Conceptual Alternatives created by the Richmond BRAC, and discussing the preferred uses with City of Richmond staff, three potential uses for qualitative analysis were selected: (1) a meeting center; (2) a business incubator with an office/light industrial/warehouse or live/work component; and (3) residential development. These uses were selected because they represent potential private market interest in the site, and could absorb significant portions of the land and/or buildings available. Each land use overview includes a description of the existing competitive supply within the region, as well as feedback from developers, operators, and brokers about the potential for development at Point Molate.

To further assist the BRAC in selecting a preferred land use alternative, a brief description of possible competing reuse at other closing military installations in the Bay Area, as well as a brief assessment of other land uses included in the Conceptual Alternatives, are also provided.

A real estate feasibility analysis is based on two key factors: a description of existing and potential supply, and an understanding of the sources of demand. It is also essential to know how supply and demand can change or grow, and how these changes can affect a market over time. To conduct this feasibility analysis and gain insight into the supply an demand factors at work, approximately 35 developers, brokers and other key informants were interviewed.

This analysis assumes that environmental remediation at Point Molate will be completed to the level necessary for reuse.

The following summary highlights Point Molate's key assets and near-term development prospects, and presents key findings for each land use under consideration.

a. <u>Key Assets</u>. All of the key informants interviewed for this study agreed that Point Molate's natural setting and scenic attributes are the most important assets of the site. While it is unlikely that only a single user will occupy the site, it is clear that the alternative uses under consideration would be generally compatible under a mixed-use plan.

b. <u>Near-Term Prospects</u>. The two uses with the strongest market potential at Point Molate appear to be a small meeting center and residential development. The meeting center would allow for the reuse of the Winehaven complex for meeting and dining facilities, while the wine worker's cottages could provide accommodations for overnight guests. Residential development could occur first in the flat portions of the site, and later on slopes overlooking the San Francisco Bay. The meeting center and residential uses are considered complementary because the meeting center is envisioned as a small and relatively unobtrusive facility, and because the two developments are expected to be located in different areas of the site.

While renovation of Point Molate buildings for office use was not viewed favorably by brokers and developers, an exception may exist for office development for non-profit tenants, or for single users who seek a campus style development.

Finally, this analysis represents market conditions for a given period, and therefore may be subject to change as time passes.

c. <u>Meeting Center</u>. There appears to be good market potential for development of a small (50 to 100 guests) meeting center at Point Molate. The relatively high occupancy rates of existing meeting centers in the Bay Area demonstrate the need for facilities that serve non-profit, public sector, and other price-sensitive organizations. While successful meeting centers generally possess little in terms of indoor amenities, they nevertheless offer a unique or distinctive experience to conference goers because of their overall ambiance and outdoor amenities such as scenic views, hiking trails, or beach access.

The cottages lend themselves to reuse for overnight guest accommodations, and with renovation, the Winehaven complex could be adapted for conference and meeting space. Point Molate's excellent bay views, and the potential development of recreational amenities such as hiking trails, will enhance its

attraction as a meeting site. One of Point Molate's most significant advantages is an atmosphere that seems remote, yet is within less than an hour's drive from most of the largest urban and suburban concentrations within the Bay Area.

d.   Business Incubator. Based on interviews with business incubator experts, a business incubator at Point Molate is probably not feasible. The combination of uncertain start-up funding for such a facility, the cost of upgrading the buildings, and Point Molate's remote location present difficult obstacles to the successful development of a business incubator. According to interviewees, the shortage of both public or private funding sources for incubator development has made supporters of these projects extremely reluctant to take on difficult or pioneering reuse sites such as Point Molate. Furthermore, if an impetus were to develop for the creation of a business incubator to serve this part of the East Bay, experienced incubator developers feel that sites which are superior to Point Molate in terms of better access and lower renovation costs are available in Richmond and in other parts of Contra Costa County.

e.   Office Development and Light Industrial/Warehouse Space. Point Molate appears to be poorly positioned to support development of office, light industrial, or warehouse uses, especially for multiple tenants, at least in the short term. The site's remote location, limited access from East I-580, and potentially costly building upgrades place it at a disadvantage in the view of office and light industrial/warehouse developers. Furthermore, the existence of nearby alternative sites with superior access and infrastructure to support office and light industrial or warehouse users reduces the ability of Point Molate to compete effectively for tenants. However, an exception may exist for office development for non-profit users who are typically more amenable to limited building upgrades (although they are generally unable to pay high rental rates), or for a single user seeking a campus style development.

f.   Live/Work Space. Although their historic ambiance and former use as warehouse space would seem to make the Winehaven complex at Point Molate a prime candidate for conversion to live/work space, the obstacles to live/work development at the site are likely to prevent the success of such a project. The most difficult problem for live/work development at Point Molate would be to surmount buyers' and renters' resistance to moving to what is perceived as a remote location. The live/work product type is a proven quantity in dense urban areas, but there do not appear to be any examples located in remote, former industrial zones. It is possible that there exists a small subset of the live/work market that is made up of buyers and renters who would be attracted to a location like Point Molate, but this is not

the typical buyer or renter profile, and therefore this use should be considered
to have weak market potential.

g.     Residential Development.  According to developers and brokers
interviewed for this study, Point Molate shows strong potential for residential
development.  However, development should be carefully phased in order to
establish Point Molate's identity as an attractive residential location.  To
achieve this goal, the first phase of development should be multi-family units
on the flat parcels near the water.  Next, low density development of single-
family residences on the site's hillsides can then go forward.  Residential
densities at Point Molate can be expected to be in the range of 16 dwelling
units per acre for multi-family housing.  Actual densities will depend on site
topography, as well as other site constraints.  Current residents of southern
Marin County appear to be the most likely target market, followed by buyers
who are familiar with this section of the East Bay.  Local artists seeking a
secluded live/work environment may be another potential market.

Because of the importance of promoting a strong identity for Point Molate, an
effective marketing campaign will be necessary to educate prospective buyers
and renters about the site's numerous attributes such as bay views, mature
trees, and proximity to parks and open space.  The recent concept of "green
housing" would support the site's overall open space image by integrating the
residential and meeting center uses with a shared development theme.  For
example, a community oriented around sustainable and environmentally
sensitive uses may have very strong marketability among the project's target
market.

2.     Detailed Market Overviews

a.     Meeting Center.  For purposes of this study, the term "meeting center"
is defined as a facility developed primarily to satisfy the needs of users who
require attractive and functional, but not deluxe, meeting rooms and
accommodations.  Meeting centers fall somewhere between conference centers
that are targeted toward high-end corporate users, and retreat centers that
usually serve religious groups.  Most meeting centers are operated by public
sector or non-profit organizations.  While their guest and meeting rooms are
comfortable, indoor amenities are not luxurious and the facility's identity is
most often established around its outdoor or recreational amenities such as
views, hiking trails, beach access, etc.

The market for meeting centers is generally composed of corporate
departments, small firms, professional associations, non-profit groups, and
public sector organizations that seek to do planning or training in a retreat

setting. This type of meeting center is typically located near a major urban area and generally draws its clientele from the local region. Meeting facilities within the Bay Area that satisfy this criteria are described below (see Table 6 for a summary).

b.    Asilomar Conference Center. The Asilomar Conference Center is located on 107 acres on the Monterey coast and is operated by the State of California. At Asilomar, a typical conference runs three to four days with 100 to 200 participants. Although lodging is sold to the general public on the weekends, 90 percent of weekend business is related to conference activities. Asilomar serves a diverse market of corporate, scientific, religious and youth groups.

With 314 rooms, Asilomar can accommodate over 700 overnight guests. The Center also has 45 meeting rooms, the largest of which can accommodate an audience of 850. Asilomar's waterside location and extensive facilities have led to a high percentage of repeat business. Although the management is able to charge $86 to $142 per night (double occupancy), guest rooms do not have telephones or television sets, and meals are served cafeteria-style in a dining hall. While indoor amenities are minimal, Asilomar is able to offer beach access, a swimming pool and volleyball court, and proximity to seven public golf courses.

c.    Clark Kerr Campus Center. Operated by U.C. Berkeley, the Clark Kerr Campus Center is located on 43 acres adjacent to U.C. Berkeley. Conference duration is widely variable, ranging from three days to two weeks, although a typical conference runs for five days. While the typical group is 100 to 200, group size is widely variable, ranging from 10 to 20 attendees, to as many as 600. Daytime conferences may be held at any time, while conferences that require guest rooms must be scheduled from late May to mid-August in order not to interfere with dorm residents during the academic year. Most conference attendees are from professional societies or associations, and the principal conference activity is training.

During the summer, the Center has access to overnight accommodations for up to 725 conference attendees and provides cafeteria-style food service. The Clark Kerr Campus features 6,000 square feet of meeting space including a large theater and several break out rooms, lounges, and a conference room. Because of its proximity to the U.C. Berkeley academic community, the Center's repeat business is 75 to 80 percent. The management at Clark Kerr

Table 6
BAY AREA MEETING CENTERS

| Facility/Operator/Location | Year Opened | Number of Sleeping Rooms/Overnight Capacity | Meeting Space Total Rooms/Square Feet | Occupancy Rate | Meeting Room Rate Per Day | Overnight Rate Per Person Double Occupancy | Overnight Rate Per Person Single Occupancy | Conferences Per Year | Average No. of Attendees | Average Conference Duration |
|---|---|---|---|---|---|---|---|---|---|---|
| Asilomar State of California Monterey | 1956 | 314/702 | 45/NA | 90% | $100-$1,000 | $63-$81 | $86-$142 | 1,200 | 100-200 | 3-4 days |
| Clark Kerr Campus Center UC Berkeley Berkeley | 1984 | NA/725 | 5/6,000 | 70% | $80-$400 | $49.50-$54[a] | $62-$72[a] | 150 | 100-200 | 5 days |
| Commonweal Commonweal Point Reyes | 1976 | 17/22 | 1/630[b] | 100% | NA | $60-$120[c] | $60-$120[c] | 30 | 20 | 3-7 days |
| Marconi Center State of California Marin County | 1990 | 40/96 | NA/3,870 | 60% | $150-$600 | $75 | $120 | 200 | 30 | 2 days |
| Westerbeke Ranch Westerbeke Family Sonoma County | 1966 | 19/51 | 4/3,115 | 50-100% | $360-$2,800[d] | $99-$109 | $80-$145[a] | 120 | 35 | 3 days |

Note: NA = Not available.

[a] Rate does not include meeting space.
[b] 630 square feet does not include living room space in separate residential buildings.
[c] Rate does not include food service.
[d] Based following per person conference rates: 1-10 people-$36; 11-25 people-$34; 26-80 people-$31.

Source: Bay Area Economics, 1996.

describes Asilomar as a primary competitor although the Center also faces
competition from other U.C. conference centers, particularly UCLA and U.C.
Santa Barbara. Costs are at the low end of the scale, ranging from $49 to $54
per night (double occupancy), plus meeting space charges. In addition to
meeting facilities, Clark Kerr also offers a swimming pool and other
recreational amenities on site, and a guest pass for U.C. Berkeley recreational
facilities.

d.      Commonweal. The Commonweal meeting center is located on 200
acres adjacent to Point Reyes National Seashore in Marin County. Originally
the site of an RCA antenna dating from the 1920s, Commonweal opened in
1976 as a meeting and retreat facility for community and non-profit groups.
Commonweal itself is operated as a non-profit firm. Conferences at
Commonweal generally run for three to four days with 15 to 20 attendees. A
typical user would be a small, non-profit social service organization, such as a
children's cancer support group, that wishes to hold a meeting in a relaxing,
retreat-like atmosphere.

With 17 guest rooms and several meeting rooms, Commonweal can host only
22 overnight attendees. The management stated that capacity for a group of
40 to 50 people would be optimal because Commonweal's occupancy rate is
currently 100 percent. However, the management prefers to continue to
accommodate smaller groups and is not interested in expanding the facility.
Rates average $60 per person per night, food service not included. Guest
rooms do not have telephones or televisions. For an additional charge,
Commonweal will provide food service for meeting attendees. Outdoor
amenities at Commonweal reflect the management's efforts to maintain a
secluded, restful setting. Guest have access to hiking trails both on the
Commonweal property and within the Point Reyes National Seashore.

e.      Marconi Conference Center. Marconi Conference Center is located on
62 acres along Highway 1 in Tomales Bay State Park, 1½ hours north of San
Francisco and is operated by the State of California. A typical conference
runs for two days with 20 to 40 people. One day conferences are not
permitted. Groups can be as small as seven or as large as 50. Most
conference attendees are from corporations, and social, religious and fraternal
organizations.

With 40 guest rooms, Marconi can accommodate up to 96 overnight
attendees. Marconi also has 3,800 square feet of meeting space, including a
meeting room with capacity for 100 persons. Management estimates that
Marconi's repeat business is 85 percent and that Asilomar is the closest
competitor, with groups often alternating between the two sites. Rates

average $75 per person (double occupancy) with full-service dining facilities.
Guest rooms do not have telephones or televisions. Amenities at Marconi
include volleyball and badminton courts, horse shoe pits, and extensive
walking and bicycling trails with vistas of Tomales Bay.

f.    Westerbeke Ranch Conference Center. The Westerbeke Ranch
Conference Center is located on the 300-acre Westerbeke Ranch in southern
Sonoma County and is operated by the Westerbeke family. A typical
conference runs for three days with an average of 35 attendees. Most meeting
attendees are from private companies, public agencies, and community groups.

With 19 guest rooms and three meeting rooms, Westerbeke is able to
accommodate 51 overnight attendees and provides sit-down dining service.
While Westerbeke's occupancy rate runs as high as 100 percent in the spring,
summer, and fall, it declines in the winter months to approximately 50
percent. The facility closes completely from December 15 to January 15.
Rates range from $99 to $109 per night (double occupancy). Guest rooms do
not have telephones or televisions. On-site amenities include a hot tub, sauna,
pool, and volleyball court, as well as a ropes course (used for team building), a
guided nature hike, and personal services such as shiatsu massage therapy and
yoga instruction. Available off-site activities include riding, golf, bicycle
rentals, and tennis.

g.    Meeting Center Conclusions. The relatively high occupancy rates of
Asilomar, Clark Kerr, Commonweal, Marconi, and Westerbeke demonstrate
that a need exists in the Bay Area for meeting facilities that serve non-profit,
public sector, and other price-sensitive organizations. The experience of the
meeting centers discussed above also indicates that users in this sector of the
market are generally willing to sacrifice typical hotel amenities (telephone,
television, etc.) as long as the facility provides something distinctive or unique.
In the cases cited above, the most appealing qualities of the meeting centers
are their outdoor and recreational amenities, i.e., hiking trails, swimming
pools, bicycle trails, scenic views, beach access, etc. It is precisely this type of
amenity that gives the above facilities their character and makes them
attractive to groups who either are not able to afford the cost of hotel guest
and meeting space in urban or suburban areas, or who seek an alternative
atmosphere to support the purpose of their meeting.

Based on interviews with operators at the facilities listed above, it is
recommended that the development of a small (50 to 100 guests) meeting
center at Point Molate be further investigated. The cottages lend themselves
to reuse for overnight guest accommodations, and with renovation, the
Winehaven complex could be adapted for conference and meeting space.

Point Molate's excellent bay views, and the potential development of recreational amenities such as hiking trails, will enhance its attraction to the same types of users who currently patronize the meeting centers listed above. One of Point Molate's most significant advantages is an atmosphere that seems remote, yet is within less than an hour's drive from most of the largest urban and suburban concentrations within the Bay Area. The correspondence between active market demand for small, functional meeting facilities, and the availability of existing cottages and historic warehouse buildings at Point Molate make the development of a small conference center an attractive reuse opportunity for the site.

h.    <u>Business Incubator</u>. Business incubator projects are innovative developments that foster new business formation while enabling the reuse of obsolete or underutilized office and industrial space. Increasingly, communities throughout the U.S. are attempting to foster new business development through mechanisms such as providing direct technical assistance to small business start-ups, or partnering with private and non-profit organizations to create business incubators to support local entrepreneurship. These business development approaches are based on the assumption that most new jobs are created by small businesses.

The typical local government-sponsored small business incubator provides low cost office or industrial space, shared professional and support services, and technical and financial assistance to start-up businesses. Business incubator facilities are usually located in buildings that have been renovated for multi-tenant use. There is general agreement among incubator development experts that one of the key factors in creating a successful business incubation project is selecting a building with low renovation costs and low operating costs so that rents can be held to below-market rate levels. High renovation costs can lead to the need to charge high rents in order to break even, defeating the purpose of the incubator.

In addition to providing "brick and mortar," cities must build internal capacity for developing and managing an incubator, or else contract out for these services. Incubators require capability in both property management and service provision, and their technical assistance programs must be fully staffed. Because of the high level of resource commitment required by incubator development, cities must conduct thorough market research in order to understand the demand and supply factors in the local community. This research will inform decision makers about the size and needs of the target incubator market, including requisite technical assistance and rent levels.

Interviews with business incubator experts in the Bay Area revealed that while there is no standard approach to developing a successful incubator, most facilities are located near the industry they support, and typically require 40,000 square feet or less. While private sector firms often provide in-kind goods or services, the major source of financing is the public sector. For example, the Software Business Cluster (SBC) in downtown San Jose has received $990,000 in funding from the San Jose Redevelopment Agency over the past three years. Intel, Hewlett-Packard, 3Com and other technology firms have provided $75,000 in equipment, while Arthur Andersen has donated 10 hours of consulting to each incubator tenant. The 24,000 square foot incubator houses 21 start up firms with 140 employees, and three firms that have graduated from the incubator program employ 115 workers.

Incubator financing is usually obtained through the Economic Development Agency (EDA), or through Community Development Block Grants (CDBG). This funding is very competitive and is uncertain year-to-year. EDA typically funds only bricks and mortar, while CDBG funds both bricks and mortar and ongoing administration. However, CDBG funding is restricted to incubator projects which target enterprises that will provide employment for low- and moderate-income workers. This proviso usually eliminates the use of CDBG funds for high technology or biotechnology business incubators.

According to Bay Area incubator development experts, it is not clear that buildings at Point Molate would make an optimal site for a business incubator because of their unknown rehabilitation costs, and because of the site's remote location. The shortage of both public or private funding sources has made supporters of incubator projects extremely reluctant to take on difficult or pioneering reuse sites such as Point Molate. Furthermore, if an impetus were to develop for the creation of a business incubator to serve this part of the East Bay, experienced business incubator developers feel that sites which are superior to Point Molate in terms of better access and lower renovation costs are available in Richmond and in other parts of Contra Costa County.

Based on the information collected from business incubator experts, a business incubator at Point Molate is probably not feasible. The combination of uncertain funding, the cost of converting warehouses to office space, and Point Molate's remote location present difficult obstacles to the successful development of a business incubator.

i.     Office Development. Office space developers and brokers who were interviewed for this study agree that Point Molate is not an optimal location for private sector office users. The site's remote location, lack of access from East I-580, and the need to make costly building upgrades, all combine to

reduce Point Molate's ability to compete as an office development. Other factors working against office development at Point Molate include the experience of Marina Bay in Richmond, a site with new buildings and good access that is having difficulty attracting tenants, and the existence of nearby alternative sites with freeway access that currently have high vacancy rates.

The developers and brokers contacted did not feel that Point Molate's waterside location, or the historic character of the existing structures were sufficiently attractive to compensate for the site's limited access and lack of infrastructure. According to one developer familiar with the site, Point Molate's relatively small size, and the current building layout may make it difficult to establish a business community atmosphere. Furthermore, because Point Molate currently lacks adequate infrastructure to support office users, this developer recommends that the City of Richmond consider alternatives to office development.

However, several interviewees mentioned that while mainstream office users would not be attracted to Point Molate, the site may be an appropriate headquarters for non-profit organizations. While non-profit tenants typically cannot afford to pay high lease rates, they also do not require the same level of improvements as other private sector firms. The successes of Fort Cronkhite in Marin and Fort Mason in San Francisco, both waterside locations with several non-profit tenants, were cited as possible models for the reuse of the Winehaven complex at Point Molate. Since the column spacing in the Winehaven building does not lend itself to efficient space division, potential office tenants would have to be willing to adapt to a somewhat awkward floorplan. The small windows limit available light, and therefore any building renovation for office use would require expensive construction of several light courts or atriums. Developers and brokers contacted felt that, bearing in mind the above caveats, if the City of Richmond were determined to reuse the Point Molate buildings as office space, it should be "spartan space" with minimal upgrades for non-profit tenants.

Although interviewees responded negatively to the concept of reusing Point Molate as a multi-tenant office location, several did acknowledge that it is possible that a single user may wish to locate its corporate campus at the site. Because of the obstacles associated with office development at Point Molate, it will require a special user with a compelling reason to locate there, and a vision of the site's potential. Unfortunately, it is not possible to identify through a market study the sort of user that would be willing to overlook Point Molate's problems in order to acquire space at such a unique location.

j.    Light Industrial/Warehouse Space.  Industrial brokers and developers
interviewed for this study feel that light industrial/warehouse development may
not be an appropriate reuse for Point Molate.  One broker pointed out that
new light industrial/warehouse uses make sense in areas with lower land values
than those typically found in the inner Bay Area.  Furthermore, Point
Molate's access problems from East I-580 may not be acceptable to light
industrial or warehouse users, and the present roadways at the site are also
inadequate.  As with office development, the high cost of building renovation
and seismic upgrades are also an important issue.

While there is a healthy market in Alameda and Contra Costa Counties for
light industrial/warehouse space, it is not likely that tenants in the mainstream
I-880 corridor would relocate or expand to this section of Richmond unless
lease terms were extremely favorable.  Point Molate may attract users from
southern Marin County who are seeking cheaper rents, but Marin tenants are
not typically large space users so the potential interest in Point Molate may
not be great.  The developers and brokers interviewed felt that Point Molate's
views, open space, and potential recreational uses may be of greater value to
the City of Richmond than the possible benefits of reusing the site for light
industrial or warehouse development.

k.    Office and Light Industrial/Warehouse Space Conclusions.  Point
Molate appears to be poorly positioned to support development of office, light
industrial or warehouse uses, especially for multiple tenants.  In the case of
office development, the site's remote location, poor access from East I-580,
and potentially costly building upgrades place Point Molate at a disadvantage
in the view of office space developers.  Furthermore, the existence of nearby
alternative sites with superior access and infrastructure to support office users
reduces the ability of Point Molate to attract office tenants.  However, it is
possible that an exception exists for office use by non-profit organizations.
While these groups are generally unable to pay market rate rents, they are
more amenable to limited building upgrades, and they may not be as averse to
Point Molate's remote location as other private sector firms.  Another
possibility may exist for Point Molate's buildings to be taken over by a single
office user that views site's limitations as a trade off for access to a unique
location.

In the case of light industrial/warehouse uses, the same disadvantages exist as
for office development in terms of the site's remote location, poor access, and
costly building renovation.  Given these critical factors, and the existence of
superior locations with light industrial and warehouse space nearby, it is
unlikely that the market would support development of light industrial or
warehouse space at Point Molate unless there is a special user who would

want to take advantage of the site's amenities and would not be affected by
the access constraints, and if infrastructure improvements can be partially
financed by other means.

l.      Live/Work Space.  Live/work space can be defined as a combination of
living space and artistic studio/work space in one unit, offering users such as
painters, photographers, and craftspeople, and knowledge-based workers such
as software developers, graphic designers, and architects, the opportunity to
integrate their personal and professional lives.  While the concept of live/work
is attractive in theory, in practice, most live/work buyers are actually "live-only"
and are considered to be a subset of the condominium market that desires a
non-traditional residential unit.  Many live/work projects in the Bay Area are
predominantly occupied by non-artist renters or owners who seek an
alternative physical design or unusual ambiance for their residence.  A smaller
group of buyers is made up of small business owners ("work-only") who are
seeking work space to conduct their businesses, but will not use the unit as a
residence.

Typically, live/work units have been constructed in old industrial or warehouse
buildings located in former and active industrial districts.  These structures
offer occupants large windows, high ceilings, open floor plans, and low rents
or sales prices because of their pioneering location.  Once a nucleus of
live/work projects are developed within the same area, local-serving retailers
such as cafes and restaurants are attracted to the neighborhood.  This
progression often leads to a change in perception of the area's image from a
fringe district to a trendy, alternative retail and residential zone.  In the Bay
Area, numerous live/work projects have been developed in Emeryville, West
Berkeley, East and West Oakland, and the South of Market district in San
Francisco.

According to interviews with live/work developers in the East Bay and San
Francisco, the success of a live/work project relies on proximity to the
employers and urban amenities that are located within a city's central business
district.  Most live/work residents do not wish to be car-dependent and either
walk to work or rely on public transportation.  Paradoxically, while design and
atmosphere are very important to live/work buyers, and they consciously seek
a non-traditional residential type, people in this market are not generally
"nesters" in that they do not spend most of their leisure time at home.
Therefore, most live/work buyers are averse to projects in isolated or remote
locations.

Live/work buyers can be divided into first-time homebuyers who are very price
sensitive, and "loft savvy" buyers who have purchased live/work space

previously and are trading up for a unit with more space and amenities. The San Francisco live/work market tends to be dominated by professional singles and couples with no children, as well as residents of the East Bay, Marin, and the Peninsula purchasing a pied-a-terre for weekend use. East Bay live/work residents have a different profile compared to the San Francisco market and are considered the "real" live/work type in that they combine their residential space with a home office. However, the majority of people in this market are not buyers and are in the East Bay because they are seeking lower rents.

Live/work development has stayed active in San Francisco over the last four years, but has slowed in the East Bay. Currently the East Bay is not considered an attractive market. Although the construction and rehabilitation costs in the East Bay are comparable to those of San Francisco, the lower sales prices and rental rates for East Bay live/work projects limit the payback to the developer. Developers who are still active in the live/work market in the East Bay are doing rental rather than for sale projects and have become more selective when choosing a site. Even relatively urbanized areas in the East Bay are considered unacceptably remote for live/work development because of their distance from a BART station.

Interviews with live/work developers in San Francisco and the East Bay confirmed that the majority of live/work owners do not work in their unit, and that the artists and craftspeople who would like to own or rent live/work space can rarely afford to. Furthermore, most live/work developments have a condominium ownership structure with conditions, covenants, and restrictions (CC&Rs) that specifically prohibit activities such as welding, ceramics, dark rooms, or other artistic activities that would cause nuisance or liability issues because of fumes and fire hazards. It is very difficult to obtain insurance coverage for live/work structures where these uses are allowed.

Live/work developers interviewed for this study were intrigued by the possibility of renovating historic warehouse buildings at Point Molate, but were skeptical of the location because of its remoteness. In the words of one developer, Point Molate "is a long drive to live in a loft." Although proximity to the bay is an important amenity, it is greatly offset by the need typically felt by users in this market to be close to urban amenities. In addition, one interviewee was skeptical about the ability to receive development financing from a bank or other lending sources because of the unproven nature of the site. Loans for such projects are generally difficult to obtain, especially given the ability of other sites in proven neighborhoods (West Berkeley, for example), where financing has recently been difficult to secure.

Although their historic ambiance and former use as warehouse space would seem to make the Winehaven complex at Point Molate a prime candidate for conversion to live/work space, the obstacles to live/work development at the site are likely to prevent the success of such a project. The most difficult problem for live/work development at Point Molate would be to surmount buyers' and renters' resistance to moving to what is perceived as a remote location. Even the site's proximity to Point Richmond, Interstate 580, and the Richmond-San Rafael Bridge is unlikely to overcome the perception by live/work developers that the site is too far from urban amenities to attract typical live/work buyers and renters. The live/work product type is a proven quantity in dense urban areas, and it was not possible to identify examples of this product type in remote, former industrial zones. It is possible that there exists a small subset of the live/work market that is made up of buyers and renters who would be attracted to a location like Point Molate, but this is not the typical buyer or renter profile.

m.    Residential Development. According to developers and brokers interviewed for this study, Point Molate shows strong potential for residential development. The group of developers, brokers, and real estate experts who visited Point Molate on the Open Tour day in October, 1996, responded favorably to the residential reuse alternative and felt that residential opportunities exist in both the flat and sloping portions of the site. For purposes of this market analysis, developers and brokers familiar with existing and planned residential projects in Richmond and the North Bay were contacted to discuss comparable water-oriented locations, and to assess Point Molate's potential as a residential site. Table 7 presents selected data regarding residential projects in Point Richmond and Marina Bay.

(1)    Point Richmond. Proposed development of residential units in Point Richmond is very limited. BAE examined the development history of Brickyard Landing, as well as Brickyard Cove Marina. Brickyard Landing is completed and offers only resales, while Brickyard Cove has 35 residential lots available.

- The 241-unit Brickyard Landing condominium project, located at a former brick manufacturing plant on the bay side of Point Richmond, opened in 1985 and sold out within three years. Floorplans range from one to three bedroom units that originally sold for $115,000 to $300,000. Site amenities include: tennis courts, swimming pool, clubhouse, sauna, and exercise room. Brickyard Landing has scenic bay views, as well as excellent views of the San Francisco skyline.

**Table 7**
## SELECTED RESIDENTIAL PROJECTS IN POINT RICHMOND AND MARINA BAY

| Location/project/Developer | Units at Buildout | Type | Units Per Acre | Floor Plans | Sales Price |
|---|---|---|---|---|---|
| **Marina Bay** | | | | | |
| *Bayfront*<br>Penterra Company | 163 | Condo | 16 | 2-3 BR | $150,000-$190,000 |
| *Promontory*<br>Greystone Homes | 77 | Single-family detached | 8 | 2-3 BR | $232,000-$250,000 |
| *Sunset Point*<br>Penterra Company | 131 | Single-family detached | 8 | 2-3 BR | $232,000-$250,000 |
| *Brickyard Cove*<br>Point Potrero Properties | 110 | Single-family detached | NA | NA | [a] |
| **Point Richmond** | | | | | |
| *Brickyard Landing*[b]<br>Innisfree | 241 | Condo | NA | 1-3 BR | $19-0000-$220,000 |

[a]  Vacant lots available. Sales prices not disclosed.
[b]  Sales prices reflect resales of one, two and three bedroom units. Penthouse units sales prices are approximately $300,000.

Source: Bay Area Economics, 1996.

The site's developer, The Innisfree Companies of Sausalito, targeted the units toward the high end of the market, with special focus on people living and working in Marin County. This strategy was a success and the project experienced healthy absorption, averaging seven sales per month. According to the developer, site clean up and environmental remediation was not a significant issue either during the construction phase, or for the condominium buyers.

Because of the project's unusual location, the developer initiated an extensive marketing campaign costing over $1 million to bring prospects to the site, overcome buyers' reservations about an area with problems of negative perception, and publicize the site's desirable bayside location. Many of the initial buyers were from Marin County and, like most condominium owners, were single professionals and couples without children. Approximately three years ago many of the units on

the market had difficulty attracting buyers, although the current vacancy rate has fallen. The percentage of resales and the resale prices are not known, but the developer estimates that currently 17 percent of the units are now rented out by their owners, a decrease from 20 to 25 percent over the last 18 months when owners were having more difficulty selling their units at the prices they wanted. The current rate is somewhat high for this type of development.

According to the developer of Brickyard Landing, residential development at Point Molate is likely to encounter many of the same obstacles faced by Brickyard Landing in terms of negative perceptions about the surrounding area. However, as with Brickyard Landing, the waterside location and bay views are highly desirable amenities that can be expected to attract East Bay and Marin condominium buyers.

• Brickyard Cove Marina is a mixed-use, water-oriented development constructed in the 1980s and consisting of 35 single-family homes, 35 single-family lots, a 250-boat marina and a 40,000 square foot office building. A later phase will include a small number of townhomes. Construction of a second 40,000 square foot office development is anticipated to begin in mid-1997. The existing office building draws marine-oriented tenants such as boat brokers, engineering consultants and a submarine manufacturer.

The 35 improved residential lots available at Brickyard Cove are 5,000 to 6,000 square feet and are expected to sell from $200,000 to $400,000 each. The 35 existing homes were constructed on spec and lot sales have been very slow since the project began.

According to the developer, Brickyard Cove Marina's remote location and single access route are considered a benefit in terms of privacy and safety by the development's residents. The developer anticipates that this view will be held by future residents of Point Molate if residential development goes forward there. In this developer's opinion, units on slopes with bay views at Point Molate should sell at a premium over waterside sites.

(2)    Marina Bay. Three residential projects are currently selling at Marina Bay:

• Sales for the Bayfront condominium project located on the southern shore of the Richmond waterfront opened in January 1996. Asking prices for the two-and three bedroom units range from $150,000 to $190,000. At build-out, the project will have a total of 162 units.

Twenty-three of the 36 units that have been completed have been sold. Total absorption averages 2.1 units per month.

- Promontory is a 77-unit single family detached project that opened in June, 1995. Asking prices for the three bedroom units range from $210,000 to $245,000. Thirty units have been sold. Total absorption averages two units per month.

- Sunset Point is a gated development. It opened in April, 1996 with plans for 131 single-family detached units. To date, 50 units are under construction and 31 of them have been sold. Absorption average four units per month. Asking prices for the two-and three bedroom units range from $232,000 to $250,000. Homes with a bay view sell for an additional $50,000.

According to developers familiar with Marina Bay and this section of the East Bay residential market, Point Molate is likely to face many of the same obstacles that arose for developers at Marina Bay. Marina Bay sites that were contaminated by former public and private industrial uses required extensive environmental remediation in order to accommodate residential, office, and commercial uses. Although waterside amenities available at Marina Bay may offset negative perceptions some buyers may have about this section of the East Bay, developers nevertheless felt obliged to offer homes at very attractive prices (compared to other locations in the Bay Area) in order to ensure healthy sales.

In terms of product type, interviewees noted that single family units are selling more quickly than multi-family, a trend that is expected to continue. Overall, buyers consist primarily of single adults and empty nesters.

(3) North Bay. Proposed development of residential units in the North Bay is very limited. Only two proposed developments were identified, both in Marin County: a 49-unit project near the bay in Tiburon; and a seven-unit project with bay views in Greenbrae.

- Located along the slope above Keil Cove in Tiburon, Easton Point, when developed, will have single-family detached homes and will include 15 acres of shoreline and 110 inland acres. Most of the land is unincorporated, with the balance located within Tiburon city limits. The Master Plan EIR is currently under review by the City of Tiburon and the unincorporated areas are expected to be annexed by the City at some time in the future.

  The 125-acre area will be subdivided into 49 lots (averaging approximately 2.5 acres each). The homes will target the high end of the residential market, with prices ranging from $400,000 to $800,000

dollars each. The developer anticipates that construction will begin in 1999 at the earliest, and although the project has not yet broken ground, the developer has already been contacted by potential buyers.

The units will be sold by a realtor through a standard lot sales program, with some presales predating construction. The developer anticipates that the desirability of the product type and the project's location will be sufficient to preclude the need for extensive and costly marketing.

- Located on Paradise Drive in Greenbrae, Verona Place has been under construction since August, 1996. The project includes seven high end single-family homes, ranging from 3,400 to 3,600 square feet, situated on one half to one acre lots with views of the bay. The developer anticipates the project will be completed by mid-1997.

  The homes range in price from $795,000 to $850,000, targeting move-up home buyers from Marin County. Thus far, two homes have been pre-sold and three are in the contract negotiation phase.

### 3.   Additional Information

a.   <u>Residential Developers' Assessment of Point Molate</u>.  Developers familiar with water-oriented residential development in the East and North Bay were contacted to provide an assessment of Point Molate's potential reuse as a residential site.  Overall, the interviewees agreed that both the hillsides and areas near the shoreline are attractive development sites for residential use.  Most developers felt that any residential project at Point Molate should include a mix of high density multi-family ownership and rental units near the shore, as well as lower density single-family homes on the hillsides.  There was also concurrence that the first phase should include multi-family units along the shore in order to create an identity for the site and attract a critical mass of buyers and renters.  Phase two should be made up of single-family development on the site's slopes, with units laid out in a staggered pattern in order to preserve views.

In terms of the target market, the interviewees agreed that the early units should be targeted toward first-time and first move-up buyers who typically take greater risks and are often willing to move to a pioneering location.  The higher end, hillside development that capitalizes on bay views will attract single-family buyers who are willing to pay a premium for a scenic location.

In order to preserve Point Molate's special ambiance, any residential development must leave the site with the maximum amount of open space for recreation and view corridors.  In spite of their enthusiasm for the site, no developer was willing to estimate the minimum number of residential units

that Point Molate would have to accommodate in order to thrive as a successful residential community.

b.    Residential Conclusions.  Opinions from local developers and brokers support the view that development at Point Molate should be carefully phased in order to establish the site's identity as an attractive residential location.  To achieve this goal, most of the interviewees agreed that the first phase of development should be multi-family units on the flat parcels near the water. Once this portion of the project has been proved successful, the development of single-family units on the hillsides should go forward.  Current residents of southern Marin County appear to be the most likely target market, followed by buyers who are familiar with this section of the East Bay.

Because of the importance of promoting a strong identity for Point Molate, an effective marketing campaign will be necessary to educate prospective buyers and renters about the site's numerous attributes such as bay views, mature trees, and proximity to parks and open space.  In fact, many developers felt that the project's identity should be strongly linked to the environment and open space since the natural scenery is Point Molate's primary asset.  The recent concept of "green housing" would support the site's overall open space image by integrating the residential and meeting center uses with a shared development theme.  For example, a community oriented around sustainable and environmentally sensitive uses may have very strong marketability among the project's target market.

c.    Other Bay Area Military Base Closure Activities.  Reuse and development at Point Molate will compete with other closing bases in the region.

(1)    Hamilton Air Force Base.  The Martin Group, a San Francisco real estate development firm, is currently undertaking the reuse of 400 acres of Hamilton Air Force Base in Novato into for-sale residential units.  When the Army Corps of Engineers proposed to clean-up the base over five years at a cost of $50 million, the Martin Group took over the clean-up process to expedite the project's development.  The clean-up occurred over 18 months and cost the DOD only $17 million.  Currently $30 million of infrastructure is being installed to serve the development's 900 residential units.  To date, four developers have joined the project to build an assortment of single-family, duplexes, and townhomes.

(2)  Mare Island Business Incubator. The City of Vallejo is currently
pursuing the development of a business incubator at the former Mare Island
Naval Shipyard. One possible alternative under consideration is a precision
tool manufacturing incubator that would reuse or salvage industrial equipment
currently in place at the site. Another alternative may be a food processing
incubator that would salvage kitchen and cafeteria equipment left at the site
by the Navy.

(3)  Presidio of San Francisco. The National Park Service (NPS)
plans to rehabilitate buildings at Fort Scott for reuse as a conference and
training center. This facility could contain up to 200,000 square feet of space
and will be targeted toward groups of 100 to 300 persons. The NPS envisions
an Asilomar-type facility with relatively spartan space and moderately priced
meeting rooms and guest accommodations. With historic buildings, playing
fields, superb views of the Golden Gate Bridge, and access to other portions
of the Presidio, Fort Scott is ideally suited for reuse as a conference and
training center. Although the Fort Scott Conference Center may be viewed as
a competitor to a meeting center at Point Molate, the markets served by each
facility are expected to be different. Point Molate is expected to serve smaller
groups that wish to meet in a more intimate setting, while Fort Scott is
expected to host larger groups needing greater facilities and closer access to
the urban amenities of San Francisco.

d.  Skaggs Island. Skaggs Island, the site of the former Skaggs Island
Naval Security Group, is located on 65 acres adjacent to San Pablo Bay in
Sonoma and Napa Counties. Like Point Molate, Skaggs Island has a remote
location with difficult access. The Skaggs Island Foundation is currently
considering plans to reuse the site as a conference center. In addition to 250
residential structures (i.e., one- and two-bedroom houses), the site also
contains recreational amenities such as tennis courts, swimming pools, sports
fields, a community center, and dining facilities. Like Fort Scott at the
Presidio, a conference center at Skaggs Island may present competition to a
meeting facility at Point Molate. However, development of a conference
center at Skaggs Island may not go forward because the site is located on
sinking slag land.

e.  Other Land Uses Under Consideration. Other land uses considered for
Point Molate not discussed in detail above, are addressed below:

(1)    <u>Pier Restaurant</u>. The development of a full-scale restaurant on
the Point Molate pier is probably not a realistic or feasible use on the pier.
The reuse of the 1,450-foot pier for commercial activity is expected to be
impractical because of the high cost of rebuilding the pier to comply with
seismic codes, and because a restaurant may not receive approval from BCDC.
Furthermore, restaurant operators who generally rely on foot traffic and
visibility for their success are unlikely to have a favorable view of such an
isolated location as Point Molate.

