UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE GUIDIVILLE RANCHERIA OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Case No. CV 12-1326 YGR<br><br>[~~PROPOSED~~] **AMENDED JUDGMENT** |

In March 2012, plaintiffs Guidiville Rancheria of California (Tribe) and Upstream Point Molate LLC (Upstream) (together, Plaintiffs) commenced the above-captioned action (Action) against defendant City of Richmond (City). The controversy concerns a Land Disposition Agreement (LDA) and its amendments, between Upstream and the City, the subject of which was a proposed development of property located at the former Navy Fuel Depot Point Molate in Richmond, California.

Following the signing of the LDA in 2004 and in accordance with the California Environmental Quality Act (CEQA), the Court finds that the City conducted a multi-year review of potential environmental impacts resulting from several proposed projects, including a project with residential units.[1] In 2011, the City certified a final environmental impact report (EIR) for potential projects at Point Molate. No party challenged the EIR.

In this Action, Plaintiffs allege, *inter alia*, that the City breached the LDA; the City denies Plaintiffs' claims.

In accordance with the stipulated request of the Parties, and good cause appearing,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. Under 28 U.S.C. §§ 1331 and 1362, the Court has jurisdiction over the Action and shall retain such jurisdiction to enforce this Judgment.

2. The Court expressly finds and determines that the terms of this Judgment are fair, reasonable and in the public interest.

## DEFINITIONS

3. "Judgment" shall mean this Amended Judgment, the Judgment dated April 12, 2018, and all exhibits attached thereto.

---

[1] The project with residential units analyzed in the 2011 Certified EIR is consistent with the City's previously approved Point Molate Reuse Plan, which the City adopted to comply with the terms of the transfer of Point Molate from the U.S. Navy to the City. The Reuse Plan expressly contemplates 670 residential units at Point Molate and Alternative D of the Certified 2011 EIR analyzed a project with more than 670 residential units.

4. "Point Molate" or the "Property" shall mean the approximately 270 acres of upland and 134 acres[2] of tidal and submerged real property that was transferred to the City by the United States Navy in or around September 2003, and the "Remainder Property" transferred to the City by the Navy in or around September 2009.

5. "Development Areas" shall mean the four development areas shown on Figure 6, Land Use Areas, Point Molate Reuse Plan (attached as Exhibit A) or any parcel subsequently designated or subdivided from those four Development Areas subject to the provisions of Paragraph 20.

6. "Point Molate Reuse Plan" shall mean the Reuse Plan prepared by a 45-member Blue Ribbon Advisory Committee in or around March 1997, and adopted by the Richmond City Council in 1997. In 2002, the U.S. Navy published a "Record of Decision for Disposal and Reuse of the Fleet Industrial Supply Center, Naval Fuel Depot, Point Molate, CA" (67 Fed. Reg. 41967, June 20, 2002) based on the Point Molate Reuse Plan, which included residential use as one of three alternatives. A complete copy of the Point Molate Reuse Plan is attached as Exhibit B and it is also available on the City's website at https://www.ci.richmond.ca.us/DocumentCenter/Home/View/7510. The City shall maintain a hard copy of the Point Molate Reuse Plan for review by the public.

7. "Certified EIR" shall mean the final Environmental Impact Report certified by the City on or about March 8, 2011, which can be located at http://www.ci.richmond.ca.us/1863/Point-Molate-Resort-and-Casino, and any and all errata, addenda or other modifications thereto, and as the same may be amended, supplemented or updated. The City shall maintain a hard copy of the Certified EIR for review by the public.

8. "Discretionary City Approvals" shall mean all discretionary approvals made by the City necessary to entitle development and construction of the Development Areas. The Discretionary City Approvals shall allow for a minimum of 670 residential units and further the

---

[2] Any variation of the total acreage shall not alter the Parties obligations regarding the Property, which the Parties understand to mean the total land transferred from the Navy to the City in 2003 and 2009.