(2)    <u>Visitor Attraction/Tourist Destination by Boat</u>. The development
of a visitor attraction or tourist destination is also not viewed as a feasible
alternative for Point Molate for similar reasons cited above. Regional serving
visitor attractions rely heavily on easy access, good visibility, and require
significant parking accommodations. The proposal to develop a tourist
destination that would bring visitors by ferry to the site must be considered in
the context of existing ferry service to tourist destinations around the bay. For
example, at the height of the summer, the Blue and Gold Fleet in San
Francisco carries fewer than 500 passengers per week to Marine World in
Vallejo.

(3)    <u>Film Studio</u>. The potential for reuse of Point Molate buildings
by tenants in the film or entertainment industry is unlikely to occur given the
limitations of available structures. A film or video studio used for temporary
shooting requires a 20,000 to 40,000 square foot building with 50- to 70-foot
ceilings with large clear spans. The former warehouse and administration
buildings do not meet this criteria because of their low ceilings and obstructive
columns. Furthermore, several opportunities for film production in the Bay
Area currently exist at former industrial and warehouse buildings on Mare
Island, and at former airplane hangars on Treasure Island.

### B. Focused Market Analysis of a Winery

### 1.    Introduction

a.    <u>Background</u>. The Winehaven Building and Building 6, known
collectively as the Winehaven complex at the former Point Molate Naval Fuel
Depot, offer a significant potential development opportunity which could be
the driving force behind the successful reuse of the entire property. Unlike
many naval bases where buildings were constructed only to satisfy a military
purpose, these two buildings were built for use by what was once and is again
becoming a key segment of Northern California's agricultural based industry:
wine making. When it was built, the Winehaven complex was part of the

largest winery in California and possibly the world, with the capacity to produce approximately three million cases of wine per year. By today's standards, this volume would be commensurate with a single large winery such as Wente Brothers Estate Winery in Livermore, or Kendall-Jackson Winery in Healdsburg.

In evaluating reuse options for Point Molate, the City of Richmond recognizes the potential value of reusing these buildings for their original purpose, thus capitalizing on both their historic nature and character, and trying to capture some of the significant market momentum that has developed around the Northern California wine industry. Prior to the implementation of Prohibition in 1919, there were wine vineyards throughout the Bay Area, extending from Livermore into Contra Costa County and up into the Napa and Sonoma Valleys. In fact, prior to Prohibition, the Livermore region was considered the prime grape growing area. Prohibition all but killed the wine making industry in Northern California and only a few wineries were able to survive and continue to cultivate grapes. Northern California began to see a real resurgence of the wine industry in the late 1970s and early 1980s when wine consumption began to increase and many wineries were able to sell their highest quality wines at premium prices.

Today, wine making has become a very big business in Northern California. California wines make up almost 90 percent of the $12.5 billion U.S. wine industry. Napa and Sonoma Counties are classified as two of the prime grape growing regions in the world, and wines produced from these Sonoma and Napa vineyards compete with the finest French wines in terms of both quality and price. Wineries are very sophisticated operations, with highly educated wine makers and viticulture experts trained at universities like U.C. Davis. Large wineries such as Robert Mondavi, Fetzer, and Sebastiani devote significant resources to marketing their wines. Smaller wineries have also developed their own marketing strategies, often relying on direct sales to customers or individual wine shops and restaurants.

b.     Report Purpose.  This report is intended to provide an initial assessment of whether there is market support for any type of winery operation at Point Molate to use the Winehaven building and, if necessary, Building 6. While addressing the broad question of market feasibility, this report also focuses on very specific questions raised by the City of Richmond about the wine industry including: how much space could a winery operation occupy at Point Molate; could all aspects of a winery operation take place there; is a multi-winery tasting room feasible; what are the opportunities for a job training facility related to the wine industry; what ancillary uses (restaurants, meeting center, lodging) are complementary to a winery

operation; and how compatible is a winery with other planned uses
(residential, recreation) at Point Molate?

c.    Research Methodology.  In order to analyze the feasibility of any type
of wine making operation at Point Molate, it is first necessary to understand
the actual process of wine making.  It is equally important to appreciate the
wine market and the economics of the wine industry.  To gain a complete
understanding of the wine making process, and the economics of the wine
industry, an extensive literature search was made of business and industry
publications, as well as wine industry-related Web sites on the Internet.

To explore the specific issues raised by the City of Richmond related to the
requirements of a potential winery operation at Point Molate, including size,
square footage, number of employees, etc., BAE conducted over 25 interviews
with wine industry experts.

d.    Report Contents.  The three major sections of this report cover:  an
overview of the wine industry, including a discussion of the wine making
process and industry economics; questions raised by the City of Richmond
regarding a winery operation at Point Molate; and conclusions.  An Appendix
with brochures and other marketing materials from winery operators,
information from an architect specializing in winery design, and a rendering of
the original Winehaven from a wine history text are also included.

## 2.    Wine Industry Profile

a.    Overview of the Wine Making Process.  Although the manufacture of
wine does not follow a fixed recipe or formula in the manner of Coca-Cola®,
the process of transforming grapes into wine is essentially the same for
wineries ranging from large scale operations that produce several million nine-
liter cases each year, to small vintners who make only a few thousand cases.
In general, making wine involves pressing the grapes, fermenting the juice,
clarifying the wine, and aging and storing the wine until it is ready for bottling.

(1)    Harvesting and Crushing.  During the growing season, grape
growers prune, stake, and fertilize the vines.  Grape harvesting takes place
from August to October in California, and the grapes are picked when ripe.
Mechanical harvesters that shakes the berries from the clusters are widely
used in California.  The wine making process is mechanized and begins when
the grapes are placed in a crusher-stemmer machine that crushes the berries
and separates the stems from the fruit.  The crushing process results in a
dense, pulpy juice known as "must".  When the grapes are crushed and

allowed to stand in stainless steel tanks, the fermentation process begins almost immediately.

(2)  <u>Fermentation</u>. Fermentation is simply a yeast-enzyme conversion of grape sugar into alcohol, carbon dioxide, and heat. Because the yeast is temperature-sensitive, the winemaker must make sure that the temperature stays suitably low during the fermentation process. This is usually achieved by using stainless steel containers with built in refrigeration systems that allow the winemaker to control the temperature precisely. Many premium wines are fermented and aged in 60-gallon oak barrels. Barrel fermentation also requires temperature regulation and generally takes place in temperature controlled facilities.

During fermentation, small amounts of sulfur dioxide may be added to the must to kill unwanted microorganisms. However, some microorganisms are considered desirable, such as the lactic acid bacteria that helps reduce the must's acid content, and therefore aids in producing a more mellow wine.

(3)  <u>Red Wines</u>. In making red wines, the skin, pulp, and seeds are left in the must and the skin pigments dissolve into the juice to color the wine. Grape skins and seeds provide tannins which impart a stronger flavor and astringency, and also help protect the wine from the oxidation process and prolong its shelf life. Red wines are usually left to ferment in their skins for several days up to a week or more. Complete fermentation requires from 10 to 30 days. During fermentation, the red wine is filtered or "pressed" into stainless steel tanks or oak barrels, leaving behind a mixture of skins, pulp, and seeds, known as "pomace." The leftover pomace may be sold to distillers that use it to produce wines for distilling into beverages of higher alcoholic content, such as brandy.

(4)  <u>Racking</u>. Although the pomace has been removed, the filtered wine still contains particles such as grape and yeast solids, potassium bitartrate (i.e., cream of tartar), and other materials, collectively known as "lees." Next, in a clearing procedure called "racking," the new wine is drawn off from the lees. Racking entails removing the wine from the fermenting tanks or barrels for temporary storage in a large, central holding tank. The tanks or barrels are then cleaned, and the lees are removed. Then the wine is pumped from the temporary storage tank back into the tanks or barrels. Racking wine in barrels is more labor intensive than other phases of the wine making process, as each barrel must be emptied, moved, cleaned, and then refilled individually. In the case of premium wines, racking may be repeated at intervals for several years during the aging period in wood.

(5)    Ageing.  During barrel aging, the winemaker may blend together different grape varieties to achieve desired characteristics.  For example, blending a little Merlot into a Cabernet Sauvignon mellows its taste.  Temperature and humidity control are very important to assure proper aging, for both tank and barrel aged wines.  Because of evaporation, workers must top off the tanks and barrels to eliminate air which would permit the growth of bacteria that turn wine into vinegar.  Aging allows many reactions to occur in the wine which enhance its taste and aroma, and wine may be aged for several months to several years.  However, most wine is drunk "young," (i.e., 12 to 18 months after it is produced).

(6)    Bottling.  Before bottling, in the final clarification process, known as "fining," gelatin or a similar substance is added to the wine to entangle and settle out minute particles of debris.  Colored bottles help to reduce damage by light which can cause the breakdown of the wine into undesirable chemicals.  Just prior to filling the bottle, the producer may insert nitrogen which will sit above the liquid, preventing contamination by oxygen.  A capsule is placed over the cork and the top of the bottle.  Originally made of lead foil, fears of lead poisoning have brought about the use of other metals and plastic.

(7)    Bottle Aging.  Most wine experts feel that it is desirable to bottle age most red wines for two to three years.  Economics often prevent this as a general practice, and usually only six to nine months elapse from bottling to shipping.  While some red wines improve very little with time, others may develop for ten to twenty years and may hold their quality for another 20 years.  However, this can only be accomplished in ideal storage and temperature conditions.  Most wineries cannot afford to store their wines in the bottle for two or three years; however, a number of wineries hold back a portion of their wines for additional bottle age, and release them later at a higher price.

(8)    White Wines.  Making white wine follows a procedure similar to that for red wine, except that the must is separated from the skins and seeds immediately after crushing and before fermentation begins.  In some cases the must may be left with the skins for 12 to 24 hours.  Because tannins are extracted from the grape skins and seeds during fermentation, and the skins and seeds are removed in the making of white wine, white musts contain less tannin than red musts, and white wines are generally milder to the taste.

b.    Economics of the Wine Industry.  Following are descriptions of the various marketing segments of the wine industry.

(1)     U.S. Market Size.  The $12.5 billion (total 1995 revenues) U.S. wine market is dominated by California wines, which make up nearly 90 percent of U.S. wine production.  While U.S. wine consumption peaked in the mid-1980s and has declined 25 percent in the past ten years to 470 million gallons in 1995, total revenues have actually increased, owing to a shift in consumption patterns toward better quality and higher value wines. Furthermore, the downward trend in U.S. wine consumption has been reversing itself in recent years since the 1991 "French Paradox" study which linked red wine consumption with a reduced risk for heart disease.  In fact, from 1994 to 1995, U.S. wine consumption actually rose two percent.

(2)     Market Segments.  Table wine makes up 83 percent of all U.S. wine sales and includes jug wines, as well as premium varietals.  Although jug wines are the largest table wine segment in terms of volume, their share has declined from 90 percent of table wine volume in 1980 to only 60 percent today, and they account for only one-third of total table wine revenues.  A varietal is a wine produced primarily from a single grape variety, and may be named after a grape such as Chardonnay or Cabernet Sauvignon if the designated variety makes up at least 75 percent of the product.  Varietal wines may also claim an appellation of an approved viticultural district (such as Napa Valley) if no less than 85 percent of the wine's grapes come from that area.  While total white wine varietal sales exceed those of red, red wine varietals are the fastest growing market segment.  Other wine segments, including sparkling wine, dessert wine, wine coolers, and vermouth, make up 17 percent of the U.S. wine market, and all have suffered declining consumption in recent years.

(3)     Wine Imports and Exports.  Fifteen percent of the wine sold in the U.S. in 1995 was imported.  Although the U.S. currently runs a $1 billion wine trade deficit, long term trends point to a weakening of imports and an expansion of exports.  Forty-one percent of U.S. wine imports are from Italy, and 26 percent are from France, although French wine imports exceed Italy's in terms of total value.  The U.S. is not a major wine exporter, although U.S. wine exports have more than doubled in the past decade to 47 million gallons (10 percent of total production).  In 1995 alone, California wine exports grew 10 percent in volume, and 23 percent in value.  Historically, California wine exports have been dominated by cheaper wine, but average export prices have been rising in recent years.  Major export markets for California wine include the United Kingdom, Canada, and Japan.  U.S. wine exporters are also targeting fast growing Asian countries outside Japan.

(4)    <u>California Wine Market</u>.  Wine production in California reflects
U.S. purchase patterns, with the highest volume represented by jug wines, and
the highest value represented by higher margin varietal wines.  Wineries in
California present an interesting mixture of concentration and fragmentation.
For example, Gallo Winery alone accounts for more than one-third of
California's production market, and dominates the bulk wine segment, as well
as the Chardonnay and Cabernet varietals.  On the other hand, the California
wine industry's growth and vitality has resulted from the rise of many small,
family-owned wineries, especially in the prime grape-growing regions of Napa
and Sonoma Counties.  In spite of recent merger activities among Northern
California wineries, small, high-quality producers are expected to continue to
flourish because of persistent market support for their product.  In total,
California is estimated to have 650 commercial wineries, the majority of which
are family owned and operated.

(5)    <u>Grape Supply</u>.  Although the rate of winery ownership of
vineyards is 66 percent in Napa County, and 50 percent in Sonoma County,
historically, California wineries have been reluctant to "self-source" their
grapes, opting instead for long-term purchase contracts with independent
growers.  Under these long-term contracts, grape purchases are tied to the
previous year's average price, or indexed to the spot market.  However, with
three years of below-average grape harvests between 1992 and 1995, the trend
is shifting toward vineyard ownership by wine producers attempting to assure
an adequate supply of grapes.  Napa wineries have been the most aggressive in
developing new vineyards for premium grapes, on the expectation that demand
will remain high enough to support new incremental supply.

Phylloxera, an insect pest that attacks the roots of the grape vine, causing the
leaves to drop, and eventual death of the plant, is another threat to the
California grape supply.  In Napa County alone, Phylloxera has destroyed
approximately 2,000 acres (7 percent of total vineyard acreage).  Ironically,
one of the benefits of the Phylloxera infestation has been the greater
productivity and efficiency of the replanted vineyards where Phylloxera-
resistant vines can be planted closer together and produce more grapes.  Some
growers in Napa have been able to install up to 2,000 vines per acre, four
times the previous level.

(6)    <u>Distribution</u>.  Wine distribution is dominated by large, nationwide
distributors that use their significant bargaining power to reduce net prices
received by wineries.  This trend is mirrored at the retail level, especially
among high volume food outlets and warehouse clubs.  Currently, 20 percent
of wine sales in California are through warehouse clubs.  Because of this
pressure on producer margins from large, multi-region distributors and

retailers, the wine industry must pursue new distribution channels in order to expand the consumer base. Renewed concerns about responsible drinking habits means that growth in wine consumption is not expected to result from existing consumers drinking more, but from attracting new consumers.

California is among the few states that permit direct sales to consumers, and vineyard tasting rooms account for five percent of wine sales in California, while providing an excellent marketing forum. Wine sales through restaurants and bars are another important retail outlet. While restaurant and bar sales of wine account for approximately 20 percent of U.S. wine sales volume, they represent 40 percent of U.S. wine sales revenue.

(7)    Small Winery Distribution. Because many small wineries produce an insufficient quantity of wine to adequately stock grocery and liquor stores on a regular basis, stores may be unwilling to carry a brand if they cannot be sure of a stable supply. Distributors may also be unwilling to carry a winery's products if there is a risk of running out of stock. Therefore, many small wineries must rely on marketing their products through newsletters, customer lists, individual arrangements with bars and restaurants, or direct sales through their own tasting rooms.

Direct sales are the most important distribution channel for small wineries that do not generate sufficient volume to market their products through a typical grocery or liquor store distributor. The advantages of tasting room sales include giving the consumer the opportunity to try wines before making a purchase, and building brand loyalty. When wine drinkers are aware of the details concerning a particular winery, such as when it was established, whether it is family-operated, etc., they are more likely to feel closer to the brand and this can carry over into subsequent purchases at bars, restaurants, and liquor stores. Increased margins are another important advantage to tasting room sales since the wines typically are not discounted. The winery receives the full retail price which can be nearly double the amount it would receive if the wine was sold through a distributor. Direct sales can also allow a winery to develop an outlet for its product before it is accepted by a retailer who may be reluctant to stock and unknown wine.

(8)    Complementary Marketing of Wine, Food, Art and the Performing Arts. Promotion of responsible drinking by the liquor industry, as well as by public health and law enforcement agencies, has resulted in the growing incorporation of food, art, and the performing arts into wine marketing and advertising. In fact, many wineries have combined culinary and cultural programs and events into their selling strategy. For example, Robert Mondavi winery operates a satellite wine and food center in Southern

California, while the Sebastiani family's Viansa Winery and Italian Marketplace in Sonoma promotes Italian wine and cuisine as it educates patrons about proper food-wine combinations. More food tie-ins to the wine industry include the retailing of wine-based vinegars, mustards, and other specialty foods at winery tasting rooms and other retail outlets. Many wineries also host musical events and house art collections.

(9)    Recent Trends in Wine Retailing. The explosion of the World Wide Web in the past two years has encouraged the entrepreneurial development of electronic commerce, including outlets for the retail wine trade. During this short period, both large and small wineries have turned to the Internet as a source for customer outreach. A cursory search of the World Wide Web discovered 287 wineries, most located in California, with their own Web sites. While individual wineries offer product and ordering information on the Web, a burgeoning number of Web-based wine shops have also emerged to serve wine consumers.

Virtual Vineyards of Palo Alto, California went on-line in 1995 with the specific goal of providing small wineries with an avenue to reach an audience beyond their tasting room patrons. By using the Web to sell wine, Virtual Vineyards seeks to give potential customers in-depth information about the wines being offered in a comfortable, non-intimidating fashion. Virtual currently carries 250 wines from 65 wineries, as well as food products such as specialty cheeses, olive oil, vinegar, biscotti, gourmet teas and coffees, etc. Virtual acts as an agent for the wineries and food producers, and the wine and food inventory is stored in the company's central warehouse in Napa County (perishable foods are shipped directly from the vendor). The Web site's sophisticated software tools make shopping an easy and convenient experience, and response from customers and the media has been very positive.

c.    Summary. Small wineries are a strong market segment in the Northern California wine industry. A brief survey of Sonoma County wineries identified approximately 98 small wineries producing less than 65,000 nine-liter cases per year.

Many wineries, and the majority of small wineries, are not vineyard owners because of the high capital cost associated with land ownership. However, shortages in the grape supply have recently led to a shift toward more winery ownership of vineyards in Napa and Sonoma Counties.

Tasting room sales and other direct marketing techniques play a significant role in the marketing strategies of small wineries. Another recent trend for

both small and large wineries has been the incorporation of food into wine marketing and promotion.

## 3.    Questions About Potential winery Operations at Point Molate

This section addresses topics about the wine industry raised by the City of Richmond. During the course of this research, the City indicated its wish to explore the following issues:

a.    How much space could a winery occupy at Point Molate?  A brief survey of small, medium, and large wineries in the Bay Area, and in Napa and Sonoma Counties indicated that physical space requirements are not standardized across the industry (see Table 8). Interview respondents stated that in general, the most space intensive winery activities are racking, aging, and storage. On-site bottling facilities can also cover substantial areas of built space. By comparison, crushing and pressing are less space intensive, although they do require large amounts of water and sewer infrastructure.

Very often small wineries (less than 50,000 cases per year) will lease facilities for their wine making needs. For example, in Napa and Sonoma it is possible to lease custom crushing facilities, and use commercial warehouses for storage and distribution of the finished product. Custom crushing operations and storage facilities appear to be in high demand right now in the Napa and Sonoma valleys due to a shortage in the amount of built space at existing wineries. In Napa, this shortage is aggravated by the difficulties—especially for wineries with less than 40 acres of vineyard land—in obtaining use permits from the county planning agency.

Rosenblum Cellars, a small winery based in an industrial park in the East Bay, utilizes 20,000 square feet to produce 42,000 cases of wine per year. This facility is a full scale winery that brings in grapes and juice from other locations. Unlike other small wineries that utilize custom crushing or warehouse facilities, Rosenblum has machines and storage space for all facets of the wine making operation from crushing and fermenting, to racking, aging, and final bottling.

J. Lohr Winery, a mid-size winery located in an urban setting in San Jose produces 375,000 cases per year in a 47,000 square foot facility. Except for crushing and pressing, all other wine making functions (fermentation, racking, storage, bottling, and distribution) are accommodated at the site. Because it is unable to build necessary expansion space at its current facility, J. Lohr is opening a second operation near Paso Robles in San Luis Obispo County.

### Table 8
### REPRESENTATIVE SPACE REQUIREMENTS AND
### EMPLOYEE COUNT OF NORTHERN CALIFORNIA WINERIES

| Name of Winery/Location | Cases Per Year | Total Square Feet[a] | Permanent Employees | Seasonal Employees |
|---|---|---|---|---|
| Fetzer Vineyards<br>*Hopland, Mendocino County* | 3,000,000 | 340,000 | 240 | 50-150 |
| J. Lohr Winery<br>*San Jose* | 375,000 | 47,000 | 35 | 5-6 |
| Rosenblum Cellars<br>*Alameda* | 43,000 | 20,000 | 10 | NA |
| Wente Brothers Estate Winery<br>*Livermore* | 2,500,000 | 122,000 | NA | NA |

[a]   There may be significant variations in the amount of physical space required by wineries
      with similar annual production levels, depending upon reliance of off-site crushing or
      storage facilities.

Source: Bay Area Economics, December 1996.

Wineries producing over 500,000 cases of wine per year require substantially
larger facilities with more sophisticated refrigeration and pump equipment.
Fetzer Vineyards of Hopland, California produces and ships nearly 3,000,000
cases of wine per year from its 340,000 square foot winery complex. Out of
this total, nearly 230,000 square feet are dedicated to the bottling and
warehouse operations. Wente Vineyards of Livermore, California currently
makes more than 2,500,000 cases of wine per year and maintains a physical
plant covering approximately 122,000 square feet. A significant amount of this
space is occupied by 200 fermenters with 2,000,000 gallons of fermentation
capacity, 550 controlled-temperature blending and storage tanks, and 10,000
oak barrels for fermentation and aging.

This survey of winery space needs indicates that the square footage available
at the Winehaven complex is more than adequate to meet the needs of a
small, medium or large scale wine operation. The 198,000 square foot
Winehaven Building by itself would be sufficient to accommodate a relatively
large winery, thus allowing Building 6 to accommodate a different use, or even
to be demolished if structural rehabilitation is not economically feasible.

b.    Could all winery functions take place at Point Molate?  In theory, with
sufficient building improvements, all functions of a winery operation could
take place at Point Molate's Winehaven complex.  However, the noise from
refrigeration facilities that are required for fermentation, and the noise
generated by a bottling line may be incompatible with other uses that are
planned for adjacent areas on the site.  With its expansive warehouse facilities,
the Winehaven complex may be better adapted for distinct segments of a
winery operation such as aging, storage, and/or distribution.  It may be feasible
to operate the Winehaven complex as an aging, storage, or distribution site for
more than a single user, thereby providing such facilities for multiple wineries.

Feedback from industry experts was inconclusive regarding whether it is
economically viable for a typical winery to move its aging and distribution
operations away from its crushing, fermenting, and bottling facilities.  On the
other hand, there is precedence in the industry for having separate processes
take place at separate locations.  For example, as mentioned above, many
small wineries ship their grapes to custom crushing facilities, or send the
finished wine to commercial warehouses for storage and distribution.  In
addition, a small winery that does not have the capital to invest in its own
bottling line will often ship its wine to an independent operator for bottling,
labeling, and packing, and then return it to the winery for storage and
distribution.

In order for this to be a viable option at the Winehaven complex, an adequate
turn-around space for semi-trailer delivery trucks will have to be developed.

c.    Is a cooperative or multi-winery tasting room a feasible alternative at
Point Molate?  A tasting room is typically an ancillary use at a winery and is
rarely located off-site.  Discussions with industry experts indicated that it
would probably be difficult to persuade a single winery to set up a tasting
room away from its main operation.  Although the development of a
cooperative, or multi-winery tasting room may be feasible, it has not been a
successful model in the Napa Valley.  In the last five years, two attempts to
establish multi-winery tasting rooms at the Cement Works in St. Helena, and
at Beard Plaza in Napa did not generate sufficient business, and so both
operations have closed.  The failure of the Cement Works tasting room was
attributed to its relatively isolated location, and the availability of equivalent
or superior wine tourism opportunities in the nearby vicinity.

According to industry experts, in order for a multi-winery tasting room to be
successful, the developer would have to identify winery owners who are willing
to permit their products to be showcased in close proximity to competing
wines.  Because most wineries already have their own tasting rooms and

distribution channels, a cooperative tasting room would have to be a convincing alternative because of its location, ambiance, access to a new market, or because of its novelty. Even small wineries with limited distribution channels have a strong tendency toward independence and would have to be convinced that the advantages of a novel location or access to new consumers should outweigh their reluctance to present competing products side by side.

d.    Is some type of job training facility related to the wine industry a possibility at Point Molate?  Jobs in the wine industry can be divided into the broad categories of seasonal and permanent employment. Low skill, low wage seasonal employment opportunities are available during the harvest and "crush" from August through December. Tasting room jobs are also seasonal, and salaries and required experience are commensurate with other specialty retail employment opportunities. Permanent jobs in the wine industry can be divided into low skill cellar worker positions, and highly skilled, well compensated occupations such as a wine-maker or grower relations representative.

To give a sense of the quantity of workers required to keep an winery operation going, a brief survey of Bay Area and Napa wineries revealed that Rosenblum Cellars, a small urban winery that produces 47,000 cases per year, has ten permanent employees. J. Lohr Winery which produces 375,000 cases per year has 35 permanent employees and five to six seasonal workers. Fetzer Vineyards, a large winery which produces 3,000,000 cases per year, was also surveyed and was found to employ 240 permanent workers in its vineyards, winery, and administrative headquarters, with 50 to 150 seasonal workers. Fetzer employs 10 full-time wine makers to oversee the wine program.

Because on-the-job training and informal networking appear to be the primary paths for job advancement, there are no standard job training programs in the wine industry, either through vocational schools, community colleges, or other typical training sources. Despite the fact that the wine industry and wine related tourism are major regional employers, the Napa County Private Industry Council receives very few inquiries related to wine industry employment, and is not familiar with any systematic job training program for wine-related occupations. For highly skilled positions, such as wine maker, educational opportunities area available through four-year degree programs at colleges and universities such as California State University at Fresno, and the University of California at Davis.

While the wine industry in Northern California is a relatively significant source of permanent and seasonal employment, individual wineries typically do not

generate a high number of jobs. Furthermore, positions available are either
quite low skill, where on-the-job training is the norm, or else require formal
education through programs offered at colleges and universities. Therefore,
while in theory it may be feasible to develop a wine-related job training facility
at Point Molate if enough funds and enough support were available, it is not
clear that the future job opportunities for the participants would justify the
investment of their time in the training program (i.e., they may find better
wages and opportunities through on-the-job training). On the other hand, if a
winery operation were to be developed at Point Molate, the City may wish to
require the operator to hire his workforce from local residents, and to provide
a job training or job skills program.

e.    What ancillary uses (retreat center, lodging, restaurant, etc.) would be
complementary with a winery operation at Point Molate? Many wineries
promote their product and generate additional revenue by expanding their
business to include restaurants, event venues, and/or meeting centers. These
facilities accommodate the growing numbers of users who make Northern
California wineries popular sites for weddings, parties, and corporate events.
A recent article in the *Wall Street Journal* describing the Napa Valley's
growing popularity for special events mentioned that many venues are booked
12 months in advance.

Wineries that have incorporated food service into their operations include
Fetzer and Wente Brothers Vineyards. Wente has operated a successful
restaurant and visitor center in Livermore since 1986. In addition to a tasting
room and retail outlet, the 30,000 square foot complex includes conference
facilities and extensive catering services for business clients wishing to combine
training and meetings with the enjoyment of food and wine. The 200-seat
Wente restaurant has gained a regional reputation for excellence. Fetzer
Vineyards operates a less extensive tasting room and visitors center that
includes a gourmet deli and retail outlet. The deli features food products
from Sonoma and the North Coast along with Fetzer wines.·

In Southern California, the Mondavi Food and Wine Center (see Appendix D
for the brochure) located in Costa Mesa is a unique destination for wine and
food related events. The Mondavi Center does not generate significant
profits, although it serves to enhance the image and corporate profile of the
Robert Mondavi Winery in the expanding Southern California wine market.
The center hosts five to six public events per month as well as private events
for special occasions like weddings. Corporate events are by far the most
profitable aspect of the Mondavi Center's operations. According to a
Mondavi representative, businesses are actively interested in unique locations

for meetings and company parties, and the Mondavi facility is in high demand (Appendix D).

Based on the experiences of both the Mondavi Center in Costa Mesa and the Wente Winery, it appears that from a functional standpoint, there is a synergistic link between the wineries, gourmet food, and meeting or conference facilities. This seems to suggest that a winery operating at Point Molate could incorporate a restaurant as well as additional meeting or conference space. An alternative scenario might be that a restaurant, with or without additional meeting facilities, could co-locate with the winery but not be operated by the same entity.

There are currently no examples of wineries that also operate overnight lodging facilities in the Napa or Sonoma Valleys. This trend is probably primarily driven by zoning restrictions rather than by than market demand (i.e., overnight lodging facilities are not considered allowable uses in agricultural zones). The primary market issue for overnight lodging in the Napa Valley is the fact that business tends to be very cyclical based on the time of year and time of week. Virtually all of the Valley's lodging facilities are fully occupied on weekends during the summer and fall because people come to see the harvest and crush. To survive financially, the bigger lodging facilities, including the Vintage Inn and Napa Valley Lodge in Yountville, depend very heavily on corporate meetings to fill rooms mid-week and during the off-peak season.

It is likely that if there is winery and restaurant at Point Molate, overnight lodging would be compatible. However, the primary market support for this facility is most likely to come from meetings and conferences, rather than leisure travel. These conclusions are consistent with other market research recently conducted for Point Molate, which indicates that there is likely market support for a meeting center at this location, with or without a winery and/or restaurant. While the winery and meeting center could each operate on their own, a restaurant might do better if it is operated in conjunction with at least one of the other two uses. In addition, any combination of the three uses is more likely to be successful than any one alone because they all contribute to a synergistic image for the site.

f.    How compatible is a winery operation with other planned uses at Point Molate (residential, recreation)? The two major land use compatibility issues at Point Molate are related to noise and truck traffic that would be generated by a winery. Both overnight lodging and residential development at Point Molate could be compatible with a winery operation if measures are taken to mitigate the impact of noise generated by the winery facilities. Even if the

Point Molate operation did not include the more "industrial" aspects of wine making such as crushing, fermenting, racking, etc., other issues remain. For example, residential occupants would be required to share Point Molate's access road with the large semi-trailer rigs that would make deliveries to the winery. Traffic delays caused by slow moving delivery trucks, diesel fumes, and pot holes are potential sources of conflict between site residents and the winery. Restricting deliveries to non-peak traffic hours may be one way to diminish this impact, or if the winery operation were small enough, the potential conflicts mentioned above may not be significant enough to require mitigation.

Precedents for residential development adjacent to a light industrial or agricultural use exist. For example, at the Clos du Lac development in Folsom, California, a working vineyard is the site's central design feature, and it is surrounded by 40 homes on half-acre lots. During the grape harvest, residents accept the noise, dust, and inconvenience of the harvesting operation. In return, they are able to enjoy a unique environment, unlike a typical Central Valley tract development.

Significant conflicts are not expected between a winery operation and recreation and open space uses at Point Molate. The availability of biking, hiking, and other recreational opportunities at Point Molate would be a bonus for a winery operation because of the number of visitors who would be brought to the site. A certain percentage of these visitors are likely to visit the winery's tasting room, and/or purchase wine or food. A possible conflict may develop if the winery operation were to include a meeting center and/or lodging. In this case, it would be necessary to secure such facilities so that members of the public who visit Point Molate for recreational purposes would not easily intrude on groups who are at the site to use the meeting center and/or lodging.

### 4.   Conclusions

After an extensive review of business literature related to the wine industry, and conducting key informant interviews with over 25 wine industry experts, the following conclusions should assist the City of Richmond in its planning for Point Molate:

- **Space Requirements.** If the development of some type of winery operation at Point Molate goes forward, the City could expect all or part of the Winehaven complex to be reused for this purpose, depending on the size of the winery operator. A small winery may require only 20,000 square feet, while a larger operation may take

50,000 to 100,000 square feet, or more. The City therefore has the option of rehabilitating Building 6, or allowing it to be demolished.

- **Appropriate Winery Functions.** Because of noise generated by a winery's refrigeration and bottling facilities, the winery functions that may be best suited to the Winehaven complex are aging, storage, and distribution. However, if the winery operation is small enough, all functions may be accommodated at Winehaven and the noise generated by refrigeration and bottling facilities may not be significant. In either case, for a winery operation to work a Point Molate, adequate turn-around space for semi-trailers must be developed.

- **Winery Infrastructure Requirements.** A fully operational winery at Point Molate that encompasses all phases of the wine making process will require large amounts of water and sewer infrastructure, particularly for the crushing and pressing processes. In addition, for a winery operation to work a Point Molate, adequate turn-around space for a semi-trailer must be developed in order to provide pick-up and delivery access to the Winehaven complex.

- **Tasting Room Prospects.** Although a multi-winery tasting room has not been a successful model in the past, it may work at the Winehaven complex because of Point Molate's unique location, and its proximity to a large market. However, this use alone would only occupy up to 1,000 square feet.

- **Job Training Prospects.** By nature, wine industry employment is divided into high skill workers who have extensive education, and low skill positions where on-the-job training is the norm. Because the wine industry historically has not required, or supported formal vocational training for wine workers, it may be difficult to establish such a facility at Point Molate. Nevertheless, as part of the agreement allowing a wine operation to reuse the Winehaven complex, the City may wish to require the operator to hire local residents and provide a job training or job skill program.

- **Ancillary Uses.** Successful examples of ancillary uses associated with wineries in California, that could also be incorporated into Point Molate, include restaurants and meeting centers. Although precedence does not exist in Northern California for a lodging facility at a winery, overnight accommodations that are connected with a meeting center would be a desirable ancillary use.

- **Residential Development.** Residential development would also be compatible with a winery operation, if mitigation measures are taken to reduce noise created by the wine facility. Potential conflict may exist between residential traffic and semi-trailers making traveling to and

from the winery, but delivery restrictions could reduce this impact. Significant conflicts are not anticipated to arise between a winery operation and recreation and open space uses at Point Molate. In fact, park and recreation facilities are likely to benefit the winery because they will attract visitors to the site.

# Chapter 4
# GLOSSARY OF ACRONYMS

■   ■   ■

### GLOSSARY OF ACRONYMS:

| | |
|---|---|
| ABAG | Association of Bay Area Governments |
| ACHP | Advisory Council for Historic Preservation |
| ADA | Americans with Disabilities Act |
| AWWA | American Water Works Association |
| BCP | Base Realignment and Closure Clean-Up Plan |
| BS&W | Ballast, Sediment, & Wastewater System |
| BTEX | Benzyne, Toluene, Ethylbenzene, and Xylene |
| BCDC | San Francisco Bay Area Conservation and Development Commission |
| BRAC | Blue Ribbon Advisory Committee |
| BART | Bay Area Rapid Transit |
| COE | U.S. Army Corps of Engineers |
| COR | City of Richmond |
| CATS | Consolidated Area Telephone System |
| CCC | Contra Costa College |
| CERFA | Community Environmental Response and Facilitation Act |
| CDFG | California Department of Fish & Game |
| CNPS | California Native Plant Society |
| DoD | Department of Defense |
| EIS | Environmental Impact Statement |
| EIR | Environmental Impact Report |
| EBMUD | East Bay Municipal Utility District |
| EPA | Environmental Protection Agency |
| EDC | Economic Development Conveyance |
| EBRPD | East Bay Regional Park District |
| EBS | Environmental Baseline Survey |
| EFA-West | Engineering Field Activity-West Naval Facilities Engineering Command |
| FISCO | Fleet & Industrial Service Center in Oakland |
| FOST | Finding of Suitability to Transfer |
| HUD | Department of Housing & Urban Development |

| | |
|---|---|
| IR | Installation Restoration |
| kV | Kilovolt |
| LRA | Local Reuse Authority |
| MTC | Metropolitan Transportation Commission |
| MLLW | Mean Lower Low Water |
| NRHP | National Register of Historic Places |
| NFD | Naval Fueling Depot |
| NPDES | National Pollutant Discharge Elimination System |
| NAVSUP | Naval Supply |
| ORP | Oil Reclamation Plant |
| ORS | Oil Recovery System |
| OWS | Oil/Water Separator System |
| PBC | Public Benefit Conveyance |
| PG&E | Pacific Gas & Electric |
| Qhbm | Bay Mud |
| RI | Remedial Investigation |
| ROD | Record of Decision |
| R&D | Research & Development |
| RNCC | Richmond Neighborhood Coordinating Council |
| ROW | Right of Way |
| RWQCB | Regional Water Quality Control Board |
| SFBAAB | San Francisco Bay Area Air Basin |
| SHPO | State Historical Preservation Office |
| SI | Site Investigation |
| TDM | Transportation Demand Management |
| USFWS | U.S. Fish & Wildlife Service |

# Chapter 5
# BIBLIOGRAPHY

■  ■  ■

Alterman, Lee and Sandres Swanson, Congressman Ronald D. Dellum's Office. Personal Communication to Jeanette Dinwiddie-Moore, Dinwiddie and Associates. Decembher 18, 1996.

Association of Bay Area Governments. 1989. The Bay Trail: Planning for a Recreation Ring around San Francisco Bay.

California Native Plant Society. 1996. CNPS Plant Survey Conducted May 16, 1996.

Chavez, David and John Holson. 1985. Cultural/ Archaeological Resources Investigation at the Naval Supply Center Fuel Department, Point Molate, Contra Costa County.

City of Richmond. 1995. Draft Zoning Ordinance.

Clausen, W.B. 1996. Memo of Job Site Visit of the Old Winehaven Storage Building on March 8, 1996. Prepared for Manson Construction & Engineering, Richmond, California.

City of Richmond. 1995. Consolidated Plan.

City of Richmond. 1996. Point Molate Draft Land Use Concept Paper.

City of Richmond. 1993. Draft, Richmond General Plan. Prepared by the City of Richmond, Richmond, California.

City of Vallejo. 1994. Mare Island Final Reuse Plan.