goals of the Point Molate Reuse Plan, including preservation of open space and rehabilitation of the Core Historic District (including Building 6). Those 670 residential units must comply with the requirements of the City's inclusionary housing ordinance in effect at this time. That compliance can be met either by (i) providing within the City the percentage of below market units presently specified in section 15.04.810.063 of the City's Municipal Code or (ii) paying an in-lieu fee, which must equal the amounts presently applied to residential projects within the City. Discretionary City Approvals includes any additional review and actions required under CEQA, zoning changes, and general plan amendments, but excludes (1) design review permits and certificates of appropriateness by the City; (2) ministerial permits provided by the City; and (3) other approvals or permits provided by any entity other than the City, such as the United States government, State of California, or regional agencies, such as the Bay Conservation Development Commission and the Regional Water Quality Control Board. The City shall diligently process any required design review permits and certificates of appropriateness and ministerial permits to be provided by the City; and City shall also diligently process and cooperate with all requests for information that might be required for any other approvals or permits provided by any entity other than the City, such as the United States government, State of California, or regional agencies, such as the Bay Conservation Development Commission and the Regional Water Quality Control Board.

9. "Effective Date" shall mean the date this Judgment is entered by the Court.

10. "Revenues" shall mean all amounts received or earned by City or Plaintiffs from the sale or development or long-term leasing (more than one (1) year) of any portion of the Development Areas, including, without limitation, any amounts received for (i) exclusive rights to negotiate, (ii) any purchase monies or purchase deposits paid, (iii) any option payments, (iv) any amounts paid pursuant to a services agreement or any similar one-time payment, or recurring payments made to City or Plaintiffs by the purchaser(s), developer(s), builder(s) or any subsequent owner of any portion of the Development Areas or (v) any reimbursement for costs or expenses incurred pursuant to Paragraph 24. "Revenues" does not include grants, reimbursements paid to the City or to Plaintiffs by a third party (e.g., developer) for costs incurred

in the pre-development phase other than costs incurred under Paragraph 24, short-term rental/use fees collected by the City prior to the sale of the Development Areas, property taxes or other taxes paid to the City and proceeds received from a financing district.

11. "Customary Fees" means fees paid to City for permits or similar customary administrative fees, cost-recovery fees, development fees and/or impact fees (e.g., traffic, school and in-lieu housing impact fees) in amounts routinely charged and similarly collected by the City on other projects.

12. "Sale" or "Sold" or "Sell" or any similar term relating to the sale of the property that is the subject of this Judgment, shall mean close of escrow upon which purchase monies are paid to City or Plaintiffs in exchange for which title to the portion of the property being sold in that transaction is simultaneously transferred to the buyer(s). The terms "Sale" or "Sold" or "Sell" shall also include execution of a contract or agreement to sell any portion of the Development Areas so long as the sale of a substantial portion of any one of the Development Areas is closed and title transferred within 48 months of the Effective Date, with the understanding that such contracts/agreements are to facilitate phased developments and must remain in effect until the final parcel of the Development Area at issue is sold.

13. "Entitlement Costs" shall mean all costs incurred after the Effective Date, which directly concern the issuance of entitlements and compliance with CEQA, including, without limitation, the preparation of environmental review documents and costs similar to those Plaintiffs previously paid prior to completion of the Certified EIR. The City is responsible for Entitlement Costs and related legal fees.

14. "Pre-Development Costs" shall mean other costs incurred after the Effective Date, such as surveying and engineering consulting fees, and other costs associated with creating parcels, escrow fees, and title fees, and legal fees related to the disposition of the property, including, but not limited to, legal counsel for preparing and reviewing contracts and agreements, parcel maps, and subdividing and surveying the property.

15. "Net Revenue" shall mean Revenues less Customary Fees and Pre-Development Costs.

## COMPLIANCE REQUIREMENTS

16. Within 6 months from the Effective Date, in accordance with CEQA and other applicable law, City shall consider Discretionary City Approvals, as defined in Paragraph 8 of this Judgment.

17. The Court anticipates and expects that City will receive and consider input from the public with respect to the future development of Point Molate. Nothing herein shall prohibit or limit the City from holding public workshops or receiving any other public input with respect to any future development considered by City pursuant to this Judgment, including selection of a master developer or developers.

18. Of the approximately 270 acres of upland area, the Point Molate Reuse Plan designates approximately 30% as Development Areas and 70% as open space, the ratio of which shall not change. In the Core Historic District (including Building 6), there are 374,572 square feet of contributing structures (based on the list in Table 3.6-1 and Figure 3.6-6 from the Certified EIR), all of which shall be preserved for adaptive reuse.