Cultural, Education, Recreation and Open Space Subcommittee (BRAC). 1996. Working Paper for the Point Molate Naval Fuel Depot Reuse Plan, Richmond, CA.

East Bay Regional park District. Parkland Planning Department. 1988. Master Plan 1989.

Engineering Field Activity, West Naval Facilities Engineering Command. 1996. Background Information Navy Existing Conditions Fleet Industrial Supply Center, Naval Fuel Depot, Point Molate Richmond, California.

Environmental Laboratory. 1987. Corps of Engineers Wetlands Delineation Manual, Technical Report Y-87-1. U.S. Army Engineer Waterways Experiment Station, Vicksburg, Mississippi.

EDAW, Inc. 1996. NAS Alameda Community Reuse Plan. Prepared for Alameda Reuse & Redevelopment Authority, Alameda, California.

Governor's Office of Planning and Research. 1991. California Permit Handbook.

Holland, Robert F. 1986. Preliminary Descriptions of the Terrestrial Natural Communities of California.

JRP Historical Consulting Services. 1996. Proposed Boundary Revision: Winehaven. Prepared for Engineering Field Activity, West, Naval Facilities Engineering Command, San Bruno, California.

LSA Associates. 1987. Natural Resources Management Plan, Point Molate Fuel Supply Depot. Prepared for the United States Navy.

Moffatt & Nichol Engineers. 1996. Point Molate Pier Alternative: Site Inspection Report. Prepared for Wickland Oil Martinez, Martinez, California.

Moore Iacofano Goltsman, Inc. 1995. Point Molate: Envisioning the Future (A Summary of the Visioning Workshop held on November 18, 1995). Prepared for the Point Molate Reuse Plan Blue Ribbon Advisory Committee.

Nygren, Rick. Personal Communication with Rick Nygren, U.S. Navy, to Catherine Payne, B&A. December 10, 1996.

Plummer, Dave. Letter dated August 2, 1996. Explanation of California State Lands Trust as It Applies to Point Molate. Prepared for Patricia M. Jones, City Manager for Richmond, California.

PRC Environmental Management, Inc. 1996. Basewide Environmental
Baseline Survey, Draft Report, Naval Fuel Depot Point Molate. Prepared for
the Department of the Navy, EFA West, San Bruno, California.

PRC Environmental Management, Inc. 1996. Preliminary Draft Base
Realignment and Closure Cleanup Plan. Prepared for the Department of the
Navy, EFA West, San Bruno, California.

PRC Environmental Management, Inc. 1996. Final Base Realignment and
Closure Cleanup Plan. Prepared for the Department of the Navy, San Bruno,
California.

Richmond Waterfront Development Committee. 1973. Richmond Coastline
Plan. Prepared for the Richmond City Council, Richmond, California.

Robertson, Tom. Personal Communication with Tom Robertson, U.S. Navy,
to Judy deReus, B&A. December 5, 1996.

ROMA Design Group. 1996. Naval Station Treasure Island Reuse Plan.
Prepared for the Office of Military Base Conversion, Planning Department,
City & County of San francisco, and the San Francisco Redevelopment
Agency.

San Francisco Bay Conservation and Development Commission. 1979. San
Francisco Bay Plan.

Stevenson, Blake D. Personal Communication with Blake D. Stevenson, State
Lands Commission, to Jeanette Dinwiddie-Moore, Dinwiddie & Associates.
December 27, 1996.

United States Navy. 1995. Draft Biological and Sensitive Species Survey,
Point Molate Fuel Depot, Richmond, California.

Uribe and Associates. 1995. Draft Sixty-Percent Environmental Assessment,
Closure of Navy Fuel Depot Point Molate. Prepared for Engineering Field
Activity, West Naval Facilities Engineering Command.

U.S. Navy. 1988. Master Plan for Naval Supply Center, Oakland, California.

Vitz, Martin. 1996. Personal Communication with Martin Vitz, EBRP, to
Sheila Brady, B&A. October 29, 1996.

Wiese, Brian. 1996. Environmental Document Review: Existing Conditions Report and Closure/ Cleanup Plan. Prepared for the BRAC Environmental Subcommittee, Richmond, California.

Wilson, David. Personal Communication with David Wilson, East Bay Conversion Commission, to Jeanette Dinwiddie-Moore, Dinwiddie & Associates. December 17, 1996.

# Appendix A

■ ■ ■

*Point Molate:  Envisioning the Future--A Summary of the Visioning Workshop held on November 18, 1995, for the Point Molate Reuse Plan Blue Ribbon Advisory Committee.*

City of Richmond

# POINT MOLATE: ENVISIONING THE FUTURE

*A summary of the Visioning Workshop held on November 18, 1995, for the Point Molate Reuse Plan Blue Ribbon Advisory Committee.*

*Prepared by*
Moore Iacofano Goltsman, Inc.
1802 Fifth Street
Berkeley, CA 94710

December 1995

# CONTENTS

**I.   INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
    A.   Purpose  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
    B.   Overview  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
    C.   Report Organization  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1


**II.   SUMMARY OF THEMES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    A.   Assets  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    B.   Liabilities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    C.   Goals  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    D.   Visions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4


**III.   DETAILED COMMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    A.   Assets  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    B.   Liabilities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
    C.   Goals  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
    D.   Visions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

**APPENDIX**

Photoreductions of Wallgraphics

# I. INTRODUCTION

On November 18, 1995, the City of Richmond conducted a "visioning" workshop for the Point Molate Reuse Plan Blue Ribbon Advisory Committee. This report presents the Committee Members' insights and suggestions for the reuse of Point Molate.

## A. PURPOSE

The purpose of the visioning workshop was to identify the site's existing assets and liabilities and to generate visions for the future development of Point Molate. A vision is a broad description of the ideally preferred use of a site, an image that helps to orient planning and decisionmaking. Together with their assessment of existing conditions, the Committee Members' vision themes will provide a framework for the Committee's work on the detailed reuse plans.

The vision framework builds on and augments the guidelines provided by the City of Richmond to the Advisory Committee for their work on the Reuse Plan:

1. Provide for ongoing public access to property generally located west of Western Drive and north of I-580.
2. Recognize and preserve the historic importance of the existing facility designated as a National Historic Area.
3. Involve a broad range of community interests in preparing specific reuse plans for Point Molate.
4. Use the Point Molate facilities to enhance the City of Richmond's Economic Development Strategies.
5. Maintain Point Molate in public ownership

## B. OVERVIEW

The vision workshop was part of a full-day session for the Advisory Committee, which was organized into five parts. First, Richmond Mayor Rosemary M. Corbin welcomed the Advisory Committee's Members, and City staff Natalia Lawrence and Patricia Jones reviewed the workshop agenda and the October 26 orientation meeting. Next, facilitator Daniel Iacofano of MIG, Inc., conducted the visioning process with the Committee Members. The third part consisted of subcommittee sessions on goals and internal operations, and the fourth part consisted of subcommittee chair reports to the full committee. Finally, Mayor Corbin and Patricia Jones closed the workshop.

## C. REPORT ORGANIZATION

After this introduction, Section II describes the main themes of the workshop. Section III presents a detailed summary of comments gathered during the workshop on written comment sheets. The appendix contains a photoreduction of the wallgraphics prepared during the workshop.

## II. SUMMARY OF THEMES

This section presents a summary of themes based on the workshop participants' comment sheets and the wallgraphic record of the comments made during the workshop. The findings are organized into four major areas: assets, liabilities, goals, and visions. (The full range of members' comments are presented in Section III of this report.)

### A. ASSETS

#### Natural Features
The committee members named Point Molate's natural features as the site's outstanding assets. Among the natural features, they identified the Bay shoreline as the highlight, with its easy public access, natural sandy beach, and undeveloped, natural character. Committee members also praised highly Point Molate's open space, and the related natural, peaceful setting and panoramic views. An aspect of the natural setting—the Point's wildlife and plant habitat—was also mentioned frequently by board members as an asset. They also saw potential at the site for tourism and recreational activities, such as horseback riding and fishing.

#### Historic Significance
Committee members consistently mentioned the importance of the site's history, especially the Winehaven building, which is listed in the Winehaven Historic District. Point Molate was also a camp for Chinese shrimpers, another historically significant use of the site.

#### Buildings and Facilities
Committee members identified Point Molate's diverse and unique facilities as significant assets for the site. They often mentioned Winehaven and the housing units, with their "medieval," and "castle-like" appearances. They were especially appreciative of the pier's potential uses. In a different vein, the Committee members saw the fuel storage tanks as potential revenue-producing assets, (although many said that the tanks could become a liability if not used for this purpose).

#### Location and Access
Committee members frequently cited Point Molate's location and it's access to San Francisco as assets. (Other members saw access as a liability, especially from Marin—see Location and Access in the Liabilities section below.) They described the site's remoteness from developed areas as a benefit of the location, preserving the Point's quiet character.

#### Low Acquisition Cost/Potential Revenue
Some members mentioned as assets the low initial cost to acquire the site and the potential for revenue from the rental of the fuel storage facilities.

#### Other Assets
A variety of other assets related to educational opportunities, issues of governance, climate, and other regional plans were identified.

## B.   LIABILITIES

### Environmental Remediation

The main concern of Committee members was the need for potentially extensive clean-up of toxic and hazardous wastes in soils and groundwater related to the use of the site as a fuel facility.  Committee members also cited the need for removal of lead paint and asbestos from buildings as environmental liabilities.

### Location, Access and Traffic

Committee members also expressed concern over the location of and access to the site.  Key aspects of this liability were the existing access road (which is narrow and only provides one entrance), the cost of upgrading infrastructure, limited parking, no public transportation to the site, and the lack of freeway access from Marin County.  Some Committee members also felt that remoteness from urban activities would deprive the site of amenities, such as restaurants and shops, which could support new uses.  Concerns were also raised about industrial through traffic.

### Fuel Facilities

Although members recognize the potential benefit of the fuel facilities, they also see them as potential conflicts with other uses of the site.  They also indicated that the tanks and pipelines may be substandard, requiring expensive rehabilitation and ongoing maintenance.  Several Committee members expressed concern about the proximity to the Chevron refinery.

### Public Facilities and Existing Structures

members saw the lack or inadequacy of public facilities as significant liabilities.  They frequently cited the lack of a sewer system, as well as the need to improve roads and the water system.  Other shortcomings mentioned included the need to strengthen and to seismically retrofit buildings to withstand earthquakes and to allow new uses.

### Cost and Revenue Limitations

Several members mentioned the disparity between the significant costs to develop and then maintain the site, and the lack of a dedicated funding source.

### Natural Features

The site's natural endowment includes certain liabilities, according to the Committee members.  These include uncontrolled non-native plants; a limited amount of developable land (in part due to steep slopes); and a degraded native habitat.

### Regulatory Constraints

Members noted that several sets of environmental and land use regulations apply to the site.  While intended to protect public health and the site's natural and cultural assets, these restrictions may limit its use or present delays in the development process.  These include regulations concerning:

| | |
|---|---|
| ✓   Coastal zone status | ✓   Endangered species habitat |
| ✓   Federal base reuse guidelines | ✓   Ground/surface water pollution |
| ✓   Lead and asbestos removal | ✓   Soil contamination |
| ✓   Historic district registry | ✓   BCDC requirements |

**Public Policy**
Several members noted that a lack of public policy for land uses at the site was a liability. Public policy should be consistent with existing south shoreline document, or related to that study.

**Adjacent Uses**
Members cited several adjacent uses as liabilities. They frequently mentioned the quarry operation. The also mentioned that there may be a need for a buffer against the activities at the Chevron refinery.

**Other Liabilities**
The members identified a set of other challenges, mentioning the Navy's continued presence, the lack of public policy regarding the site, and potential conflicts with other interests.


## C.  GOALS

During workshop, a number of vision statements emerged as potential goals for the Plan. Goals for the ultimate use of Point Molate are to:

- ✓  Be a good neighbor.
- ✓  Showcase Richmond.
- ✓  Be economically self-supporting.
- ✓  Find market niche.
  - •  Open space.
  - •  Quiet retreat.
  - •  Historic qualities.
- ✓  Ensure compatibility.
- ✓  Create opportunities.
  - •  Local ownership.
  - •  High-paying jobs.
  - •  Business incubators.
- ✓  Look at the big picture.
- ✓  Avoid competing with other areas.
  - •  Tie into Point San Pablo.
- ✓  Ensure consistency with Richmond's General Plan goals and policices, coordinate with existing planning projects in the City of Richmond, and learn from other base closings.


## D.  VISIONS FOR THE FUTURE OF POINT MOLATE

This section presents common themes drawn from Committee members' vision for Point Molate. The themes have been organized into categories that represent the major potential uses for the site.

While the themes are presented separately, many Committee members combined the several potential uses into an overall concept or theme. For example, several members envisioned Point Molate as primarily an open space park for hiking and recreation, with amenities and shops to

support this predominant use. Other visions included a more central role for commercial development, for example, with a tourism-oriented waterfront development like Pier 39 in San Francisco.

## Natural and Recreational Uses

The Committee members were largely unanimous in their desire to preserve open space, which was the predominant theme regarding natural and recreational uses. Maintaining public shoreline access was a key aspect of members' vision statements. This theme also included the preference for the development of shoreline and hillside trails, either for hiking and walking or for multiple uses. They also were very supportive of recreational uses, such as fishing, swimming, and biking. Members also envisioned the restoration and enhancement of plant and wildlife habitats. Another desired use was connection to the San Francisco Bay Trail.

## Education and Research

The Committee members' vision of educational uses of Point Molate builds from their appreciation of its natural assets. Accordingly, they mentioned environmental education most frequently as the specific educational endeavor appropriate to the site. There were several variations of this, including marine and plant biology, a children's environmental camp, and an environmental education facility. Several members suggested general educational uses, such as a satellite university campus, arts education, or research and development activities. Museums based on the site's unique history were another frequently envisioned use.

## Conference Center

A frequently mentioned option was development of a retreat and conference center, like the Asilomar retreat in Monterey, which would build on the site's unique natural and historic features. Members saw the potential for using the housing to accommodate participants in multi-day retreats. Such a site could also be used for business conferences. Members expressed the hope that a conference center would be self-supporting. .

## Tourism/Visitor Attractions

Members were also supportive of amenities for visitors such as restaurants and hotels or hostels. They also often mentioned the potential for development of a waterfront area and marina with shops and activities, suggesting San Francisco's waterfront as a model.

## Arts and Cultural Uses

Another frequently mentioned development option was a facility for arts and cultural activities, including performing arts, studios, and crafts. Fort Mason, in San Francisco, was cited as an example of this type of development. Some members mentioned the potential for using the on-site housing for resident artists or actors.

## Uses of Existing Structures (Winehaven and Housing)

While many of these ideas imply the use of Winehaven, Committee members often mentioned specific plans for Winehaven. Ideas ranged from reuse of the facility for wine industry activities, to development of a multi-tenant facility for artists, non-profits, and educational endeavors. Another suggestion envisioned the creation of a showcase for Richmond's cultural, historic, and culinary institutions.

Committee members often discussed the potential uses of the site's housing units. In addition to accommodations for retreat participants and artists, housing for low-income and homeless persons was mentioned. Conversely, other members sought to limit residential development.

## Business Opportunities
Committee members often described general business opportunities. For example, some Members mentioned development of office space or light industrial and high-tech businesses. These uses, they felt, have the potential to become business incubators, which could also benefit from environment created by the conference center and educational uses.

## Maritime Uses
The Committee members indicated a desire to take advantage of the site's access to the water by including maritime access to the Point. Very frequently, they mentioned the possibility of including a ferry landing. Other suggestions included accommodating major cruise lines, non-motorized boats, and Bay cruises.

## Access
A few Committee members suggested improving access as part of the reuse of the site.

## Fuel Facilities
Several members suggested the removal of fueling facilities and associated buildings.

## Overall Redevelopment Considerations
Together with these specific development ideas and site improvements, Committee members suggested overall guidelines for redevelopment. A key goal was to maintain the site's open space and historical significance. Many expressed a desire to involve youth, and to develop the employment potential of the site and provide job training opportunities. Others sought to minimize industrial development. Some Committee members suggested that development plans should address the needs of homeless persons.

Committee members indicated a desire to learn from other examples of the civilian reuse of military installations. Examples included fuel depot closures in Alameda and Sacramento and the reuse of the Oak Knoll hospital in Oakland.

## III. DETAILED COMMENTS

This section presents the detailed comments made by participants both orally during the workshop and in written form on comment sheets. Numbers in parentheses indicated the number of times an issue was mentioned.

## A. ASSETS

### 1. Natural and Recreational Assets

Shoreline and water. (25)
- ✓ Relatively undeveloped.
- ✓ Easy public access.
- ✓ Unobstructed.
- ✓ Natural sandy beach. (9)

Views (16)
- ✓ Natural, beautiful views.
- ✓ Panoramic.
- ✓ Of bays and bridge.

Open space (13)

Natural setting adjacent to the Bay. (8)
- ✓ Strong identity as a place
- ✓ Peace, quiet and tranquillity.
- ✓ Country character.

Landscape. (4)

Good climate. (3)

Habitat. (2)
- ✓ Grassland.
- ✓ Wetlands.

Flora and fauna. (6)

Potential for tourism. (2)

Potential for recreational uses such as:
- ✓ Horse-back riding.
- ✓ Fishing.

The large area (about 400 acre) is an asset (but also a liability).
Connection to Brother's Lighthouse.

## 2.    Buildings, Facilities, and Structures

Pier. (15)
- ✓  With parking.
- ✓  Good shape.

Underground storage reservoirs. (8)

Buildings. (7)
- ✓  Large/major structures. (3)
- ✓  Bungalows (cottages), which are in good shape.
- ✓  Diverse Facilities with many possible uses.
- ✓  Winehaven.
    - •  Remarkable old brick castles.
    - •  Medieval quality.

Potential for housing. (7)

Existing infrastructure. (5)
- ✓  Road system
- ✓  Rail Line.

Gateway.

## 3.    Historic Significance

Historic interest and significance of the site and buildings, especially Winehaven. (18)
- ✓  Value of historical registry status. (6)
- ✓  Whaling station and Chinese camp, etc.

## 4.    Location/Access

Good accessibility. (12)
- ✓  Close to freeway system. (5)
- ✓  Accessible from San Francisco. (6)
- ✓  Boat access.

Parking is an asset. (7)

Location. (3)

- ✓ The site is a natural amphitheater with protective hills to back, the Bay in front, and few intrusions because the Navy isolated the site from mass use by the public.

Remoteness and isolation from developed areas. (4)

## 5. Revenue and Cost

Possible rental of storage tanks and pipelines as revenue source. (6)

Potential to acquire the land at no cost. (2)

## 6. Other

Control by a single jurisdiction.

Existing shoreline plans.

Chevron is an asset, but refinery is a liability

No loss of employment. (2)

Audubon and Navy studies.

Educational opportunities.

## B. LIABILITIES

### 1. Environmental Remediation

Clean up and disposal of toxics and hazardous wastes in soils and groundwater related to fueling systems and storage. (24)

Compliance with environmental standards for buildings:

- ✓ Lead paint. (9)
- ✓ Asbestos. (7)

Other environmental problems. (4)

### 2. Location, Access and Traffic

Poor access. (16)

- ✓ Narrow road to the site—linear access is a problem. (7)

✓  No freeway ramp from Marin.  (6)

✓  No public transportation access.

✓  Lack of knowledge of location

✓  Poor access to industry at the Point.

✓  Entrance is too small.

✓  Lack of name/site recognition.

Remoteness.  (2)

✓  From urban amenities such as restaurants and stores, which could support new uses.  (2)

Lack of connection to other shoreline parks and trails.


### 3.  Fuel Facilities and Industrial Uses

Existing fuel tank and pipeline infrastructure.  (13)

✓  Tanks are a liability unless something is done quickly.

Substandard facilities potentially requiring rehabilitation and maintenance:  (5)

✓  Piping on the wharf and under ground.  (5)

✓  Tanks too small for rental to Chevron.  (3)

Industrial debris in water.  (5)

Proximity to industrial facilities raise safety and other issues:

✓  Chevron's refinery and storage facility.  (10)

✓  General Chemical

Existing "ugly" sites.  (6)

The quarry operation, although it is closing.  (3)

✓  Industrial traffic.

Industrial through traffic


### 4.  Public Facilities and Existing Structures

Lack of adequate utilities and infrastructure such as roadways, water, and sewer system.  (10)

✓  No sewer system  (6)

Need for seismic retrofit of older brick and unreinforced masonry buildings.  (10)

Deficits in old buildings such as unattractiveness, inappropriate design for new uses, failure to meet contemporary standards.  (7)

## 5.  Revenue and Cost Questions

Significant costs and lack of significant revenue.  (10)
- ✓  Initial development costs could be significant, for example, the costs to demolish old structures and to conduct environmental remediation.
- ✓  Ongoing maintenance and management of shoreline and open space areas.  (7)
- ✓  Lack of federal funding.

## 6.  Natural Features

Exotic plants (eucalyptus, broom, pampas grass).  (10)

Steep, undevelopable slopes.  (5)

The cool, windy climate.

The site's large area is a liability (but also an asset).

Small amount of developable land.

Loss of native habitat and disturbance of ecosystems.

## 7.  Regulatory Constraints

Coastal zone regulation.

Federal constraints.  (2)
- ✓  Base re-use guidelines.

Historic register guidelines.

Building codes:
- ✓  Local.
- ✓  State.
- ✓  Federal.

Regulations concerning endangered species and habitat  (2)
- ✓  Environmental permitting restrictions

## 8.  Other

Continued Navy presence.  (10)
- ✓  Possibility of Navy resuming control in future.

No public policy regarding the site. (10)

Conflict with Red Rock Marina. (5)
   ✓   Red Rock could fit in to Point Molate plans.

South Shoreline Study for Marin to Point Molate.

Lack of a shoreline study.

No golf course.

## C.  GOAL STATEMENTS

Be a good Neighbor.

Showcase Richmond.

Be economically self-supporting.

Find market niche.
   ✓   Open space.
   ✓   Quiet retreat.
   ✓   Historic qualities.

Ensure compatibility.

Create opportunities.
   ✓   Local ownership.
   ✓   High-paying jobs.
   ✓   Business incubators.

Look at big picture.

Don't compete with other areas.
   ✓   Existing planning projects.
   ✓   Tie into Point San Pablo.

## D. VISIONS

### 1. Nature and Recreation Uses

Preserve open space. (23)
- ✓ Trails. (5)
  - Shoreline.
  - Hiking. (2)
  - Multi-use.
- ✓ Restore shoreline and hillside environments, with self-guided teaching trails.
- ✓ From the road up.
- ✓ Include some adjacent Chevron lands.
- ✓ Create regional park.
- ✓ Unique, large, hilly shoreline open space.

Include public access to shoreline. (5)

Include recreational uses. (10)
- ✓ Fishing. (5)
  - From pier. (2)
- ✓ Boating. (2)
- ✓ Swimming.
- ✓ Pier for fishing, walking, and picnicking.
- ✓ Camping.
- ✓ Biking.
- ✓ 9-hole golf course.
- ✓ Picnic areas.

Restoration and enhancement plant and wildlife habitat. (7)
- ✓ Protect and enhance intertidal marine habitat.
- ✓ Create a buffer around Chevron to protect endangered species. (3)
- ✓ Preserve open space for flora and fauna.
- ✓ Eradicate pampas grass and broom and replace with appropriate native plants.
- ✓ Public viewing of wildlife.

Connect to San Francisco Bay Trail. (6)
- ✓ Pt. Molate could be an important segment.
- ✓ On Belt Line right-of-way.

Create an environmental showcase.

## 2. Education and Research

Education Opportunities. (13)
- ✓ Education center. (3)
- ✓ Satellite campus. (3)
- ✓ Research and development.
- ✓ Historical.
- ✓ For the arts.
- ✓ Research and office facility.
- ✓ Extension classes (Contra Costa College, UC). (2)

Environmental Education. (11)
- ✓ Marine biology: education and research. (7)
- ✓ Environmental education facility. (4)
- ✓ Kids environmental camp.
- ✓ Plant biology.
- ✓ Site where all kids in area visit before the 6th grade.
- ✓ Like fort Cronkite and Coyote Point.

Museum. (12)
- ✓ Winehaven
- ✓ Railroad.
- ✓ Liberty (victory) ship. (3)
- ✓ Similar to Fort Mason. (2)
- ✓ Historical.
- ✓ Railroad/City of Richmond.

Environmental job corps base. (2)

Regional center for arts, science and education.
- ✓ Computer training, application and repair.
- ✓ Short-term educational offerings.
- ✓ Marine biology and environmental and other science opportunities.
- ✓ Satellite campus (UC Berkeley and Contra Costa College).
- ✓ Art presentations in Winehaven.

Interpretive signs and exhibits on the history of the site. (2)

## 4. Conference Center

Conference Center. (14)
- ✓ Asilomar-type conference and retreat facility (cottages and common areas). (4)
- ✓ Business conference center. (2)
- ✓ For events, workshops and seminars—option of staying in on-site housing for multi-day events.
- ✓ Small.
- ✓ Financially self-supporting.
- ✓ Build on unique site (e.g., in conjunction ocean liner port.)
- ✓ Technical training center.

## 5. Tourism/Visitor Amenities

Restaurants. (6)
- ✓ Like Sam's in Tiburon
- ✓ On pier. (3)
  - ▪ With view.

Visitor Accommodations. (5)
- ✓ Bed and breakfast facility. (3)
- ✓ Hotel (4)
  - ▪ Small. (2)
  - ▪ First class.
- ✓ Hostel. (2)
  - ▪ Elderhostel
- ✓ Accommodations for users of retreat and other facilities.

Marina. (4)
- ✓ With restaurants and shops.
- ✓ Convert Red Rock to public use.
- ✓ Boardwalk with shops as a historic area.
- ✓ Waterfront development like San Francisco/ Pier 39. (3)
- ✓ Active pier.
- ✓ Wharf should not used for petrochemical shipment.
- ✓ Consider the economic value of the port.

Tourism. (2)
- ✓ Tourism is the biggest income-generating industry in the world.

A Sausalito-type environment.

✓  Shops and boutiques.

✓  Restaurants.

✓  Galleries.

✓  Artists studios.

✓  Park.

✓  While maintaining the historical and natural feel of the Shoreline.


## 6.  Arts and Cultural

Arts and cultural activities.  (6)

✓  Performing arts.  (2)

✓  Arts generate limited income.

✓  Cultural center.

✓  Arts marketplace.

✓  Arts and cultural like Fort Mason.

✓  Artist studios.

✓  Hobbies and crafts area.


## 7.  Business Opportunities

✓  Office space development.  (2)

✓  Business incubator.  (3)

   ▪  Related to retreat, conference center, and educational uses.

✓  Consider Emery Bay development model.

✓  High tech businesses.

✓  Light industrial.

✓  To attract the public and support open space and wildlife and ecosystem enhancement.


## 8.  Use of Winehaven and Housing Units

Uses of Winehaven:

✓  Winehaven as a thriving area to link and showcase groups in Richmond: arts, entertainment, history, food and wine.  Connected to Richmond as a whole to improve the city's image.  Emphasize links to City and regional projects.

✓  Re-use of Winehaven warehouse as a multi-tenant facility for non-profit, education al activities, performance groups, large common/shared meeting areas.  Existing housing for people working on site.  New housing for market.

✓  The use of Winehaven will set the tone.  It is the dominant building in scale and floor area.

✓ Cultural uses:
  * Artist studios.
  * Theatrical sites.
✓ Wine industry uses.
  * Distribution of wines.
  * Winemaking by small wineries now in Richmond, Berkeley, Alameda.
✓ Develop the site like Fort Mason.

Housing. (2)
  ✓ Live/work space for artists. (2)
  ✓ Homeless and low-income. (2)
    * Even though homeless people must be considered, what role can they play?
    * Consider the Oak Knoll experience.
  ✓ Create housing like in Steep Ravine (Mount Tamalpais).
  ✓ Little houses for resident actors associated with potential theater.
  ✓ For vocational training for single persons and families.
  ✓ Use housing (bungalows) to generate revenue.
  ✓ Take advantage of views.
  ✓ New community with commercial uses and housing
  ✓ No apartments or houses.

## 9.  Maritime Uses

Ferry landing. (8)
  ✓ Water links to other shoreline sites.

Port facility. (6)
  ✓ Major cruise lines. (4)
  ✓ Bay cruises on this end. (2)
  ✓ Cargo vessels.
  ✓ Large yachts (depth of water allows).
  ✓ Access for non-motorized boats.
  ✓ Economic potential.

## 10. Access

Improve access. (2)
  ✓ For non-vehicular traffic.
  ✓ Build a two-lane access road with an improved interchange.
  ✓ The I-580 connection needs to be reworked.

✓ Keep roads relatively undeveloped to avoid "joy ride" use.

Consider a train from Marina to Point Molate.

## 11. Fuel Facilities

Remove inappropriate facilities:
- ✓ All old pipes.
- ✓ Old industrial type buildings.
- ✓ Metal sheds, old pump houses, etc.).

Convert Pac Tank and other port-operated facilities to other uses.

Consider leasing large concrete tanks to Chevron.

## 12. Overall Site Development Considerations:

Maintain the sites unique features:
- ✓ Incorporate historical significance. (3)
  - ▪ Historic District status.
- ✓ Open space.
- ✓ Avoid influx of traffic.
- ✓ No other shoreline in the Bay is like this.

Incorporate employment and job training
- ✓ Develop the site's employment potential. (10)
  - ▪ Good paying jobs for Richmond residents. (2)
  - ▪ For youth.
  - ▪ High tech.
- ✓ Include job training options. (5)
  - ▪ Hotel, recreation, and resort industry.

Creation of a new community:
- ✓ Avoid an inclusive [fully developed] community and bringing in hordes of people.
- ✓ Develop parks, housing, commercial and industrial areas to contribute to a new neighborhood with attendant human resource development.

Overall character:
- ✓ Minimize industrial development. (2)
- ✓ Establish a public but quiet character.
- ✓ Is the basic reuse concept one of "quiet, retreat" or "busy, active, urban." This choice will set the tone and guide the uses chosen.

✓ Relate the reuse plan to the City.

Development scope and arrangements:
- ✓ Use public/private partnerships.
- ✓ Develop the site only from the road down.
- ✓ Need a source of income. (2)
  - ▪ Year-round revenue.
- ✓ Identify fatal flaws related to regulations governing future use.
- ✓ Retain public ownership of site. (2)

Other guidelines and considerations
- ✓ It is difficult to come up with plan due to the unknowns regarding tanks and toxics.
- ✓ Involve youth.
- ✓ Look at regional plans.
- ✓ Learn from similar experiences.
  - ▪ Other fuel depot closures: Alameda, Sacramento.
- ✓ Watch for competing interests.
- ✓ Think of this as a incremental process, lasting 5-25 years.

December 21, 1995

Goals and Area Specific Guidelines from the Richmond General Plan:

1. Encourage the acquisition of historic buildings at Winehaven by the East Bay Regional Park District or the City when the Naval Fuel depot becomes surplus federal land. (AS - LU)

2. Promote Commerce and commercial recreation at Wineheaven when the site is available, but after public recreation and scenic roads along the shoreline north of the toll plaza are developed. (AS-LU)

3. Support the use of arts and culture as an important element in local educational opportunities. (G-CF)

4. Designate a permanent site at the Point Molate Naval Fuel Depot for use as a beach park when its present use is phased out and the site is available. (AS-CF)

5. If and when released by the Navy, encourage the reuse of Winehaven buildings as a conference center or similar use possibly under the auspices of EBRPD. (AS-OSC)

---

AS   =   Areas Specific Guidelines
OSC =   Open Space Element
LU   =   Land Use Element
G   =   Goals
CF   =   Communities Facilities Element

**Appendix B**

■ ■ ■

Maps from the City of Richmond *Draft Land Use Concept Paper* and Navy's
*Environmental Baseline Survey*:

Figure 1-2:        Parcel Delineations
Figure 5-2:        Fuel Distribution System
Figure 4-4:        Potable and Fire Protection Water System
Figure 4-3:        Storm Drain System
Figure 4-6:        Sanitary Sewer
Figure 4-5:        Electrical System
Figure 5:          Soil Types and Rainfall
Figure 5-4:        IRP Site Locations
Figure 5-8:        Extraction Trench Location (IR Site 03)
Figure 5-1:        Environmental Condition of Property Categories
Figure 5-3:        Spills and Releases



POINT MOLATE

NAVAL FUEL DEPOT

NATURAL RESOURCES
MANAGEMENT PLAN

SCALE: 1": 1000"

SOIL TYPES; RAINFALL

Lsg = Los Gatos loams
Msg = Millsholm loams
Ut = Urban fills
Qa = Quarry

= 16" isohyetal line (after Rantz)

Figure 5

**Appendix C**

■   ■   ■

Biological Inventory:

List of Threatened and Endangered Species
Inventory of Animal Species
List of Vertebrates
CNPS Plant Survey-May 16, 1996
List of Vascular Plants

## Sensitive Species

Sensitive species include those that are listed by the US Fish and Wildlife Service (USFWS) and by the California Department of Fish and Game (CDFG) as endangered, threatened, proposed for endangered or threatened status, and candidate species. Also included as other sensitive species are those listed by USFWS as species of concern, CDFG species of special concern, and plants listed on CNPS lists one through four. Table Bio-1 lists endangered and threatened species and Bio-2 lists other sensitive species that may inhabit the area based on recorded sightings in nearby areas. Endangered and threatened species with the potential to inhabit the facility are discussed separately below. The marsh gumplant, a species on CNPS list 4 but not listed by federal or state agencies, was found during surveys of the property in May 1996.[20] No other endangered, threatened, or sensitive species have been detected at the site.

## TABLE BIO-1
## THREATENED AND ENDANGERED SPECIES

| Common Name | Scientific Name | Federal Status | State Status | CNPS Status | Habitat Available at Point Molate? |
|---|---|---|---|---|---|
| **Plants** | | | | | |
| pallid manzanita | *Acrtostaphylos pallida* | C | E | 1B | No |
| Monterey spineflower | *Chorizanthe pungens var. pungens* | T | none | 1B | No |
| soft bird's-beak | *Cordylanthus mollis ssp. mollis* | PE | R | 1B | No |
| Santa Cruz tarplant | *Holocarpha macradenia* | C | E | 1B | Yes |
| beach layia | *Layia carnosa* | E | E | 1B | No |
| **Fish** | | | | | |
| winter-run chinook salmon | *Oncorhynchus tshawytsha* | T | E | none | Yes |
| tidewater goby | *Eucyclogobius newberryi* | E | CSC | none | No |
| **Amphibians** | | | | | |
| California red-legged frog | *Rana aurora draytonii* | PE | CSC | none | No |
| **Reptiles** | | | | | |
| Alameda whipsnake | *Masticophis lateralis euryxanthus* | PE | T | none | Yes |
| **Birds** | | | | | |
| California brown pelican (nesting colony) | *Pelecanus occidentalis californicus* | E | E | none | No |
| American peregrine falcon | *Falco peregrinus anatum* | E | E | none | Yes |
| California black rail | *Laterallus jamaicensis coturniculus* | SC | T | none | No |
| California clapper rail | *Rallus longirostris* | E | E | none | No |
| California least tern (nesting colony) | *Sterna antillarum browni* | E | E | none | No |
| western snowy plover (breeding) | *Charadrius alexandrinus nivosus* | T | CSC | none | No |
| **Mammals** | | | | | |
| salt marsh harvest mouse | *Reithrodontomys raviventris* | E | E | none | No |

Federal Status
E = Endangered
T = Threatened
PE = Proposed endangered
C = Candidate for listing as threatened or endangered
SC = Species of concern

State Status
E = Endangered
T = Threatened
CSC = California Species of special concern
R = Rare plant

CNPS Status
1B = Plants rare and endangered in California and elsewhere

[20] California Native Plant Society. 1996. CNPS Plant Survey Conducted May 16, 1996.