19. City may utilize the existing Certified EIR and prior studies pertaining to the Property to the extent possible to comply with CEQA.

20. The Discretionary City Approvals may adjust lot lines as allowed and analyzed under the Certified EIR, or otherwise to allow for construction of the residential units on different portions of the Property than is set forth in the Point Molate Reuse Plan and may allow for more than 670 residential units and non-residential use, insofar as this is consistent with the overall open space preservation goals of the Point Molate Reuse Plan.

21. Within 30 months of the Effective Date or 24 months of the City issuing the last Discretionary City Approval, whichever occurs earlier, City must market the Development Areas for sale to one or more qualified developer(s) or builder(s) using commercially reasonable efforts. At the City's discretion, separate portions of the Development Areas may be sold to different developers or builders to increase the sales price derived from the sale of the Development Areas. With the consent of the Parties, which consent must be made by a writing signed by all Parties, Development Areas or parcels may be leased long term instead of being sold. Prior to the Sale of

the Development Areas, either Party may elect to have an independent, third-party that is selected jointly by the Parties verify that the subject Sale is fair and reasonable and the product of an arms-length negotiation, and such verification shall be a condition precedent to completion of such Sale. The Parties shall share evenly the costs associated with any such verification.

22. Plaintiffs Tribe and Upstream, on the one hand, and City, on the other hand, will split all Net Revenues 50/50.

23. Within thirty (30) days of receiving any Revenues, City shall notify Upstream and the Tribe of the amount and source of such Revenues. Within sixty (60) days of receiving any Revenues, City shall distribute 50% of any Net Revenues via wire transfer into a banking account to be designated by Plaintiffs in writing within thirty (30) days of the Effective Date, or as may be designated in writing thereafter by Plaintiffs.

24. City shall bear all expenses of maintaining and securing the Property, until the Development Areas are sold to a third party.

25. If the Northern Development Area, Southern Development Area, Central Development Area, or any portions thereof, are not Sold within 30 months of the Effective Date or 24 months of City approving the last Discretionary City Approval, whichever occurs first ("City Sale Deadline"), Plaintiffs or either of them as designated by Upstream and the Tribe in writing, shall have the option to buy such Development Area(s) or portions thereof for a purchase price of $100 per Development Area or portion thereof. Plaintiffs' option to purchase the Development Area shall include up to fifty percent of the land-side portion of the shoreline knoll referenced in the Certified EIR. Promptly after Plaintiffs, or either them, exercise the option granted herein, City shall be obligated to forthwith sell the parcels identified in the exercise of the option, or portions thereof, to Plaintiffs, or either of them. Within thirty (30) days of the Effective Date, City shall cause a memorandum of this Judgment to be recorded on title to the Property, which shall reference the above-referenced option of Upstream and Tribe.

26. For each parcel of the Development Area or portion thereof sold to Plaintiffs, upon a sale by either of them of such parcel(s), Plaintiffs shall pay to the City fifty percent (50%) of the Net Revenues received by Plaintiffs. Plaintiffs must sell any Development Area or portion

thereof purchased pursuant to this Judgment within 5 years of the City's Sale Deadline or 4 years after the City makes a decision on any additional, discretionary City entitlements concerning any purchased portions, whichever is later, otherwise the Development Area(s) or portion(s) thereof revert back to the City, and the City shall pay Plaintiffs $100 for each Development Area or portion thereof.[3] If the City takes back property under this Paragraph, the Revenue sharing described in Paragraph 22 will still apply, and the City will have an on-going obligation to market and sell the remaining unsold portions of the Development Areas.

27. Within thirty (30) days of receiving any Revenue, Plaintiffs shall notify the City of the amount and source of such Revenue. Within sixty (60) days of receiving any Revenues, Plaintiffs shall distribute 50% of Net Revenue received by Plaintiffs to the City via wire transfer into a banking account to be designated in writing by the City.

28. Upstream and Tribe, or either of them as designated by Upstream and the Tribe in writing, and any of their transferees, may pursue development of the parcels in accordance with the Discretionary City Approvals, or may seek additional or new entitlements for the development of the parcels beyond the Discretionary City Approvals required by this Judgment that City may or may not grant in its sole discretion. The Parties, and each of them, acknowledge the Tribe, commencing in 2004 and ending in 2012, maintained an office in Building 123 at Point Molate.