## TABLE BIO-2
### OTHER SENSITIVE SPECIES

| Common Name | Scientific Name | Federal Status | State Status | CNPS Status | Habitat Available at Point Molate? |
|---|---|---|---|---|---|
| **Plants** | | | | | |
| alkali milk-vetch | *Astragalus tener* var. *tener* | SC | none | 1B | No |
| San Francisco Bay spineflower | *Chorizanthe cuspidata* var. *cuspidata* | SC | none | 1B | No |
| northcoast bird's-beak | *Cordylanthus maritimus* ssp. *palustris* | SC | none | 1B | No |
| dwarf downingia | *Downingia pusilla* | SC | none | 2 | No |
| fragrant fritillary | *Fritillaria liliacae* | SC | none | 1B | Yes |
| marsh gumpant | *Grindelia stricta* var. *angustifolia* | none | none | 4 | Yes |
| Diablo rock-rose | *Helianthella castanea* | SC | none | 1B | No |
| Kellogg's horkelia | *Horkelia cuneata* ssp. *sericea* | SC | none | 1B | No |
| Mason's lilaeopsis | *Lilaeopsis masonii* | SC | R | 1B | No |
| adobe sanicle | *Sanicula maritima* | SC | none | 1B | No |
| most beautiful jewelflower | *Streptanthus albidus* ssp. *peramoenus* | C | none | 1B | No |
| San Francisco owl's-clover | *Triphysaria floribunda* | SC | none | 1B | No |
| **Invertebrates** | | | | | |
| Marin elfin butterfly | *Incisalia mossii* | SC | none | none | No |
| Ricksecker's water scavenger beetle | *Hydrochara rickseckeri* | SC | none | none | No |
| Opler's longhorn moth | *Adella operella* | SC | none | none | No |
| San Francisco lacewing | *Nothochrysa californica* | SC | none | none | No |
| Bridge's Coast Range shoulderband snail | *Helminthoglypta nickliniana bridgesi* | SC | none | none | No |
| **Fish** | | | | | |
| green sturgeon | *Acipenser medirostris* | SC | none | none | Yes |
| **Amphibians and Reptiles** | | | | | |
| California tiger salamander | *Ambystoma tigrinum californiense* | C | CSC | none | No |
| northwestern pond turtle | *Clemmys marmorata marmorata* | SC | CSC | none | No |
| southwestern pond turtle | *Clemmys marmorata pallida* | SC | CSC | none | No |
| **Birds** | | | | | |
| Barrow's goldeneye (breeding) | *Bucephala islandica* | none | CSC | none | No |
| long-billed curlew (breeding) | *Numenius americanus* | none | CSC | none | No |
| Caspian tern (nesting colony) | *Sterna caspia* | none | CSC | none | No |
| double-crested cormorant (rookery) | *Phalacrocorax auritus* | none | CSC | none | No |
| osprey (nesting) | *Pandion haliaetus* | none | CSC | none | No |
| Cooper's hawk (nesting) | *Accipiter cooperi* | none | CSC | none | No |
| sharp-shinned hawk (nesting) | *Accipiter striatus* | none | CSC | none | No |
| black-shouldered kite (nesting) | *Elanus caeruleus* | none | CSC | none | No |
| northern harrier (nesting) | *Circus cyaneus* | none | CSC | none | No |
| short-eared owl (nesting) | *Asio flammeus* | none | CSC | none | No |
| burrowing owl | *Athene cunicularia* | none | CSC | none | Yes |
| loggerhead shrike | *Lanius ludovicianus* | SC | CSC | none | Yes |
| tricolored blackbird | *Agelaius tricolor* | SC | CSC | none | Yes |
| salt marsh common yellowthroat | *Geothlypis trichas sinuosa* | SC | CSC | none | No |
| Alameda song sparrow | *Melospiza melodia pusillula* | SC | CSC | none | Yes |
| **Mammals** | | | | | |
| salt marsh wandering shrew | *Sorex vagrans halicoetes* | C | CSC | none | No |
| long-eared myotis | *Myotis evotis* | SC | CSC | none | No |
| fringed myotis | *Myotis thysanodes* | SC | CSC | none | No |
| long-legged myotis | *Myotis volans* | SC | CSC | none | No |
| Townsend's big-eared bat | *Plecotus townsendii townsendii* | SC | CSC | none | No |
| California mastiff bat | *Eumops perotis californicus* | SC | CSC | none | No |
| San Pablo vole | *Microtus californicus sanpabloensis* | SC | CSC | none | No |
| San Francisco dusky-footed woodrat | *Neotoma fuscipes annectans* | SC | CSC | none | No |

| Federal Status | State Status | CNPS Status |
|---|---|---|
| C = Candidate for listing as threatened or endangered | CSC = California Species of special concern | 1B = Plants rare and endangered in California and elsewhere |
| SC = Species of concern | R = Rare plant | 2 = Plants rare in California but more common elsewhere |
| | | 4 = Plants of limited distribution |

# Appendix Bio-2 Animal Species

Common Name Common Name

**Invertebrates (not enough data is available to determine scientific names)**

| | |
|---|---|
| anemone | limpet |
| barnacle | mussel |
| beach hopper | nudibranch |
| chiton | octopus |
| clam | opossum shrimp |
| copepod | oyster |
| crab* | ribbon worm |
| flatworm | sea spider |
| hydrozoa | segmented worm* |
| jellyfish | shrimp |
| leech | |

Common Name      Scientific Name

**Fish**

| | |
|---|---|
| American shad | *Alosa sapidissima* |
| topsmelt | *Atherinops affinis* |
| jack smelt | *Atherinopsis californiensis* |
| Pacific herring | *Clupea pallasii* |
| sculpin | *Cottus sp.* |
| shiner surfperch | *Cymatogaster aggregata* |
| pile surfperch | *Damalichthys vacca* |
| threadfin shad | *Dorosoma petenense* |
| black surfperch | *Embiotoca jacksoni* |
| Pacific cod | *Gadus macrocephalus* |
| threespine stickleback | *Gasterosteus aculeatus* |
| white croaker | *Genyonemus lineatus* |
| diamond turbot | *Hypsopsetta guttulata* |
| striped bass | *Morone saxitalis* |
| brown smoothhound | *Mustelus henlei* |
| bat ray | *Myliobatis californica* |
| chinook salmon | *Oncorhynchus tshawytsha* |
| English sole | *Parophrys vetulus* |
| starry flounder | *Platychthys stellatus* |
| sand sole | *Psettichthys melanostictus* |
| steelhead trout | *Salmo gairdneri* |
| brown rockfish | *Sebastes sp.* |
| spiny dogfish | *Squalus acanthias* |
| bay pipefish | *Syngnathus leptorhynchus* |
| leopard shark | *Triakis semifasciata* |

**Amphibians**

| | |
|---|---|
| arboreal salamander | *Aneides lugubris* |
| slender salamander | *Batrachoseps attenuatus* |
| western toad | *Bufo boreas* |
| ensatina | *Ensatina eschscholtzi* |
| Pacific chorus frog | *Hyla regilla* |

| Common Name | Scientific Name |
|---|---|
| **Reptiles** | |
| racer | *Coluber constrictor* |
| sharp-tailed snake | *Contia tenuis* |
| western rattlesnake | *Crotalus viridis* |
| ring-necked snake | *Diadophis punctatus* |
| northern alligator lizard | *Gerrhonotus coeruleus* |
| southern alligator lizard | *Gerrhonotus multicarinatus* |
| gopher snake | *Pituophis melanoleucus* |
| western fence lizard* | *Sceloperus occidentalis* |
| aquatic garter snake | *Thamnophis couchi* |
| terrestrial garter snake | *Thamnophis elegans* |
| | |
| **Birds** | |
| Cooper's hawk | *Accipiter cooperi* |
| sharp-shinned hawk | *Accipiter striatus* |
| spotted sandpiper | *Actitis macularia* |
| western grebe | *Aechmophorus occidentalis* |
| white-throated swift | *Aeronautes saxatilis* |
| red-winged blackbird | *Agelaius phoenicus* |
| wood duck | *Aix sponsa* |
| grasshopper sparrow | *Ammodramus savannarum* |
| northern pintail | *Anas acuta* |
| American widgeon | *Anas americana* |
| northern shoveller | *Anas clypeata* |
| green-winged teal | *Anas crecca* |
| cinnamon teal | *Anas cyanoptera* |
| mallard* | *Anas platyrhynchos* |
| gadwall | *Anas strepera* |
| scrub jay* | *Aphelocoma coerulescens* |
| great blue heron* | *Ardea herodias* |
| ruddy turnstone | *Arenaria interpres* |
| black turnstone | *Arenaria melanocephala* |
| short-eared owl | *Asio flammeus* |
| lesser scaup | *Aythya affinis* |
| redhead | *Aythya americana* |
| ring-necked duck | *Aythya collaris* |
| greater scaup | *Aythya marila* |
| canvasback | *Aythya valisineria* |
| cedar waxwing | *Bombycilla cedrorum* |
| American bittern | *Botaurus lentiginosus* |
| Canada goose | *Branta canadensis* |
| great horned owl | *Bubo virginiana* |
| bufflehead | *Bucephala albeola* |
| common goldeneye | *Bucephala clangula* |
| Barrow's goldeneye | *Bucephala islandica* |
| red-tailed hawk* | *Buteo jamaicensis* |
| sanderling | *Calidris alba* |
| dunlin | *Calidris alpina* |
| red knot | *Calidris canutus* |

| Common Name | Scientific Name |
|---|---|
| western sandpiper | Calidris mauri |
| least sandpiper | Calidris minutilla |
| Anna's hummingbird | Calypte anna |
| lesser goldfinch | Carduelis psaltria |
| house finch | Carpodacus mexicanus |
| purple finch | Carpodacus purpureus |
| great egret | Casmerodius albus |
| turkey vulture* | Cathartes aura |
| hermit thrush | Catharus guttatus |
| willet | Catoptrophorus semipalmatus |
| brown creeper | Certhia familiaris |
| wrentit | Chamaea fasciata |
| snowy plover | Charadrius alexandrinus |
| semipalmated plover | Charadrius semipalmatus |
| killdeer* | Charadrius vociferus |
| Vaux's swift | Cheatura vauxi |
| snow goose | Chen caerulescens |
| lark sparrow | Chondestes grammacus |
| northern harrier | Circus cyaneus |
| marsh wren | Cistothorus palustris |
| northern flicker | Colaptes auratus |
| band-tailed pigeon | Columba fasciata |
| rock dove* | Columba livia |
| common crow* | Corvus brachyrynchos |
| hermit warbler | Dendroica occidentalis |
| Townsend's warbler | Dendroica townsendi |
| snowy egret | Egretta thula |
| black-shouldered kite | Elanus leucurus |
| western flycatcher | Empidonax difficilis |
| horned lark | Eremophila alpestris |
| Brewer's blackbird* | Euphagus cyanocephalus |
| American kestrel | Falco sparverius |
| American coot | Fulica americana |
| common snipe | Gallinago gallinago |
| common loon | Gavia immer |
| red-throated loon | Gavia stellata |
| black oystercatcher | Haematopus bachmani |
| cliff swallow* | Hirundo pyrrhonota |
| barn swallow | Hirundo rustica |
| Bullock's oriole | Icterus galbula |
| dark-eyed junco* | Junco hyemalis |
| loggerhead shrike | Lanius ludovicianus |
| herring gull* | Larus argentatus |
| California gull* | Larus californicus |
| mew gull | Larus canus |
| glaucous-winged gull | Larus glaucescens |
| Heerman's gull | Larus heermanni |
| western gull* | Larus occidentalis |
| Bonaparte's gull | Larus philadelphia |

| Common Name | Scientific Name |
|---|---|
| short-billed dowitcher | *Limnodromus griseus* |
| long-billed dowitcher | *Limnodromus scolopaceus* |
| marbled godwit | *Limosa fedoa* |
| hooded merganser | *Lophodytes cucullatus* |
| California quail | *Lophortyx californicus* |
| belted kingfisher | *Megaceryle alcyon* |
| white-winged scoter | *Melanitta fusca* |
| surf scoter | *Melanitta perspicillata* |
| song sparrow | *Melospiza melodia* |
| red-breasted merganser | *Mergus serrator* |
| northern mockingbird* | *Mimus polyglottos* |
| brown-headed cowbird | *Molothrus ater* |
| long-billed curlew | *Numenius americanus* |
| whimbrel | *Numenius phaeopus* |
| black-crowned night heron* | *Nycticorax nycticorax* |
| plain titmouse | *Parus inornatus* |
| chestnut-backed chickadee | *Parus rufescens* |
| house sparrow | *Passer domesticus* |
| savannah sparrow | *Passerculus sandwichensis* |
| fox sparrow | *Passerella iliaca* |
| brown pelican | *Pelecanus occidentalis* |
| double-crested cormorant* | *Phalacrocorax auritis* |
| pelagic cormorant | *Phalacrocorax pelagicus* |
| Brandt's cormorant | *Phalacrocorax pencillatus* |
| ring-necked pheasant | *Phasianus colchicus* |
| black-headed grosbeak | *Pheucticus melanocephalus* |
| downy woodpecker | *Picoides pubescens* |
| rufous-sided towhee | *Pipilo erythrophthalmus* |
| brown towhee | *Pipilo fuscus* |
| black-bellied plover | *Pluvialis squatarola* |
| horned grebe | *Podiceps auritus* |
| red-necked grebe | *Podiceps grisegena* |
| pied-billed grebe | *Podilymbus podiceps* |
| sora | *Porzana carolina* |
| bushtit | *Psaltriparus minimus* |
| Virginia rail | *Rallus limicola* |
| California clapper rail | *Rallus longirostrus* |
| American avocet | *Recurvirostra americana* |
| ruby-crowned kinglet | *Regulus calendula* |
| black phoebe | *Sayornis nigricans* |
| rufous hummingbird | *Selasphorus rufus* |
| Allen's hummingbird* | *Selasphorus sasin* |
| American goldfinch | *Spinus tristis* |
| least tern | *Sterna antillarum* |
| Caspian tern | *Sterna caspia* |
| Forster's tern | *Sterna forsteri* |
| western meadowlark | *Sturnella neglecta* |
| starling | *Sturnus vulgaris* |
| violet-green swallow | *Tachycineta thalissina* |

| Common Name | Scientific Name |
|---|---|
| Bewick's wren | *Thryomanes bewickii* |
| California thrasher | *Toxostoma redivivum* |
| greater yellowlegs | *Tringa melanoleuca* |
| robin | *Turdus migratorius* |
| barn owl | *Tyto alba* |
| orange-crowned warbler | *Vermivora celata* |
| Hutton's vireo | *Vireo huttoni* |
| Wilson's warbler | *Wilsonia pusilla* |
| mourning dove* | *Zenaida macroura* |
| gold-crowned sparrow | *Zonotrichia atricapilla* |
| white-crowned sparrow | *Zonotrichia leucophrys* |

**Mammals**

| | |
|---|---|
| feral dog | *Canis familiaris* |
| coyote* | *Canis latrans* |
| opossum | *Didelphis marsupialis* |
| feral cat* | *Felis domesticus* |
| black-tailed hare* | *Lepus californicus* |
| striped skunk | *Mephitis mephitis* |
| California vole | *Microtus californicus* |
| house mouse | *Mus musculus* |
| dusky-footed woodrat | *Neotoma fuscipes* |
| mule deer* | *Odocoileus hemionus* |
| deer mouse | *Peromyscus maniculatus* |
| harbor seal | *Phoca vitulina* |
| raccoon | *Procyon lotor* |
| Norway rat | *Rattus norvegicus* |
| black rat | *Rattus rattus* |
| western harvest mouse | *Reithrodontomys megalotis* |
| salt marsh harvest mouse | *Reithrodontomys raviventris* |
| California mole | *Scapanus latimanus* |
| eastern fox squirrel | *Sciurus niger* |
| California ground squirrel* | *Spermophilus beechyi* |
| spotted skunk | *Spilogale putoius* |
| brush rabbit | *Sylvilagus bachmanii* |
| Mexican free-tailed bat | *Tadarida brasiliensis* |
| Botta's pocket gopher | *Thomomys bottae* |
| gray fox | *Urocyon cinereoargenteus* |
| red fox | *Vulpes vulpes* |

*Animals that have been detected at Point Molate

Sources:  U.S. Navy. 1987. Natural Resources Management Plan, Point Molate Fuel Supply Depot.
            Prepared by LSA Associates, October 1987.
          U.S. Navy. 1988. Master Plan for Naval Supply Center, Oakland, California, January 1988.
          U.S. Navy. 1995. Draft Biological and Sensititve Species Survey, Point Molate Fuel Depot, June 1995.

Amphibians

California newt
*slender salamander
ensatina
arboreal salamander
western toad
*Pacific treefrog

Reptiles

*western fence lizard
northern alligator lizard
*southern alligator lizard
western skink
aquatic garter snake
*terrestrial garter snake
ringneck snake
*racer
striped racer
*gopher snake
common kingsnake
western rattlesnake

Birds

*turkey vulture
sharp-shinned hawk
*Cooper hawk
*red-tailed hawk
*sparrow hawk
*California quail
*ring-necked pheasant
*band-tailed pigeon
*mourning dove
barn owl
screech owl
*great horned owl
poor-will
*white-throated swift
*Anna hummingbird
rufous hummingbird
Allen hummingbird
*red-shafted flicker
yellow-bellied sapsucker
black phoebe
western flycatcher
horned lark
*violet-green swallow
*barn swallow
*cliff swallow
*scrub jay

Birds (cont.)

chestnut-backed chickadee
plain titmouse
*bushtit
wrentit
house wren
*Bewick wren
*mockingbird
*California thrasher
*robin
*Swainson thrush
western bluebird
ruby-crowned kinglet
cedar waxwing
*loggerhead shrike
*starling
solitary vireo
orange-crowned warbler
yellow warbler
Audubon warbler
*western meadowlark
*redwing blackbird
Bullock oriole
*Brewer blackbird
black-headed grosbeak
purple finch
*house finch
*American goldfinch
*rufous-sided towhee
*brown towhee
savannah sparrow
lark sparrow
*dark-eyed junco
*white-crowned sparrow
*golden-crowned sparrow
fox sparrow
song sparrow

Mammals

*opossum
broad-footed mole
Trowbridge shrew
*raccoon
long-tailed weasel
spotted skunk
striped skunk
coyote
gray fox
*Beechey ground squirrel
fox squirrel

<u>Mammals</u> (cont.)

*valley pocket gopher
 western harvest mouse
 deer mouse
 pinyon mouse
 chaparral mouse
*dusky-footed woodrat
*California vole
 Norway rat
 black rat
*house mouse
*black-tailed jackrabbit
*brush rabbit
*mule deer
 myotis (several species)
 big brown bat
 red bat
 hoary bat
 western lump-nosed bat pallid bat
 Mexican free-tailed bat

    Note:  This list does not include fishes or water- or shorebirds.

45



# EAST BAY CHAPTER
## Alameda & Contra Costa Counties
## California Native Plant Society

June 5, 1996



RECEIVED
JUN 06 1996
RICHMOND
PLANNING DEPARTMENT

Bruce Beyaert
73 Belvedere Ave.
Richmond, CA 94801

Dear Bruce,

Enclosed is the report and plant list from our trip to Pt. Molate on May 16, plus a list of some of the more interesting and significant plants seen at each stop, and a map of where we stopped. I am also sending copies to Mayor Rosemary Corbin and to Natalia Lawrence of the planning department.

We all enjoyed the trip and hope this will be of some help in determining future plans for the area. As mentioned in the report, the area is more diverse than the previous study implied, and a more thorough survey needs to be done to meet the requirements of the California Department of Fish and Game and CEQA.

I am also sending copies of the enclosed plus most of the correspondence and information I've received from you in the past, to Jo Ann Karlton, our local Fish and Game official, and to Caitlin Bean who is responsible for reviewing environmental impact reports and development plans for projects in Region 3 (which includes Contra Costa County) for Fish and Game, so that they will both be aware of the situation.

Good Luck, and let me know if I can be of any further help.

Sincerely,

Dianne Lake
Unusual Plants Coordinator, Rare Plant Co-Chair
Rare Plant Committee, CNPS, East Bay Chapter

DEDICATED TO THE PRESERVATION
OF CALIFORNIA NATIVE FLORA

POINT MOLATE NAVY BASE
CNPS PLANT SURVEY, MAY 16, 1996

Three CNPS members, Barbara Ertter, Dianne Lake, and Chris Thayer, drove through the Pt. Molate Navy Fuel Depot with Bruce Beyaert of the Pt. Molate Blue Ribbon Advisory Committee on May 16, stopping at 12 different sites.

A plant list of all plant species observed is enclosed, as well as a list of rare, unusual and significant plants seen at each stop. A map is also enclosed identifying the various sites that were explored.

The area was found to be much more vegetatively diverse than indicated by the survey done in June of 1995. Most of the open grassland areas are actually coastal prairie or contain remnants of coastal prairie, with several of them containing California Wild Oat Grass (*Danthonia californica*), Red Fescue grass (*Festuca rubra*), and Western Rush (*Juncus occidentalis*). This plant community is rare in the East Bay, and diminishing along the immediate coast as well.

Marsh Gum Plant (*Grindelia stricta var. angustifolia*), a CNPS List 4 rare plant, was seen along the shore (Site #10), on the coastal bluff (Site #11), above the road approaching Site #11, and in the small salt marsh (Site #12).

The coastal prairie and bluff at the southeastern end of the property (Site #11) are remarkably in tact with several perennial grasses and a large population of Sea Lettuce (*Dudleya farinosa*), which is not found anywhere else in the East Bay. Seaside Wooly Sunflower (*Eriophyllum stachaedifolium*), another plant not found elsewhere in the East Bay, also occurs here. Both of these plants are also on the bluff at the north end.

The *Dichondra donelliana* population found by the Navy last year was located (Site #8), and another population was found further west on the toe of that same hillside. This plant species is also not known from anywhere else in the East Bay outside of the Pt. Molate area.

Two wetland areas were seen on the hillsides, one at the intersection of C road and an unmarked road a few hundred feet past the Hotel road turnoff (Site #2 on map), and the other at the intersection of Drum and B roads (Site #7).

The results of this brief suvey indicate that the grasslands, coastal bluffs, shoreline, salt marsh, and wetlands should be avoided when planning any development. A comprehensive, professional rare plant survey needs to be done of the entire property, at the appropriate blooming times, to meet CEQA and California Department of Fish and Game requirements before any development can proceed.

---Dianne Lake, Unusual Plants Coordinator
Rare Plant Committee, CNPS, East Bay Chapter

| Species | Common Name |
|---------|-------------|
| Acacia dealbata | Green Wattle |
| Acacia sp. | Acacia |
| Acaena pinnatifida var. californica | Acaena |
| Achillea millefolium | Yarrow |
| Aesculus californica | California Buckeye |
| Agoseris grandiflora | Large-flowered Agoseris |
| Agrostis pallens | Seashore Bent Grass |
| Aira caryophyllea | Hair grass |
| Anagallis arvensis | Scarlet Pimpernel |
| Anthriscus caucalis | Bur Chervil |
| Aristolochia californica | Dutchman's Pipe |
| Artemisia californica | Coastal Sagebrush |
| Astragalus gambelianus | Gambell's Dwarf Locoweed |
| Atriplex triangularis | Fat Hen; Spearscale |
| Avena barbata | Slender Wild Oats |
| Avena fatua | Wild Oat |
| Baccharis pilularis | Coyote Bush |
| Briza maxima | Rattlesnake Grass |
| Briza minor | Small Rattlesnake Grass |
| Brodiaea elegans ssp. elegans | Harvest Brodiaea |
| Bromus carinatus var. carinatus | California Brome |
| Bromus diandrus | Ripgut Grass |
| Bromus hordeaceus | Soft Chess |
| Bromus madritensis ssp. madritensis | Spanish Brome |
| Bromus madritensis ssp. rubens | Red Brome |
| Cakile edentula | California Sea Rocket |
| Calystegia purpurata | Western Morning Glory |
| Calystegia subacaulis | Hill Morning Glory |
| Carduus pycnocephalus | Italian Thistle |
| Carex praegracilis ? | Clustered Field Sedge |
| Carpobrotus edule | Hottentot Fig |
| Castilleja densiflora ssp. densiflora | Pink Owl's Clover |
| Castilleja foliolosa | Wooly Paint Brush |
| Centaurea solstitialis | Yellow Star Thistle |
| Centaurium muehlenbergii | Monterey Centaury |
| Centranthus ruber | Red Valerian |
| Cerastium glomeratum | Mouse-ear Chickweed |
| Chamaesyce maculata | Large spurge |
| Chamaesyce serpyllifolia ssp. serpyllifolia | Thyme-leaved Spurge |
| Chlorogalum pomeridianum | Soaproot; Amole |
| Cirsium vulgare | Bull Thistle |
| Claytonia parviflora ssp. parviflora | Small-leaved Miner's Lettuce |
| Claytonia perfoliata | Miner's Lettuce |
| Cortaderia jubata | Pampas Grass |
| Cotoneaster pannosa | Cotoneaster |
| Cotula coronopifolia | Brass Buttons |
| Crassula connata | Sand Pigmyweed |
| Cupressus sp. | Cypress |
| Cuscuta salina var. major | Alkali Dodder |
| Cynara cardunculus | Artichoke Thistle |
| Cynodon dactylon | Bermuda Grass |
| Cyperus eragrostis | Nutsedge; Chufa |

| Species | Common Name |
| --- | --- |
| Cytisus scoparius | Scotch Broom |
| Dactylis glomerata | Orchard Grass |
| Danthonia californica | California Oatgrass |
| Daucus pusillus | Rattlesnake Weed |
| Deschampsia elongata | Slender Hair Grass |
| Dichondra donnelliana | Dichondra |
| Dipsacus sativus | Fuller's Teasel |
| Distichlis spicata | Salt Grass |
| Dryopteris arguta | Wood Fern |
| Dudleya farinosa | Sea Lettuce |
| Elymus glaucus ssp. glaucus | Western Rye Grass; Blue Wild Rye |
| Elymus multisetus | Big Squirreltail |
| Epilobium brachycarpum | Panicled Willowherb |
| Epilobium ciliatum | Willow Herb |
| Erechtites glomerata | Tasmanian Fireweed |
| Eriogonum nudum var. auriculatum | Coast Buckwheat |
| Eriophyllum staechadifolium | Seaside Wooly Sunflower |
| Erodium botrys | Long-beaked Filaree/Storksbill |
| Erodium cicutarium | Red-stemmed Filaree/Storksbill |
| Erodium moschatum | White-stemmed Filaree/Storksbill |
| Eschscholzia californica | California Poppy |
| Eucalyptus globulus | Eucalyptus; Blue gum |
| Euphorbia crenulata | Chinese Caps |
| Festuca arundinacea | Reed Fescue |
| Festuca idahoensis | Blue Bunch Grass |
| Festuca rubra | Red Fescue |
| Filago gallica | Narrow-leaved Filago |
| Foeniculum vulgare | Fennel |
| Galium aparine | Bedstraw; Cleavers |
| Galium porrigens | Climbing Bedstraw; Cleavers |
| Gastridum ventricosum | Nitgrass |
| Genista monspessulana | French Broom |
| Geranium dissectum | Cut-leaf Geranium |
| Gilia sp. | Gilia |
| Gnaphalium californicum | California Everlasting |
| Gnaphalium canescens | Everlasting |
| Gnaphalium luteo-album | Cudweed |
| Gnaphalium purpureum | Purple Cudweed |
| Gnaphalium ramosissimum | Pink Everlasting |
| Grindelia hirsutula | Hirsute Gumweed |
| Grindelia stricta var. angustifolia | Pacific Gumweed |
| Hedypnois cretica | Hedypnois |
| Hemizonia pungens | Spikeweed |
| Heracleum lanatum | Cow Parsnip |
| Heteromeles arbutifolia | Toyon; Calif. Christmas Berry |
| Hirschfeldia incana | Mediterranean Mustard |
| Holcus lanatus | Velvet Grass |
| Hordeum brachyantherum ssp. brachyantherum | Meadow Barley |
| Hordeum marinum ssp. gussoneanum | Mediterranean Barley |
| Hypochaeris glabra | False Dandelion; Smooth Cat's Ear |
| Hypochaeris radicata | False Dandelion; Hairy Cat's Ear |
| Juncus bufonius var. bufonius | Toad Rush |

| Species | Common Name |
| --- | --- |
| Juncus bufonius var. congestus | Toad Rush |
| Juncus effusus var. pacificus | Bog Rush |
| Juncus occidentalis | Western Rush |
| Juncus patens | Common Rush |
| Juncus xiphioides | Iris-leaved Rush |
| Lathyrus latifolius | Everlasting Pea |
| Lepidium latifolium | Tall Lepidium |
| Lepidium nitidum | Peppergrass |
| Leymus triticoides | Beardless Wild-Rye |
| Lolium multiflorum | Italian Ryegrass |
| Lonicera hispidula var. vacillans | Honeysuckle |
| Lonicera japonica ? | Japanese Honeysuckle |
| Lotus corniculatus | Birdsfoot Lotus |
| Lotus micranthus | Small-flowered Lotus; Trefoil |
| Lotus purshianus var. purshianus | Spanish Lotus; Trefoil |
| Lotus scoparius var. scoparius | Deerweed |
| Lotus wrangelianus | Chile Lotus; Trefoil |
| Lupinus arboreus | Yellow Bush Lupine |
| Lupinus bicolor | Dove Lupine; Dwarf Lupine |
| Lupinus bicolor var. umbellatus | Dove Lupine |
| Lupinus formosus ? | Summer Lupine |
| Lupinus succulentus | Succulent Lupine |
| Lythrum hyssopifolia | Hyssop Loosestrife |
| Madia anomala ? | Plump-seeded Madia |
| Madia gracilis | Slender Tarweed |
| Madia sativa | Common Tarweed |
| Marah fabaceus | Valley Wild Cucumber; Manroot |
| Medicago polymorpha | Burr Clover |
| Melica californica | Western Melic |
| Melilotus indica | Yellow Sweet-clover |
| Mimulus aurantiacus | Sticky or Bush Monkeyflower |
| Monardella villosa | Coyote Mint |
| Nassella lepida | Narrow Needle Grass |
| Nassella pulchra | Purple Needle Grass |
| Oemelaria cerasiformis | Osoberry |
| Olea europea | European Olive |
| Parapholis incurva | Sickle Grass |
| Pellaea andromedifolia | Coffee Fern |
| Pentagramma triangularis | Goldback Fern |
| Phacelia californica | California Phaceliaa |
| Phalaris aquatica | Harding Grass |
| Phoenix canariensis | Canary Island Date Palm |
| Phyla nodiflora | Garden Lippia; Fog Fruit |
| Picris echioides | Bristly Ox-tongue |
| Plantago coronopus | Cut-leaved Plantain |
| Plantago erecta | Dwarf Plantain |
| Plantago lanceolata | English Plantain |
| Platanus acerifolia | London Plane Tree |
| Platanus racemosa | Sycamore; California Plane Tree |
| Poa secunda ssp. secunda | Pine Bluegrass |
| Pogogyne serpylloides | Thyme-leaved Pogogyne |
| Polycarpon tetraphyllum | Four-leaved Polycarp |

| Species | Common Name |
|---------|-------------|
| Polypodium calirhiza | California Polypody |
| Polypogon monspeliensis | Rabbitsfoot Grass |
| Pteridium aquilinum var. pubescens | Bracken Fern |
| Pyracantha angustifolia | Pyracantha |
| Raphanus sativus | Wild Radish |
| Rhamnus californica ssp. californica | Coffeeberry |
| Ribes menziesii var. menziesii | Canyon Gooseberry |
| Ribes sp. | Gooseberry |
| Robinia pseudoacacia | Black Locust |
| Rosa californica | California Wild Rose |
| Rubus discolor | Himalaya Blackberry |
| Rubus ursinus | California Blackberry |
| Rumex acetosella | Sheep Sorrel |
| Rumex conglomeratus | Green Dock |
| Rumex crispus | Curly Dock |
| Rumex obtusifolius | Bitter Dock |
| Rumex pulcher | Fiddle Dock |
| Rumex salicifolius var. crassus | Willow Dock |
| Salicornia virginica | Pickleweed |
| Salix laevigata | Red Willow |
| Salix lasiolepis | Arroyo Willow |
| Salsola soda | Salsola |
| Sambucus mexicana | Blue Elderberry |
| Sanicula bipinnatifida | Purple Sanicle |
| Sanicula crassicaulis | Pacific Sanicle; Snakeroot |
| Scrophularia californica | Figwort; Calif. Bee Plant |
| Sidalcea malvaeflora | Checkerbloom |
| Silene gallica | Windmill Pinks; Catchfly |
| Sisymbrium officinale | Hedge Mustard |
| Sisyrinchium bellum | Blue-eyed Grass |
| Solanum furcatum | Forked Nightshade |
| Solidago californica | California Goldenrod |
| Sonchus asper | Prickly Sow Thistle |
| Sonchus oleraceus | Sow Thistle |
| Spartina foliosa | California Cordgrass |
| Spergularia macrotheca var. macrotheca | Large-flowered Sand Spurry |
| Spergularia rubra | Sand Spurry |
| Spergularia villosa | Villous Sand Spurry |
| Stachys ajugoides var. rigida | Hedge Nettle; Woodmint |
| Stellaria media | Chickweed |
| Stephanomeria sp. ? | Stephanomeria |
| Tetragonia tetragonioides | New Zealand Spinach |
| Torilis arvensis | Hedge Parsley |
| Toxicodendron diversilobum | Poison Oak |
| Trifolium ciliolatum | Tree Clover |
| Trifolium dubium | Shamrock |
| Trifolium gracilentum var. gracilentum | Pin-point Clover |
| Trifolium hirtum | Rose Clover |
| Trifolium microcephalum | Small-headed Clover |
| Triteleia laxa | Ithuriel's Spear |
| Typha angustifolia | Narrow-leaved Cattail |
| Ulmus sp. | Elm Tree |

4

| Species | Common Name |
| --- | --- |
| Umbellularia californica | California Bay Tree |
| Vicia sativa ssp. sativa | Spring Vetch |
| Vicia villosa | Winter Vetch |
| Vulpia bromoides | Six-week Fescue |
| Vulpia myuros var. myuros | Rattail Fescue |
| Wyethia angustifolia | Narrow-leaved Mule Ears |
| Zostera marina | Eel-Grass. |

RARE, UNUSUAL and SIGNIFICANT PLANTS, POINT MOLATE
CNPS, East Bay Chapter
May 16, 1996

#1 - Hotel Road
Calystegia purpurata ssp. purpurata
Danthonia californica
Juncus occidentalis
Nassella pulchra


#2 - Junction of C Rd. and unpaved road (Wetland)
Calystegia purpurata ssp. purpurata
Danthonia californica
Deschampsia elongata
Epilobium ciliatum
Nassella lepida


#3 - End of Road C
Acaena pinnatifida var. californica
Castilleja densiflora ssp. densiflora
Danthonia californica
Eriogonum nudum ssp. auriculatum
Gnaphalium canescens
Lupinus bicolor ssp. umbellatus
Lupinus formosus
Madia anomala
Nassella pulchra
Oemleria cerasiformis
Phacelia californica


Along Ridge Road (between #3 and #4)
Danthonia californica
Festuca idahoensis
Sidalcea malvaeflora


#4 - Tank # 13 area
Spergularia villosa (alien)


#5 - Past Tank 14
Elymus multisetus
Hemizonia pungens
Nassella pulchra

### #6 - Tank 17 area (Coastal Scrub)
Agrostis pallens
Centaurium muehlenbergii
Danthonia californica
Elymus multisetus
Eriogonum nudum var. auriculatum
Gilia sp.
Lupinus formosus
Melica californica
Monardella villosa (ssp. not yet identifiable)
Nassella lepida
Nassella pulchra
Plantago erecta
Poa secunda ssp. secunda
Stephanomeria sp. ?

### #7 - Intersection of Drum and B Roads (Wetland)
Carex praegracilis
Danthonia californica
Deschampsia elongata
Hordeum brachyantherum ssp. brachyantherum
Juncus occidentalis
Juncus xiphioides
Parapholus incurva

### #8 - Dichondra hillside and below (Northwest of D Road)
Aristolochia californica
Deschampsia elongata
Dichondra donneliana
Nassella lepida
Pogogyne serpylloides
Rumex salicifoius ssp. crassus

### #9 - Above Tank 9
Lasthenia sp. (according to Bruce Baeyart, but it was too late in the season to
                relocate it)

#10 - Coastal Bluff and Shoreline at Northwest End
Dudleya farinosa
Eriophyllum stachaedifolium
Grindelia stricta var. angustifolia (CNPS List 4)
Nasella pulchra
Rumex salicifolius var. crassus
Spergularia macrotheca ssp. macrotheca
Zostera marina


#11 - Coastal Bluff and Coastal Prairie Above at Southeast End
Danthonia californica
Dudleya farinosa
Eriophyllum stachaedifolium
Festuca idahoensis
Festuca rubra
Grindelia hirsutula
Grindelia stricta var. angustifolia (CNPS List 4)
Lupinus arboreus
Nassella pulchra
Phacelia californica


#12 - Salt Marsh
Grindelia stricta var. angustifolia (CNPS List 4)
Spartina foliosa



Figure 3-12: Native and Nonnative Vegetation Communities

APPENDIX A:  LIST OF VASCULAR PLANTS

Ferns and Horsetails

goldback fern, Pityrogramma triangularis
polypody, Polypodium californicum
sword fern, Polystichum munitum
wood fern, Dryopteris arguta
bracken, Pteridium aquilinum
coffee fern, Pellaea andromaefolia
bird-foot fern, P. mucronata
maidenhair, Adiantum jordani
scouring rush, Equisetum hyemale
giant horsetail, E. telmateia

Grasses and Sedges

California fescue, Festuca californica
red fescue, F. rubra
annual fescue, F. dertonensis
ryegrass. Lolium multiflorum
annual bluegrass, Poa annua
pine bluegrass, P. scabrella
rattlesnake grass, Briza maxima
little rattlesnake grass, B. minor
dogtail, Cynosurus echinatus
Torrey melic, Melica torreyana
California brome, Bromus carinatus
soft chess, B. mollis
ripgut, B. diandrus
red brome, B. rubens
foxtail barley, Hordeum jubatum
meadow barley, H. brachyantherum
hare barley, H. leporinum
squirreltail, Sitanion jubatum
blue wildrye, Elymus glaucus
creeping wildrye, E. triticoides
wild oat, Avena fatua
slender oat, A. barbata
hairgrass, Aira caryophyllea
velvetgrass, Holcus lanatus
slender hairgrass, Deschampsia elongata
junegrass, Koeleria cristata
creeping bentgrass, Agrostis diegoensis
rabbit grass, Polypogon monspieliensis
nitgrass, Gastridium ventricosum
Harding grass, Phalaris tuberosa
purple needlegrass, Stipa pulchra
smilo, Oryzopsis miliacea
giant reed, Arundo donax
pampas grass, Cortaderia selloana
California oatgrass, Danthonia californica
Bermuda grass, Cynodon dactylon
saltgrass, Distichlis spicata

Grasses and Sedges (cont.)

barnyard grass, Echinochloa cruzgallii
knotgrass, Paspalum distichum
kikuyu grass, Pennisetum clandestinum
umbrella sedge, Cynerus eragrostis
tule, Scirpus californicus
alkali bulrush, S. olneyi
sedges, Carex spp.

Forbs

cattail, Typha latifolia
bur head, Echinodorus berteroi
water-plantain, Alisma triviale
duckweed, Lemna gibba
toad rush, Juncus bufonius
rushes, Juncus spp.
woodrush, Luzula subsessilis
arrowgrass, Triglochin maritima
checker lily, Fritillaria lanceolata
yellow mariposa, Mariposa lutea
harvest brodiaea, Brodiaea elegans
wild hyacinth, B. pulchella
Ithuriel's spear, B. laxa
soap plant, Chlorogalum pomeridianum
zygadene, Zygadenus fremontii
wakerobin, Trillium chloropetalum
Solomon's seal, Smilacina racemosa
Solomon's seal, S. stellata
fairy bells, Disporum hookeri
blue-eyed grass, Sisyrinchium bellum
rein orchid, Habenaria unalascensis
coralroot, Corallorhiza striata
creek nettle, Urtica holosericea
annual nettle, U. urens
western nettle, Hesperocnide tenella
buckwheat, Eriogonum latifolium
sheep sorrel, Rumex acetosella
curly dock, R. crispus
fiddle dock, R. pulcher
knotweed, Polygonum aviculare
beet, Beta vulgaris
lamb's quarters, Chenopodium album
Mexican tea, C. ambrosioides
fat hen, Atriplex patula
whiteleaf saltbush, A. leucophylla
tumbleweed, Salsola kali
New Zealand spinach, Tetragonia expansa
ice plant, Mesembryanthemum edule
windmill pink, Silene gallica
chickweed, Cerastium viscosum

## Shrubs

nightshade, Solanum umbelliferum
sticky monkeyflower, Diplacus aurantiacus
gooseberry, Ribes menziesii
toyon, Heteromeles arbutifolia
cotoneaster, Cotoneaster pannosa
pyracantha, Pyracantha coccinea
creambush, Holodiscus discolor
osoberry, Osmaronia cerasiformis
bitter cherry, Prunus emarginata
California rose, Rosa californica
blackberry, Rubus vitifolius
Himalaya berry, R. procerus
Canary Island broom, Cytisus canariensis
Spanish broom, Spartium junceum
deerweed, Lotus scoparius
silver lupine, Lupinus albifrons
horehound, Marrubium vulgare
coyote mint, Monardella villosa
hazel, Corylus rostrata
Dutchman's pipe, Aristolochia californica
coffeeberry, Rhamnus californica
poison oak, Rhus diversiloba
blue elderberry, Sambucus mexicana
snowberry, Symphoricarpos albus
creeping snowberry, S. mollis
alkali-heath, Frankenia grandifolia
pickleweed, Salicornia pacifica
sagebrush, Artemisia californica
coyote brush, Baccharis pilularis
salt marsh baccharis, B. douglasii
golden yarrow, Eriophyllum confertiflorum
lizard tail, E. staechadifolium
gum plant, Grindelia humilis

## Trees

Monterey pine, Pinus radiata
bishop pine, P. muricata
Coulter pine, P. coulteri
aleppo pine, P. halepensis
ironwood, Casuarina sp.
blue gum, Eucalyptus globulus
madrone, Arbutus menziesii
bay, Umbellularia californica
live oak, Quercus agrifolia
scrub oak, Q. dumosa
buckeye, Aesculus californcia
Fremont cottonwood, Populus fremontii
arroyo willow, Salix lasiolepis
yellow willow, S. lasiandra
blackwood acacia, Acacia melanoxylon

**Appendix D**

■  ■  ■


Robert Mondavi Wine and Food Center Brochure

Wente Vineyards Press Kit

Hall & Bartley Architecture Brochure (Winery Specialists)

# THE
# ROBERT
# MONDAVI
# WINE AND FOOD
# CENTER



1570  Scenic  Avenue
Costa  Mesa   CA 92626
office • (714) / 979-4510    fax • (714) / 979-5616

photography & graphic design by harold w. vincent / visualize studio

# WINE & FOOD CENTER FACILITIES

The Robert Mondavi Wine & Food Center exemplifies the casual, country elegance of the Robert Mondavi Winery in Oakville, Napa Valley, California. Guests will experience the tranquility of a southwest mission throughout the Center. The rooms have an abundance of natural light from the many skylights and windows. Views range from the rose garden and sculpture park to a newly planted demonstration vineyard. Arizona flagstone covers the floors, and the walls display an ever-changing exhibit of fine art. Inside the building we can comfortably accommodate up to 175 guests for a seated meal or 250 for a reception. On the lawn or the terrace we can seat up to 250 for a meal or up to 500 for a reception.