## REPORTING REQUIREMENTS

29. Absent further order from the Court, the Parties shall provide a joint update to the Court every 120 days regarding efforts to comply with the Judgment.

30. Within 30 days of a request made by Plaintiffs, or either of them, the City must provide Upstream and Tribe a copy of any contracts, agreements or other documents providing

---

[3] For purposes of paragraph 26, discretionary City entitlements include any additional review and actions required under CEQA, zoning changes, and general plan amendments but excludes (1) design review permits and certificates of appropriateness by the City; (2) ministerial permits provided by the City; and (3) other approvals or permits provided by any entity other than the City, such as the United States government, State of California, or regional agencies, such as the Bay Conservation Development Commission and the Regional Water Quality Control Board.

for payment of Revenue to City with respect to any portion of the Property that is the subject of this Judgment.

31. The City must provide Plaintiffs a copy of any agreements the City executes for sale of any portion of the Property, including the Development Areas, within fifteen (15) days of the City Council's approval of such agreement(s).

32. The reporting requirements of this Judgment do not relieve City of any reporting obligations required by any other federal, state or local law, regulation, permit or other requirement.

33. Notwithstanding the foregoing, Upstream and Tribe may use and disclose any information provided pursuant to this Judgment in any proceeding to enforce the provisions of this Judgment and as otherwise permitted by law.

**AUDITING OPTION**

34. The City shall keep accurate and complete accounting records of all transactions relating to the maintenance, entitlement, development, sale of, or receipt of funds relating to the Property, including, without limitation, any records of Revenues or other monies paid to or received by City relating to the Property, all accounting records, invoices, ledgers, cancelled checks, deposit slips, bank statements, original estimates, estimating work sheets, contracts or contract amendments, change order files, insurance documents, memoranda and correspondence. City shall establish and maintain a reasonable accounting system that enables City to readily identify City's costs, expenses, Revenues, and other monies paid to or received by City relating to the Property.

35. Upon no less than 30 days' written notice, and no more than once a year during the first five years after the Effective Date, Upstream and Tribe and their authorized representatives may audit, examine and make copies of City's records kept by or under City's control relating to its performance under this Judgment, including, without limitation, records of all Revenues or other monies paid to, received by, or committed to City relating to sale or development of the Property. If an audit is requested, City, at Plaintiffs' expense, shall make its records available for examination and copying during regular business hours at City's offices or another location as

mutually agreed by the Parties. Excluded from any audit are records protected by federal, state, and local privilege laws, including any records that would fall under exemptions set forth in the California Public Records Act.

36. Costs of any audits conducted under the authority of this right to audit will be borne by Upstream and Tribe unless the audit identifies City's failure to disburse more than $50,000 owed to Upstream and Tribe hereunder, in which case City shall reimburse Upstream and Tribe for the costs of the audit.

## COMPLIANCE WITH CEQA AND OTHER LAWS

37. The Parties acknowledge, and the Court expressly finds and orders, that this Judgment is not an approval of a project, and the City is responsible for compliance with all federal, state and local laws, regulations, and permits, relating to the Property, including compliance with CEQA. This finding and order may be asserted by the Parties as a bar to any suit challenging the validity of this Judgment.

38. The Parties agree that the Judgment does not grant any entitlements for development at Point Molate, and that the City acknowledges it is required to comply with all laws, statutes, or regulations, including compliance with CEQA, applicable to any future specific entitlements or development at Point Molate that the City may consider.

## RELEASE

39. Upon entry of this Judgment, Plaintiffs, and each of their respective executors, representatives, heirs, successors, assigns, bankruptcy trustees, guardians, and all those who claim through them or who assert claims on their behalf, will be deemed to have completely released and forever discharged City from any claim, right, demand, charge, complaint, action, cause of action, obligation, or liability of any and every kind, based on an alleged violation of the LDA or its amendments, in connection with the sale and/or development of Point Molate, and all claims for monetary, equitable, declaratory, injunctive, or any other form of relief, whether known or unknown, suspected or unsuspected, under the law of any jurisdiction, which Plaintiffs ever had or now have, resulting from, arising out of, or in any way, directly or indirectly, connected with the claims raised in the Action or in the California state court action entitled *The City of*

*Richmond v. Upstream Point Molate, LLC*, filed in Contra Costa County Superior Court, Case No. C11-01834 ("State Court Action"), or claims which could have been raised in the Action or State Court Action based on or relating to the same facts.