## THE BOARDROOM

This room provides a private setting for meetings up to 14. It is equipped with a built-in screen, overhead and slide projectors, television, VCR and a 17th century old world wooden conference table.

## THE PAVILLION ROOM

The Pavillion Room can graciously accommodate up to 96 guests for luncheon or dinner and 200 for a reception. This room surrounds a marble statue of St. Francis of Assisi, sculpted by famed artist Beniamino Bufano. French doors open onto the Rose Garden, where your guests may enjoy a stroll before or after dinner. In the niches are more of Mr. Bufano's sculptures of marble, bronze and granite. The Pavillion Room is linked by French doors to the Tasting and Vineyard Rooms.

## THE VINEYARD ROOM

Our Vineyard Room elegantly accommodates 56 guests for luncheon or dinner, and is also equipped with a screen for a classroom style meeting up to 60 or a theatre-style presentation of up to 85 guests.

## THE TASTING ROOM

With a large mission-style lantern as its focus, our Tasting Room overlooks the Rose Garden and is comfortably furnished with sofa and chairs for a small, informal gathering. For luncheon or dinner, this room comfortably accommodates 32 guests.

## THE PRIVATE DINING ROOM

The Private Dining Room provides a secluded atmosphere for intimate groups of eight to twelve. This room offers a view of our demonstration vineyards.

## THE LAWN & ROSE GARDEN (some limitations and additional charges may be incurred when using these areas)

Our lawn and rose garden are also available for larger groups. These two beautifully landscaped areas can provide you with a beautiful outside location or can be tented to accommodate up to 250 for a seated meal or up to 500 for a reception with food stations.

# ROBERT MONDAVI WINE & FOOD CENTER

Since founding the Robert Mondavi Winery in California's renowned Napa Valley in 1966, the Robert Mondavi family's goals have remained constant: to produce world-class fine wines, to educate the public about wine and its proper role as a mealtime beverage of moderation, and to promote the enjoyment of wine and food. Inaugurated in 1989, the Robert Mondavi Wine & Food Center is the first of its kind in America. Located in the heart of Orange County's South Coast Metro district, the Robert Mondavi Wine & Food Center encompasses a rose garden terrace and one-acre sculpture park. The Center is available on a reserved basis for your special event.

If you are interested in the Wine & Food Center, we will be happy to schedule a time for you to tour the facility.

> *"Making good wine is a skill, fine wine an art."*
> Robert Mondavi

The Robert Mondavi
Wine & Food Center
1570 Scenic Avenue
Costa Mesa, CA 92626
(714)979-4510

Exit the 405 freeway at Harbor Blvd., go north to Scenic Avenue and turn left. Located 10-20 minutes from John Wayne Airport, Anaheim Convention Center, Disneyland, South Coast Plaza and the Performing Arts Center.



# CELEBRATIONS

Wine is a celebrant. It is the beverage with which we toast the happiest occasions of our lives ... promotions, graduations, anniversaries, and of course, weddings. The Robert Mondavi Wine & Food Center provides an intimate and exclusive setting, fine wines and a very special menu to help you celebrate this day with family and friends.

## THE CEREMONY

You may hold your ceremony inside the building or on the lawn at the Wine & Food Center. The maximum ceremony attendance for indoors is 75, outdoors is 500. We will arrange chairs for your guests, an archway decorated with fresh flowers*, candles at the altar and, for ceremonies on the lawn, a canopied seating area.

Ceremony Prices                                                          To be quoted

## THE RECEPTION

Your wedding day should be special and unique and memorable. Our Chef will design a custom lunch or dinner menu to delight your guests, with a complimentary wine at each course. Our menus are three to five courses and are designed to allow your guests to sample several wine and food combinations. Our floral designer will provide centerpieces for the tables at no additional charge*. Please see the enclosed tariff sheet for pricing on luncheons, dinners and receptions. Our maximum capacity in the building is 175 guests for a seated meal or 250 for a stand-up reception.

Sparkling Wine Toast with cutting and serving the cake                  Five per person
Cutting and serving the cake only                                       One fifty per person

## THE WEDDING CAKE

Toast the cutting of your cake with a glass of our Sparkling Wine for each guest. We will be happy to recommend a pastry chef to design your cake, and our Chef will cut and serve it for you.

## THE FIRST DANCE

You may continue your celebration with dancing. We have several musical styles and arrangements you may choose from. If you wish, we offer after-dinner wine stations and a cheese and fruit display for your guests while they are dancing.

Musical entertainment:                                                  To be quoted
15 x 24 foot dance floor                                                Three hundred eighty

## FLORAL DISPLAYS

If you would like additional floral displays, bouquets, headpieces, corsages or boutonnieres for your ceremony, our floral designer will be happy to provide a complimentary consultation and estimate.

*Flowers that are included in an established tariff may be subject to an upgrade charge if unusual, exotic or unseasonal blooms are requested.

*In order to adhere to the standards of quality and style established by the Robert Mondavi Winery, we do not allow dried or silk flower arrangements or outside caterers. We are a winery and our winegrowers licensing permits us to serve only wine. No other alcoholic beverages are permitted on the premises.

# CORPORATE EVENTS & WINE SEMINARS

In today's business environment, fine wine and food play an important role in corporate entertaining and promotion. We offer a variety of personalized programs tailored for your next successful meeting or promotional event.

- Educational seminars and tastings to complement your meetings and conferences.

- Commemorative bottles and special packaging for your corporate gifts and incentive programs. Sandcarved bottles are permanently etched and painted in an involved handcrafted technique. They make an exciting visual package to promote your company or special event.

- A versatile and elegant environment for your corporate meetings, luncheons, dinners and receptions tastefully complemented by fine art, fresh flowers and music.

- A unique and spacious environment perfect for promotional shows and business meetings. We can accommodate your special audiovisual needs and provided a most private setting in which to conduct your business.

The Robert Mondavi Winery supports an extensive educational program. Our goal is to make learning about wine easy and enjoyable. Each seminar illustrates its objectives through careful examination of a variety of wines. These are interactive seminars and usually inspire a good amount of audience participation.

# SPECIAL EVENTS

The Robert Mondavi Wine and Food Center offers an exciting variety of special events. Our staff is delighted to customize any event to your special needs, from a formal elegant dinner to a more casual luncheon or educational seminar.

## NAPA VALLEY BARBEQUE

Your guests will enjoy a casual Napa style barbeque prepared by our chef, while they learn about Robert Mondavi wines and winemaking techniques.

## COOKING DEMONSTRATIONS

Our chef will conduct an exciting and informative cooking class in our kitchen. The classes are demonstration style and include recipes and tastes of all dishes, paired with Robert Mondavi wines.

## WINE AND FOOD PAIRING

Our chef will prepare a wide selection of foods for you to taste with our classic varieties of wine. You will have the opportunity to choose your favorite combinations, as well as learn from our chef in this educational, informal dining experience.

## THEME DINNERS

Combine our wonderful food and wine with a special theme to create a unique and unforgettable evening. Some popular themes include murder mystery dinners, guest chef dinners, concerts and theatrical dinners where your guests are entertained with songs and performances from popular or classical musicals and plays.

## ETIQUETTE CLASS

We can provide you with an interesting look at modern business and social etiquette, from how to communicate in various cultures to appropriate selection and service of fine wine. This class is informative and fun and can include a luncheon, dinner or reception.

Most of the classes and dinners that we offer on our Calendar of Events can be adapted for private groups.

# EVENT TARIFFS

The Robert Mondavi Wine & Food Center is committed to culinary excellence and the good life. We are here to serve you in customizing and personalizing a wide variety of events. Our tariffs are per person and include use of our floral arrangements and custom printed menus. These rates apply to events held within the building with a maximum of 175 guests for a seated meal or 250 for a standing reception.

| EVENT | TARIFFS |
|---|---|
| **Wine Seminars** (minimum attendance of 16/maximum of 80) | |
| Designed as an educational experience for the novice as well as the most sophisticated enophile. Accompanied by a display of domestic and imported cheeses, dried fruit and crackers. | Twenty-five |
| | |
| **Receptions** (stand-up reception with hors d'oeuvre stations, minimum attendance of 24) | |
| Napa Valley Reception | Twenty-one |
| Oakville Reception | Thirty-four |
| Reserve Buffet Reception (seated reception with buffet stations) | Fifty-five |
| | |
| **Luncheon** (minimum attendance of 12) | |
| Napa Valley Luncheon - three courses | Thirty-six |
| Oakville Luncheon - three courses | Forty-two |
| Reserve Luncheon - four courses | Fifty |
| | |
| **Dinner** (minimum attendance of 12) | |
| Napa Valley Dinner - three course | Sixty-four |
| Oakville Dinner - four courses | Seventy-two |
| Reserve Dinner - five courses | Eighty-eight |
| | |
| **Additions to Lunch or Dinner** | |
| Reception with two passed hors d'oeuvres, Sparkling Wine | Ten |
| Single passed hors d'oeuvre | Three |
| | |
| **Small Group Charge** (if under minimum attendance) | One hundred fifty |

**Services Available**
musicians, floral designer, invitations, valet parking, audio visual equipment

*Please add applicable sales tax and 17% service charge.*
*Tariffs subject to change without notice.*

*In order to adhere to the standards of quality and style established by the Robert Mondavi Winery, we do not allow outside caterers. We are a winery and our licensing permits us to serve only wine. No other alcoholic beverages are allowed on the premises. We do provide mineral waters and sodas for guests who prefer not to drink wine.*

ROBERT MONDAVI WINE & FOOD CENTER
EVENT FACILITY FLOOR PLAN

RECEPTION DESK

BOARDROOM

HALLWAY

TASTING ROOM

PRIVATE DINING ROOM

VINEYARD ROOM

PAVILION ROOM





VINEYARDS

# PRESS KIT



**WENTE**

VINEYARDS

# PRODUCT LINE

◆The Estate Grown wines are comprised of Chardonnay, Cabernet Sauvignon, and Sauvignon Blanc. These wines are the priority wines of Wente Vineyards. The packaging will be in the new flange-top bottle design in a distinctive antique green glass for both red and white varietals. The second tier of Estate Grown wines (Le Blanc de Blancs, Johannisberg Riesling, White Zinfandel) will have separate packaging. The concept is to distance these wines and their related pricing from our high-end varietals. The white wines will be packaged in dead-leaf green, burgundy-style, push-up bottles. The White Zinfandel will remain in a clear, bordeau-style bottle to reveal the blush color of the wine.

◆The Vineyard Selection category and the Reserve category will be merged over the next year into one category which will be referred to as Vineyard Reserves. The wines in this tier are Riva Ranch Reserve Chardonnay, Crane Ridge Reserve Merlot, Charles Wetmore Reserve Cabernet Sauvignon, Herman Wente Reserve Chardonnay, and a new wine to be introduced in May, Reliz Creek Reserve Pinot Noir.

◆Our Methode Champenoise Sparkling wine will continue to be produced in small quantities. The packaging will remain the same with the exception of changing the label to read "Brut Reserve" instead of "Grande Brut."



## Wente Vineyards: New Image

We have created a new look which we feel represents the venerated tradition of the Wente name in California winemaking while, at the same time, reflecting the bold, progressive outlook of the current generation of the Wente family.

The package design created by Michael Osborne Design of San Francisco includes a bold new proprietary word mark for "Wente" embossed and foil stamped in copper for easy recognition. It is paired with a new woodcut illustration of the wine tasting cellars and visitors center on the Wente grounds. The illustration captures the intimacy of the family owned company, hinting at the story of the winery's heritage in the Livermore Valley. The package also uses a muted color scheme to create a traditional elegance highlighted by contrasting copper foil stamping. Tall, stately bottles are used to even further differentiate the packaging. Variations on the design were completed to visually define each of the three tiers in the Wente product line, culminating in a elegant two-piece lobel for the Vineyard Reserve varietals.







**WENTE**
VINEYARDS

**The Wente Estate Vineyards**
**Two of California's Most Distinctive Appellations**
**The Livermore Valley and the Arroyo Seco**

<u>The Wente Family Livermore Valley Vineyards</u>

In 1883 C. H. Wente planted forty-eight acres of vineyard in the Livermore Valley. Today, the Wente family manages the cultivation of nearly three thousand acres of vineyard. These vineyards are located in two distinctly different coastal appellations: The Livermore Valley and the Arroyo Seco.

The Livermore Valley is one of the few valleys in California with an east-west orientation. This, combined with the Valley's proximity to the San Francisco Bay, produces an extremely favorable environment for growing wine grapes. During the growing season cool, foggy mornings give way to warm mid-day temperatures. Late afternoon temperatures are cooled by the strong breezes created as marine air rushes east to the much warmer Central Valley. The hundreds of windmills which dot the surrounding hillsides bear witness to the regularity with which these breezes blow. Evening fog returns to further cool the vineyards. This regular climatic cycle is beneficial to wine grapes which need warmth for healthy growth and mature development, but which are easily overstressed by excessive heat.

The Wente Livermore vineyards enjoy three distinct types of soils: deep, sandy loam; lean soil with large amounts of gravel and rock; and soil which is a mixture of chalk, gravel and loam. The gravelly soil is akin to that found in parts of Bordeaux, France and the Livermore Valley was long known as the "Graves" district of California because of its similar soil. These distinct soil types have provided the opportunity to match grape varieties to the appropriate soil.

The Livermore vineyards are particularly suited to growing the Bordeaux varieties; Sauvignon Blanc, Semillon and Cabernet Sauvignon. More than sixty consecutive vintages of outstanding Chardonnay have been produced from these vineyards as well.

Sixteen grape varieties are grown in the Livermore Valley vineyards: Cabernet Franc, Cobernet Sauvignon, Chardonnay, French Colombard, Grey Riesling, Merlot, Mourvedre, Petite Sirah, Petite Verdot, Sangiovese, Sauvignon Blanc, Sémillon, Syrah, Trebbiano, Viognier, Zinfandel.

#### The Wente Arroyo Seco Vineyards

In 1961, our father Karl Wente, grandson of the winery's founder, acquired the Riva Ranch just west of Greenfield in the northern Salinas Valley for the purpose of planting a vineyard. He chose this oreo over the many he had surveyed in California, because, like other winemakers to follow, he was particularly impressed by the climate of the Arroyo Seco river basin, the availability of excellent water, and the well droined, rocky soils, studded with limestone ond shale deposits.

Korl considered the Arroyo Seco district to be an ideal area for Chardonnay as well as other varieties which favor a long, cool growing season. It wos from this vineyord that Karl produced the legendary Spätlese and Auslese series of Rieslings, California's first naturally botrytised late-harvest wines.

In the late 1970s, Eric, Philip and I, took over monagement of the winery and vineyards. We realized that the climate is particularly well suited to Pinot Noir ond Chardonnay grown for sparkling wine production. The long, cool growing season allows the grapes to be picked at low sugar levels and still possess the maturity, varietal character and acids necessary for fine sparkling wine. Since 1985, we have been producing *méthode champenoise* Arroyo Seco Brut Sparkling Wine

In consideration of a long history of outstanding vintages, the Wente Arroyo Seco vineyard was recently named one of California's twenty best vineyards by The Wine Spectator.

Thirteen grape varieties are grown in the Arroyo Seco vineyards: Cabernet Sauvignon, Chardonnay, Chenin Blanc, Gewürztraminer, Merlot, Pinot Blanc, Pinot Gris, Pinot Noir, Sauvignon Blanc, Sémillon, Viognier, White Riesling, Zinfandel.

Carolyn Wente
President, Wente Vineyards

2



## Grape Varieties and Acreage

|  | Livermore Valley | Arroyo Seco | Total |
|---|---|---|---|
| Chardonnay | 724 | 359 | 1,083 |
| Cabernet Sauvignon | 363 | 2 | 365 |
| Merlot | 299 | 61 | 360 |
| Sauvignon Blanc | 97 | 2 | 99 |
| Zinfandel | 96 | 1 | 97 |
| Pinot Noir | 5 | 82 | 87 |
| Semillon | 68 | 1 | 69 |
| Pinot Blanc |  | 66 | 66 |
| Petite Sirah | 56 |  | 56 |
| White Riesling |  | 42 | 42 |
| French Colombard | 35 |  | 35 |
| Gewürztraminer |  | 30 | 30 |
| Chenin Blanc |  | 29 | 29 |
| Trebbiano | 24 |  | 24 |
| Grey Riesling | 15 |  | 15 |
| Pinot Gris |  | 14 | 14 |
| Sangiovese | 13 |  | 13 |
| Cabernet Franc | 12 |  | 12 |
| Petite Verdot | 12 |  | 12 |
| Syrah | 11 |  | 11 |
| Viognier | 4 | 3 | 7 |
| Mourvedre | 5 |  | 5 |
|  | 1,839 | 692 | 2,531 |



**WENTE**
VINEYARDS

### Winemaking at Wente Vineyards

What makes winemaking different at Wente Vineyards? To my mind, a key difference is the ability to separately manage the grapes from every single vineyard block, whether it be five or fifty acres, from picking through barrel aging to the final blending. So that every lot of grapes that comes into the winery can receive special treatment.

Our harvesting system has been specifically developed for night picking, when temperatures are cool. Due to the efficiency of the harvest system and cool temperatures, grapes are brought to the presses in vine fresh condition. When grapes are brought to the winery, we are able to handle them with a gentleness and speed that are unmatched in our industry. Furthermore, we have designed the harvesting and winemaking systems especially to deal with grapes as whole, unbroken clusters until they are juiced. This means that we can carefully control the crushing and pressing of the grapes.

White wines are made in what I refer to as the "champagne" style. By that I mean that the white grape varieties as pressed as whole berry clusters in a system created to extract the purest, free run juice possible. We have eight tank bladder presses ranging in capacity from five to twenty-five tons. They are custom built to be filled by an ingenious screw delivery system which does not break the clusters, or macerate the grapes before pressing begins. By having several presses of different sizes, we gain flexibility in dealing with different varieties and diverse load sizes.

There are two hundred temperature controlled fermenters of various sizes at the winery. This large number of fermenters gives us a two million gallon fermentation capacity and allows us tremendous flexibility in dealing with the large number of different grape varieties grown in the Wente vineyards. We maintain an inventory of ten thousand French and American oak barrels for fermentation and aging. Our barrel handling capacity enables us to barrel ferment wines using a variety of techniques and procedures.

Quality and consistency are hard earned traits which come from more than one hundred years of grapegrowing and winemaking experience. We are very conscious of the tremendous efforts made by our predecessors to continually offer quality and consistency by constantly improving their vines, vineyards and winemaking. We are diligently working to offer our customers the same.

Philip R. Wente
Executive Vice President, Wente Vineyards

addition of The Course at Wente Vineyards will make ours one of the world's most unique winery destinations.

The creation and continuing expansion of the Wente Vineyards Restaurant and Visitors Center is part of a larger vision to promote the spirited renewal of winemaking interest occurring in the Livermore Valley. As such, Crane Ridge Vineyards is a cornerstone development in our efforts to promote viticulture and related lifestyle activities in the valley while protecting open space and the environment. An innovative concept which enables homeowners to share the rich rewards of land production, Crane Ridge is a gated community of 18.5 acre parcels. Each parcel has a one acre homesite and 14.5 acres of planted vineyards. Crane Ridge Vineyards is located directly across from the new NCGA 27-hole Poppy Ridge Golf Course. Through novel projects like Crane Ridge, which combine land development with vineyards, the Livermore Valley is expanding rapidly as a winegrowing region.

In addition to constantly improving, replanting and expanding vineyards, we have continued to develop our winemaking facilities. The Wente Vineyards winemaking facilities are among the most technologically advanced, boasting new, state-of-the-art equipment. There are separate facilities for table and sparkling wines. In addition, the premium winemaking facility boasts 550 controlled-temperature blending and storage tanks ranging in size from 500 to 50,000 gallons.

Equally important, more than 200 fermenters and an overall two-million-gallon fermentation capacity mean each vineyard block can be harvested at optimum ripeness and fermented separately. Consequently, every vineyard lot is handled separately from harvest throughout the finished aging process. We have also greatly expanded our barrel fermentation and barrel aging capacity, maintaining an inventory of 10,000 French and American oak barrels. As a result, our system enables Wente Vineyards winemakers to create wines of exceptional quality and consistency.

Realizing we live in an information age in which it is vitally important to communicate directly with our customers, Wente Vineyards has begun the wine industry's first interactive 800 telephone line. The Wente "Grapeline" is available toll-free to touch-tone phone users around the nation. Callers hear a comprehensive menu of choices and are able to listen to wine tips, make reservations at the Wente Restaurant, receive information about special events and purchase tickets to the Wente Concerts at the Vineyard. At any time, "Grapeline" callers can connect live to the winery's tasting room, restaurant and concerts and event departments. One of the system's most important features is the unique "Touch Tone Party Planner." The "Grapeline" can be used to reserve the amount and variety of wine needed for a dinner party based on information entered on touch-tone pads. All of the system's options are updated each quarter. The telephone number

responsible for maintaining the high standards of food and service which led to three national awards in less than two years. The prestigious Travel-Holiday Magazine selected The Restaurant as among the finest in North America. Similar awards soon followed, among them a prestigious DIRONA.

The award-winning menu features regional American dishes, influenced by California and French presentations and techniques. Many are traditional family recipes prepared with a distinctive Wente flair. Executive Chef Kimball Jones creates seasonal menus which change daily. Jones uses the best and freshest seasonal ingredients, primarily from local growers. Beef comes from the family cattle ranch located in the hills behind the winery. Presentation is important and the dishes, made pleasing to the eye as well as the palate, are created to harmonize with the many fine California wines available.

Through its very extensive wine list The Restaurant aims to promote wines from all California appellations. The influential Wine Spectator voted the list one of the best in the nation and has awarded it the "Best Award of Excellence" several times. Most impressive is The Restaurant's wine library, which contains many rare older California vintages.

The Wente Vineyards and Restaurant reflect the unique spirit of this pioneer family– a thoroughly modern outlook imbued with a deep respect for the tradition and natural grandeur of California. In making its award to The Restaurant, Travel-Holiday Magazine captured the essence of this spirit by saying: "When the fourth generation of the Wente family turned to restauranteuring, some offered prayers for their deliverance, but some knew the family's drive for perfection would win out, and it has. The place is stunningly beautiful, comfortable, and worth a special trip!"



VINEYARDS

## The Wente Vineyards Restaurant and Visitors Center

Created by the Wente family just a decade ago, the stunning Wente Vineyards Restaurant and Visitors Center rests in a picturesque canyon at the southern end of the Livermore Valley.  A state historic landmark, the historic winery was once known as Cresta Blanca, named for the white sandstone cliffs which overlook the vineyards.  The new cellars have an early California motif with distinctive red tile roofs and white stucco exteriors and arched windows and doorways echo the century old aging caves reaching deep into the hillside behind the winery.  Surrounded by 90 acres of Wente estate vineyards, the landscaped grounds include terraces and an expansive lawn dotted with oaks, sycamores and regal palms. .

. This dimension of the Wente Vineyards holdings was begun in 1981 when the Wente family decided to purchase the long abandoned Cresta Blanca winery site.  Building by building, the winery began to regain its elegance.  New white stucco walls with red tile roofs were surrounded by replanted vineyards at the foot of the hillsides.  Next came the restoration of 650 feet of sandstone aging caves which provide, as they did originally, an ideal resting place for wine as it ages and matures.

<u>The Wente Vineyards Restaurant</u>

The last phase of the restoration was the building of an elegant restaurant where visitors enjoy delicious brunches, lunches and dinners in the idyllic country setting with its early California grandeur.  The architecture, an artful blend of Spanish and California influences, features white stucco walls and beautiful wood.  The building is surrounded by large terraces shaded by graceful eaves and, in the summer, by large umbrellas for outdoor dining.

Inside, an understated elegance enhances the splendor of the surrounding hills and vineyards.  Floor to ceiling French windows provide a panoramic view, and the handsome but restrained decor allows the vistas of vineyards, hillsides and landscaped grounds to predominate.  The natural beauty of the terra-cotta tile floors is echoed by ceilings made of virgin redwood milled from the staves of century old wine casks.  In the dining rooms, high cane-back chairs and white table cloths emphasize the feeling of casual elegance.

Opened in April of 1986, The Restaurant soon became renowned for its cuisine and gracious hospitality.  Carolyn Wente, a fourth generation member of the Wente family, is

1

responsible for maintaining the high standards of food and service which led to three national awards in less than two years. The prestigious Travel-Holiday Magazine selected The Restaurant as among the finest in North America. Similar awards soon followed, among them a prestigious DIRONA.

The award-winning menu features regional American dishes, influenced by California and French presentations and techniques. Many are traditional family recipes prepared with a distinctive Wente flair. Executive Chef Kimball Jones creates seasonal menus which change daily. Jones uses the best and freshest seasonal ingredients, primarily from local growers. Beef comes from the family cattle ranch located in the hills behind the winery. Presentation is important and the dishes, made pleasing to the eye as well as the palate, are created to harmonize with the many fine California wines available.

Through its very extensive wine list The Restaurant aims to promote wines from all California appellations. The influential Wine Spectator voted the list one of the best in the nation and has awarded it the "Best Award of Excellence" several times. Most impressive is The Restaurant's wine library, which contains many rare older California vintages.

The Wente Vineyards and Restaurant reflect the unique spirit of this pioneer family– a thoroughly modern outlook imbued with a deep respect for the tradition and natural grandeur of California. In making its award to The Restaurant, Travel-Holiday Magazine captured the essence of this spirit by saying: "When the fourth generation of the Wente family turned to restouranteuring, some offered prayers for their deliverance, but some knew the family's drive for perfection would win out, and it has. The place is stunningly beautiful, comfortable, and worth a special trip!"



VINEYARDS

## Wente Vineyards
## Looking to the Future

Much as the pleasing taste of Wente Vineyards wines stems from a blend of fine grapes and painstaking preparation, the Wente wine philosophy rises from a foundation of abiding respect for the environment nurtured over four generations of farming, grape growing and winemaking. This essential philosophy reflects the Wente family commitment to the ideal that wine and food play an important role in helping to make all of our lives richer and more enjoyable. Simply put, Wente Vineyards believes the pleasures and benefits that fine food and wine bring to the enjoyment of life are universal. Consequently, we take pride in bringing to the world a fuller appreciation of California wine and food.

In realizing its vision, Wente Vineyards employs a system of viticultural practices we call *Farming for the Future*. This system of stewardship begins with careful cultivation techniques utilized in the vineyard and continued during fermenting, aging and bottling operations carried out inside the winery. To better manage the land, grape vines are matched with the characteristics of the soils in which they are grown. Soil is one of our most vital resources. As a result, stewardship of the land remains foremost among the concepts of sustainable agriculture and organic farming that we use in cultivating nearly 3,000 acres of vineyards in the Livermore Valley and Monterey County.

In parallel efforts, our belief in the importance of wine and food in the enjoyment of life led to the creation of The Wente Restaurant and Visitors Center. Since opening in 1986, the 200-seat restaurant, which is open for lunch and dinner year-round, has developed an international reputation for the excellence of its innovative American cuisine. Moreover, beautifully landscaped grounds and an outdoor amphitheater make the sun-drenched site a perfect location for all types of events and celebrations. Conference facilities and extensive catering services make it possible to combine business with the best in wine and food. Each summer, more than fifteen thousand visitors enjoy special Concerts at the Vineyard, evening events featuring superb dining and superlative entertainment. Further, Australian great Greg Norman has designed an eighteen-hole championship golf course situated a tee shot away from the Wente Vineyards Restaurant and Visitors Center. The

addition of The Course at Wente Vineyards will make ours one of the world's most unique winery destinations.

The creation and continuing expansion of the Wente Vineyards Restaurant and Visitors Center is part of a larger vision to promote the spirited renewal of winemaking interest occurring in the Livermore Valley. As such, Crane Ridge Vineyards is a cornerstone development in our efforts to promote viticulture and related lifestyle activities in the valley while protecting open space and the environment. An innovative concept which enables homeowners to share the rich rewards of land production, Crane Ridge is a gated community of 18.5 acre parcels. Each parcel has a one acre homesite and 14.5 acres of planted vineyards. Crane Ridge Vineyards is located directly across from the new NCGA 27-hole Poppy Ridge Golf Course. Through novel projects like Crane Ridge, which combine land development with vineyards, the Livermore Valley is expanding rapidly as a winegrowing region.

In addition to constantly improving, replanting and expanding vineyards, we have continued to develop our winemaking facilities. The Wente Vineyards winemaking facilities are among the most technologically advanced, boasting new, state-of-the-art equipment. There are separate facilities for table and sparkling wines. In addition, the premium winemaking facility boasts 550 controlled-temperature blending and storage tanks ranging in size from 500 to 50,000 gallons.

Equally important, more than 200 fermenters and an overall two-million-gallon fermentation capacity mean each vineyard block can be harvested at optimum ripeness and fermented separately. Consequently, every vineyard lot is handled separately from harvest throughout the finished aging process. We have also greatly expanded our barrel fermentation and barrel aging capacity, maintaining an inventory of 10,000 French and American oak barrels. As a result, our system enables Wente Vineyards winemakers to create wines of exceptional quality and consistency.

Realizing we live in an information age in which it is vitally important to communicate directly with our customers, Wente Vineyards has begun the wine industry's first interactive 800 telephone line. The Wente "Grapeline" is available toll-free to touch-tone phone users around the nation. Callers hear a comprehensive menu of choices and are able to listen to wine tips, make reservations at the Wente Restaurant, receive information about special events and purchase tickets to the Wente Concerts at the Vineyard. At any time, "Grapeline" callers can connect live to the winery's tasting room, restaurant and concerts and event departments. One of the system's most important features is the unique "Touch Tone Party Planner." The "Grapeline" can be used to reserve the amount and variety of wine needed for a dinner party based on information entered on touch-tone pads. All of the system's options are updated each quarter. The telephone number

(1-800-95-WENTE) will be included on the back labels of all Wente wines beginning in 1996.

In a similar vein, we have all expanded our business and sales horizons to encompass a global view of the marketplace. Perhaps no other California winery is as aggressive as Wente Vineyards in marketing its products world-wide. As a result, we now sell wine in more than one hundred countries and have organized a series of California Food and Wine Festivals throughout the world. In addition to our offices in Mexico City, Vienna and Moscow, we are involved in joint venture projects in Israel, Chile, and the Republic of Georgia.

As far-flung as the branches of Wente Vineyards might be, the Wente approach to business remains rooted in an appreciation for life's simple pleasures, such as leaning back and watching the clouds float across the Livermore Valley sky, catching the scent of fine wine lifted in a celebratory toast, or savoring the taste of good food shared with family and friends.

Carolyn Wente
President, Wente Vineyards



# HALL & BARTLEY

ARCHITECTURE · PLANNING





Domaine Michel Healdsburg, California

Buena Vista Winery Sonoma, California



Silverado Vineyards Napa Valley, California





Holve Studio Sebastopol, California

White Residence Santa Rosa, California

HALL & BARTLEY • 4701 OLD REDWOOD HWY. • SANTA ROSA, CA. 95403 • 707 544-1642

Architectural excellence is a harmonious blending of forms, spaces, colors, and materials in consideration of the site, people, function, and community. It is not a statement of the year or an extension of the architect's ego; but rather a reflection of you, the client: your desires, your tastes, your needs.

We at Hall & Bartley are driven by a commitment to design excellence and a dedication to service. The use of strong threads of architectural continuity and careful attention to detail are hallmarks of our work. With a comprehensive approach, we work closely with you to define and achieve all of your goals.



Silverado Vineyards                    Napa Valley, California



Domaine Michel                    Healdsburg, California

**Appendix E**

**COMMENTS ON DRAFT POINT MOLATE REUSE PLAN**

■ ■ ■

1.  **Beyaert, Bruce.** BRAC, Environmental Subcommittee. January 9, 1997.

2.  **Beyaert, Bruce.** BRAC, Environmental Subcommittee. January 28, 1997.

3.  **Bonino, Mark G.** Department of the Navy, Engineering Field Activity, West, Base Conversion Manager. February 14, 1997.

4.  **Boortz, Marielle J.** BRAC, Marketing and Economic Development Subcommittee. January 13, 1997.

5.  **Boortz, Marielle J.** BRAC, Marketing and Economic Development Subcommittee. January 30, 1997.

6.  **Brubaker, Bruce R. and Malone, Nancy.** Architects. February 14, 1997.

7.  **Burkhart, Cate.** West Contra Costa Unified School District, Administrative Specialist. January 13, 1997.

8.  **Cerkanowicz, Deirdre.** Richmond Arts and Cultural Commission, Co-chair. February 14, 1997.

9.  **Comnes, Leslie.** Resident. February 3, 1997.

10. **Driller, Jonathan.** Orchidnet, Executive Director. February 6, 1997.

11. **Dumont, Dan.** San Francisco Resident. February 1, 1997.

12. **Fuller, Sharon Y.** Resident. January 28, 1997.

13. **Genser, Joshua.** BRAC, Marketing and Economic Subcommittee. January 29, 1997.

14. **Gosney, Don.** BRAC, Environmental Subcommittee. January 13, 1997.

15. **Jackson, Charles K.** Real Property Research. February 14, 1997.

16. **Kirkpatrick, William R.** East Bay Municipal Utility District, Manager of Water Distribution Planning. February 14, 1997.

17. **Lanshoff, Debbi.** Alternate BRAC member, CERO. December 30, 1996.

18. **Landshoff, Debbi.** Sierra Club, West Contra Costa County Group, Executive Committee Chair. January 30, 1997.

19. **Landshoff, Debbi.** CERO Subcommittee. February 11, 1997.

20. **Rao, Nagarajo.** BRAC, Environmental Subcommittee. January, 1997.

21. **Steelman, William D.** Chevron Products Company Richmond Refinery, General Manager. February 14, 1997.

22. **Vitz, Martin.** East Bay Regional Park District, Advanced Planning Manager. January 30, 1997.

23. **Wilcox, Claire.** Public Development Review Board, Associate Planner. February 14, 1997.

From: BEYAERT FAX MODEM
Total number of pages: 10



To: Patricia Jones, City of Richmond
      Manager's Office

Tuesday, January 28, 1997

Mayor Rosemary Corbin, Chair
Point Molate BRAC

Dear Rosemary,

The following nine pages contain the comments of the
Environment Subcommittee on the draft Reuse Plan for
Point Molate NFD. Please mail these comments to all
Members and Alternates of the BRAC so that they will
have an opportunity to review them prior to the February 3
BRAC meeting. At this meeting, the Environment
Subcommittee would like the opportunity to present these
recommendations for adoption by the entire BRAC. Thank
you very much.

      Bruce Beyaert, Chair
      Environment Subcommittee

© 1994 Sandhill Arts. All rights reserved.

# Comments on January, 1997 Draft Point Molate Reuse Plan
## By Environmental Subcommittee of Blue Ribbon Advisory Committee

## Table of Contents

| Topic | Page No. |
|---|---|
| 1. General Comment On Compatibility Of Uses | 2 |
| 2. Light Industrial Uses Should Not Be In Plan | 2 |
| 3. The Winery Needs More Analysis | 3 |
| 4. The Regional Park Boundary Should Be Expanded And Incompatible Or Infeasible Uses Weeded Out | 3 |
| 5. Residences Should Be Sited In Developed Areas And On The Inland Side Of Western Drive | 3 |
| 6. Historic District Boundaries Should Extend To The Bay From Winehaven and Building 6 | 4 |
| 7. The Amphitheater Site Is Inappropriate | 5 |
| 8. A Marina Is Not Feasible Or Desirable | 5 |
| 9. Clarify The Status Of The Railroad And Its Right-of way | 6 |
| 10. The Meeting Center Needs More Analysis | 6 |
| 11. Consider A Vista Restaurant | 6 |
| 12. Accelerate Development of Hillside Trails | 7 |
| 13. Address Underground Pipes and Tanks | 7 |
| 14. Remove All Pipes From Pier | 7 |
| 15. Plan To Remove PCB-containing Transformers | 8 |
| 16. Eliminate Source Of Lead In Drinking Water | 8 |
| 17. A Vegetation Management Plan is Needed | 8 |
| 18. A Wetlands Delineation Study May Be Needed | 9 |
| 19. Eliminate Palm Trees | 9 |
| 20. The Action Plan Should Include An EIS/EIR | 9 |

January 28, 1997

1

# Comments on January, 1997 Draft Point Molate Reuse Plan
## By Environmental Subcommittee of Blue Ribbon Advisory Committee

### 1. General Comment On Compatibility Of Uses

The Reuse Plan should devote more attention to the compatibility of various uses and their spatial arrangement on the property. Incompatible uses should be weeded out and those which are synergistic and reinforce each other in terms of activity and anticipated economic outcomes should be added or strengthened. Many of the following comments address specific concerns about compatibility of the uses proposed.

### 2. Light Industrial Uses Should Not Be In Plan

The draft Reuse Plan proposes light industrial uses either on 14 acres in the area around Building 6, if that building is demolished, or on a strip of land between Western Drive and the Bay up to 100 feet from the high water line in the Southern Development Area (See pages I-24, 40 & 43). **Yet, Industrial use was never recommended by the BRAC.** The BRAC ranked light industrial uses as the least desirable among all uses considered during both the November, 1995 Visioning workshop and the November, 1996 Land Use Alternatives workshop.

If light industrial operations take place in the Northern Development Area on the Building 6 site, the architectural character and truck traffic generated could be incompatible with the adjacent historic district, proposed public uses in the Winehaven area and with proposed retreat/conference center operations nearby. If light industry is sited on the Bay side of Western Drive in the Southern Development Area, it would make a poor "gateway" for the proposed Point Molate historical village concept and interfere with the sweeping open vistas of the Bay.

The Plan's market analysis concludes on page III-12:
- "Industrial brokers and developers interviewed for this study feel that light industrial/warehouse development may not be an appropriate reuse for Point Molate";
- "The developers and brokers interviewed felt that Point Molate's views, open space, and potential recreational uses may be of greater value to the City of Richmond than the possible benefits of reusing the site for light industrial or warehouse development"; and
- " Point Molate appears to be poorly positioned to support development of office, light industrial or warehouse uses, especially for multiple tenants."

**Because light industrial use is both infeasible and incompatible with other proposed uses, reference to it should be deleted from the Reuse Plan.**

### 3. The Winery Needs More Analysis

The comments above concerning light industrial uses may have certain implications for the proposed winery. A number of levels of development are suggested, ranging from retailing only to crushing, fermentation and storage to bottling. While the Environment Subcommittee believes that some level of winery activity may be both profitable and compatible with public use, further analysis is needed to determine: 1) the extent to which various levels of use would be compatible with general public use of the site (conference center, restaurant, museum, recreational and residential); and 2) the extent to which each of these levels would be considered economically feasible to a potential lessee if separated from other parts of the wine production operation.