40. Upon entry of this Judgment, City, and all those who claim through City or who assert claims on behalf of City, will be deemed to have completely released and forever discharged Plaintiffs, and each of their respective executors, representatives, heirs, successors, assigns, bankruptcy trustees, guardians, and all those who claim through them or who assert claims on their behalf, from any claim, right, demand, charge, complaint, action, cause of action, obligation, or liability of any and every kind, based on an alleged violation of the LDA or its amendments, in connection with the sale and/or development of Point Molate, and all claims for monetary, equitable, declaratory, injunctive, or any other form of relief, whether known or unknown, suspected or unsuspected, under the law of any jurisdiction, which the City ever had or now has, resulting from, arising out of, or in any way, directly or indirectly, connected with the claims raised in the Action or in the State Court Action, or claims which could have been raised in the Action or State Court Action based on or relating to the same facts.

41. As of the Effective Date, all claims asserted in this Action shall be and hereby are dismissed with prejudice. The Parties further agree that they will dismiss with prejudice the claims asserted in the State Court Action.

42. The Parties, and each of them, each waive and release any and all provisions, rights, and benefits conferred either (a) by section 1542 of the California Civil Code, or (b) by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to section 1542 of the California Civil Code, with respect to the claims released pursuant to Section 4.1. Section 1542 of the California Civil Code reads:

> Section 1542. General Release, extent. A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The Parties, and each of them, may hereafter discover facts other than or different from those that they know or believe to be true with respect to the subject matter of the claims released pursuant to the terms of this Judgment, but the Parties, and each of them, expressly agree that, upon entry of the Judgment, they shall have waived and fully, finally, and forever settled and released any known or unknown, suspected or unsuspected, asserted or unasserted, contingent or non-contingent claim with respect to the claims released, whether or not concealed or hidden, without regard to subsequent discovery or existence of such different or additional facts.

43. The Parties shall bear their own costs of this action, including attorneys' fees, except that the prevailing party in any action or proceeding to enforce the terms of this Judgment shall be entitled to recover, from the non-prevailing party, all reasonable costs, including reasonable attorney's fees.

44. Nothing in this Judgment is intended to limit or expand the Tribe's right to continue to pursue its claims asserted in this Action against the Federal Defendants, which expressly are not resolved herein, or to pursue any lands be taken into trust by the United States for the benefit of the Tribe, for any lawful purposes. The Tribe will request to license City-owned or City-controlled property for Tribe use and the City will process that request in the normal course, in the same manner as other such requests are processed.

## NOTICES

45. Unless otherwise specified in this Judgment, whenever notifications, submissions, or communications are required by this Judgment, they shall be made in writing and addressed as follows:

As to Upstream by email:	Jim.Levine@upstream.us.com; and
	garet@okeefelaw.com

As to Upstream by mail:	Jim Levine
	Upstream Point Molate LLC
	2000 Powell Street, Suite 920
	Emeryville, CA 94608
	(510) 350-4101
	and
	Garet D. O'Keefe
	O'Keefe & O'Keefe LLP
	1068 Cragmont Avenue

Case No. CV 12-1326-YGR	-11-
[PROPOSED] AMENDED JUDGMENT

|   |   |   |
|---|---|---|
| | | Berkeley, CA 94708 |
| | | (510) 282-0319 (t) |
| | As to the Tribe be email: | mdwastenot@gmail.com; and |
| | | scottcrowell@clotag.net |
| | As to the Tribe by mail: | Guidiville Rancheria of California |
| | | P.O. Box 339 |
| | | Talmage, CA 95481 |
| | | Attention: Merlene Sanchez, Chairperson |
| | and | |
| | | Scott Crowell |
| | | Crowell Law Offices – Tribal Advocacy Group |
| | | 1487 W. State Route 89A, Suite 8 |
| | | Sedona, AZ 86336 |
| | | (425) 802-5369 (t) |
| | As to City by email: | agonzalez@mofo.com |
| | | aamezcua@mofo.com |
| | and | |
| | | Bruce_Goodmiller@ci.richmond.ca.us |
| | | Rachel_Sommovilla@ci.richmond.ca.us |
| | As to City by mail: | Arturo González |
| | | Alexis Amezcua |
| | | Morrison & Foerster LLP |
| | | 425 Market Street |
| | | San Francisco, CA 94105 |
| | and | |
| | | Bruce Reed Goodmiller |
| | | Rachel Sommovilla |
| | | City Attorney's Office |
| | | 450 Civic Center Plaza |
| | | P.O. Box 4046 |
| | | Richmond CA 94804-1630 |

46. Any Party may, by written notice to the other Parties, change its designated notice recipient(s) or notice address provided above.