Other positive, synergistic uses should also be further considered. For example, the possibility of one or more restaurants or light food concessions **in conjunction with the winery** was briefly mentioned but not analyzed. A restaurant might also be run in conjunction with a culinary school, as proposed by Contra Costa Community College. The Plan proposes an amphitheater, but not in relationship to winery/restaurant activities. A number of larger wineries now feature regularly scheduled concerts (in locations much further from the central Bay Area). Similarly, a wine-bar/night club might be considered to extend the hours of activity.

### 4. The Regional Park Boundary Should Be Expanded And Incompatible Or Infeasible Uses Weeded Out

The regional park should be shown as including the entire shoreline area to the west of Western Drive, and possibly the hillside areas. This would include the entire Bay Trail alignment as well as local trails on the hillsides. Having one entity, e.g. the East Bay Regional Park District, responsible for designing and managing the entire shoreline should lead to a better integrated overall park design and more efficient management of park lands and facilities.

Some of the proposed uses, e.g. seafood/produce market and flea market, do not seem compatible with the proposed regional park, which would generally have a recreational character and take advantage of the natural setting of the shoreline for hiking, strolling, fishing, picnicking, etc. Would the proposed markets be run by concessionaires? If so, who would be responsible for overseeing these concessions and assuring their quality? It seems doubtful that they would be economically viable at this remote Point Molate location.

### 5. Residences Should Be Sited In Developed Areas And On The Inland Side Of Western Drive

Page I-42, Section b, proposes residential development in the Central Development Area "only if needed to support full implementation of the Plan" because "this area is highly visible from off-shore, supports habitats unique to the region, and may support

sensitive plant and animal species". Residential use also is proposed in the Building 6 area if that building is demolished (page I-40) and in the Northern Development Area in a narrow strip of land between Western Drive and the BCDC 100-foot setback from the high water line (page I-43).

If additional residential development is required to support full implementation of the Plan, consideration should be given to siting it inland of Western Drive where there are suitable sites not included in the current draft Plan. The sweeping vistas from Western Drive should be preserved and not cluttered with housing. In the Northern Development Area, the Environmental Subcommittee questions the compatibility of single-family residential with the other proposed uses. Given the sensitivity of the Central Development Area and the fine views over San Francisco Bay, this area could become a very attractive area for picnicking and other public uses.

The inland areas should be at least as valuable as the Central Development Area for residential use. For example, the draft Reuse Plan states:
   "...units on slopes with bay views at Point Molate should sell at a premium over
   waterside sites" (page III-17);
   " Overall, the interviewees agreed that both the hillsides and areas near the
   shoreline are attractive development sites for residential use" (page III-19); and
   " The underground fuel tanks, if fully cleaned and filled with soil, could be used as
   foundations for buildings of a limited size, especially high end single-family
   residential" (page II-33).

### 6. Historic District Boundaries Should Extend To The Bay
### From Winehaven and Building 6

The Navy has applied to reduce the Historic District to 27 acres from the current 71 acres (pages I-31 and 32). The Environmental Subcommittee is concerned that the proposed downsizing of the Historic District boundaries so close to the ends and Bay side of the Winehaven building and Building 6 could lead to future problems with incompatible development very close to these "contributing" historic buildings. The State Historic Preservation Officer recommended in his original 1975 letter to the Navy that the Historic District "should include the winery buildings and associated worker's housing, along with a visual buffer around the complex". The Environment Subcommittee is concerned that the Navy is set on a course to eliminate this visual buffer.

Referring to Figure 7 on page 1-24, we suggest extending the boundary west from the northern end of the proposed boundary to the shoreline just south of the heliport and from the the southern end of the Navy's proposed boundary west to the shoreline just north of the proposed multi-family residential area. This westerly extension would provide a better buffer around the Winehaven building and would not interfere with the proposed reuse plan assuming that the Navy's non-contributing oil handling facilities could still be removed for the proposed regional park. The Environment

4

Subcommittee recommends that the City bring this issue to the attention of the National Park Service, which is now considering the Navy's request to reduce the Historic District, and request a shoreward extension of the Historic District boundary.

Moreover, we are concerned with the proposal in this draft Reuse Plan to further reduce the Historic District to only 17 acres -- a 76% reduction from the current 71 acres (page 1-32 & 33). The draft Plan contains no conclusive support for demolishing Building 6, which is a contributing historic structure. In fact, Table I on page I-8 describes it as in "good to fair" condition, which is better than Winehaven's "fair to poor" rating in this table. It is premature to write off Building 6 and recommended reduction of the 71-acre Historic District to only 17 acres.

## 7. The Amphitheater Site is Inappropriate

Although an amphitheater or other facility for outdoor concerts is a good concept, the amphitheater should not be sited against the "hillside" as described on page 1-50 and Figures 7 - 8, etc. First, the prevailing summer winds off the Bay would blow directly into the faces of the audience. Amphitheaters usually are sited to protect the audience from the elements, rather than pitting them against Mother Nature. Second, the "hillside" at the proposed site of the amphitheater has a sensitive coastal prairie plant community on top of it, as recognized on pages II-17 and II-34. Moreover, the Bay side of this hill has a sensitive coastal bluff plant community, which contains the CNPS List 4 marsh gum plant. This may be the only place in the East Bay where these declining plant communities are contiguous.

With protection of these plant communities, this bluff could be made into an educational feature. This bluff was in fact the source of the site 11 plant list from the May 16, 1996 reconnaissance by the California Native Plant Society (CNPS). (The circle drawn around reconnaissance site 11 is incorrect on the map in the CNPS report. It should extend to include this coastal bluff feature. The original underlying map from a 1996 Navy report does show this bluff as noted in the map legend.) The discussion of the "hill" in the third paragraph on page I-47 should describe these special coastal bluff and coastal prairie plant communities.

## 8. A Marina is Not Feasible Or Desirable

The Plan indicates both by word and in some of the artist's renditions (e.g. Figure 8) that small and large boats may dock at the pier and use the cove surrounding it. Page II-28 states "...the pier can accommodate some boats that are too large for other Bay Area marinas". Use of the pier for small and large boats would require mooring platforms and ramps to allow ready access from the boats to the pier. With the swift currents and strong winds at the site, an expensive breakwater would also have to be erected with substantial, environmentally harmful Bay fill required.

Dredging may also be required if the intent, as shown in the above drawing, is to

5

encourage sailboats between the wharf and the shoreline. Although the area immediately adjacent to the causeway is as deep as 12 feet, the depths between the wharf and the shoreline range from a low of three feet to a high in one small area of nine feet. With the waterway between the wharf and the shoreline as shallow as it is and varying radically in depth, environmentally-harmful dredging may be required to accommodate boats. Dredging also would be prohibitive in cost if the sole purpose is to provide access to a limited number of small to large boats.

### 9. Clarify The Status Of The Railroad And Its Right-of way

Figure 4 on page I-17 states "Proposed railroad use of existing tracks would impede public access to water and Bay Trail plans". The first full paragraph on page II-30 also refers to possible reactivation of the railroad. What is the situation? Who owns the rail right-of-way? Does someone have the option to reactivate it? If so, this could be a very serious problem which should be addressed and resolved promptly. This issue was raised by the Environment Subcommittee many months ago. We have yet to receive a response from the City Attorney's Office, which was asked to investigate the situation.

The Environmental Subcommittee understands that this right-of-way ownership question may be complex and difficult to resolve with the Navy, Chevron and two or three railroad companies potentially involved. We suggest that the City consider initiating a non-adversarial condemnation and see what claimants emerge in order to clear the title. If this "friendly taking" is initiated, it would be good to clarify the situation for the entire stretch of rail line from the Richmond - San Rafael Bridge to Terminal 4.

### 10. The Meeting Center Needs More Analysis

There should be further analysis of the feasibility of a meeting center, particularly in relation to the facilities at Point Molate. Is there adequate meeting space for the size of groups in the target market? What is the feasibility of maintaining overnight guest accommodations in separate cottages, factoring in rehabilitation and maintenance costs? What additional facilities would be needed to compete with conference centers at the Presidio or UC, Berkeley? What is the market advantage of a group meeting center, as opposed to a bed-and-breakfast operation? Could the two be combined on a space-available basis?

### 11. Consider A Vista Restaurant

No matter how spectacular the view is from the shoreline, the hillside and ridgeline views are even better. With restaurants in scenic areas, the more spectacular the view they have to offer, the more popular and successful they can become. The Environment Subcommittee suggests that the City investigate the economics and aesthetic viability of a restaurant set high up on the hillside above the Northern Development Area that would have a fantastic view of the entire northern Bay Area. A

patio area would provide patrons with an opportunity to enjoy the fine weather Richmond has to offer. Classy lunches and elegant dinners might be especially successful. Many of the trails could pass by the restaurant so walkers, joggers and bikers could enjoy the benefits at the end of the rainbow.

## 12. Accelerate Development of Hillside Trails

Please move establishment of hillside trails from Phase III to Phase I of Table 3 on page I-83 -- at least to the extent that existing roads can be used.

## 13. Address Underground Pipes and Tanks

The disposition of the nearly two dozen underground concrete tanks and 26 miles of mostly underground pipes should be an important part of the Reuse Plan. A study is needed to determine whether it would by prudent to remove these tanks and lines with backfill of rock and soil or to fill them, e.g. with a cement-sand slurry mix. This question is particularly important if there is a possibility that the City will ultimately desire to have structures such as residences or a restaurant built at the level sites where these tanks are located. This issue should be added to the Section D.1. discussion of Additional Investigations and Assessments on page I-68.

Remediation of oil contamination also is likely to be required whether the Reuse Plan identifies hillside areas as open space for public recreation, a restaurant or for residential use. The tanks can be cleaned and sealed but the areas immediately under and surrounding them, as well as the adjacent valve boxes, are areas where leaks and spills have occurred. The underground piping systems also have been identified by the Navy as sources for numerous leaks and require an equally intense scrutiny. Since the pipelines travel throughout the hills and may coincide with many of the proposed trails and roads, the cleanup of these areas also may be important.

## 14. Remove All Pipes From Pier

The Plan suggests that all pipes on the pier might be painted a decorative color and used as a type of safety barrier and even a source of education. Complete and absolute cleansing of the interior of the piping system is unlikely as often there are low points in the system that never seem to get cleaned or drained. Since the products that passed through these pipes were toxic and highly flammable, any leaks that might be exposed to the public would be an unnecessary hazard.

The salt air surrounding the pier is highly corrosive to ferrous metals and to prevent constant deterioration of these pipes a continuing maintenance program would have to be implemented. Because of restrictive environmental regulations, any work performed over the Bay usually costs three to four times the cost to perform the same work over land. As the paint ages, flakes, chips and falls into the Bay, the City may be liable for fines levied for failure to protect the Bay. The bottom sides of the pipes are

usually the first to corrode and, because of the location, are the most difficult to notice in time to take preventative action.

Reuse of these pipes for safety barriers seems unlikely, considering their locations and heights. It is unlikely that they could be economically retrofitted to meet safety standards.

The wharf itself also has loading arms and a vapor recovery system that no longer serve a purpose and are aesthetically unacceptable. If equipment looks bad, serves no purpose and is likely to require costly maintenance, it should be removed.

### 15. Plan To Remove PCB-containing Transformers

The presence of PCB-containing transformers is described on pages I-58, I-73 and II-20. The Reuse Plan should address the hazard they create and the need to remove all PCB-containing transformers. If they explode, they will create serious hazards and major liability and cleanup expenses for the City.

### 16. Eliminate Source Of Lead In Drinking Water

The Reuse Plan reports that there are substantial levels of lead in drinking water throughout the facility. There are probably three potential sources of this lead contamination. Although lead pipes are not as commonly used as people might believe, considering the age of some parts of the system, this is a possibility. A more likely possibility would be lead based solder used to seal the joints of the piping. the last possibility would be if the system utilized cast iron pipe for the supply main. The joints on cast iron pipes installed before the 1980's were sealed by stuffing oakum into the joint and pouring molten lead into the fibers.

No matter what the source of the lead, the source must be identified and remediated. It is very likely that if the source were any or all of the three sources suggested, this would indicate a widespread problem that could very well demand the complete replacement of the drinking water supply system.

### 17. A Vegetation Management Plan is Needed

The Reuse Plan should have a section recommending control of vegetation such as eucalyptus forest, pampas grass and coyote brush thickets to reduce fire hazards and encroachment on the coastal prairie grasslands. This section could be based largely on the 1982 Natural Resource Management Plan prepared for the Navy by Havlik, except that the pampas grass apparently had not invaded in 1982. Eucalyptus forests are problems and constraints for Figure 4 -- not an "opportunity" as they are portrayed on Figure 3 of page I-15. Consideration should be given to removing most of the eucalyptus trees as has been done on Mount San Bruno and Angel Island. The Environment Subcommittee understands that there are companies which would log

8

out these forests at no cost to the City due to the high value of eucalyptus wood chips for pulp in Asia.

### 18. A Wetlands Delineation Study May Be Needed

Referring to Sections e and f of page I-78, the Environment Subcommittee is not aware that a wetlands delineation has been conducted yet and understands that this will be needed. Shouldn't this be added to the discussion of Army Corps and CDFG requirements?

### 19. Eliminate Palm Trees

The Environment Subcommittee believes that the use of a "palm tree plantation" at the entrance to the facility and elsewhere is inappropriate. Palm trees are alien to the area and would be inconsistent with much of the rest of the facility. The existing palm trees are a by-product of the Navy's presence and are too reminiscent of Southern California. Although some sort of "plantation" would improve the appearance of the gateway, a different type of tree would be more appropriate, preferably native species.

### 20. The Action Plan Should Include An EIS/EIR

Preparation of the EIS/EIR on property transfer and reuse should be added to Phase I of Table 3 on page I-83.

January 28, 1997

73 Belvedere Avenue
Richmond, CA 94801
January 9, 1997
Phone/Fax 235-2835

FAX TO:
Mayor Rosemary Corbin, Chair
Point Molate BRAC
City of Richmond

Dear Rosemary:

As requested during the January 6 BRAC meeting, I have reviewed the January 1997 draft Point Molate Reuse Plan prepared by Brady and Associates. Due to time limitations, my review focused on Section I plus the environmental portions of Section 2. Overall, this plan is very well done. The Brady team has been creative in developing a workable plan which is generally responsive to the thinking of the BRAC. This letter contains my major comments. Additional signlicant comments are contained in the attachment. These comments do not, in general, single out for kudos the many good concepts contained in the draft.

Regional Park: It would be best to extend the regional park along the South shoreline, rather than terminating it on the south side of the Point Molate headland. Having one entity, e.g. the East Bay Regional Park District, responsible for designing and managing the entire shoreline should lead to a better integrated overall park design and more efficient management of park lands and facilities.

Historic District: The proposed downsizing of the Historic District boundaries so close to the ends and Bay side of the Winehaven building could lead to future problems with incompatible development very close to this historic building. Referring to Figure 7 on page 1-24, a better boundary would extend west from the northern end of the proposed boundary to the shoreline just south of the heliport and from the the southern end of the proposed boundary west to the shoreline just north of the proposed multi-family residential area. This westerly extension would provide a better buffer around the Winehaven building without interfering with the proposed reuse plan. If you agree with this recommendation, then it seems that the City should make this known to the National Park Service, which is now considering the Navy's request to reduce the Historic District.

Light Industrial: I continue to be troubled by the potential for light industrial uses in the Northern and Southern Development Areas to create conflicts with the historic character of Point Molate and with the proposed residential, conference center and other uses in the reuse plan. This is why the BRAC has ranked light industrial uses as the least desirable of all those considered. The problem is that the light industrial

category is not tightly defined (at least, not in my mind or in BRAC discussions) and apparently could include anything from a Pixar-type office to a factory-type operation, which could have loud noises, heavy truck traffic or other undesirable features. Would it be possible to expand the discussion of proposed light industrial uses on pages 1-43 and 1-44 to narrow the definition of light industrial and emphasize that such any such use must be fully compatible with the nearby Historic District and residential areas?

Amphitheater: The amphitheater should be eliminated from page 1-50 and Figures 7 - 8, etc. As recognized on pages II-17 and II-34, the "hill" at the proposed site of the ampitheatre has a sensitive coastal prairie plant community on top of it. Moreover, there is a coastal bluff plant community on the Bay side, which contains the CNPS List 4 marsh gum plant. This may be the only place in the East Bay where these declining plant communities are contiguous. With protection of these plant communities, this bluff could be made into an educational feature. This bluff was in fact the source of the site 11 plant list from the May 16, 1996 reconnaissance by the California Native Plant Society (CNPS). (In checking the map in the CNPS report, I see that the circle drawn around reconnaissance site 11 is incorrect. It should extend to include this coastal bluff feature. The original underlying map from a 1996 Navy report does show this bluff as noted in the map legend.)

Vegetation Management: For consistency with the Environmental Subcommittee's recommendations, please add a Reuse Plan section recommending control of vegetation such as eucalyptus forest, pampas grass and coyote brush thickets to reduce fire hazards and encroachment on the coastal prairie grasslands. This section could be based largely on the 1982 Natural Resource Management Plan prepared for the Navy by Havlik, except that the pampas grass apparently had not invaded in 1982.

The above are my major comments. Additional significant comments are contained in the attachment and arranged by page number of the draft Reuse Plan. I hope that you find these comments helpful and that they will be reflected in the final Reuse Plan presented to the LRA. Please let me know if you have any questions.

Sincerely,

*Bruce Beyaert*

Attachment

cc: Patricia Jones
    Sheila Brady
    Shirley Butt
    Thomas Cowling - Please make copies of this letter and its attachment for the
    January 13 meeting of the Environment Subcommittee.

## Additional Comments on January, 1997 Draft Point Molate Reuse Plan
## By Bruce Beyaert

Page 1-1: There is a typo in the first word of the last paragraph.

Page 1-2: Referring to the last sentence of the first paragraph in Section 2, is the road within the 40-foot easement?

Page 1-5: Some potential users of the property may be concerned about noise from the rifle and pistol range mentioned in the first paragraph. That concern may be alleviated somewhat if this sentence were revised to read "... a private rifle and pistol range for use by Chevron employees...".

Page 1-6: Referring to Section d, the first sentence states that the CALWA winery was the largest in the state at the time. I have read many times that it was the largest in the world. Which is correct? If it was only the largest winery in California, it must have at least been the largest in the U.S. Please clarify whether the 11 million gallon capacity is an annual figure or for some other time period.

Page 1-8: The statement in Table 1 that Building 6 is in "good to fair" structural condition seems to contradict the later recommendation that this building should be demolished because of the high cost of repairing it.

Page 1-12: For consistency with the Environment Subcommittee's Goals and Objectives, please make the following changes under Environmental Compatibility:
   fourth item: * Ensure adequate and safe cleanup of contaminated land and
           groundwater.
   sixth item: ⁻ Identify rare, threatened and endangered species and ensure
           protection of them and their habitat.
   new item: Control exotic vegetation and restore native plants
   new item: Minimize the risk to people, property and the environment due to fire
           hazards, slide areas and flooding.
   new item: Ensure that the production, use, storage, disposal and transport of
           hazardous materials within the Point Molate area is minimized and
           adequately regulated

Page 1-13: Typo in the word "was" in the sixth line of this page.

Page 1-14: The third line of the fifth paragraph should state that there are four (not five) BRAC subcommittees.

Page 1-15 (Figure 3): Most people would regard the eucalyptus forests as problems or constraints for Figure 4, rather than "opportunities". According to Mr. George R. Coles, Adjunct Professor of Archaeology at San Francisco State, there is a disturbed Native American site, which potentially could contain burials, on the upper portion of the north end of Point Molate Beach State Park. His telephone number is (510) 204-1045.

Page 1-21: Sections f. and g. on interim uses and low-cost, non-profit uses should be revised to recognize the importance of ensuring that such uses are attractive and do not create a poor image interfering with the marketability of the property for preferred long term uses.

Page 1-22: Referring to Section j, providing elsewhere for homeless needs is good. Having homeless people living and using the site would create a poor image and make it difficult to attract other planned users. Referring to the last paragraph, care should be exercised to ensure that temporary uses of the quonset hut do not create an unattractive image at this location near the entry to the property. The "disease vector" sign sounds scary and should be removed now.

Page 1-31 (Table 2): It does not seem prudent to restrict the operation of a restaurant and meeting rooms in the Winehaven building to non-profit organizations. There would be very few non-profits which are both interested and capable of running such operations effectively. Qualified private enterprises are more numerous and more likely to be successful. Similarly, the option should remain open for private enterprises to operate the retreat and B&B facilities in Cottages 33-59, as well as the retreat center in the Winemaster's Cottage. I assume that the assignments of space to the Rescue Mission, Neighborhood Coordinating Council and Orchidnet are tentative and will be revised based on the BRAC's input.

Page 1-32: Referring to the third paragraph, please delete the conclusion that the Navy's reduced boundaries for the Historical District are "a logical alteration" and add the discussion on this subject in the cover letter.

Page 1-36: Use of the word "unreinforced" in the second line of the third paragraph may be inappropriate in view of the massive I-beam reinforcements inside the Winehaven building. Please substitute "many" for "closely spaced" in the second line of the fourth paragraph to avoid the impression that the building interior is cluttered with supports, which is not the case.

Page 1-43: Referring to the next-to-last paragraph, the relocation of Western Drive eastward would also require investigation of the Native American site discussed above under Page 1-15.

Page 1-47: Please expand the discussion of the "hill" in the third paragraph to describe the special coastal bluff and coastal prairie plant communities discussed in the cover letter.

Page 1-50: Please delete the last sentence of the second paragraph. The BRAC has never bought into the feasibility or desirability of docking the Red Oak Victory at the pier.

Page 1-58: Referring to the PCB-containing transformers discussed in the fourth paragraph, is there any legal requirement for the Navy or the City to replace them?

This question also applies to the fifth paragraph on page 1-73 and Section b on page II-20.

Page 1-65: Does Orchidnet belong in this Public Benefit Conveyance section?

Page 1-66: Is "BRAC" the correct word in line I of paragraph four?

Page 1-68: Please add to Section D.1. an investigation of how to deal with the underground tanks and pipelines to ensure that they will not be a problem for the City over the long term.

Page 1-69: Singling out lead content of drinking water in the fifth bullet suggests that there are lead water pipes. Is this correct and, if so, does the piping have to be replaced?

Page 1-71: Delete the phrase "in areas where IR sites are located" in the last sentence of paragraph three. Contamination is not limited to IR sites, and cleanup plans haven't even been designed for other areas. The word should be "precedence" in the first line of the fourth paragraph. In the first sentence of the last paragraph, add a condition that these early uses should be consistent with the historical village theme.

Page 1-72: Now that the final EBS has been published, the word "Draft" may be deleted from line five of paragraph four and line one of the last paragraph, and the last sentence of paragraph four may be deleted.

Page 1-73: The first sentence is incorrect. Clean-up is underway only at IR site 3, which is the treatment ponds area.

Page 1-74: Please delete the sentence near the end of the last paragraph which claims "Clean-up to residential standards is not thought to be practical for the entire site." I know of no reason why cleanup to residential standards would not be practical for the entire treatment ponds IR site if the City determined that it was necessary. In fact, the proposed regional park use may require a comparable cleanup standard.

Page 1-78: Referring to Sections e and f, I do not believe that a wetlands delineation has been conducted yet and understand that this will be needed. Should this be added to the discussion of Army Corps and CDFG requirements?

Page 1-83 (Table 3): Please add preparation of the EIS/EIR on property transfer and reuse to Phase I. Also, please move establishment of hillside trails from Phase III to Phase I -- at least to the extent that existing roads can be used. Please note that my copy of Table 3 doesn't contain any items below the Development category.

Page II-13: Please add the coastal bluff plant community to the third sentence of the last paragraph. Please revise the penultimate sentence to indicate that the CNPS also prepared a map showing the location of species identified and that their species list is

incomplete since it based only on a brief five-hour reconnaissance on one day.

Page 2-15: Please add the gray fox to the list of mammals in Section 4. Gray foxes are rather abundant in the Potrero Hills. In fact, one currently inhabits the Winehaven building. Is the reference to red fox in line five correct?

Page 2-17: Please add the coastal bluff plant community to the discussion in Section d.

January 9, 1997



**DEPARTMENT OF THE NAVY**
ENGINEERING FIELD ACTIVITY, WEST
NAVAL FACILITIES ENGINEERING COMMAND
900 COMMODORE DRIVE
SAN BRUNO, CALIFORNIA 94066-5006

IN REPLY REFER TO:

11000
Ser 60D/7048
14 Feb 1997

City of Richmond
Attn: Patricia Jones
Post Office Box 4046
2600 Barrett Avenue
Richmond, CA 94804

Subj: **COMMENTS ON DRAFT POINT MOLATE REUSE PLAN**

### Comment #1 - Caretaker Responsibilities

In the discussion of the reuse planning process (page I-11), the paragraph dealing with the Caretaker Agreement is not entirely correct. The Navy's caretaker responsibilities, including the scope and duration of those responsibilities, are outlined in regulation (32 CFR 90) and the Base Reuse Implementation Manual (BRIM), both of which implement BRAC laws. A cooperative agreement (rather than "caretaker agreement") should be viewed as a method by which the Navy would execute its caretaker responsibilities and not an agreement as to what those responsibilities will be.

### Comment #2 - Asbestos and Lead Based Paint Remediation

Under the Additional Investigations and Assessments (page I-69) and in the discussion on the environmental clean-up program (page I-74), the assumption is made that the Navy will be responsible or could assume responsibility for asbestos and lead based paint remediation. Under environmental policies laid out in the BRIM, asbestos will only be removed by the Navy if it poses an immediate health hazard. Lead based paint abatement is limited to housing built prior to 1960 which will continue to be used for housing. In both cases, the presence of asbestos and lead based paint will be documented in the Environmental Baseline Survey.

### Comment #3 - OWS Wastewater Treatment

Under the discussion on the environmental clean-up program (page I-74), the assumptions regarding the Navy's operation of the oil/water separators and the associated wastewater treatment system is unclear. The treatment ponds are an integral part of the industrial wastewater treatment system and are being used in the interim for surface water treatment. As the treatment ponds are part of the Installation Restoration Program, the plan is to close and dismantle the treatment ponds as quickly as the we can be assured that stormwater runoff is not contaminated.

**Comment #4 - Demolition of Buildings**

The reuse plan makes the assumption that the Navy will demolish buildings and structures. We are proscribed from demolishing structures unless the cost of demolition is less than the cost of caretaking those facilities. In the case of the structures identified for demolition, it is unlikely the Navy will expend any significant funds for caretaker. There should not be an assumption that the Navy will not be demolishing any structures.

**Comment #5 - Phased Action Plan**

McKinney Act screening is not applicable to BRAC. Homeless assistance and acquisition of any real property is solely addressed in the reuse plan subject to the Base Closure Community Redevelopment and Homeless Assistance Act of 1994.

Sincerely,

MARK G. BONINO
Base Conversion Manager

*Chevron Companies*
*P.O. Box 1272*
*Richmond, CA 94802-0272*

# Fax Cover Sheet

DATE:      January 22, 1997  *(24)*

TO:        BRAC Marketing & Economic Dev.
           Subcommittee: fellow members

| | | |
|---|---|---|
| Judy Morgan | **FAX:** | 234-3540 |
| Kevin Hufferd | | 642-9442 |
| Lonnie Washington | | (by mail) |
| Paul Schultze | | 787-3382 |
| Don Ryder | | (by mail) |
| Cheryl Maier | | 236-5815 |
| Joshua Genser | | 236-9851 |
| | | |
| Peter Haas | | 237-3714 |
| Alan Wolken | | 307-8149 |
| Pat Jones | | 620-6542 |

FROM:      Marielle J. Boortz        **PHONE:**   (510) 242-3585
           Chevron Companies         **FAX:**     (510) 242-3515
           Government Affairs

RE:        Chevron preliminary comments on draft Pt. Molate Reuse Plan

**Number of pages including cover sheet: 3**

## Message

As I promised at our last meeting, here is a copy of the letter I sent to City staff re Chevron preliminary comments on the draft reuse plan. We are continuing to review the draft plan and will submit additional comments prior to the deadline. I will provide you with copies of those comments too.

As discussed at the meeting, our strongest comment will probably continue to be that residential uses (and uses involving overnight stays, e.g., hotels, overnight camping) are highly inappropriate and incompatible with the refinery and other industrial uses on the peninsula; we strongly oppose residential and like uses at the Pt. Molate site.



January 13, 1997

**The Chevron Companies**
P. O. Box 1272
Richmond. CA  94802-0272

**Marielle J. Boortz**
Government Affairs
(510) 242-3585

Ms. Patricia M. Jones
Pt. Molate Local Reuse Authority Staff
City Manager's Office, Richmond City Hall
2600 Barrett Avenue
Richmond, CA  94804

**Draft Pt. Molate Reuse Plan**
**Preliminary Comments**

Dear Ms. Jones:

At last week's Pt. Molate Blue Ribbon Advisory Committee (BRAC) meeting, the BRAC received copies of the draft Pt. Molate Reuse Plan (dated January, 1997). You requested the BRAC members to submit any preliminary comments we have on the draft plan to you by January 13, 1997. I have not completely read the draft plan yet, but do have some preliminary comments.

As you are aware, Chevron property abuts the Pt. Molate property on three sides. Chevron has a strong desire to maintain compatible land uses on our borders. The draft reuse plan proposes residential development in three designated "development areas" of the Pt. Molate site. We are concerned that residential development at Pt. Molate is incompatible with industrial operations on the Pt. San Pablo Peninsula, including the Chevron Richmond Refinery.

Over many years, Chevron has purposely moved refinery operations toward the northwest portion of Chevron property, toward Pt. Molate, and away from residential and populated areas to create a buffer. If there are residences at Pt. Molate, they would probably be the closest residences to refinery operations.

In the BRAC meeting, as well as in the draft plan, it is indicated that residential development would provide monies for the City of Richmond to finance necessary infrastructure improvements at Pt. Molate. Before finalizing the plan, residential and other proposed development alternatives should be further evaluated for their economic viability. We believe

Ms. Patricia M. Jones
January 13, 1997
Page 2

there are public economic studies which suggest that residential development requires more services than could be supported from the tax revenues generated.

Please call me if there are any questions.

Sincerely,



January 30, 1997

**The Chevron Companies**
P. O. Box 1272
Richmond, CA 94802-0272

**Marielle Boortz**
Government Affairs Representative
Phone No. 242-3585
Fax No. 242-3515

Ms. Patricia M. Jones
Pt. Molate Local Reuse Authority Staff
City Manager's Office
Richmond City Hall
2600 Barrett Avenue
Richmond, CA 94804

**Draft Pt. Molate Reuse Plan: Supplemental Comments**

Dear Ms. Jones:

As requested in the notice for the February 3, 1997 Pt. Molate BRAC (Blue Ribbon Advisory
Committee) meeting, I am submitting additional comments on the draft Pt. Molate Reuse Plan. I
and others at Chevron are continuing to review the draft plan. We will be submitting additional
and more detailed comments before the end of the public comment period (February 14, 1997).

Chevron strongly objects to the draft Pt. Molate reuse plan primarily because the plan calls for
residential uses, and other uses involving overnight stays. We believe that such uses at Pt.
Molate would not be in the best interests of the City of Richmond, the Chevron Richmond
Refinery and other existing uses on the Pt. San Pablo Peninsula. The draft reuse plan ignores
potential incompatibilities between Pt. Molate uses and surrounding, industrial uses. Similarly,
the plan does not anticipate potential conflicts from possible expansion of existing industrial
uses, e.g., the City of Richmond Terminal 4 operation. The reuse plan must be modified to
address these oversights.

Any proposed residential (and overnight stay) uses at Pt. Molate would be too close to the
Chevron Richmond Refinery. The Pt. Molate hillside provides insufficient buffer between the
refinery and such uses. Unforeseen incidents which might occur at the refinery would be more
likely to impact residents living so close to the refinery than those living farther away.

It was suggested at the LRA (Local Reuse Authority) meeting on January 14, 1997 that
residential uses at Pt. Molate would be acceptable, despite their closeness to the refinery, since
the prevailing winds do not blow toward Pt. Molate. However, there are times when the wind
does blow from the direction of the refinery toward Pt. Molate. It is unrealistic to believe that
unforeseen incidents would only occur when the winds are blowing in the normally prevailing
wind direction.

Residential development at Pt. Molate is incompatible and inconsistent with the City of
Richmond General Plan. Neither the General Plan nor Richmond zoning ordinances contemplate
residential use on the peninsula. The General Plan's goals and policies require substantial

Ms. Patricia M. Jones
January 30, 1997
Page 2

buffers between residential developments and fuel and industry intensive uses, such as M-2, M-3, M-4, and even CRR, which are the predominant use classifications on the peninsula. In many CRR zones, the zone applicable to Pt. Molate and some portions of the refinery property, industrial uses are not only permitted, but are in operation. The draft Pt. Molate reuse plan does not include the substantial buffer required by the General Plan.

Emergency access in and out of Pt. Molate is restricted to Western Drive. In emergency situations, residents would not be able to evacuate from Pt. Molate nearly as easily as they could from more open developments. Likewise, emergency services vehicles would not be able to enter the Pt. Molate area as easily as they might in more accessible areas. Access to Pt. Molate through the Richmond Refinery is not an alternative.

No infrastructure and support services currently exist to serve a residential community at Pt. Molate. The investment needed would probably be substantial because of the geographic isolation from any other neighborhood.

The draft plan indicates that revenue from residential development could provide funds to address infrastructure needs of the developed portion of the Pt. Molate site. However, we believe revenues from industrial uses would likely exceed revenues derived from residential use.

We are also opposed to the proposed hillside trails for the same reasons as our objections to residential uses at Pt. Molate.

In closing, I would like to iterate that Chevron works very hard to prevent incidents and any adverse impacts from our operations on the surrounding community. The proposed residential uses at Pt. Molate would be the closest residences to the refinery. We do not think this residential development, and other overnight uses at Pt. Molate, would be a prudent thing to do.

Sincerely,

cc:     BRAC Marketing & Economic Development Subcommittee members

14 February 1997

Point Molate Reuse Committee
Attn: Pat Jones
Special Assistant to the City Manager
City Managers Office
City of Richmond
Richmond CA 94804

FAX 510/620-8542

We are writing this as a response to a presentation of the Point Molate
Reuse Plan to the Point Richmond Neighborhood Council. In general, we
thought the ideas behind the plan were good, especially: containing
development to a relatively small portion of the site, concentrating
development in areas already developed, and use of a large portion of the
site as regional trail.

We would like to make additional recommendations regarding the proposed
plan. There is projected to be a continual growth of the Bay Area in the next
10 years - most of the growth on the periphery of the metropolitan area.
This has obvious costs in traffic, pollution, infrastructure and use of valuable
agricultural land. In order to counteract this environmental pressure, groups
such as the Greenbelt Alliance and Urban Ecology are calling for urban infill
in existing communities. All communities need to take part, and Point
Molate is an outstanding opportunity for Richmond to provide additional
housing and job growth. The proposed plan acknowledges this but should
go further:

> The density of housing proposed is not enough to create a viable
> community here. There needs to be housing at different densities to
> allow for a mix of people: seniors, young families, all income levels.

> There should be a clear "town center" to the plan, a central place for
> people to gather and transit to serve. It should be planned and built
> at the start of the project, and other development planned around the
> center, hopefully within walking distance of the center (1/2 mile).

There should be more thought to alternative modes of transportation: bicycle, bus, rail, even ferry.

The proposed use as a conference center will not serve the interests of Richmond. Rather, the development will be better if used by people with long term commitments in Point Molate, people who live and work there, not weekend visitors.

As Architects and residents of Point Richmond, we feel that Point Molate is an exciting opportunity for the City of Richmond. We hope that the City realizes that the best solution is to build a community on this site, not a collection of buildings.

Sincerely,

Bruce Brubaker                        Nancy Malone

| Post-it® Fax Note | 7671 | Date 1/13 | # of pages ▶ 18 |
| To Pat Jones | | From Cate Burkhart | |
| Co./Dept. City of Richmond | | Co. WCCUSD | |
| Phone # | | Phone # 220-2019 | |
| Fax # | | Fax # | |

# *memo:*

*West Contra Costa Unified School District*
*January 13, 1997*

TO:        Pat Jones, Project Manager, Pt. Molate, Reuses

FROM:   Cate Burkhart, Administrative Specialist

SUBJECT:   Comments on the Draft Land Reuse Plan

---

Pat, Congratulations on the draft proposal for Pt. Molate. I know you and your staff have assisted the consultants greatly on this project. I do have the following comments on the draft.

Just a reminder that the school district should be included in many of the college proposals for joint ventures.

I think the idea of the operating winery is excellent, but there have been a great proliferation of wineries in California in recent years, and wonder if this is a viable idea with so much competition. Maybe there is one looking to expand, and needs this space. Has anyone been in touch with the Wine Institute to see what the current marketability is?

Re the Richmond Neighborhood Coordinating Council proposal, I'd like to see office space for several non profits available in one of the larger buildings, as well as a common meeting space. I feel that giving one of the cottage to one organization would not be wise; there are other needs that would use the cottage on a more regular basis. (i.e., housing for the retreat/conference center). No question this is a great need.

Re OrchidNet: great idea-how about some classes on general or specific gardening run by OrchidNet or the college-fee based?

RE Housing developments: Good idea-esp. high end. They would need to provide bus transportation to the schools-district does not do any busing except Special Ed, and the distance and safety conditions to get to even Washington school is a concern. I understand the need for a developer to do more than a few houses to make it profitable, and there are some designs that could be used to give the appearance of single family, but taking less space.

Citation is doing a project near Hilltop that they are referring to a clusters pattern-might be something that could be used here for some of the housing.

Re homeless and warehouse for Rescue Mission-I feel it is not a good location for homeless-remote and isolated. Warehouse would not be appropriate either-there are plenty of vacant buildings in Richmond that could be used for this purpose. I also feel it is not appropriate for a religious organization that requires prayer as part of their training program to be given publicly owned property.

In conclusion, I think the conference/retreat center is an excellent idea that would be a real benefit to the area, as well as training for students (hotel management, restaurant, etc.) as well as a spectacular location. I am pleased to see that in the Northern Development, there is some space for satellite college courses.

Thank you again for your excellent leadership in this process. As a resident of Richmond, I look forward to enjoying the results of our planning.

Please feel free to contact me if you have any questions.



City of
*Richmond*

Patricia Jones
Point Molate Blue Ribbon Advisory Panel
City of Richmond

February 14. 1997

Dear Pat.

Enjoyed talking with you at the Point Richmond Business Association meeting on
Wednesday. It was helpful listening to Marsha Vallier's report on Point Molate. I have
been reading the reuse plan and am impressed with the amount of time. work and
thought that went into it.

I have included a list of comments and suggestion that hopefully represent the
opinions of both the Richmond Arts and Culture commission and my own. (The copy of
the plan I was given was a Xerox of the original and was missing several pages. so I
hope I don't comment on something already covered.) Feel free to call me at 510 237-
1445 if you need clarification on any of my comments.

Again. congratulations for a job well done— Although I guess it is really just beginning.

Sincerely,

Deirdre Cerkanowicz.
Co-chair. Richmond Arts and Cultural Commission

The Richmond Arts and Culture Commission would like to remind the Point Molate
Blue Ribbon Panel and the City Council of the importance of the Arts in improving and
enhancing the economy (please see Economic Impact of the Arts brochure) by
bringing people to an area and in increasing jobs, either through direct employment
and also in training. Being exposed to the arts and culture has scientifically shown to
improve SAT score for high school students, and in increasing life expectancy. The
arts help teach creativity and improve self esteem in both those participating and in the
audience.