47. Notices submitted pursuant to this Section shall be deemed submitted upon receipt, unless otherwise provided in this Judgment or by agreement of the Parties in writing.

**RETENTION OF JURISDICTION**

48. The Court shall retain jurisdiction over this Action to enforce the terms of this Judgment. To avoid doubt, this Judgment applies to and is binding upon the Tribe and Upstream and the City, and their respective heirs, successors, assigns and future councils for the City and the Tribe. Consistent with settled law, any change in the composition of the City Council for the City shall not alter the City's obligations under this Judgment.

49. This Judgment embodies the final, complete and exclusive agreement and understanding among the Parties with respect to the agreement reflected in this Judgment and supersedes all prior agreements and understandings, whether oral or written, concerning settlement embodied herein. Other than deliverables that are subsequently submitted and approved pursuant to this Judgment (if any), the Parties acknowledge that there are no representations, agreements, or understandings relating to the disposition of the Action other than those expressly contained in this Judgment.

Date: November 21, 2019

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

FOR THE GUIDIVILLE RANCHERIA OF CALIFORNIA:

Dated: 11-08-19.    _____
                    MERLENE SANCHEZ   for
                    Tribal Chairperson

As to Form:

CROWELL LAW OFFICES – TRIBAL ADVOCACY GROUP

Dated: _____    By: _____
                                Scott Crowell
                                Attorneys for Plaintiff Guidiville
                                Band of Pomo Indians

FOR THE GUIDIVILLE RANCHERIA OF CALIFORNIA:

Dated: _____          _____
                                        MERLENE SANCHEZ
                                        Tribal Chairperson


As to Form:

CROWELL LAW OFFICES – TRIBAL
ADVOCACY GROUP


Dated: November 7, 2019          By: _____
                                     Scott Crowell
                                     Attorneys for Plaintiff Guidiville
                                     Band of Pomo Indians

FOR UPSTREAM POINT MOLATE, LLC:

Dated: Nov 9, 2019                          _____
                                            JAMES D. LEVINE
                                            General Manager
                                            Upstream Point Molate, LLC

AS TO FORM:

O'KEEFE & O'KEEFE LLP

Dated: _____     By: _____
                                            Garet D. O'Keefe
                                            Attorneys for Plaintiff UPSTREAM
                                            POINT MOLATE LLC

FOR UPSTREAM POINT MOLATE, LLC:

Dated: _____     _____
                                  JAMES D. LEVINE
                                  General Manager
                                  Upstream Point Molate, LLC

AS TO FORM:

O'KEEFE & O'KEEFE LLP

Dated: 11/6/19                    By: _____
                                  Garet D. O'Keefe
                                  Attorneys for Plaintiff UPSTREAM
                                  POINT MOLATE LLC

FOR CITY OF RICHMOND:

Dated: November 7, 2019

_____
Ach~ City Manager, City of Richmond
Carlos Privat

AS TO FORM:

ACTING CITY ATTORNEY FOR CITY OF RICHMOND

By: _____
~~Bruce Reed Goodmiller~~ Rachel Sommovilla
Attorneys for Defendant CITY OF RICHMOND

Dated: 11/7/19

MORRISON & FOERSTER LLP

Dated: _____

By: _____
Arturo González
Attorneys for Defendant CITY OF RICHMOND

FOR CITY OF RICHMOND:

Dated: _____

_____
City Manager, City of Richmond

AS TO FORM:

CITY ATTORNEY FOR CITY OF RICHMOND

Dated: _____

By: _____
Bruce Reed Goodmiller
Attorneys for Defendant CITY
OF RICHMOND

MORRISON & FOERSTER LLP

Dated: October 23, 2019

By: *[signature]*
_____
Arturo González
Attorneys for Defendant CITY
OF RICHMOND