## Remote Location

In section III-4 and I—13 on live/work spaces, we would like to bring to your attention
to places that might to considered "remote" and yet are popular with artists for live and
or work spaces—Benicia and the Marin Headlands. There is a waiting list of artists
wanting to rent small work spaces in old military barracks at the Headlands, and two
building have been renovated, through grants and sweat equity of artist into the
international know Headlands Center of the Arts. Other buildings at the headlands
contain a museum, a youth hostel, a YMCA conference center and a marine mammal
research center. All the above places used exiting facilities without much
improvement of them.

The Vulcan Foundry and many other sites in industrial areas of Oakland show how
artists move and create a more friendly environment.

Another art venue which is quite remote and yet extremely popular with both artists
and the public is Villa Montalvo in Saratoga. This place contains historic building,
gardens, galleries, concert facilities and live/work space for artists. It is located at the
top of a winding road in a rural setting, To get there you need to leave your car in the
parking lot and take a shuttle bus. This helps to give it a very quiet special feeling.

Parts of it can be rented for wedding and other occasions.

## Homesteaders

Artists and craft people are often the "homesteaders" who blaze trails by moving into areas where know one else wanted to go. Once there they draw in others. Look at Emeryville and Fourth Street. Berkeley for examples. The art commission strongly hopes you will consider using either building six or some of the existing residential housing for artists in residence programs. The presence of artists. galleries, a cafe will make the area more livable.

Could Skylight be put into the Winery building without destroying its historic integrity? The trend in to cocooning, so why go out it you have everything you need at home—a great view, a space to work and good neighbors. In a time where people easily (or not so easily) drive a hundred miles and leave for work at 5 a.m. to get to the office. how can Point Molate be considered remote?

This and other cultural uses of the area will help draw in people. And this use would be consistent with having meeting center and winery activity.

## Art and Wine

A visit to Napa or other winery areas will show a connection not only between wine and food but between wine and arts. Many wineries have concert programs. and or gallery and sculpture gracing their property. And the people with disposable income to purchase wines also like to look at and purchase fine arts and crafts. Use of the area was mentioned but notably lacking was any mention of retail space.

## Elitism and Exclusivity

If the plan for a "village" is truly to be met, then some space need to be allocated for at least some sort of store and cafe.I am concerned that " the lower end of housing should not be excluded just because of the "high value of the waterfront property." A real village or community is made up of all kinds of people. and by including only

"moderate to upper income" housing—it is in danger of being elitists and exclusive.
Down in Aptos, Section 8 housing is located in the SeaScape section of town, across
from a hotel/conference complex, the ocean and a golf course. Why shouldn't
Richmond try such innovations. Planned communities like Columbia Maryland
includes several types of housing stock and include the shops, meeting halls etc so
people didn't have to drive miles away to grocery stores and work. And new urban
and suburban planning is getting back to front yards and porches and sidewalks and
away from cul'd'sacs and walled settings.

I would hate to see huge single family homes crowded up against each other and
taking up the bay views, while being circled by gates and fences to keep others out.

## Percent for the Arts

I-22. Also any development whether residential, commercial or industrial need to set
some amount of money toward public art- architectural design elements that will be
available for all the people to enjoy. Local artists should be considered for these
projects which can be anything from street furniture (benches, kiosks, trash cans) to
lighting standards, tree grates and supports and interpretive signage. In I-53 on a
Gateway entrance to Point Molate, please again consider the use of artists to make a
big impact.

## Education.

The presence of artist and cultural facilities like galleries and museums is also a great
educational tool for kindergarten through adult education.

Training program like Youth Build could be use to do some of the renovations on the
buildings and to build interpretive exhibits.

## Economic Impact and Jobs

The art commission is quite confident there is more than just a small subset of artist
willing to live at Point Molate and would be willing to do a survey to find out how many

people would get on a waiting list to rent/ease buy out at Point Molate. Many artists
have production facilities to make jewelry, ceramics, fabric items etc. Incentives to train
and hire locally could come in reduced rent. Many computer software and imaging
companies like Industrial light and Magic and Pixar are looking for artistic types to hire.
There are several successful models through out the country that combine working
with youth at risk in vocational and arts settings. I would be glad to meet with
representatives of the city and talk about these further.

What better training than a world class art center at Point Molate? Public Benefit
conveyance could help get things started.

Early Reuse

In the criteria for Early use several things were stressed— maximizes public access
promotion. economic activity and vocational job training at a minimal cost. The arts
provide all of those and more.

In conclusion the Arts and Culture Commission urge the Point Molate Commission to
consider further and more seriously how the arts have already impacted Richmond
and how much more that can do to make Richmond a World Class city on the Bay.

Leslie Comnes
3200 South Ridge Drive
Richmond, CA 94806
510-222-8613

February 3, 1997

Point Molate Local Reuse Authority
2600 Barrett Ave.
Richmond, CA 94804

I am very excited about the draft plan for the reuse of the Point Molate Navy Fuel Depot. I am
pleased with the primary criterion being preservation of open space and visual quality.

However, I am concerned about four things that I would urge you to consider in the final plan.

> 1. The plan needs to have the preparation of an Environmental Impact Statement as a
> required milestone.

> 2. The plan needs to include a vegetation management plan that would work to protect
> or restore the plant communities in the hillside open spaces.

> 3. The housing portion of the plan needs to include viable transit from the beginning--
> not "at some point in the future."

> 4. I think the berthing of a Victory ship would take away from the "open space and
> visual quality" of the area, and would have high maintenance costs. I am opposed to
> this idea.

Thank you for taking on the difficult task of planning for this site. As a resident of Richmond,
I am pleased at the possibility of our acquiring this attractive piece of SF Bay shoreline.


Sincerely,

Leslie Comnes

Leslie Comnes

February 6, 1997

Ms. Pat Jones
City Manager's Office
City of Richmond
Local Reuse Authority
City Hall
2600 Barrett Avenue
Richmond, California 94804

Dear Ms. Jones:

I am writing to state that OrchidNet endorses, and is very excited about, the BRAC and Brady Associates plan for Point Molate.

OrchidNet had been making plans for a tourist/public outreach indoor garden and micropropagation facility at the twin Quonset huts at the south end of the property. Despite much higher renovation costs, the Steam Generation building coupled with an office and training space in housing unit #31 would be very well suited to what we have planned. We also feel that our facility will mesh well with a conference center and ideally with another tourist attraction/vintner.

We also encourage the maintenance of large areas of open space which will maintain the unique character and appeal of Point Molate. OrchidNet will endeavor to help turn this Richmond treasure into a destination known throughout the Bay and beyond.

Sincerely,

Jonathan Driller,
Executive Director

2/1/97

Point Molate Local Reuse Authority,

I would like to make some suggestions concerning the Point Molate Navy Fuel Depot. I would like to see the plan contain an Environmental Impact/Statement Review. This would contain a habitat survey, a wetlands delineation that would identify the presence of rare/endangered species as well as native plant communities.

The plan also needs a vegetation management plan that would access loss of native plants to coyote brush, pampas grass, and eucalyptus. Native plant restoration should be considered.

Transportation needs and housing and services need to be addressed immediately in order to not have sole reliance on cars.

I would like to see the pier without a Victory ship. Natural views and land/seascapes are preferable to a ship with attendent maintenance costs that could drain funds from open space and park requirements.

Thank you,
Don Durant
356 5th Ave.
S.F. Ca 94118

# Sharon Y. Fuller

1268 Greenway Drive, Richmond, California 94803 (510) 232-6594 email:
syfuller@igc.apc.org

January 28, 1997

Pat Jones
City Hall
2600 Barrett Avenue
Richmond, California 94804

RE: Point Molate Reuse Plan

Dear Ms. Jones:

I am writing in response to the January 16th article in the *West County Times* regarding the reuse proposal for the Point Molate area. I am extremely concerned about placing residences and recreation areas in locations that have potentially high levels of toxins as a result of former Navy activities and also for being in such close proximity to the Chevron refinery. Consideration of economic benefits are fine, but I feel we must not loose sight of environmental and health issues.

Therefore, I am interested in knowing if an environmental impact report has been prepared in addition to the 275 page reuse plan. If so, does it consider the impacts to residents should, for example, an explosion occur at the refinery? Does is also address air, soil and water quality in the area?

I look forward to hearing from you.

Sincerely,

Sharon Fuller
Resident

c: Mayor Corbin

January 29, 1997

Patricia M. Jones
Point Molate Bay Reuse Advisory Commission
2600 Barrett Avenue
Richmond, CA 94804

Re: Comments on Point Molate Reuse Plan

Dear Ms. Jones:

The Point Molate Reuse Plan is an impressive document. Brady and Associates, in a very short period of time, gathered great quantities of information and packaged it in a readable and accessible document. I wish we had such a document with which to begin the planning process, because it outlines so clearly those issues which require further inquiry.

The Plan contained within the document, however, is unrealistic and premature. If this Plan is to be a framework for zoning and other land-use decisions regarding the Point San Pablo Peninsula, and if adoption of this Plan means that City staff and the Marketing and Economic Development Committee of the BRAC will be asked to invest time and effort in making the Plan a reality, then the Plan should not be adopted without further research.

The Plan does not adequately address the risks of locating residences adjacent to the Chevron refinery and to other industrial users of the Peninsula. The practicality of the land-use recommendations remain a mystery, because the costs of transportation and utility improvements necessary to accommodate the intended development are unknown. The Plan does not seriously consider alternative uses which deserve a look. Specifically:

    1. Nowhere does the Plan discuss whether it is appropriate to place residential development adjacent to the Chevron refinery and near other industrial users of the Point San Pablo Peninsula. I understand that the consultants and staff have dispensed in oral reports with such concerns by noting that prevailing winds blow from offshore. I am not at all comfortable that favorable prevailing winds resolves all concerns about whether homes should be so near an oil refinery:

        a. Not all toxins or other noxious emissions from an oil refinery are necessarily airborne. The Plan, thus, should consider whether residents of Point Molate face risks from spills, seepage, noise and whatever other hazards might emanate from the refinery.

b. Although I am no scientist, it seems to me that "prevailing," as in "prevailing winds," implies only that the wind **usually** blows in that direction. The Plan should address the probability of unusual winds blowing in other than the prevailing direction and the risks posed thereby.

c. Chevron has been, compared to other local refineries, relatively free of serious industrial accidents. Nevertheless, the Plan should consider the dangers from an industrial accident on the ridge above the residences.

2. Development of the site, especially residential development, cannot be accomplished without the construction of significant improvements to the infrastructure, including, better road access. The Plan notes that the scope and costs of these necessary improvements are unknown, and recommends further study. Such further study should, indeed, be done, but no conclusions regarding the use of the land should be drawn until the information is available.

I sense, in the Plan, a hope that the prospective profits from residential development will attract a developer who will construct the infrastructure improvements at little or no cost to the City. However, it is possible that the costs of such improvements will exceed any reasonable estimates of profits from the proposed development. If so, then any effort to interest a developer in the site will be futile. In the meantime, a great deal of time, money and effort will have been wasted, other opportunities may have been lost, and irreversible decisions may have been made. Certainly, we should have some better idea of the practicality of the Plan before we invest in it.

3. The authors of the Plan considered only three alternative uses for Point Molate: (1) a meeting center; (2) a business incubator with office/light industrial/warehouse or live/work component; and (3) residential development. Although those uses would be most consistent with the desires of the City as expressed by the LRA and the BRAC, the exclusion of less palatable but perhaps more practical alternatives disserves the planning process.

One alternative not discussed is the possibility that Point Molate could be used with little or no development. While such use would not meet the City's hope that the property could contribute jobs and economic development, it might fulfill other desires at considerably less cost. For example, it might be possible to develop the conference center idea, alone, which, if sufficiently modest, would not require the level of infrastructure improvement residential development would require. I understand that without the residential component, it might not be possible to construct infrastructure improvements, but the Plan does not appear to consider whether the level of such improvements necessary for the less intensive development might be possible without the lure of profits from the residential component.

Another possibility would be to make the entire area a park, which would preserve a beautiful area of natural and historical interest. In addition, the City might be able to

attract partners, such as the East Bay Regional Parks, to assist in the construction of those improvements necessary to make the land into a park.

A second alternative is the use of Point Molate for heavy industrial purposes. It would be a shame for such a beautiful piece of land to remain inaccessible to the public and to face the potential damage heavy industry can do. On the other hand, heavy industry does bring jobs and tax revenues, and such use would be entirely consistent with other uses already being made of the Point San Pablo Peninsula. The BRAC voted against considering such use, but did so in a vacuum, without any information on the relative practicality of alternatives and the potential benefits of industrial use.

In short, the Plan is the document with which the base closure planning process should have started, but it is not a satisfactory conclusion. Had the Marketing and Economic Development Committee had this information months ago, for example, I am confident that we could have gathered some of the information which, missing from the Plan, tantalizes us. As it is, too much remains unknown for this Plan to be the basis of any concrete action.

Very truly yours,

Joshua Genser

## Don Gosney
929 Lassen Street
Richmond. California 94805-1030
(510) 233-2060

# COMMENTS AND OVERVIEW
# POINT MOLATE DRAFT REUSE PLAN

The following comments are on potential reuses of the Point Molate Naval Fuel Depot and a review of the Draft Reuse Plan submitted by Brady and Associates. On the whole, and in general, their proposal was well thought out, innovative and professionally prepared so rather than use up paper commenting on areas of agreement, it shall be assumed that the proposal is acceptable unless otherwise noted.

Before commenting on specific items in the proposal, I will expound on a few topics of my own:

## RESIDENTIAL

Residential use of the facility is, I believe, the key to the success of the reuse plan. Because of the remoteness of the facility and the almost complete lack of usable infrastructure, the city needs to establish and maintain a substantial residential community. Because any new developer would need to bring in new water, electrical, communication and sewer systems, the cost can be prohibitive if we expect only a few developers to absorb the costs. Unless the city can expect full occupancy almost immediately, it means that either the developers or the city would have to carry the costs of these infrastructure upgrades until the developers can lease out their properties to paying customers. If the Navy's time consuming cleanup and transfer process are factored in with the slow process of bringing in clients to a new development, its very likely that the cost of a new infrastructure to a developer or the city would make the project cost prohibitive.

By establishing a heavy residential presence up front, a large part of the initial infrastructure costs could be absorbed by the residential development.

Another factor to consider is that with commercial use of the facility, the city will, most likely, try to maintain ownership of the property and lease it to developers or other clients. This might bring in a slow and steady income once the project is fully engaged, but the sale of parcels for residential use brings in immediate cash that can be used by the city to augment their funding requirements. It also brings in tax revenue almost immediately.

One of the great beauties of Pt. Molate is the area west of Western Drive and I would advocate the maintenance of this area as natural open space as much as possible. Since this contradicts some of the proposed plans for residential use, the city may need to consider other options. The flat area in the Southern Development Area (Drum Storage Area #2) would be ideal for a large high density residential complex aimed at higher end users. With few prospects for the hillside area to the east, this would allow the complex to reach an acceptable three to five stories with a minimum impact. The view from this area would make these units very desirable. Its also far enough away from what may end up being light industrial development so there will be less of a clash between those that live and those that

# POINT MOLATE REUSE PLAN OVERVIEW

work in the area.

There is also a wonderful area where the maintenance and storage sheds are located in that part of the Northern Development Area east of Western Drive. Again, its already relatively flat and surrounded by trees, hillsides and historic buildings. It should be possible to allow three or four story complexes in this area without significantly detracting from the vista views.

With both of these residential areas, a computer mock-up of the surrounding views could indicate how large the complexes could be before they became a disruption.

Instead of the 500+ proposed units, my thoughts were running four to six times that number (keeping in mind that this is an arbitrary number based only on desire rather than empirical facts).

No matter how many units are built, however, they will need some version of a social infrastructure of their own and the number of residents needed to justify these businesses cannot be maintained with only 500+ units. Whether its a snack shop, convenience store, gas station or a Starbuck's, 500+ residential units won't be large enough to sustain their business.

The larger the native presence, the more secure the residents and businesses will feel. A 24 hr per day presence is quite intimidating to any criminal element that might have aspirations of picking the area clean or spraying their colors on every wall.

## VISTA RESTAURANT

No matter how spectacular the view is from the shoreline, the ridgeline view is even better. With reastaurants in secenic areas, the better the view they have to offer, the more successful they can become. I would suggest that the city set up a restaurant high up on the hillside above the Northern Development Area that would have a vista view of the entire bay area. Make it have a patio area so patrons can enjoy the fine weather Richmond has to offer. Classy lunches and elegant dinners can be successful and many of the trails can terminate there so walkers, joggers, bikers and hikers can enjoy the benefits at the end of the rainbow.

## PIER

Public access piers are a major asset to any beachfront property. Pt. Molate's, though, is encumbered with the remnants of its former industrial use. The salt air from the bay is highly corrosive to ferrous materials on the pier requiring high maintenance just to sustain them. Any work over the waters of the bay requires special procedures and permits that can triple or quadruple the costs to perform the same work over dry land. The city should not expect to be able to use the vapor recovery system and loading arms at the ends of the wharf so the city should make them disappear. Using my construction and piping background as a foundation for my opinion, I cannot stress this point hard enough: <u>get rid of the pipes as soon as possible.</u>

Some thought has been made about small pleasure craft using the pier but boating charts indicate that the depth of the waters between the wharf and the shoreline range from three to nine feet and vary wildly. Unless the city consider's expensive and ecologically sensitive dredging, they may need to reconsider this proposal.

# POINT MOLATE REUSE PLAN OVERVIEW

## HISTORIC SITES

The city needs to closely re-examine their priorities with regards to Historic Sites. It will, and should be, a difficult process balancing the desires for preservation of old things with the need to accept their demise. Some of the area currently listed in the Historic Register have little historic or architectural value but they happen to be old so there's been a desire to keep them. Since this isn't always practical, if they offer little in value as an historic site, then it may be necessary to consider alternative uses for them. Furthermore, the city cannot ignore the costs they may have to absorb to maintain these historic sites.

## OVERVIEW OF REUSE PLAN

PAGE I-2:    Too much emphasis has been placed on the results of an informal conceptual workshop held on November 18, 1995, long before the BRAC members became educated about the facility or the influences that might determine the possible reuses. Using this workshop as a foundation is like forcing a grown man to become a fireman just because he wanted to be one when he was still a child. Too many items brought out at that workshop were "wish list" items that might not have been given quite as much merit had they been more thoroughly thought out at the time.

PAGE I-2:    Suggesting that Chevron only stores and transports petroleum products is like stating that Diablo Canyon only creates electricity. There's a little more to it than this. Chevron's main function at this site is to **process** petroleum products. The significant difference here is that the safety factor associated with processing the products is incrementally higher than just storing or transporting them. Failure to clearly indicate the true nature of Chevron's activities would be misleading.

PAGE I-5:    The mention of the rifle and pistol range might be misleading without clarifying it to state that it is a seldom used facility that may only be used by Chevron employees.

PAGE I-5:    Although the Pt. Molate sight is visible from eastern Marin County, the sight is fully three and a half miles from the eastern shores of Marin County. This is not a populated area frequented by persons that might be viewing the Pt. Molate site. It is likely that most of the improvements or changes to the facility would be virtually imperceptible or important to viewers in Marin County.

PAGE I-7:    It's important to clarify that the "dozens of large concrete fuel tanks" were installed and remain underground. Also, the quantity of tanks is finite and the exact number should be listed. The use of the word "dozens" indicates any number between 24 tanks and millions with only the reader to judge just how many are being referred to. In various reports from the Navy, they've claimed to have 26 miles of pipelines rather than the 17 miles stated here. Which is correct is truly unknown but should be verified for accuracy. It would also be helpful to state the capacity of the tanks in a term more commonly used by persons outside of the oil industry; that is to say that the capacity of 1.1 million barrels is also 46 million gallons.

PAGE I-7:    When the claim is made that "no other buildings are occupied or operational", does this mean that they are not in operation or that it is not possible for them to be put in operation?

PAGE I-8:    Along with Table 1, which lists the existing buildings at Pt. Molate and their varying sizes and conditions, it would be helpful to include a map of the site at this point

clearly showing the buildings and their building numbers. This map should <u>not</u> confuse the issue by including too many items not related to the buildings.

<u>PAGE I-9:</u>   With regards to Table 1's reference to Buildings 132, 111, 55, 65, 67, 80 and 81, stating that the size is unknown is unacceptable. Determination of their size is too easy and too important to ignore. The reference to the sizes of Bldgs 31-60 should not be grouped together with a size variance from 820 to 2097 sq ft. This might mislead a reader into thinking that most of the buildings were closer to the 2100 sq ft variety rather than the opposite. When precise information is available or easily attainable, present that information. By stating that easily attainable information is "unknown" this presents the appearance that the people compiling the data and this report should not be relied upon for accurate information. We know this not to be the case so we need to assure the readers of that.

<u>PAGE I-10:</u>   It would be inaccurate to infer that the public had been provided ample opportunity to work with the BRAC or the City with regards to the formulation of these plans. If there were public notifications about the BRAC meetings, they were difficult to spot and did not appear to be printed in the same section of the newspapers as other public meeting notices.

<u>PAGE I-10:</u>   References to the workshop held on November 18, 1996, indicate that this was the foundation used for this draft plan. The format of that workshop did not allow a free flow of information between the parties and stifled divergent opinions. Because the agenda was full, questions from the BRAC members during the presentations were cut off before they could be presented; there were no printed handouts of the presentations so the BRAC members had to rely solely on their memories with nothing to use as a reference guide; because the BRAC was broken into smaller groups to review and process information, viewpoints that might have been inconsistent with the majority of that small group were ignored rather than presented as a dissenting or alternative opinion. Also, during the presentation of the three proposals, it was stated that the BRAC members could cull the desired points from one proposal and insert them into the other proposals to customize a plan that might suit the committee but during the small group workshops this was not allowed. The rush to proceed prohibited a <u>full</u> review and discussion of the proposals.

<u>PAGE I-12:</u>   Limiting new development to areas previously developed and preserving the hillsides from further development seem to be inconsistent with each other. Since the hillsides were extensively developed by the Navy (e.g. tanks, pipelines, small arms range, refuse dump and roadways) it would seem that the entire hillside would be available for future development. Furthermore, I have no recollection that the BRAC ever came to a concrete conclusion or statement of policy that the hillsides would be preserved from future development. This would infer a total moratorium on any development in the hillsides and I believe this would be a mistake both to state this or to plan for this. (please refer back to the Residential and Vista Restaurant commentary on pages 1 and 2).

<u>PAGE I-12:</u>   With regards to MARKET DEMAND, the proposed choices offered the BRAC members were heavily influenced by the winery concept and viable alternatives did not appear to be a part of the equation. Had alternatives that excluded the winery concept been offered, it's very likely that the direction of this plan would be vastly different.

<u>PAGE I-13:</u>   It would be helpful to know who suggested the limitation of 16 units per acre. For instance, was this someone with a reputation that deserves reverence or was it a slow growth environmentalist? If the suggestion of "green housing" is going to be mentioned solely as a suggestion, then it's only fair to list the other suggestions that were made that might utilize other areas on the sight for residential (e.g. higher density residential).

# POINT MOLATE REUSE PLAN OVERVIEW

PAGE I-13: The possibility of a full scale winery might present drawbacks that might have been overlooked. The limited size of Western Drive and with unrestricted freeway access being from one direction only, trucking access would be limited. Transport trucks emit noxious odors and noise and diesel emissions are also a source of heavy particulate matter. As anyone who lives close to a freeway will testify, dirt and trucking debris from road traffic leaves an unhealthy mess on cars, window sills, table tops, clothing and even the air which passes through our lungs. If the grapes are crushed and/or fermented on the site, the odors emanating from such a process might be offensive to other potential users of the site. This might be especially true in the case of the residential users. While winery lovers might find the bouquet to be quite pleasant, others might just smell rotting fruit.

If the concept of a winery was accepted, I believe we would be remiss in arbitrarily excluding the possiblity of establishing a tasting room/restaurant up in the hills where a view of the entire bay would enhance the ambience. (Refer to: Vista Restaurant on Page 2)

PAGE I-14: With regards to the possibility of residency requirements being a condition for a business to set up shop, Richmond's history of residency requirements has not been as successful as they would lead their constituency to believe. These requirements rarely provide career opportunities to residents and usually provide short term low paying menial positions created simply to appease civic leaders. There are only a limited number of positions for grounds keepers, janitors, sucurity personnel or dishwashers. Abuses of these requirements have shown applicants to falsify residency to obtain a position and for others to move out of Richmond shortly after pocketing a paycheck or two. This system is also very unfair to residents of surrounding communities (San Pablo. North Richmond. El Sobrante, El Cerrito and even unincorporated areas close to the site) that still have a vested interest in the successful reuse of the facility. The system has also been abused to promote residents with a specific heritage and exclude those that might otherwise meet the residency requirements.

PAGE I-14: Are there four or are there five BRAC subcommittees? The Plan does not adequately respond to some of the findings of the subcommittees and, in particular, the reports of the Environment Subcommittee with regards to the plant life on the site which seems to have either been overlooked or disregarded.

PAGE I-18: The preservation of the site on the National Registry of Historic Places (NRHP) should be meticulously reviewed. While the preservation of an historic site should be paramount in our thoughts, what constitutes an historic site should be reviewed and reevaluated. Some of the buildings have limited value as an historic site and are hardly unique with the bungalows being but one example. Although they are old, their architecture is not much different than many dozens of homes scattered throughout the surrounding community. Directly across the street from my own home sits a building that was built during the same time period with similar style but has absolutely no protected status. The "garages" are nothing more than car ports or sheds that have as much architectural integrity as what many weekenders would construct in their own back yards. Many of the maintenance sheds also fall into this category. The point here is that the city needs to keep and preserve only those sites which do have historical significance and allow those that do not to be dealt with accordingly. Some of these buildings, quite plainly, may not fit into the city's plans as long as they remain historically protected.

No matter what plans are accepted for the reuse, some sort of a museum needs to be incorporated into the facility. This can provide a wealth of information, education and enjoyment and a missed opportunity like this would be a mistake.

PAGE I-20: The use of the facility as an active winery poses the problem that it would then become a moderate to heavy industrial facility and this would be in conflict with the rest of

# POINT MOLATE REUSE PLAN OVERVIEW

the goals of the Plan.

PAGE I-25:  Figures 8 and 9 show no fewer than 17 small water craft using the north and south coves on either side of the pier.  Boating charts indicate that the water depth in these areas range from three to nine feet with great variances in the depth.  If the city wants readers to believe that this will be a possible use for small water craft, the city had better include some serious dredging in their plans.  If dredging is not a part of the plans, perhaps the city ought not try to fool readers with an artist's rendering of what's not going to happen.  Also, the location of the ampitheater takes out a bluff with some vegetation that should be preserved.  The ampitheater also faces into prevailing winds pitting the customer against the elements.  Perhaps a relocation would be in order.

PAGE I-29:  The use of Bldgs 31 and 10 for Orchidnet's use seems to conflict with their verbal request for the quonset hut at the south end of the facility.  Is the city suggesting that they will only accept non-profit restaurants in the Winehaven building?  Isn't this what got the city in so much trouble at the Marina?  Aren't restaurants supposed to make a profit?  The use of any of the Pt. Molate facilities by the Richmond Rescue Mission should be closely scrutinized and evaluated.  Although the Rescue Mission has wonderfully filled a void in the city's social services and provides the community with a warm sense of humanity, they were explicit in their presentation to the BRAC that religious indoctrination was an integral part of their operation.  As a government entity that is supposed to be free from any religious ties, the city cannot condone the use of their facilities by a non-profit organization if it forces any sort of religious indoctrination upon their employees, volunteers or even the recipients of their goodwill.  By doing so, the city would become a partner in this enterprise and violate their Constitutional rights to freedom of religion and would be open to the demands for equal space and opportunities by every other known or unknown religion, cult or sect.  It has been suggested that this is something that can be worked out later but I believe that because the Rescue Mission is such an important part of the city, this should be worked out now so the city can adequately put their needs into the plan.

PAGE I-32:  If Building 6 is in "good to fair" condition, why is the plan advocating its demolition?  The statements of the plan need to be consistent.  Even though the structural engineers have stated that the cost to repair the building may exceed the value of the building, before any decisions should be made, the numbers should be crunched to make a quantitative evaluation.  Although the cost of repairs may be high, the city should not discount the costs of demolition and the possibility of replacing the structure.

PAGE I-32:  If the alteration of the boundaries of the Historic District were logical, then this would be a universal truth.  As there is still some dissension and disagreement with regards to this action, perhaps the alterations aren't quite as logical as they appear to be.  Perhaps we can agree that "a" revision to the boundary is logical but not necessarily "this" revision.

PAGE I-33:  To suggest that the bungalows all have lawns is misleading.  What they have is greenery.  Because the site has been abandoned for a prolonged period, the old lawns have become overgrown.  If the site were under the legal jurisdiction of the city at this time, it is highly likely that the city would demand weed abatement within 14 days.

PAGE I-33:  While the bungalows are relatively small, suggesting that they are less suited to long-term residential use seems insulting to the thousands of residents of the city living in similar housing from generation to generation.  As these were built as residences, consideration of their usage for anything but residential (long or short term use) seems inappropriate.

# POINT MOLATE REUSE PLAN OVERVIEW

PAGE I-36: The suggestion that the Winehaven building is "most suitable" as a "winery" indicates that this is the "best" possible use for the building. Perhaps it might be more prudent to suggest that the building is "very" suitable as a winery. This might allow readers to think that there are other uses for the building's attributes that might not have been considered by the plan drafters.

PAGE I-37: Once again, the suggestion has been made that Orchidnet make use of the steam generating building and the refrigeration building rather than the quonset hut that they requested as being "ideal" for their uses. If the city considers the possibility of maintaining the firehouse as a fire station, does this suggest that the city will allocate the resources to man it with fire fighters? This may come as a surprise to many neighborhoods that believe themselves to be understaffed with regards to fire protection and may be the inspiration for dissent if a "small" new community gets preferential services over long standing neighborhoods that have paid for services without receiving as complete a benefit as they feel they deserve.

PAGE I-37: Keeping eucalyptus trees solely because they were planted by the winery workers is insufficient reason. As a non-native tree to this area, their value is limited. Eucalyptus trees can be aesthetically pleasing but thier inherent fire danger should be cause for reconsideration. If Chevron were to be polled on the subject, considering that their storage tanks are on the downwind side of these trees, their elimination or reduction might be worth evaluating.

PAGE I-38: The modifications to the Winehaven building to meet current standards will be expensive. Just the inclusion of an elevator for disabled persons should stagger the imagination. It should not be assumed that the elevators that are already in place will suffice towards this end as these are freight elevators and do not even come close to meeting today's standards for hauling people.

PAGE I-40: I do not agree with the concept of the possible light industrial use of the space between Building 6 and the waterfront. You just don't take the most prime pieces of scenic land and use it for light industry.

PAGE I-42: SOUTHERN DEVELOPMENT AREA...I don't understand the statement that this area is the last area that can be developed. Is it physically impossible to develop this area sooner or has some legislation been passed making this so or is it just a recommendation that this area be left for last. With the low amount of cleanup necessary to make this area developable, I would think that an effort should be made to make it available. With the right type of development, revenue can start to come in and it can be used as a showpiece to demonstrate to other developers what can be done.

PAGE I-43: The quonset hut described in the third paragraph was used mostly as a railroad car repair facility. Under the possibility of allowed uses for the area west of Western Drive, I believe this area should be preserved as much as possible as a wilderness area to be used as a type of park. Furthermore, the old waste disposal site referred to in the last paragraph may not be clean enough in our lifetimes for possible reuse by humans. It would be great if it is cleaned but the city's plans should consider this area as a hole in the earth that no one shall ever be allowed to enter.

PAGE I-47: The suggestion is being made in the last paragraph about using the tanks near the Historic District and Northern Development Area for group camping. Are we talking about the tanks themselves or the tank sites? Also, the possible use of these sites for agricultural use seems unlikely. Not only are the sights relatively small for orchards, tree farms or vineyards, the soil is not known for being particularly fertile.

# POINT MOLATE REUSE PLAN OVERVIEW

<u>PAGE I-50:</u>  The pipes mentioned in the second paragraph would require ongoing maintenance.  With continuing corrosion due to the salt air there would be serious negative ramifications to keeping the pipes intact.  Also, it's nearly impossible to completely clean the pipes and if they should corrode through, there would be a potential for unwanted disasters.  <u>If at all possible, all pipes should be removed.</u>

<u>PAGE I-50:</u>  No mention of berthing the SS Red Oak Victory ship has ever been mentioned at a BRAC meeting.  Outside of rumors and newspaper articles, there has been no consideration by the Committee to berthing this ship here.  If there is a possibility of this happening, it would have a serious impact on the plans for the facility and the BRAC should be approached by some responsible party to provide them with some details.  Having a military cargo ship permanently docked out in the front yard might alter the view for most of the people using the facility.

<u>PAGE I-51:</u>  As stated earlier, remove all pipes--especially those on the pier.  Maintenance of pipes over the bay is a <u>very</u> expensive proposition and these pipes are very old and the salt air has certainly taken its toll on them.  Also, since the vapor recovery system at the end of the pier no longer has a use and is unsightly, make it disappear.

<u>PAGE I-52:</u>  The pedestrian/Bicycle route referred to in the last paragraph should be far enough off of the road so the risk of being struck by the ever present speeding vehicles might be minimized.

<u>PAGE I-53:</u>  "Palm tree plantations" at the entrance might have a particularly fine historical look to them.  The Navy has always been fond of planting trees indigenous to the South Pacific at their bases all over the world.  While this might not remind people of the old Winehaven days it should certainly remind them of the Navy's presence.

<u>PAGE I-53:</u>  When discussing the traffic on Western Drive, the possibility of Wickland Oil's proposed oil terminal at the north end of Western Drive should not be ignored.  Not only might there be significantly more traffic but it most likely will be heavy industrial traffic.

<u>PAGE I-54:</u>  When planning for a special private shuttle to and from the Bart station, the city needs to consider the preferences of the people they are trying to attract.  Many of these people have little faith in the guarantee of their safety at the Richmond Bart station so a shuttle to the El Cerrito stations might be a better attraction.

<u>PAGE I-55:</u>  Reports received from the Navy have indicated that the fire protection system in the hills will not hold pressure and the Navy did not even charge up the system for fear of washing down the hillsides.  It might be safe to assume that the system will have to be replaced in its entirety.

<u>PAGE I-57:</u>  The Sanitary Sewer System was never designed for the number of people the facility is hoping to attract.  The system should either be enlarged or, preferably, shut down and replaced with a hook-up into the city's existing facility.

<u>PAGE I-58:</u>  Everyone seems to agree that the electrical system has numerous transformers containing PCB's but no one seems to know who will be responsible for removing them from the sight.  If the city takes on this responsibility, this should be a high priority and completed before developers are allowed near the sight.  Elimination of the safety problem is always preferred over reacting to the lawsuit.

<u>PAGE I-63:</u>  The community has a moral imperative to take care of those less fortunate than ourselves but this is not the place to do it.  Housing the indigent at this site would be a

disservice to them and others that might occupy the sight. Access to the sight is so remote that the homeless might have a place to sleep but would be completely cut off from any other social services. There would be no access to food services, health care, schooling, employment opportunities or government supplied social services. The city and county have facilities closer to these services that might be better suited to serve the needs of the homeless. The homeless might be better served by job training and job opportunities that might be made available at the site.

PAGE I-64: The option of leasing property versus the transfer of the property through a public benefit conveyance is discussed heavily on this page. The city should resist all attempts to relinquish control of the land and buildings on this facility. The only time they should even consider this is when residential property is concerned. If the city expects to maintain the caliber of the occupants or the type of businesses set up, they need to retain ownership.

PAGE I-68: Included in the additional investigations to be considered would be a complete investigation and plan for the pipes and tanks throughout the facility. A plan must be in effect before the property is transferred to ensure that the city will not be stuck with a megamillion dollar mess some years in the future.

PAGE I-69: There have been numerous references to excessive lead in the drinking water. The source of this lead must be determined if it is to be remediated. The most likely sources would either be lead pipes, lead based solder or lead and oakum in the joints of cast iron pipes.

PAGE I-69: There is a dangerous assumption in the second paragraph when it is assumed that "the Navy will be responsible for asbestos and lead remediation." This must be an area that the city should stay on top of and never let up.

PAGE I-70: An assessment of the communication needs must include an evaluation of the potential cable supplier. Considering the negative reputation that TCI Cable has promoted recently, any suggestion that they may be the carrier may doom the facility to unoccupancy.

PAGE I-71: As it stands now, early reuse may be restricted to those IR sites already identified and under remediation. There are other sites that may have minimal environmental damage but have not yet been assigned an IR status and been put on the schedule for cleanup. Drum Storage Area #2 in the Southern Development Area should require minimal cleanup for reuse and is a large plot of relatively flat land ideal for initial reuse. If the city opens their minds to other opportunities, they can see this facility start to take shape in our lifetimes.

PAGE I-72: Orchidnet's prized Quonset hut is referred to once again in the third paragraph on the page. I think they want to use it. Maybe the city should consider it. Also, the EBS has been final since November of 1996 so it can be used instead of the EBS Draft. Furthermore, the Base Cleanup Plan was available in November but the EBS Draft was available 2½ months earlier. The chronology in the last paragraph should reflect this.

PAGE I-76: To those readers that may not be too savvy to big business, perhaps the 20% investment tax credit in the third paragraph can be explained.

PAGE I-80: When reading a list of building numbers slated for demolition, once again a map showing their locations would be helpful. Readers should not required to forage through a 200+ page document to find a map. Figure 1-2 (Parcel Delineations) in the EBS

# POINT MOLATE REUSE PLAN OVERVIEW

does a pretty good job of showing the locations and numbers of the buildings. Figure 4-2 (Topographic Map) is another excellent example.

PAGE I-83: In Table 3, an explanation of the McKinney Act Screening process would help those of us less versed in these matters. Also, this chart appears to be incomplete as it stops right at the beginning of the heading "INFRASTRUCTURE IMPROVEMENTS". Is there more?

PAGE II-1: The third paragraph suggests an unnatural tie with Oakland. This is the same mistake that our legislators made when they forced Richmond to accept State Assembly members from Oakland because of these alleged ties. The assumption was that all minority regions should be bunched together but Richmond has a character and flavor all her own and should not be associated with Oakland.

PAGE II-6: The second paragraph alludes to the DOD retaining ownership throught the year 2001. Is this correct? Has the BRAC been misled into thinking that they might be able to act on this property in the near future?

PAGE II-28: Section "B" discusses seven areas on the site and refers to them by number. Once again, a map might help the reader understand exactly what area is being discussed.

PAGE II-31: The first paragraph of Section 4 refers to Winehaven having 31,740 square feet. Is this the footprint it leaves? If so, it needs to be explained so as not to confuse the reader who has read so many other times that Winehaven has 198,865 square feet.

PAGE III-11: With regards to the BCDC in paragraph two: what control do they have over development on shore? How far from the shoreline do they retain jurisdiction?

PAGE III-16: Richmond's negative perception problem will be a major factor in the success of the reuse of the facility. Despite the best efforts of the Chamber of Commerce and civic leaders, most people think that Richmond breeds only gang members that don't attend schools that are no longer open and that simply driving through the town is a risky venture. Business owners are more than reluctant to open up shop because of the perceived gang activity and the perception that no one in town has money to spend in their shops. Most people believe that where there's graffiti there must also be gangs, drugs and the criminal element that associates with them. Richmond is beginning to rival South Central LA and Long Beach for the intensity of their grafitti and the failure of the local constabulary to control it. Cal/Trans' recent erection of soundwalls and the immediate application of grafitti along the I-80 corridor has only amplified this negative perception. The freeways are the gateways to Richmond and this city has lost control of them. Unless the city can convince people that Pt. Molate is really just an eastern subdivision of Marin County, they may have a difficult time attracting high end users and even high end visitors.

PAGE III-17: The first paragraph refers to a 20 to 25 percent rental rate in Brickyard Landing. If the reader does not play the real estate market, should he assume that this is a high, low, or normal rental rate?

APPENDIX A: The summary of the envisioning workshop held on November 18, 1995, should have a disclaimer placed on the cover page alerting the readers that this is an abridged version edited by the city staff to include what they believed to be important.

APPENDIX B: The maps contained in this appendix are of poor quality and thusly of limited value. The photocopying process was of poor quality making many of the finer details unreadable. Also, they are reductions from 11x17 originals that originally allowed the

small printing to be viewed with the unnassisted eye. Many of the maps were originally in color with varying parts of the maps color coded. The black and white reproduction process prints these different components in varying shades of gray but few readers are capable of differentiating between the different shades. Also, with some of the maps shading different parcels with different colors, when they are reproduced the shade of gray is so dark that it masks the writing underneath so the reader loses even more information. Since color copying is cost prohibitive, maps designed only for black and white reproduction should be used.



## CHARLES K. JACKSON, ASA
REAL PROPERTY RESEARCH
FAX, 510/526-7864

EIGHTEEN HIGHGATE ROAD
KENSINGTON. CA 94707-1141
510/524-8911

POST OFFICE BOX 393
BODEGA BAY, CA 94923-0393
707/875-2438

February 14, 1997

Point Molate Local Reuse Authority
2600 Barrett Avenue
Richmond CA 94804

Re: YES! For "Red Oak Victory" at Point Molate Pier

Dear Authority Members:

Except for the comments regarding the "Red Oak Victory," and as a member of Sierra Club, I endorse the recommendations of the West Contra Costa Group regarding reuse plans for Point Molate Navy Fuel Depot. Regarding "Alternate Transit," please make sure existing railroad rights-of-way and tracks are retained.

Regarding the "Red Oak Victory," at the end of the 1,450 foot pier, she will be a vital part of the natural seashore scenic view, rather than detracting from it.

As in the case of the restored Liberty Ship "Jeremiah O'Brien," San Francisco, and the restored Victory Ship "Lane Victory," Long Beach, the vessel restoration and maintenance costs are for the account of the volunteer restoration group, not the city, and will have no effect on the funding for open space and park areas.

As one of the volunteers, I write this not only because I was a WW2 employee at Kaiser Richmond Shipyard No. 2, and sailed as a radio officer during WW2 and the Korean "Police Action," but also because I belong to number of organizations many of whose members are now or shortly will be working on the project, i.e., American Legion Post 448;; American Merchant Marine Veterans Association, East Bay Mariners Chapter, Golden Gate Chapter, Jeremiah O'Brien Chapter; Gallups Island Radio Association; The East Bay Amateur Radio Club, Inc.; U.S.Maritime Service Veterans Association.

Cooperatively yours,

C.K.Jackson, ASA

Email: JacksonRPR@worldnet.att.net

cc  Lois Boyle, Richmond Museum Association
Debbie Landshoff, Sierra Club West Contra Costa Group





**EAST BAY**
**MUNICIPAL UTILITY DISTRICT**

MARILYN L. MILLER
DIRECTOR OF ENGINEERING AND CONSTRUCTION

February 14, 1997

Ms. Patricia M. Jones, Project Manager
Office of the City Manager
City of Richmond
2600 Barrett Avenue
Richmond, CA 94804

SUBJECT: Point Molate Reuse Plan, Richmond

Dear Ms. Jones:

Thank you for the opportunity to comment on the subject environmental document. The District has the following comments regarding water service to the project site.

On page I-14, for the Winehaven building, the projected large amounts of water required by the winery operations should be quantified. This comment also applies to the bullet for "Winery Infrastructure Requirements" on page III-38.

On page I-55, a. Water Supply, third paragraph, the District is not planning to replace the Richmond Reservoir. The District is planning to replace Potrero and Nichol Knob Reservoirs. The Nichol Knob Reservoir, located on Nichol Knob, is near the Richmond Reservoir, which may be the cause of the confusion. The six-inch pipe is to be replaced with 12-inch pipe, not eight-inch pipe. Refer to page II-8, fourth paragraph for the correct information.

On page I-55, a. Water Supply, a distinction must be made in this section of the Reuse Plan to differentiate between the EBMUD water system and the private water system that is owned and operated by the Navy. Comments regarding one water system can be confused with the other water system. This section should be split such that discussion about the EBMUD water system is separate from the Navy's water system. This comment also applies to page II-8. The District's water system is not continuously leaking and lead levels are not above EPA standards. These comments apparently apply to the Navy's private water system, though the District does not have firsthand knowledge of this as being true about the Navy's water system.

On page I-55, a. Water Supply, many of the recommended evaluations may not be valid. These recommendations assume that the Navy's private water system will continue to be used, which may not be the case. Continued use of the private water system after the Navy conveys ownership of the property is an important issue that needs to be discussed between us at the earliest opportunity. Comments regarding reviewing the water system for compliance with City (of Richmond) standards as to reusability may not be appropriate. EBMUD is the regional water provider for the area and EBMUD standards should be the criteria used for reusability.

W:\WDPD\WWMCG\PTMOLATE.EIR

Ms. Patricia Jones
February 14, 1997
Page 2

Page I-55, a. <u>Water Supply</u>, the District's Central Pressure Zone, of which Richmond and Potrero Reservoirs are a part, serves properties up to elevation 100 feet. The District's pipeline in Western Drive is in the Central Pressure Zone. To serve those portions of the site above 100 feet will likely require the construction of a new reservoir and a new pumping plant. Because of the large size and high elevation of the Navy's existing fire water storage reservoir relative to possible project demands for the area above elevation 100 feet, use of the Navy's reservoir as a District reservoir may not be possible or feasible.

Page I-69, sixth paragraph, more information is needed about water service demands, including fire flow requirements before the District could reevaluate the capacity of Potrero Reservoir. Please provide the anticipated water service demands so that the District can determine the impact to the storage requirements and the overall impact of the project on the District's finite water supply.

Page II-8, fourth paragraph, if the fire flow requirements are greater than 1,000 gallons per minute, the current fire flow standard set by the Richmond Fire Department, pipeline improvements at applicant expense may be required beyond those soon to be constructed by the District.

Page II-8, sixth paragraph, bid opening for installation of the pipeline replacement was January 29, 1997.

To help mitigate the impacts of additional water demands on the District's finite water supply, the District recommends that water conservation measures for both internal and external use be incorporated in the design and construction of the proposed project. The District encourages the use of equipment, devices, and methodology that furthers water conservation and provides for long term efficient water use. The District also recommends the use of drought resistant plants, use of inert materials, and minimal use of turf areas. The project sponsor should contact the District's Manager of Water Conservation at (510) 287-0591 for more information.

If you have any questions, or if the District can be of further assistance, please contact Prab M. Jog, Senior Civil Engineer, Water Service Planning at (510) 287-1026.

Very truly yours,

William R. Kirkpatrick
Manager of Water Distribution Planning

WRK:WWMcG:djr

W:\WDPD\WWMCG\PTMOLATE.EIR

# Memorandum

**To:**   Blanche Jaggi

**From:**  Debbi Landsholf

**Date:**  December 30, 1996

**Re:**   CERO Meeting, October 8, 1996

---

This memo describes the discussion of the SS Red Oak that took place on October 8. I represented you as your alternate at that meeting.

The purpose of the meeting was to go over the CERO working paper prior to submitting it to the contractors. We discussed each of the points in detail.

The largest controversy was over section II.2. which recommended berthing the SS Red Oak victory ship at the existing dock. Several of the people at the meeting, including myself, expressed strong opposition to making such a recommendation. In addition to our opposition to the problems the ship would create, we noted that the proposed use of Point Molate Pier as a fishing pier with bait shop, commercial shops, restaurant, and tie-up dock could not co-exist with a large victory ship.

Rod Jones said that we didn't have enough people at the October 8 meeting to remove it from the list. There was some protest at this, since we felt that the group as a whole had only accepted this item as a starting point for discussions, and had never agreed to recommend it; in fact I believe there has been disagreement about it at almost every meeting since it was proposed.

Although Rod was not willing to remove the Red Oak from the list, he did agree to strengthen the note about how controversial the issue is. In addition, since we felt that there was a lot of background to this and other issues, we asked Rod to invite the contractor to the next CERO meeting so that we could express our concerns in person.

Unfortunately, I cannot find the final CERO paper. My recollection is that it more clearly stated CERO's position: the group did NOT recommend berthing the Red Oak although some members favored it. In addition, the final CERO paper DID include developing the pier for fishing, small craft tie-up and other uses not compatible with a victory ship.

Therefore, I was very surprised and upset to see the Red Oak listed as a recommendation in the Point Molate Land Use Concept Paper, with no recommendation for any other use of the pier. There were quite a few other organizational changes made in the final CERO paper that did not make it into the concept paper. Perhaps the contractors were given the wrong revision of the CERO file.



# Sierra Club

## West Contra Costa County Group

January 30, 1997

Point Molate Local Reuse Authority
2600 Barrett Avenue
Richmond, CA 94804

The West Contra Costa County Group of the Sierra Club has reviewed the draft Reuse Plan for the Point Molate Site. This letter contains our comments.

Sincerely,

Debbi Landshoff, Executive Committee Chair
6016 Orchard Avenue
Richmond, CA 94804

cc:
Fred Beddall, Sierra Club Bay Chapter
Blanche Jaggi, BRAC member
Mayor Rosemary Corbin
Brady and Associates

# Sierra Club Comments on Draft Point Molate Reuse Plan
January 28, 1997

### Preservation of Open Space and Visual Quality
We very strongly endorse this criterion for evaluating reuse alternatives. It should remain the primary criterion throughout the planning process. Given the time restraints, Brady and Associates has done an admirable job of creating a plan that preserves open space and visual quality. We are particularly pleased that the plan preserves so much land as open space and that it suggests design features that would make new construction blend well with the surroundings. There are changes that might be made to better achieve the goal of preserving open space and visual quality. Some of these changes are described below. In addition, we urge that this criterion be used throughout the reuse planning and implementation process.

### Environmental Impact
The plan should carefully consider the environmental impact of new construction, new activities in the current landscape, and site cleanup. Preparation of an EIS/EIR should be added to Phase I of the Phased Action Plan starting on page I-83. It is very likely that some of the planned developments will create serious problems; an early and thorough EIS/EIR will allow us to modify the plans in an orderly manner.

### Vegetation Management
The plan does not include a vegetation management plan. A good management plan is necessary to control fires and stop/reverse the encroachment of species such as eucalyptus, pampas grass, and coyote brush on the native coastal prairie grasslands. In addition, two items in the plan appear to contradict good vegetation management practices: excepting the eucalyptus trees from removal (Page I-37) and creating palm tree plantations on Western Drive (I-53 ).

### Mixed Use Village
The plan calls for residential construction, both to collect developers' fees that can pay for public developments and to increase safety by ensuring that people will be on-site twenty-four hours each day. We believe these are reasonable goals. However, to implement housing in a sustainable manner, the plan should mandate a truly mixed-use village with higher-density housing. The planned single-family and fairly low-density multifamily housing probably doesn't bring enough people into the area to support any sort of transit, so residents will be completely dependent on their cars. Because the housing plans do not include a retail component, people will have to get into their cars and drive out of the area for a cup of coffee or a bottle of milk. Increasing housing density and mixing some commercial space with the housing would help to correct these problems.

### SS Red Oak Victory Ship
This project should not be included in the reuse plan. Berthing the Red Oak at the pier contradicts the criteria of preservation of visual quality. This ship would block natural views from many points in Point Molate and from outside Point Molate. In addition, the high maintenance costs very likely will affect the City's ability to pay for maintenance of the open space and park areas.

### Transportation
Public transit should be moved out of the "Alternative Transit" category (page I-54). Good urban planning requires that public transit be an integral part of any transportation plan. Other transportation options, particularly bicycle and foot access to the site should be more clearly spelled out.

DATE:   Tuesday, February 11, 1997

TO:     Pat Jones

FROM:   Debbi Landshoff

RE:     CERO letter


Attached are the CERO comments. Please give me a call at 233-9733 to let me know it came in.

Thank you.

# Comments on January, 1997 Draft Point Molate Reuse Plan
## By CERO Subcommittee of Blue Ribbon Advisory Committee

### Housing

CERO has many concerns about the housing component of the plan. We would like to see a serious study both of the economic feasibility of private housing and of the desirability of placing housing so close to an industrial site (Chevron).

If housing is deemed to be feasible and desirable, CERO would like a careful study of what housing density is appropriate. Housing density guidelines should reflect the criteria on page I-10.

### Accelerate Development of Hillside Trails

We concur with point 12 of the Environmental Subcommittee's comments.

### Shoreline Park

The entire shoreline area to the west of Western Drive, with the exception of the historic district, should be a shoreline park.

The shoreline open space and trail area must extend all the way north and south, so that the Bay Trail can occupy this space. In particular, the "heliport" area should be accessible open space; although it can be used for helicopters in an emergency, its primary use is as part of the shoreline park.

### Remove All Pipes from Pier

We concur with point 14 of the Environmental Subcommittee's comments.

### Eliminate Palm Trees

We concur with point 19 of the Environmental Subcommittee's comments.

### SS Red Oak Victory Ship

There should be a detailed study of the economic risks posed by berthing the Red Oak in Point Molate. We also need to evaluate the compatibility of a Victory ship with the other uses planned for the site.

## COMMENTS REGARDING DRAFT PLAN OF POINT MOLATE

To: Patricia Jones
City Manager's Office
2600 Barrett Ave.
Richmond, CA 94804

There were nine major reuses proposed for Point Molate by the CERO subcommittee. One of the most important, and one that is most possible, was omitted from the draft plan, and that is the Victory ship given to the museum by Congress, for the City of Richmond.

That ship and its related uses could provide an immediate use. I hope that it will be included in the final plan going to Washington so we can have a maritime museum and monument for all to enjoy at Point Molate.

Very truly yours,

N. Rao
4724 Castilla Ave.
Richmond, CA 94804
(510)-235-1184

 **Chevron**

February 14, 1997

Chevron Products Company
Richmond Refinery
P. O. Box 1272
Richmond, CA 94802-0272

William D. Steelman
General Manager
(510) 242-4400

Ms. Patricia M. Jones
Pt. Molate Local Reuse Authority Staff
City Manager's Office, Richmond City Hall
2600 Barrett Avenue
Richmond, CA 94804

**Draft Pt. Molate Reuse Plan**
**Supplemental Comments**

Dear Ms. Jones:

The following comments supplement prior comments submitted to you by the Chevron
representative on the Pt. Molate Blue Ribbon Advisory Committee (BRAC), Ms. Marielle
Boortz, in letters dated January 30, 1997 and January 13, 1997. These supplemental comments
include this letter and two attachments: a summary of conflicts between the draft Reuse Plan and
the City of Richmond General Plan goals and policies, and a listing of comments by draft Reuse
Plan page number.

The BRAC's inability at their February 3, 1997 meeting to support the draft Pt. Molate Reuse
Plan without amendments raises serious concerns that the Plan's proposed residential
development is neither in the City of Richmond's short nor long-term interest. These concerns
are evidenced in the Plan's mischaracterization that Pt. Molate is surrounded by passive uses
associated with the storage and transportation of petroleum products, rather than those active and
intensive industrial uses associated with a major oil refinery. The Reuse Plan appears to
consistently ignore neighboring land uses which would constrain reuses at Pt. Molate. This
mischaracterization fundamentally flaws the Reuse Plan.

Adopting a Plan which, while not actively promoting residential development, conditionally
permits or encourages residential development does nothing more than perpetuate this
mischaracterization at the expense of lost opportunities to the City. The City, through decades of
land use planning, recognized long ago that residential uses are inappropriate for Pt. Molate and



Ms. Patricia M. Jones
February 14, 1997
Page 2

should now reaffirm these prior actions by eliminating residential uses (and other uses involving overnight stays) from the Reuse Plan.

To substantiate eliminating residential uses from the Plan, the City must look no further than its own General Plan and the statements made by experts assembled on the Developer's Panel which toured Pt. Molate on October 9, 1996.

The fact alone that neither the General Plan nor any zoning ordinances permits residential uses on the Pt. San Pablo Peninsula severely undermines the Reuse Plan's finding of compatibility between the General Plan and a proposed residential development. A review of essential elements of the General Plan reveals even more and can not be ignored. The depth and breadth of conflicts between the General Plan and the proposed residential uses are extensive and could only be rectified by re-engineering the entire General Plan. To assist in evaluating just some of these conflicts, we have prepared the attached summary of the conflicts between the Reuse Plan and the General Plan goals and policies.

The Developer Panel did not voice an unanimous and unconditional endorsement of residential use for Pt. Molate. Panelists' statements as recorded in the "Open Site Day" transcript provided by City staff, and recollections of two Chevron employees present for the Panel discussion, support this conclusion. Besides residential use, panelists suggested a variety of uses which the City could consider, including: conference center, open space, education, industrial, high tech, and research & development (transcript pages 3, 5, 7, 9). The Panel was also not confident that residential development could finance itself (transcript pages 11, 12, 14). Panelists noted that a large obstacle for residential use was the requirement for significant investment in new infrastructure and services which does not currently exist at Pt. Molate (transcript pages 11, 12). Further, panelists indicated that the compatability of Pt. Molate reuses with the neighboring Chevron Richmond Refinery needs to be considered (transcript pages 1, 4, 13).

In summary, Chevron strongly objects to the draft Pt. Molate Reuse Plan because it mischaracterizes the Pt. Molate setting by ignoring neighboring land uses, proposes uses (e.g., residential, camping, hotel, hillside trails) which are incompatible with uses surrounding the Pt. Molate site, and does not anticipate potential conflicts from possible expansion of existing industrial uses. The Reuse Plan must be modified to correct these deficiencies.

If you have any questions, please contact Ms. Marielle Boortz at 242-3585.

Sincerely,

W. D. Stehman

Attachments

Ms. Patricia M. Jones
February 14, 1997
Page 3


cc:     Mayor Rosemary M. Corbin, Chair and members of the Pt. Molate Local Reuse
            Authority
        Members, BRAC Marketing and Economic Development Subcommittee
        Chairs, BRAC Environmental, CERO, and Development Standards Subcommittees

## ATTACHMENT I
### DRAFT PT. MOLATE REUSE PLAN (dated January, 1997)
### RICHMOND GENERAL PLAN GOAL & POLICY CONFLICTS

The Reuse Plan does not acknowledge the existing industrial uses surrounding the Point Molate site. For example, the Plan states that "Point Molate is surrounded on the north, east, and south by Chevron, which uses its property to store and transport petroleum products." Storage tanks and pipelines may be the only adjoining Chevron uses that are visible from the site, but the primary use of the adjoining property is refining oil. one of the most intensive heavy industrial uses in Contra Costa County. This operation poses serious conflicts with the land uses presently envisioned by the Reuse Plan, particularly the proposed residential development.

This deficiency is reinforced in the Reuse Plan. It applies the goals and policies of the Richmond General Plan only to the proposed conceptual land use plan for Pt. Molate. A broader context must be established which recognizes the relationship of the Point Molate site to its setting in an active industrial area. When viewed in this manner, potential conflicts with adopted goals and policies become evident.

The goals and policies which point to the conflicts between existing industrial operations and the proposed Point Molate conceptual land use plan have been extracted from the Richmond General Plan and aggregated below into three categories: Economics, Land Use, and Safety.

## ECONOMICS

GENERAL GOALS
III. Provide for a range of commercial and industrial uses to stimulate a strong growing local economy and job opportunities for residents.

LAND USE ELEMENT
Industrial Areas
LU-P     Increase the number of new permanent private sector industrial jobs available to City residents.

ECONOMIC DEVELOPMENT ELEMENT
ED-G     Retain and encourage upgrading and expansion of existing industrial development.
ED-A.1   Promote commercial and industrial development to create and maintain the maximum job opportunities for area residents.

### Conflicts:
Establishment of 670 residential units adjacent to the Refinery (as proposed in the draft Reuse Plan) will create operational conflicts that could jeopardize existing operations, diminish future expansion plans and discourage new industrial development. This would result in reduced job opportunities and a diminished local economy.

## LAND USE

GENERAL GOALS
  VIII.      Guide future growth so that the community, even when "built out", remains an attractive, uncrowded and pleasant place to live and work.

**Conflicts:**

Local precedents demonstrate that establishment of extensive residential development in an existing industrial setting will result in the new residents demanding curtailment of industrial operations to maintain their expectation for a pleasant neighborhood environment.

LAND USE ELEMENT
Residential Areas
  LU-K        Meet future housing needs within the existing Planning Area through infill development already served by community facilities, utilities and transportation systems.
  LU-K.1      Encourage the infill of housing on parcels within the multi-family residential neighborhoods at a density appropriate to an urban area and which can be efficiently served by public transit, utilities, and services.

**Conflicts:**

The residential component of the conceptual plan is not an infill development, but an intrusion on an existing, established industrial center.

Significant upgrading of the existing infrastructure will be required to serve the proposed residential population.

The proposed residences are also remote from existing neighborhoods and cannot be efficiently served with needed services, such as public transit, water, trash collection and police and fire services.

Forms and Appearances
  LU-B.1      Encourage commercial and industrial facilities to enhance and complement the surrounding areas.
  LU-B.2      Accommodate heavy industrial uses in large areas buffered from major arterials and adjacent uses.
  LU-B.4      Establish performance standards to govern the development and operation of industrial facilities to safeguard adjacent industrial uses, residential areas, and other land used in the community which might otherwise be affected.
  LU-B.5      Require sufficient visual open space and/or landscaped screening between industrial operations and adjacent residential or recreational activities in order to create adequate buffers.
  LU-C.3      Ensure that new industrial developments do not detract from the aesthetics of an area.

**Conflicts:**

Establishment of a new residential community in an existing industrial setting will force existing and future industrial concerns to implement performance standards that will inhibit their ability to operate and expand in areas visible to Point Molate. Although topography provides a site barrier between the Refinery and the proposed residential development, it does not provide an adequate buffer for potential noise and air borne emissions.

2

Industrial Areas

LU-O.2  Encourage local industries to develop their own plans for improving the appearance of their facilities, where possible, and for integrating their properties into the City as a whole.

LU-O.3  Provide convenient access for the shipment of goods and the daily commute trips of employees for all industrial firms.

LU-O.7  Avoid land uses that place residential dwellings with "heavy" industrial and maritime uses.

LU-O.8  Continue to explore ways to modernizing and renovating the port and marine terminal facilities. (Same as Economic Development Element Policy ED-B.5)

LU-O.9  Actively encourage shipping firms to utilize local marine terminals as a starting point or destination for overland shipment of goods. (Same as Economic Development Element Policy ED-B.6)

LU-O.10  Reserve certain segments of the shoreline having access to navigable water for marine terminals and closely associated uses.

## Conflicts:

The Refinery has undertaken a costly program to relocate its manufacturing facilities to secluded areas in the northern area of it property to more effectively isolate its operations from existing residential areas. The Reuse Plan jeopardizes those efforts through the introduction of new residences adjacent to the Refinery northern/northwestern boundary.

The single access route for Point Molate will create potential traffic conflicts and attendant safety hazards by mixing residential traffic with commercial truck traffic.

The Reuse Plan gives no consideration to reinforcing the existing marine terminal and offering it for lease to an industrial maritime use. The lease could generate revenues that could be applied to the public resource uses proposed by the Plan.

AREA SPECIFIC GUIDELINES, SHORELINE AREAS

West Shoreline

6.  Encourage the acquisition of historic buildings at Winehaven by the East Bay Regional Park District or the City when the Naval Fuel Depot becomes surplus federal land.

7.  Promote commerce and commercial recreation at Winehaven when the site is available but after public recreation and scenic roads along the shoreline north of the toll plaza are developed.

8.  Designate a site for a marina at the Point Molate Naval Fuel Depot when its present use is phased out and land there is available.

## Comment:

The General Plan makes no mention of establishing residential uses at Point Molate. Emphasis should be placed on reinforcing the historical commercial and industrial setting, complemented by shoreline recreational amenities as envisioned by the recently adopted General Plan.

## SAFETY

GENERAL GOALS

XII.  Protect the community from risks to human life and property caused by natural and technological disasters.

LAND USE ELEMENT
Industrial Areas

| | | |
|---|---|---|
| LU-O.5 | Use established standards to limit industrial activities which may be objectionable due to odors, noise, fumes or other emissions. |
| LU-O.6 | Use established standards to limit industrial activities that may endanger human health and may cause damage to the environment. |

## Conflicts:

Placing residential uses in close proximity to the Richmond Refinery defeats the goal of protecting future residents from risk and may result in the imposition of unreasonable operating standards on the refinery and other adjoining industrial uses.

**ATTACHMENT II**
**DRAFT PT. MOLATE REUSE PLAN (dated January, 1997)**
**PAGE-BY-PAGE COMMENTS**

p. I-1, Section 1. Reuse Vision, first paragraph: Pt. Molate reuse constraints which are located outside the Pt. Molate site, such as surrounding existing land uses on the Pt. San Pablo Peninsula, are omitted. The paragraph should be amended to be inclusive of the internal and external reuse constraints.

p. I-2, last paragraph: Statement that Chevron "...uses its property to store and transport petroleum products" is misleading and only partially correct. The Chevron property is the site of the Chevron Richmond Refinery, a major manufacturing facility which refines petroleum crude oil into petroleum products. The Richmond Refinery is one of the largest oil refineries on the U.S. West Coast and the largest refinery in the bay area. Suggest sentence be amended to read "Pt. Molate is surrounded on the north, east, and south by the Chevron Richmond Refinery, a major petroleum products manufacturing facility."

p. I-5, first paragraph: "American Rock Quarry" facility name is incorrect. The facility name was recently changed to "Dutra Materials".

p. I-11, Section 6, Goals and Objectives: One of the listed goals for Pt. Molate reuse is economic development. An extension of this thought is that Pt. Molate uses should not adversely affect existing economic activity on the Pt. San Pablo Peninsula.

p. I-12-13, Market Demand: There is no mention of whether the market analysis considered the presence of existing surrounding land uses or only addressed the Pt. Molate site attributes alone. To be realistic, the market analysis must include surrounding land uses and address whether proposed Pt. Molate uses would be compatible with and feasible given the existing neighboring industrial uses.

p. I-15, Figure 3: Diagram is marked to indicate that the existing underground fuel tanks could serve as building foundations. We question whether this is technically feasible or prudent.

p. I-17, Figure 4: This figure shows on-site constraints to reuse of Pt. Molate and implies, by omission, that there are no off-site constraints. Off-site constraints, such as surrounding land uses, need to be addressed.

p. I-18, first paragraph, last sentence: Statement suggests that the proposed plan is consistent with the City of Richmond General Plan. As noted in our other comments, the draft Reuse Plan contains elements which are in conflict with and contrary to the General Plan.

p. I-18, first paragraph in Thematic Concepts section: The text only mentions on-site constraints to reuse of Pt. Molate. Off-site constraints, such as surrounding land uses, also need to be addressed.

1

p. I-20, third paragraph: As stated in these and prior Chevron comments, residential and overnight uses at Pt. Molate are incompatible with neighboring industrial land uses and inappropriate for the Pt. Molate site. These uses should be eliminated from the Reuse Plan.

p. I-21, section d.: Hillside trails should be deleted from the Reuse Plan. The hillside should be an open-space buffer between the Chevron Richmond Refinery and Pt. Molate uses.

p. I-22, second paragraph, last sentence: Last sentence states that the proposed residential uses would be moderate to high-end cost housing. We question whether a sufficient marketing analysis would conclude that there would be a strong market for moderate to high-end cost housing since Pt. Molate is bordered by industrial uses.

p. I-24 (figure 7), I-29-30 (Table 2), I-31: Residential uses should be eliminated from these figures and the text (and elsewhere throughout the Reuse Plan document) since residential uses would be incompatible with industrial uses neighboring Pt. Molate.

p. I-40, section b. Proposed Allowable Uses: Text proposes a small hotel, campsites and residential uses. Such uses should be eliminated from the Reuse Plan since they are incompatible with industrial land uses surrounding Pt. Molate.

p. I-42, second paragraph: Proposed high-end residential use should be deleted from the Reuse Plan.

p. I-43, first complete paragraph: Second sentence refers to an excavation for parking for a building on Chevron property. The building is on Pt. Molate property (not Chevron property) and the excavation was not done by nor for Chevron.

p. I-43, last two paragraphs: Proposed residential uses should be deleted from the Reuse Plan.

p. I-43, last paragraph: Text proposes building residential units at the old waste disposal site, if contaminants at the site have been "completely removed or otherwise mitigated". Given the reported problems resulting from building houses at former waste disposal sites elsewhere, it does not seem prudent to build houses at this Pt. Molate location.

p. I-44, second paragraph: States that the residential streets be kept narrow. Narrow streets would further complicate emergency access through Pt. Molate.

p. I-46, figure 15: Hillside trails should be eliminated from the Reuse Plan. The hillside should be an open-space buffer between the Chevron Richmond Refinery and Pt. Molate uses.

p. I-47, last paragraph: Proposed group camping use should be deleted from the Reuse Plan.

p. I-50, last paragraph: Proposed waterfront hotel, or any hotel, should be deleted from the Reuse Plan.

p. I-51-52, Section 8, Transportation: The issue of adequacy of transportation access during emergencies, e.g., fire, is not addressed. There is only one way in and out of Pt. Molate, via

2

Western Drive. This transportation constraint may restrict appropriate uses at Pt. Molate and should be discussed.

p. I-53, first paragraph: Last sentence states that "the road to Chevron south of the site may need to be realigned to improve sight distances". We are not aware of any Chevron roads at this location.

p. I-55, second complete paragraph: The plan does not provide supporting evidence that residential uses would "have the ability to raise the capital resources needed to make site-wide improvements".

p. I-60, Fire Protection: Section should be amended to address the adequacy of emergency services access to the site and whether the apparent limited access (one way in and out via Western Drive) restricts uses of the Pt. Molate site.

p. I-78, paragraph e.: If reuse involves construction at the shoreline, we would question the conclusion that the U. S. Army Corps of Engineers involvement is not anticipated.

p. I-83, Table 3: Residential uses should be deleted from the Reuse Plan.

p. I-83, Table 3: Earlier in the Reuse Plan text (see page I-55, for example), it is mentioned that the proposed light industry/residential development would help fund the site infrastructure needs. However, Table 3 indicates that this development would occur in Phases II and III, while renovation and reuse of the historic district would occur in Phase I. The text and table appear to be inconsistent. Any inconsistency should be resolved.

p. II-4, section d.: Suggest adding table or chart showing the various per cent contributions, by source, to the City of Richmond tax base. Text describes the contributors to the city economy, but does not reflect the relative importance (from a fiscal standpoint) of each contributor to the Richmond economy and tax base.

p. II-28-35, Section B, Opportunities and Constraints: As noted elsewhere in these comments, the discussions of constraints in the Reuse Plan omit any constraints located off-site Pt. Molate. Off-site constraints, such as neighboring land uses, should be discussed.

p. II-33, last paragraph: This paragraph acknowledges that development of the Pt. Molate hillside within 100 feet of the ridgeline is incompatible with a neighboring land use, the Chevron facilities. However, 100 feet is insufficient buffer. Certain reuses located anywhere on the Pt. Molate site, such as residential uses and camping, are incompatible with the neighboring industrial land use (the Chevron Richmond Refinery).

p. III-1, first paragraph: States that the proposed uses were selected because of potential market interest and the ability to use significant portions of the Pt. Molate buildings and land. This selection procedure omits two important criteria which should be addressed: the compatibility of the proposed uses with existing uses neighboring Pt. Molate, and conformance with the City of Richmond General Plan. The selected uses must be re-evaluated in consideration of these criteria.

p. III-2, section b. Near-Term Prospects:  Suggests that the site could be marketed with the theme of "green housing".  We question the viability of this theme, given that Pt. Molate is bordered by heavy industry.

p. III-4, section g, Residential Development:  Residential uses should be deleted from the Reuse Plan.  In addition, the section suggests that the target market for housing would be Marin residents who like the "green housing" concept.  We question whether "green housing" at Pt. Molate is viable or feasible since the site is bordered by heavy industry.

p. III-12, section k.:  The section addresses reuse of existing buildings but does not address grass-roots development for office/light industry/warehouse, which is discussed elsewhere in the Reuse Plan (for example, see pages I-40, 43).

p. III-19-20, sections a & b:  These sections review residential developers' assessment of Pt. Molate.  There is no mention of whether the developers were aware that the Pt. Molate site is bordered by heavy industry.  The text only discusses the natural scenery, views and open space aspects of Pt. Molate.  If the developers were not made aware of the existing heavy industrial uses on the Pt. San Pablo Peninsula, they should be so informed and reinterviewed.  After these subsequent interviews, the text of these sections should be revised accordingly.

# REGIONAL PARKS

## EAST BAY REGIONAL PARK DISTRICT

January 30, 1997

BOARD OF DIRECTORS
Susan Smartt
President
Douglas Siden
Vice-President
Jean Siri
Treasurer
Beverly Lane
Secretary
Jocelyn Combs
Ted Radke
Carol Severin
Pat O'Brien
General Manager

Pat Jones
City of Richmond
City Manager's Office
P.O. Box 4046
Richmond, CA 94804

Re:    Draft Pt. Molate Reuse Plan

Dear Pat:

As you are aware, the East Bay Regional Park District (EBRPD) has had a long standing interest in the open space, park and trail potential of the Pt. Molate area. Pt. Molate has been included in the District's Master Plan and 1988 financing program (Measure AA), and the City of Richmond has recognized the District's interest in its General Plan. Based on this interest, the District has been participating in the reuse planning process for Pt. Molate and we appreciate the opportunity to review the Draft Pt. Molate Reuse Plan, prepared by Brady and Associates.

The EBRPD's interest in the Pt. Molate Fuel Depot area includes the development of the San Francisco Bay Trail along the shoreline, with links south to Pt. Richmond and north to the Pt. Orient pier area and Terminal 4. The District supports the Reuse Plan's designation of the shoreline corridor as an open space and public access area through which this trail would run. The District also supports the Plan's designation of the Point San Pablo ridgeline area as open space, including public access commensurate with public safety needs within the former fuel storage tank area and close to the Chevron refinery. The District, however, does have some specific comments which we think should appropriately be included in the Draft Plan as it is finalized to serve as the basis for preparation of an Environmental Impact Report/Environmental Impact Statement. These comments are noted below:

With regard to the area designated as "Shoreline Open Space" on Figure 6, "Land Use Areas", the District believes it is appropriate for the designation to include all of the area between Western Drive and the Bay shore in the section where Western Drive runs parallel to the shoreline and close to it. This would make the corridor slightly wider and more attractive in the southerly portion of the fuel depot. We also think the existing City-leased park area should be specifically identified as a feature to be maintained in the "Conceptual Land Use Plan" (Figure 7). It is also not clear in Figure 6 whether the area at the northerly end of the fuel depot, which is designated as a heliport site in Figure 7, is intended to be part of the "Shoreline Open Space". The District believes that it should be so

designated, and that the "heliport" should be noted only as a possible helicopter landing area for emergency response within this public open space area. We do not see that a heliport, in the sense of a commercial operation, is necessary or appropriate in the Pt. Molate area.

We also recommend that the Reuse Plan specifically state that the trail and shoreline open space within the Pt. Molate Fuel Depot are anticipated to be linked by similar trail and shoreline protection to the areas north and south of the fuel depot. This continuous trail is provided for in the District Master Plan, Bay Trail Plan adopted by ABAG, the San Francisco Bay Plan adopted by BCDC and the Richmond General Plan. The District anticipates that the right-of-way formerly used by the Richmond Belt Line will be the alignment for the Bay Trail and recommends that reestablishment of rail use on the abandoned right-of-way be dropped as inconsistent with trail and open space corridor use. Current ownership rights on the rail right-of-way need to be clarified during the planning process. The District anticipates working with the owners of the railroad right-of-way and adjacent property and with the City in the development of a continuous shoreline trail and open space corridor from the bridge toll plaza area north to at least the Pt. Orient Pier. In the "Phased Action Plan", the District supports inclusion of development of the San Francisco Bay Trail within the initial phase (0-5 years) and recommends that development of the trail system in the "hillside open space" be shifted from Phase III (10-20 years) to Phase I (0-5 years).

The District is prepared to work with the City to explore the feasibility of District participation in trail and/or open space management in the hill areas, but the issues of toxic material clean up, public safety, environmental protection and operation and maintenance cost need to be resolved in that process. The District is concerned that the development of substantial amounts of housing in the South Central Development Areas may adversely affect habitat and environmental values in the hillside open space and may have significant safety concerns, vis-a-vis relationship to the refinery. If substantial housing is retained in the Draft Plan, these concerns should be addressed in the EIR/EIS.

On figure 6, "Land Use Areas", the area at the foot of the Pt. Molate Pier is designated as "Regional Park". In figure 7, this area is designated as "Shoreline Park", with a list of suggested specific uses. Since some of the specific uses, e.g. ball fields, play structure, seafood and produce market, are not activities which the Regional Park District normally undertakes, and since the specific ownership, operation and maintenance of that prospective park area is not yet established, we recommend that the term "Shoreline Park" be used on figure 6 so as to avoid any misunderstanding that that area is specifically designated for East Bay Regional Park District ownership and management. The District is ready to work with the City through the reuse planning process to determine what role is appropriate for the Park District, but believes it is premature to use the "Regional Park" designation at this time.

These comments are submitted through you to the Blue Ribbon Advisory Committee for

consideration as it prepares its recommendations to the City Council on the Draft Pt. Molate Reuse
Plan. We recognize that the Draft Plan is intended to serve at this point only as the basis for
preparation of the EIR/EIS and that it is subject to further refinement through that process. We look
forward to continuing participation in the Pt. Molate Reuse Planning process and believe that the
reuse plan ultimately approved by the City can take advantage of the opportunities offered at this
exceptional location, including provision for the regional trail and appropriate protection of open
space and the natural environment of the peninsula.

If you have any questions regarding these points, please don't hesitate to call me at 635-0138 ext.
2621. I will have some additional copies of this letter at the BRAC meeting of February 3rd for
review by BRAC members.

Sincerely,

Martin Vitz
Advanced Planning Manager

MV/tl

cc:     Ted Radke
        Pat O'Brien
        Bob Doyle
        Sheila Brady

**CITY OF RICHMOND**
**PUBLIC DEVELOPMENT REVIEW BOARD**

## MEMORANDUM

TO:        Local Reuse Authority

FROM:    Public Development Review Board
VIA:       Claire Wilcox, Associate Planner

DATE:     February 14, 1997

RE:        Comments on Draft Reuse Plan for Pt. Molate

---

The Public Development Review Board (PDRB) briefly discussed the Draft Reuse Plan at its February 12, 1997 meeting.

Given the design review orientation of the PDRB, the PDRB thought it appropriate to limit its comments as Board to design, and to specifically not comment on land use issues. To this end, the Board offers the following comments:

1.    The Board believes the Pt. Molate process has worked well thus far, and would encourage continuation of that process in subsequent phases of Plan development.

2.    The Board believes that design guidelines should be developed in a subsequent phase of the Plan, and that those guidelines should be reviewed by the Public Development Review Board at the appropriate time.

The PDRB appreciates the opportunity to comment on the Draft Reuse Plan.